**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **APPALACHIAN VOICES, and** | ) | |
| **THE CANARY COALITION,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SAMUEL W. BODMAN, in his official** | ) | |
| **capacity as Secretary of the United States** | ) | **Civil Action No. _____** |
| **Department of Energy; HENRY M.** | ) | |
| **PAULSON, JR., in his official capacity as** | ) | |
| **Secretary of the United States Department of** | ) | |
| **the Treasury; VICTOR K. DER, in his official** | ) | |
| **capacity as Deputy Secretary for Clean Coal; and** | ) | |
| **JOSEPH GIOVE, III, in his official capacity** | ) | |
| **As Program Analyst for the Office of Clean** | ) | |
| **Energy Systems,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

### PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

Now come plaintiffs, Appalachian Voices and the Canary Coalition, by and through counsel, and request this honorable Court to grant their motion for a preliminary injunction. In support of this motion, Plaintiffs refer this Court to the accompanying memorandum of law. Plaintiffs further request this Court to set this matter for an immediate hearing.

Dated at Asheville, North Carolina this 3rd day of March 2008.

/s/ Scott Gollwitzer
Scott Gollwitzer

ATTORNEY FOR PLAINTIFFS

Scott Gollwitzer
In-house Counsel
Appalachian Voices
16 Eagle Street, Suite 200
Asheville, NC 28801
Ph: 828.505.1963

Fax: 828.262.1540
E-mail: scott@appvoices.org
NY Bar No. 2890697
VT Bar No.  3293
For Appalachian Voices

OF COUNSEL

Benjamin J. Wakefield                           Stephen H. Novak
Counsel                                         Senior Staff Attorney
Environmental Integrity Project                 Wildlaw
901 Eighteenth Street NW, Suite 250             46 Haywood Street, Suite 323
Washington, DC 20006                            Asheville, NC 28801
Phone: 202.263.4442                             Ph: 828.252.9223
Fax:    202.296.8822                            Fax: 828.252.9074
E-mail: bwakefield@environmentalintegrity.org   E-mail: wildlawNC@aol.com
D.C. Bar No. 482984                             NC Bar No.  23411

### Certificate of Service

I hereby certify that on 03 March 2008, a copy of the foregoing was hand-delivered to the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

/s/ Scott Gollwitzer
Scott Gollwitzer

ATTORNEY FOR PLAINTIFFS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| APPALACHIAN VOICES and THE CANARY COALITION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| SAMUEL W. BODMAN, in his official capacity as Secretary of the United States Department of Energy; HENRY M. PAULSON, JR., in his official capacity as Secretary of the United States Department of the Treasury; VICTOR K. DER, in his official capacity as Deputy Secretary for Clean Coal; and JOSEPH GIOVE, III, in his official capacity As Program Analyst for the Office of Clean Energy Systems, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____ |
| Defendants. | ) | |

---

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PRELIMINARY INJUNCTION

---

## I.    NATURE OF THE CASE

Plaintiffs, Appalachian Voices and the Canary Coalition, seek declaratory and injunctive relief suspending Defendants' allocation of a 1.65 billion dollar tax credit for constructing and operating experimental coal-fueled power projects based on violations of the National Environmental Policy Act. Specifically, the Department of Energy and the Department of the Treasury ("DOE") refuse to evaluate the reasonably foreseeable individual and cumulative environmental impacts associated with mining, processing, burning and disposing the coal required to fuel these unproven projects.[1]

---

[1] For the Court's convenience and to avoid unnecessary confusion, Plaintiffs will refer to Defendants as "DOE" because the Department of Energy would be designated as the "lead" agency for complying with the National Environmental Policy Act. See 40 C.F.R. §1501.5 (2007).

## II.    INTRODUCTION

Armed with behemoth earth-moving machines, bunker-busting explosives and other terrors of modern technology, surface mining operations exact a devastating—far too often deadly—toll on the people, communities and ecosystems in which they occur.  Rapaciously transforming majestic forested mountain ranges into flattened, eerily lifeless moonscapes, mountaintop removal coal mining in the Appalachian Mountains is by far the most egregious type of surface mining.

In roughly thirty years, Americans have stoked the infernos of our power plants with so much mountaintop coal that we have permanently erased more than 470 peaks from the Appalachian skyline, buried or polluted more than 1,200 miles of pristine headwater streams and swept away more than 800 square miles of America's most diverse and valuable ecosystem—the mixed mesophytic forests of the central Appalachian Mountains.  Left unchecked, mountaintop removal will destroy an area the size of Delaware by the end of the decade.  Surface mining, however, is just the beginning of coal's devastating cradle-to-grave lifecycle.  From lakes of toxic sludge to rapidly melting glaciers that leave polar bears stranded and starving, the coal industry leaves a wake of human misery and environmental destruction wherever it is extracted, processed, transported, incinerated or disposed of as air pollution and poisonous post-combustion waste.

With more than half the nation's electricity generated by burning coal, Americans depend on the people, communities and environments wherever it is mined, processed, burned and discarded. Accordingly, the nation has a moral obligation to reduce or eliminate coal's catastrophic societal and environmental impacts.  Congress codified this ethical duty in the National Environmental Policy Act ("NEPA"), which requires Defendants to take a "hard look" at the environmental consequences of their actions.  Defendants' decision to ignore their moral responsibilities under NEPA—after receiving a courtesy notice and an opportunity to comply—required Plaintiffs to initiate this lawsuit.

### III.    THE MANDATORY DUTIES OF FEDERAL AGENCIES UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d (2007), is a broad national charter designed to ensure that federal agencies do not relinquish their responsibilities to the public and the environment without first performing an extremely careful, comprehensive evaluation of major federal actions affecting the quality of the human environment. See Foundation on Economic Trends v. Heckler, 244 U.S. App. D.C. 122, 756 F.2d 143, 157 (1985) ("The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency before major federal actions occur.") (citations omitted, emphasis in original).    As explained by the Supreme Court, NEPA was intended to "reduce or eliminate environmental damage," Dep't of Transp. v. Public Citizen, 541 U.S. 752, 756, 124 S. Ct. 2204, 159 L.Ed.2d 60 (2004) (quoting 42 U.S.C. § 4321), by requiring all federal agencies to "take a 'hard look' at the environmental consequences before taking a major action."    Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed. 2d 437 (1983) (citing Kleppe v. Sierra Club, 427 U.S. 390, 410, n. 21 (1976)) (emphasis added).

NEPA serves two equally important functions.    "First, it 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.'" Baltimore Gas & Elec. Co., 462 U.S. at 97 (quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553 (1978)).    "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Baltimore Gas & Elec. Co., at 97 (citing Weinberger v. Catholic Action of Hawaii/Peace Education Project, 454 U.S. 139, 143 (1981)).    The Court of Appeals for the District of Columbia recently summarized NEPA's procedural duties: "[t]he purpose of NEPA is to integrate environmental review into the agency decisionmaking process to ensure that 'environmental values and consequences have been considered during the planning stage of agency

3

actions.'" City of Dania Beach v. FAA, 376 U.S. App. D.C. 151, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (quoting Andrus v. Sierra Club, 442 U.S. 347, 350–51, 99 S.Ct. 2335, 60 L. Ed. 2d 943 (1979)).

Whenever a federal agency proposes a major action that may affect the environment—such as allocating one billion dollars in tax credits to facilitate the construction and operation of nine experimental coal-fueled energy projects—NEPA controls the agency's planning and decisionmaking. See 42 U.S.C. §§ 4332(2)(A)–(B) (2007). Under regulations promulgated by the Council on Environmental Quality ("CEQ")—the agency created by Congress to develop NEPA's implementing regulations—all federal agencies have just three options for complying with NEPA: (1) categorically exclude the action from NEPA because the action belongs to a class of actions that normally have insignificant environmental impacts, 40 C.F.R. § 1508.4 (2007); (2) prepare an environmental impact statement ("EIS")—the most comprehensive NEPA analysis—because the action is one which normally has significant environmental impacts, 40 C.F.R. § 1501.4 (2007); or (3) prepare an environmental assessment ("EA") to determine whether to prepare an EIS or issue a finding of no significant impact ("FONSI"). 40 C.F.R. §§ 1501.4(e) and 1508.13; see also, Edmonds Inst. v. Babbitt, 42 F. Supp. 2d 1, 18 (D.D.C. 1999) (describing an agency's tripartite choices for analyzing federal actions under NEPA).

## IV.    STATEMENT OF FACTS

### A.    Defendants Allocated the Tax Credits Without any NEPA Analysis

On 30 November 2006, Defendants jointly announced the allocation of one billion dollars in tax credits to spur the construction and operation of nine experimental coal-fueled energy projects to be located in North Carolina, Indiana, Mississippi, Kentucky, California, Florida and Texas. See DOE Fact Sheet: Clean Coal Technology Ushers in New Era in Energy, www.energy.gov/media/CleanCoalTaxCreditFactSheet.pdf. The announcement of this tax credit allocation was not supported with any NEPA documentation. Id. At least one of these facilities

4

currently uses coal from the mountaintop mining regions of the Appalachian Mountains and plans to continue using this source of coal in its new power plant. See Exh. 1: Appendix E of Duke Power's "PSD Permit Application for the Cliffside Steam Station, Units 6 & 7," at E-2–3 ("The station … has maintained reasonable coal supply using Central Appalachian coal since the first units were commissioned in the 1940's. … Duke Power selected eastern bituminous coal as the primary fuel of choice …").

On 29 June 2007, Appalachian Voices, as a courtesy, notified DOE—via certified mail, return receipt requested—that it was violating NEPA by failing to conduct any NEPA analysis regarding its allocation of these tax credits. Exh. 2. Specifically, Appalachian Voices alleged that DOE failed to categorically exclude the action from NEPA analysis, prepare an EIS, or prepare an EA. Id. Congress authorized the allocation of these tax credits in the Energy Policy Act of 2005. Pub. L. No. 109-58 §§ 101–1840, 119 Stat. 593–1143 (2005). While the Energy Policy Act of 2005 exempts certain major federal actions from NEPA scrutiny, see Pub. L. No. 109-58 § 390, 119 Stat. 747–48 (2005), and expedites the NEPA process for others, see Pub. L. No. 109-58 § 362(a)(1)(A), 119 Stat. 721 (2005) and Pub. L. No. 109-58 § 369(d), 119 Stat. 728 (2005), Congress did not exempt allocation of these particular tax credits from NEPA review. See Pub. L. No. 109-58 § 1307, 119 Stat. 999–1006 (2005). In an effort to avoid this litigation, Appalachian Voices provided DOE thirty days to explain whether, and how, it intended to comply with NEPA. Id. at 5. Despite the ubiquitous and devastating social and environmental impacts associated with coal's cradle-to-grave lifecycle, DOE has yet to explain to Appalachian Voices how it has complied, or will comply, with NEPA. Exh. 3: Declaration of Scott A. Gollwitzer.

**B.      Coal-Fired Power Plants Are Major Sources of Air Pollution Significantly Affecting the Environment**

Coal-fired power plants ("CFPPs") are the nation's largest source of electricity—accounting for more than half of its production.  See DOE FACT SHEET: CLEAN COAL TECHNOLOGY USHERS IN NEW ERA IN ENERGY, www.energy.gov/media/CleanCoalTaxCreditFactSheet.pdf, at 3.  CFPPs are considered among the nation's dirtiest sources of air pollution because they: (1) emit fifty-nine percent of the nation's sulfur dioxide;[2] (2) are the largest source of mercury—a powerful neurotoxin;[3] (3) release nearly fifty percent of particulate matter in much of the United States;[4] and (4) give off thirty-three percent of all carbon dioxide emissions—the principle global warming gas.[5] In addition, the U.S. Environmental Protection Agency ("EPA") has targeted CFPPs for reducing oxides of nitrogen because they are second only to automobiles in producing this smog and ozone forming pollutant.  See UNITED STATES ENVT'L PROTECTION AGENCY, NOX HOW NITROGEN OXIDES AFFECT THE WAY WE LIVE AND BREATHE, www.epa.gov/oar/urbanair/nox, at 2–4 (1998). Finally, CFPPs have been identified as the nation's largest source of toxic air pollutants.  See CLEAN AIR TASK FORCE & PHYSICIANS FOR SOCIAL RESPONSIBILITY, CHILDREN AT RISK: HOW AIR POLLUTION FROM POWER PLANTS THREATENS THE HEALTH OF AMERICA'S CHILDREN, www.catf.us/publications, at 6 (2002).

---

[2] See UNITED STATES ENVT'L PROTECTION AGENCY, NATIONAL AIR QUALITY AND EMISSION TRENDS REPORT: SPECIAL STUDIES EDITION, Appendix A, 102–04 (2003) (Note: the percent of sulfur dioxide emitted by CFPPs in 2000 is derived by dividing the total sulfur dioxide emitted from U.S. CFPPs (10,723 thousand short tons, p. 102) by the total sulfur dioxide released in the U.S. (18,201 thousand short tons, p. 104)).  Thus, 10,723 ÷ 18,201 = 58.91%.
[3] See UNITED STATES ENVT'L PROTECTION AGENCY, FACT SHEET: EPA TO REGULATE MERCURY AND OTHER AIR TOXICS EMISSIONS FROM COAL- AND OIL-FIRED POWER PLANTS, at 3 (2000).
[4] See CLEAN AIR TASK FORCE & PHYSICIANS FOR SOCIAL RESPONSIBILITY, CHILDREN AT RISK: HOW AIR POLLUTION FROM POWER PLANTS THREATENS THE HEALTH OF AMERICA'S CHILDREN, www.catf.us/publications, at 2 (2002).
[5] See UNITED STATES ENVT'L PROTECTION AGENCY, INVENTORY OF U.S. GREENHOUSE GAS EMISSIONS AND SINKS: 1990–2005 (2007).  (Note: the percent of carbon dioxide emitted by CFPPs in 2005 is derived by dividing the carbon dioxide emitted from U.S. CFPPs (1958.4 Tg $CO_2$ Eq., from Table 3-3) by the total carbon dioxide released in the U.S. (5942.7 Tg $CO_2$ Eq., from Table 3-1)).  Thus, 1958.4 ÷ 5942.7 = 32.95%.

C.    **Mountaintop Mining, Mountaintop Removal and Valley Fills Have Significant Environmental Impacts**

Mountaintop mining begins by blasting and bulldozing "as much as 600 feet" off the top of a mountain.  See www.epa.gov/reg3esd1/nepa/mountaintop/mountaintop.htm, UNITED STATES ENVT'L PROTECTION AGENCY, ET AL., MOUNTAINTOP MINING/VALLEY FILLS IN APPALACHIA, (2005) at III.J-1, ("PEIS").  If mountaintop removal mining is involved, the rubble of what were once forested mountain peaks is discarded into nearby valleys and streams.  See PEIS at III.I-20.[6] While burying these tiny mountain streams may seem insignificant, these headwaters play an incredibly important role in protecting water quality and quantity for millions of Americans:

> [e]ven where inaccessible to fish, these small streams provide high levels of water quality and quantity, sediment control, nutrients and wood debris for downstream reaches of the watershed. Intermittent and ephemeral headwater streams are, therefore, often largely responsible for maintaining the quality of downstream riverine processes and habitat for considerable distances.

PEIS at III.C-1.  Mountaintop mining and mountaintop removal are currently employed in the mixed mesophytic forests of West Virginia, Kentucky, Virginia and Tennessee.  See PEIS at III.F-1. "The rugged terrain of this region is generally characterized by steep mountain slopes, confined river valleys and narrow ridge tops."  Id. at III.A-2.

---

[6] While it may be important to distinguish mountaintop mining from mountaintop removal, the environmental impacts of each are nearly identical.  Mountaintop removal is simply a subspecies of mountaintop mining that utilizes valley fills rather than returning the mined area to its approximate original contour ("AOC").  See PEIS at III.I-16 ("although area mining may affect an entire mountaintop or ridge line, it is considered a separate entity from mountaintop removal in that an area [mountaintop] mine site must be reclaimed to AOC."); see also, PEIS at III.I-20 (explaining that "In practice, the term mountaintop removal is used more broadly and sometimes applies … if still descriptive of the overburden removal method."); Bragg v. West Virginia Coal Ass'n, 248 F.3d 275, 286 (4th Cir. 2001) ("Mountaintop-removal coal mining, while not new, only became widespread in West Virginia in the 1990s. Under this method, to reach horizontal seams of coal layered in mountains, the mountaintop rock above the seam is removed and placed in adjacent valleys; the coal is extracted; and the removed rock is then replaced in an effort to achieve the original contour of the mountain.  But because rock taken from its natural state and broken up naturally 'swells,' perhaps by as much as 15 to 25%, the excess rock not returned to the mountain -- the 'overburden' -- remains in the valleys, creating 'valley fills.'").  In sum, the only difference between mountaintop mining and mountaintop removal is that mountaintop removal includes the additional social and environmental impacts associated with burying nearby valleys and streams.

According to EPA this region contains incredibly important biological resources for the region, the nation and the world:

> [t]hese ecoregions are unique in the world because they combine characteristically northern species with their southern counterparts, and thus boast enormous richness and diversity. That, in combination with relatively mild environmental conditions, has provided a perfect setting for the evolution of unique species of plants, invertebrates, salamanders, crayfishes, freshwater mussels, and fishes. These species include great numbers of organisms, including terrestrial, aquatic, and plant species, which are supported by the Appalachian ecoregions. The southern Appalachians have one of the richest salamander faunas in the world. The Appalachian ecoregion forests represent some of the last remaining stands of a forest type that was once widespread in the northern hemisphere. These rich deciduous forests have been profoundly altered over the past few centuries and are becoming increasingly threatened.

PEIS at III.A-1 (citations omitted. "The mixed mesophytic forests of the Appalachian coal fields supports one of the richest floral, breeding bird, mammal, and amphibian communities of any upland eastern U.S. forest type—it has also been described as 'the most biologically diverse ecosystem in the southeastern United States.'" PEIS at III.F-2 (citations omitted, emphasis added). Other forest types being destroyed by mountaintop mining in the Appalachian coalfields include: (1) Appalachian Oak Woods (i.e. Oak Dominant Forests); (2) Northern Hardwoods (i.e. Mountain Hardwood Forests); (3) Floodplain Forests; (4) Oak-Pine Forests (i.e. Hardwood/Conifer Forests and Mountain Hardwood/Conifer Forests); and (5) Pine Forests (i.e. Mountain Conifer Forests). See PEIS at III.F-4–6.

Furthermore, "as many as 14 vertebrate species may be found in the [Appalachian coalfields] that are not found anywhere else in the world." PEIS at III.F-6 (emphasis added). Similarly, "[b]irds are amazingly diverse in the [Appalachian coalfields], due largely to the mosaic of microenvironments associated with the Appalachian Plateau Province." PEIS at III.F-7. Portions of the region "contain critical breeding habitat for some species of Neotropical migratory songbirds." Id. (emphasis added). In fact,

> [s]ome of the highest concentrations of Neotropical migrant bird species like the scarlet tanager (*Piranga olivacea*), worm-eating warbler (*Helmitheros vermivorous*), Louisiana waterthrush (*Seiurus motacilla*), and wood thrush (*Hylocichla mustelina*) occur in West Virginia. The mixed mesophytic forests are reported to support the richest avifauna in Kentucky and one of the richest avifauna's [*sic*] in the eastern United States.

PEIS at III.F-7 (citations omitted). Mountaintop mining threatens to destroy this critically important biological region because such operations

> involve fundamental changes to the region's landscape and terrestrial wildlife habitats. Prior to 1998 (the start of this EIS) with the increasing size of these operations, <u>a single permit involved changing thousands of acres of hardwood forests into herbaceous cover.</u> This is true even for the short-term when forest is [the] post-mining land use. While the original forest habitat was crossed by flowing streams and was comprised of steep slopes with microhabitats determined by slope, aspect, and moisture regimes, <u>the reclaimed mines are often limited in topographic relief, devoid of flowing water, and most commonly dominated by erosion-controlling, herbaceous communities.</u> Islands of remnant hardwood vegetation may be present on some of the reclaimed mines, and some planting of trees and shrubs may have been undertaken.

PEIS at III.F-12 (citations omitted, emphasis added). The late, Honorable Charles H. Haden II, described his grim firsthand experience witnessing the permanent destruction that accompanies mountaintop mining and its cousin, mountaintop removal:

> [t]he Court's helicopter flyover of all mountaintop removal sites in southern West Virginia revealed the extent and permanence of environmental degradation this type of mining produces. On February 26, the ground was covered with light snow, and mined sites were visible from miles away. The sites stood out among the natural wooded ridges as huge white plateaus, and the valley fills appeared as massive, artificially landscaped stair steps. Some mine sites were twenty years old, yet tree growth was stunted or non-existent. Compared to the thick hardwoods of surrounding undisturbed hills, the mine sites appeared stark and barren and enormously different from the original topography. …
>
> Destruction of the unique topography of [the Appalachian Mountains], … cannot be regarded as anything but permanent and irreversible. …

<u>Bragg v. Robertson</u>, 54 F. Supp. 2d 635, 646 (S.D. WV 1999). Although Plaintiffs have, for brevity's sake, highlighted the significant environmental impacts associated with surface mining in the Central Appalachians, we recognize, as we hope this Court will, that surface mining has similarly significant

impacts wherever it occurs.  See e.g., 11: OFFICE OF SURFACE MINING, RECLAMATION AND ENFORCEMENT, DRAFT ENVIRONMENTAL IMPACT STATEMENT: PROPOSED REVISIONS TO THE PERMANENT PROGRAM REGULATIONS IMPLEMENTING THE SURFACE MINING CONTROL AND RECLAMATION ACT OF 1977 CONCERNING THE CREATION AND DISPOSAL OF EXCESS SPOIL AND COAL MINE WASTE AND STREAM BUFFER ZONES (2007), www.osmre.gov/eis.htm.  Nor do we wish to discount or diminish the severe environmental impacts associated with underground coal mining. See e.g., 66 Fed. Reg. 67,010 (2001) ("requiring underground mine operators to repair or compensate landowners for subsidence damage to certain structures and facilities and to restore or replace water supplies adversely impacted by underground mining operations.").

V.    **STANDARDS OF REVIEW**

A.    **Standard of Review and Elements Necessary for Securing a Preliminary Injunction Under NEPA**

"Where an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted …"  Realty Income Trust v. Eckerd, 183 U.S. App. D.C. 426, 564 F.2d 447, 456 (D.C. Cir. 1977); see also, American Oceans Campaign v. Daley, 183 F. Supp. 2d 1, 21 (D.D.C. 2000).  To secure NEPA's presumptive injunctive relief, Plaintiffs must establish that: "'(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will [not] substantially injure the other party; and (4) the public interest will be furthered by the injunction.'"  Ellipso, Inc. v. Mann, 375 U.S. App. D.C. 270, 480 F.3d 1153, 1157 (D.C. Cir. 2007) (quoting Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1317–18 (D.C. Cir. 1998) (citing Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 182 U.S. App. D.C. 220, 559 F.2d 841, 843 (D.C. Cir. 1977)).  While a court must balance these factors, "'[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'"  Ellipso, 480 F.3d at 1157 (quoting Serono Laboratories, 158 F.3d at 1318) (quotation omitted).  Stated another way, where "a party can demonstrate

'probable success on the merits,' the party need only establish a 'possibility of irreparable injury.'"
Fund for Animals v. Norton, 281 F. Supp. 2d 209, 219 (D.D.C. 2003) (citation omitted).

In sum, "[w]hat is called for is a particularized analysis of the violations that have occurred, of the possibilities for relief, and of any countervailing considerations of public interest. In making this determination, a court should consider the rationale for injunctions, including the need to prevent irreversible effect on the environment, until the possible adverse consequences are known." Government of the Province of Manitoba v. Norton, 398 F. Supp. 2d 41, 67 (D.D.C. 2005) (quotations omitted).

### B.     Standard of Review for Violations of NEPA

When reviewing actions—or as here, inaction—under NEPA, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." Baltimore Gas & Electric Co., 462 U.S. at 98 (citation omitted).

## VI.     ARGUMENT IN SUPPORT OF PRELIMINARY INJUNCTION

### A.     Plaintiffs Will Succeed on the Merits

This Court has long recognized that federal agencies have only three choices for complying with NEPA's duty to take a "hard look" at the environmental impacts of its actions:

> the duty to prepare an EIS is triggered only by a proposal for 'major federal action significantly affecting the quality of the human environment.' To guide agencies in determining whether this threshold has been met, the [CEQ] has issued regulations setting forth three levels of initial review.  First, those proposals that normally require an EIS should immediately trigger preparation of an EIS.  Second, the agency may designate types of actions that normally do not require the preparation of an EIS and can therefore be 'categorically excluded.'  Third, any action that is not covered by the first or second option will be subject to an Environmental Assessment or EA.  Using these guidelines, the agency makes the initial determination of what level of review is appropriate for any particular action, subject to judicial review under an arbitrary-and-capricious standard.

Edmonds Inst. v. Babbitt, 42 F. Supp. 2d 1, 18 (D.D.C. 1999) (quotations and citations omitted).

Unlike most NEPA cases (which challenge the efficacy of environmental impact statements, environmental assessments and categorical exclusions), Plaintiffs' claim is not a disagreement over the outcome or substance of DOE's NEPA decisionmaking. Rather, Plaintiffs claim that DOE acted arbitrarily and capriciously by refusing to perform <u>any</u> NEPA analysis regarding its allocation of tax credits. <u>See</u> <u>Florida Audubon Soc'y v. Bentzen</u>, 320 U.S. App. D.C. 324, 94 F.3d 658, 665 (D.C. Cir. 1996) (en banc) (holding that decisions regarding tax credits are subject to NEPA where the tax credit is "substantially likely to cause [a] demonstrable increase in risk to [a plaintiff's] particularized interest.") (citation omitted).

Buttressing Plaintiffs' likelihood of succeeding on the merits is the fact that six of the seven publicly identified projects—ranging from 390–1744 megawatts—far exceed the capacity of facilities for which DOE normally requires an EIS. <u>See</u> 10 C.F.R. § 1021, Subpart D, Appendix D (EIS normally required "… for the allocation of electric power that involve (1) the addition of new generation resources greater than 50 average megawatts, (2) major changes in the operating limits of generation resources greater than 50 average megawatts, or (3) service to discrete new loads of 10 average megawatts or more over a 12 month period. This applies to power marketing operations and to siting construction, and operation of power generating facilities at DOE sites.").

In sum, DOE's failure to subject the significant environmental and societal impacts of these experimental projects to <u>any</u> NEPA scrutiny presents the quintessential example of agency action that is "arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law." 5 U.S.C. § 706(A) (2007). Accordingly, Plaintiffs will succeed on the merits because DOE's refusal to perform <u>any</u> NEPA review constitutes a <u>de facto</u> violation of law.

**B.    <u>Plaintiffs Will Suffer Irreparable Harm Without an Injunction</u>**

A preliminary injunction is warranted because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long

duration, *i.e.*, irreparable. If such injury is sufficiently likely … the balance of harms will usually favor issuance of the injunction to protect the environment." Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987); see also, Foundation on Economic Trends v. Heckler, 244 U.S. App. D.C. 122, 756 F.2d 143, 157 (1985) ("The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency before major federal actions occur. If plaintiffs [are likely to] succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury.") (internal citations omitted, emphasis in original). While, procedural injury, by itself, may be insufficient to constitute irreparable harm justifying a preliminary injunction, Plaintiffs actual injuries bolster the case for an injunction. See Fund for Animals v. Norton, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (finding a combination of procedural and aesthetic injury sufficiently irreparable to justify an injunction) (emphasis in original). Here, DOE's decision to abandon its NEPA duties threatens Plaintiffs' members with palpable injury.

For instance, Mr. Hawkins owns a home situated on thirty-five (35) acres approximately twenty (20) miles from Duke Energy's proposed facility in Rutherford County, North Carolina (hereafter, "Cliffside").[7] See Exh. 4: Declaration of Roger Hawkins, at ¶ 3. Mr. Hawkins shares his home and property with his wife and two young sons—ages six and four. Id. Mr. Hawkins and his family spend considerable time engaging in physically exerting out-of-doors activities on and near their property including: hiking, running, soccer, baseball, football and viewing wildlife. Id. at ¶ 2. Adverse health effects caused by air pollution belched from the proposed Cliffside facility will

---

[7] Because many of Plaintiffs' members will be irreparably harmed by Duke Energy's expansion of its Cliffside facility in Rutherford County, North Carolina, the analysis of irreparable harm will, for brevity's sake, focus on Duke Energy's Cliffside expansion plans. This in no way is meant to narrow our request for preliminary relief as to DOE's decision to facilitate development of the remaining eight sources of environmental degradation because NEPA requires DOE to assess both the individual (i.e. plant-specific) and cumulative (i.e. plant upon plant) environmental impacts associated with all nine power projects. See 40 C.F.R. § 1508.7 (2007).

impair the Hawkins' use and enjoyment of their home, property, German Shepherd kennel and their very bodies. See id. at ¶¶ 1–6. More specifically, Mr. Hawkins and his family will be harmed by the well-documented deleterious health effects associated with, inter alia, inhaling fine particles, oxides of nitrogen, and sulfur dioxide. Id. at ¶ 5. Mr. Hawkins is particularly concerned about the disproportionate neurotoxicological effects that additional mercury emissions will have on his developing young sons. Id. at ¶ 3. Had Defendants taken the requisite "hard look" at these reasonably foreseeable impacts, they may have discovered measures that "reduce or eliminate environmental damage." Dep't of Transp. v. Public Citizen, 541 U.S. at 756.

In addition to these localized impacts, Plaintiffs' members will be harmed by the inevitable increase in the coal mining needed to fuel these projects. See Exh. 1: at E-2–3 ("[Duke Energy's] station … has maintained reasonable coal supply using Central Appalachian coal since the first units were commissioned in the 1940's. … Duke Power selected eastern bituminous coal as the primary fuel of choice …"). Applying the late Judge Hayden's grim observations of environmental damage wrought by mountaintop removal at Pigeonroost Hollow to the entirety of the Appalachian coalfields, it can scarcely be denied that

> [i]f the forest canopy … is leveled, exposing [streams] to extreme temperatures, and aquatic life is destroyed, these harms cannot be undone. If the forest wildlife are driven away by the blasting, the noise, and the lack of safe nesting and eating areas, they cannot be coaxed back. If the mountaintop is removed, even [the mine's] engineers will affirm that it cannot be reclaimed to its exact original contour. Destruction of the unique topography of [the Appalachian Mountains], … cannot be regarded as anything but permanent and irreversible. Such harms cannot be remedied through the availability of damages.

Bragg v. Robertson, 54 F. Supp. 2d at 646 (S.D. WV 1999). In sum, the actual and procedural injuries caused by DOE's malfeasance, coupled with Plaintiffs' certain success on the merits requires a preliminary injunction.

**C.    Neither the Federal Defendants, Nor the Erstwhile Recipients of the Unlawfully Allocated Tax Credits Will be Harmed by Suspending DOE's Decision Until Defendants Comply With NEPA**

Because Plaintiffs cannot discern how the requested relief will harm DOE, we only address the possible harm to the erstwhile recipients of the unlawfully allocated tax credits. While the two primary injuries that might befall the tax credit recipients are delay and financial loss, neither of these speculative harms should preclude this Court from issuing a preliminary injunction.

As to delay, an injunction will not prevent the tax recipients from moving forward with their projects. Instead, they simply assume the risk of proceeding without assurances that DOE will, after reviewing their proposed plans through NEPA's lens, approve their particular project for the tax credit. Regarding any potential financial loss, none of the publicly identified facilities have, based on information and belief, placed any eligible property in service—a condition precedent for receiving the tax credit. See 26 U.S.C. § 48A(b) (2007) ("the qualified investment for any taxable year is the basis of eligible property placed in service by the taxpayer during such taxable year which is part of a qualifying advanced coal project."). Even if some of the recipients have placed eligible property in service, it defies reason to believe that the Internal Revenue Service would penalize any of them for the mistakes of the DOE by not allowing them to recoup their costs in subsequent tax years.

Juxtaposed against coal's devastating cradle-to-grave societal and environmental impacts, any harm caused by short-term delays or lost investments should not preclude a preliminary injunction. See National Wildlife Federation v. Burford, 266 U.S. App. D.C. 241, 835 F.2d 305, 326 (D.C. Cir. 1987) (upholding a preliminary injunction where the potential "permanent loss of aesthetic values and environmental resources … , outweighed the possible injury to third parties," where the injuries to third parties were "delay, a cloud on title (which would have been caused to some degree by the litigation itself, even absent the preliminary injunction), and investment costs."); see also, Exh. 5: Citizen's Alert Regarding the Environment v. United States Dep't of Justice, 1995 U.S. Dist. LEXIS

18619, 31–32 (D.D.C. 1995) (where the impacts of losing just one mountaintop before NEPA review justified a preliminary injunction: "After weighing the potential loss of revenue, jobs, and monetary investment, against the environmental values inherent in the Moosic Mountain, it is the judgment of this Court that a failure to grant the preliminary injunction would cause irreparable injury to the Plaintiffs and that that harm outweighs the threatened harm to Defendants.  It is imperative that the Court ensure that the decisions of DOC and BOP to proceed with their projects comply fully with applicable law and be based on sound environmental information.  Delay of the projects in order to determine whether their likely environmental impacts have been adequately evaluated will further serve this purpose.") (emphasis added).

       **D.**       **The Public Interest Will be Best Served by an Injunction**

       In addition to those benefits realized by Plaintiffs' and their members, the public will benefit from a preliminary injunction in a number of ways.  First, DOE's failure to conduct any NEPA analysis frustrates an important public interest.  See Fund for Animals v. Espy, 814 F. Supp. 142, 152 (D.D.C. 1993) (a remarkably similar case in which this Court held that "a number of considerations weigh in favor of a preliminary injunction. The first is defendant's apparent NEPA violation. Having failed to prepare either an EIS or an EA, the administrative decisionmaker made no determination even that a 'categorical exclusion' applied. Thus, a public interest expressed by Congress was frustrated by approval of this proposal, with likely environmental consequences, without NEPA compliance.").

       Second, a preliminary injunction will safeguard the status quo; thus maintaining DOE's ability to consider, and more importantly adopt, alternatives that may have less significant impacts on the nation's critical—and increasingly scarce—water, land and air resources.  As the Court of Appeals for the District of Columbia has long held "[b]y maintaining the status quo, while additional environmental studies are performed, or additional alternatives are considered, an injunction ensures

that there will be at least a 'possibility' that the agency will 'change its plans in ways of benefit to the environment. It is this possibility that courts should seek to preserve.'" State of Alaska v. Andrus, 188 U.S. App. D.C. 202, 580 F.2d 465, 485 (D.C. Cir. 1978), vacated in part on other grounds, 439 U.S. 922 (1978) (quotation omitted, emphasis added). Indeed, an injunction will "preserve for the agency the widest freedom of choice when it reconsiders its action after coming into compliance with NEPA." Gov't of the Province of Manitoba, 398 F. Supp. 2d at 67 (quotations omitted).

Fourth, a preliminary injunction will guarantee that DOE analyzes—and fully comprehends—how its decision will either exacerbate or alleviate issues of environmental justice in those communities where the coal needed to power these experimental projects will be mined, processed, transported, burned and disposed. See Exec. Order No. 12,898, 59 Fed. Reg. 7,629 (1994) ("each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations …"). Fifth, a preliminary injunction will ensure that 1.65 billion dollars of taxpayer money will not be blindly squandered before DOE has taken the requisite "hard look."

Finally, "there is a strong public interest in meticulous compliance with the law by public officials. As Justice Jackson sagely observed many years ago: 'It is very well to say that those who deal with the Government should turn square corners. But there is no reason why the square corners should constitute a one-way street.' Indeed, the Constitution itself declares a prime public interest that the President and, by necessary inference, his appointees in the Executive Branch 'take Care that the Laws be faithfully executed.'" See Fund for Animals v. Espy, 814 F. Supp. 142, 152 (D.D.C. 1993) (citations omitted).

## CONCLUSION & PRAYER FOR RELIEF

Section 4332 of NEPA requires all federal agencies, including DOE, to comply with each of its provisions "to the fullest extent possible." The Supreme Court has held that this congressional directive is "neither accidental nor hyperbolic. Rather, the phrase is a deliberate command that the duty NEPA imposes upon the agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle." Flint Ridge Development Co. v. Scenic Rivers Ass'n of Oklahoma, 426 U.S. 776, 787 (1976) (citations to the congressional record omitted). DOE's refusal to perform any NEPA analysis—despite receiving notice that it was violating NEPA—presents the quintessential example of an agency shunting aside obviously significant environmental impacts in the bureaucratic process. DOE's decision to disregard its ethical obligations to the people, communities and environments in which coal is mined, processed, incinerated and disposed is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

**WHEREFORE**, Plaintiffs respectfully request this honorable Court to:

(1) order an expedited hearing pursuant to LCvR 65.1(d) because, as a single-issue cause of action subject to review on the administrative record, the briefing on preliminary relief could, be treated as Plaintiffs' motion for summary judgment—swiftly clearing this Court's docket; allowing the parties to expeditiously bring this litigation to finality; and providing the erstwhile tax recipients much-needed financial planning information as they seek to move their projects forward in 2008;

(2) order the Departments of Energy and Treasury to suspend allocation of the section 1307 tax credits pending a determination of this matter on the merits;

(3) waive bond, or set a nominal bond, pursuant to Fed. R. Civ. P. 65(c) because Plaintiffs are non-profit organizations with no financial interest in the outcome of this litigation and are pursuing this matter to protect the quality of life and the environment in communities impacted by coal's devastating cradle-to-grave impacts;

(4) award Plaintiffs costs (including reasonable attorney, witness, and consultant fees) under the Equal Access to Justice Act, Federal Rule of Civil Procedure 54 and any statutory authority of this Court; and

(5) order such other relief as this Court may deem appropriate, just and proper.

Dated at Asheville, North Carolina this 3rd day of March 2008.

/s/ Scott Gollwitzer
Scott Gollwitzer

ATTORNEY FOR PLAINTIFFS

Scott Gollwitzer
In-house Counsel
Appalachian Voices
16 Eagle Street, Suite 200
Asheville, NC 28801
Ph:  828.505.1963
Fax: 828.262.1540
E-mail: scott@appvoices.org
NY Bar No. 2890697
VT Bar No.  3293


OF COUNSEL

| Benjamin J. Wakefield | Stephen H. Novak |
|---|---|
| Counsel | Senior Staff Attorney |
| Environmental Integrity Project | Wildlaw |
| 901 Eighteenth Street NW, Suite 250 | 46 Haywood Street, Suite 323 |
| Washington, DC 20006 | Asheville, NC 28801 |
| Phone: 202.263.4442 | Ph: 828.252.9223 |
| Fax:    202.296.8822 | Fax: 828.252.9074 |
| E-mail: bwakefield@environmentalintegrity.org | E-mail: wildlawNC@aol.com |
| D.C. Bar No. 482984 | NC Bar No.  23411 |


**Certificate of Service**

I hereby certify that on 03 March 2008, a copy of the foregoing was hand-delivered to the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

/s/ Scott Gollwitzer
Scott Gollwitzer



# APPENDIX E: TECHNOLOGY CONSIDERATIONS

On December 13, 2005, EPA issued a letter confirming that, "consistent with EPA's established BACT policy, it would not require an applicant to consider IGCC in a BACT analysis for a supercritical pulverized coal unit. Thus, EPA would not include IGCC in the list of potentially applicable control options that is compiled in the first step of a top-down BACT analysis." While we believe this puts an end to any issue regarding the scope of the BACT analysis, DAQ requested information on IGCC and CFB in an earlier meeting. Therefore, we are providing the following information relative to IGCC and other alternate technologies.

Duke Power has proposed to construct two state-of-the-art supercritical pulverized coal-fired boilers with advanced pollution control at its existing Cliffside Steam Station as the most cost-effective alternative to meet the base load power needs of its customers. The boilers will operate at supercritical steam conditions to efficiently produce electricity. Emission controls will include combustion controls, selective catalytic reduction, dry electrostatic precipitation, wet flue gas desulfurization, and wet electrostatic precipitation. The combination of high electricity production efficiency and state-of-the-art emission controls will minimize annual emissions.

Consideration was given to various alternative generating technologies capable of base load generation in the range of 1,600 MW, including natural gas combined cycle, traditional gas or oil-fired steam boilers, nuclear power, conventional (sub-critical) pulverized coal, integrated gasification combined cycle (IGCC), and circulating fluidized bed (CFB) boilers. Other alternatives, such as renewable energy (solar, wind, etc.) were considered, but were determined to be impractical for low cost near-term base load generation at the scale of 1,600 MW. This Appendix reviews the alternative generation technologies considered, and summarizes the evaluation performed in selecting the generating technology for the proposed project.

## E-1 Fuel Considerations

Duke Power is committed to providing reliable, environmentally responsible and low-cost power to its regulated customers. Based on recent historical, as well as USDOE projected data, natural gas and oil prices have become increasingly volatile and are projected to remain as much as 2-3 times the equivalent cost of coal on a $/MMBtu basis for the foreseeable future. While natural gas and distillate oil are inherently cleaner fuels, when compared with a state-of-the-art clean coal facility in today's market, they do not represent a cost-effective economic alternative for the base load generation of bulk power. As a result, building and operating a highly efficient, low emitting coal-fired boiler will provide low-cost electricity to Duke Power's customers. The choice of the selected coal blends is described below.

Coal supplies of varying heat value, sulfur content, ash content and other aspects of quality exist in different parts of the United States. In general, bituminous coal found east of the Mississippi River in Central Appalachia, Northern Appalachia and the Illinois Basin has high heat value, low to high

December 2005



sulfur content, and varying degrees of ash, moisture and other constituents. Western sub-bituminous coal as found in the Powder River Basin (PRB) in the Great Plains, in general, has lower heat value, very low sulfur content, high moisture and varying degrees of other constituents. Furthermore, PRB coal is characterized by the potential to spontaneously-combust, requiring expensive fire-protection measures not needed for eastern bituminous coal.

Duke Power has evaluated the available coals to fuel the Cliffside boilers. As explained below, Duke Power chose to burn eastern bituminous coal or a blend of eastern bituminous and sub-bituminous coals in the Cliffside boilers rather than burn only western sub-bituminous coal because the delivery reliability is greater, the resulting emissions are comparable, the costs of PRB coal and its transportation are significantly higher on an equivalent heating value basis.

The cost of generation varies with the capital cost of the plant, the boiler design, the cost of emission reduction, and the fuel cost. The cost of fuel delivered to the plant varies with heat value, sulfur content, transportation impacts and other factors. In broad terms, the medium sulfur eastern bituminous coal has a much greater heat value and higher sulfur content than the PRB coal. On a cost per heat value ($/MMBtu) basis, the delivered cost of eastern bituminous coal is significantly less than the delivered cost of PRB. While this is partially offset by the lower cost of achieving comparable SO2 emissions from the PRB coal, the net cost of generation from the bituminous and PRB blend is much less than from firing only sub-bituminous coal.

In addition to the cost benefits of firing eastern coals or predominately eastern coals, shipping coal primarily via eastern railroads provides greater transportation reliability. The network of rail lines in the east provides a reasonable measure of certainty that eastern bituminous coal can be delivered consistently to Cliffside. The station, currently served by CSX Transportation (CSX), has maintained reasonable coal supply using Central Appalachian coal since the first units were commissioned in the 1940's. While Duke Power believes that its customers would benefit from a second rail spur accessing Norfolk Southern Railway (NS), the network of eastern rail lines has, in general, provided reasonably good service to all the Duke coal plants.

On the contrary, there are limited rail lines into and out of the PRB coal fields, located principally in Wyoming and approximately 1900 miles from Cliffside, NC. Furthermore, there are limited junctions where the western railroads can transfer PRB trains to eastern railroads. As a result, bottlenecks and delivery problems are not uncommon for the few utilities in the east attempting to burn PRB. Since the new Cliffside units are expected to be baseloaded with a high capacity factor, dependable coal supply is essential.

Unlike oil and natural gas which are increasingly dependent on foreign sources of supply, coal is domestically abundant and available for delivery by rail to the Cliffside Steam Station. Finally, today's state-of-the-art clean coal technology is capable of burning low cost, indigenous coal very efficiently, and with very low emissions and significantly reduced environmental impacts. While new nuclear capacity is considered to represent a viable long range alternative for new base load



generation, it can not be licensed and constructed within the timeframe needed for near-term planning horizons. For these reasons, Duke Power selected eastern bituminous coal as the primary fuel of choice for the required 1,600 MW of base load power generation.

**E-2 Summary of Electricity Generation from Coal**

The Cliffside Steam Station is relatively near sources of eastern bituminous coal. The proposed Cliffside Unit 6 & 7 Project has the advantage of being able to utilize advanced pulverized coal (PC) boiler technology, which represents the highest efficiency coal generating technology available today as well as the lowest generating cost technology due to economies of scale associated with two 800 MW boilers. We have reviewed three types of coal-fueled technology for electrical generation at Cliffside 6 and 7: (1) pulverized coal technology; (2) circulating fluidized bed (CFB) technology; and (3) integrated gasification combined cycle technology.

Within the category "PC Boilers", the state-of-the-art has led to many recent applications of "supercritical" pressure (>3,208 psia) designs (as opposed to traditional sub-critical pressure designs) in the United States. Factors driving the increasing use of supercritical designs are higher fuel prices and a competitive electricity market, since supercritical units are able to operate at a higher efficiency than sub-critical designs. Advances in metallurgy, welding and computer aided design have enabled steam boilers to operate at increasing margins above what is called the "critical condition" of steam.[1] Large PC boilers can be designed to operate in supercritical mode, which in turn allows them to operate much more efficiently (i.e. burning less fuel and emitting less pollutants to generate the same amount of electricity) as traditional sub-critical utility boilers. Therefore, the more fuel efficient supercritical boiler is the appropriate pulverized coal technology design for the proposed Cliffside Unit 6 & 7 Project to reduce fuel costs to its customers as well as to minimize emissions on a lb/kW-hr produced basis.

Pulverized coal-fired boilers and circulating fluidized bed boilers represent designs that are technologically mature and have been demonstrated to be reliable for base-load utility service. In each case, air pollution control systems have evolved such that generally equivalent air emission levels can be achieved (on a heat input or tons of coal processed basis). Circulating fluidized bed boilers are capable of burning a wider range of fuels (i.e. fuels other than coal), such as petroleum coke, waste coal, wood chips, rice hulls, etc. On the other hand, the commercially proven size of a CFB boiler is practically limited to about 250-300 MW each while a pulverized coal-fired boiler can be as large as 1,200 MW. Advanced pulverized coal (PC) boiler technology offers the highest efficiency coal generating technology and lowest generating cost technology due to economies of scale associated with two 800 MW boilers rather than the six to seven 250 MW CFB boilers that would otherwise be required for a 1600 MW generating facility.

---

[1] Critical Condition is defined as "the temperature and pressure at which two phases of a substance in equilibrium with each other become identical, forming one phase."

29 JUNE 2007

Samuel W. Bodman
Secretary of Energy
Forrestal Building
U.S. Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585

Victor K. Der
Deputy Secretary for Clean Coal
Germantown Building
U.S. Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585-1290

Joseph Giove
Program Analyst
Germantown Building
U.S. Department of Energy
1000 Independence Avenue, SW
Washington, DC 20585-1290

Kenneth Markel
U.S. Department of Energy
National Energy Technology Laboratory
P.O. Box 880
Morgantown, WV 26507-0880

Michael Eastman
U.S. Department of Energy
National Energy Technology Laboratory
P.O. Box 10940
Pittsburgh, PA 15236-0940

BY CERTIFIED MAIL; RETURN RECEIPT REQUESTED

**RE:    Notice of Violation of the National Environmental Policy Act**

Greetings:

We, the undersigned, submit this notice to the U.S. Department of Energy (DOE) that it is in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370d (2007), for failing to prepare an environmental impact statement (EIS) regarding its certification of one billion dollars in tax credits to promote nine[1] so called "clean coal" facilities under the Energy Policy Act of

---

[1] Seven of nine of these projects have been publicly identified by DOE and include: (1) Duke Energy's Edwardsport, IN IGCC Project; (2) Tampa Electric's IGCC Project in Polk County, FL;

2005. Based on the following analysis, we hereby request that DOE rescind its certification and prepare a comprehensive EIS evaluating the individual and cumulative environmental impacts of these certifications.

NEPA was enacted to "reduce or eliminate environmental damage," *Dep't of Transp. v. Public Citizen*, 541 U.S. 756 (2004) (citing §§ 40 C.F.R. 1501.4(e) (2005) and 1508.13 (2005)), by requiring all federal agencies, including DOE, to "take a 'hard look' at the environmental consequences [of its actions]." *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, Inc.*, 462 U.S. 87, 97 (1983). NEPA serves two equally important functions. "First, it 'places upon [DOE] the obligation to consider every significant aspect of the environmental impact of a proposed action' . . . Second, it ensures that [DOE] will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* at 97–98 (internal citations omitted). In fulfilling NEPA's twin aims, DOE must prepare an EIS for major federal actions "significantly affecting the quality of the human environment." *See* 42 U.S.C. § 4332(C).

It can scarcely be denied that these pollution sources will, individually and cumulatively, significantly affect the environment. In fact, eight of these pollution sources (ranging from 390–1744 megawatts) far exceed the capacity of facilities for which DOE "normally requires an EIS." DOE normally requires preparation of an EIS for

> [a]llocation of electric power, major new generation resources/major changes in operation of generation resources/major loads . . . [or] establishment and implementation of contracts, policies, marketing plans or allocation plans for the allocation of electric power that involve (1) the addition of new generation resources greater than 50 average megawatts, (2) major changes in the operating limits of generation resources greater than 50 average megawatts, or (3) service to discrete new loads of 10 average megawatts or more over a 12 month period. This applies to power marketing operations and to siting construction, and operation of power generating facilities at DOE sites.

10 C.F.R. § 1021, Subpart D, Appendix D. Clearly, if DOE normally prepares an EIS for "the addition of new generation resources greater than 50 average megawatts," *id.*, then it surely must prepare an EIS for each of these pollution sources because they have 7.8–34.88 times more capacity!

Of course, DOE might believe that the 50 average megawatt threshold is inapplicable because it only "applies to . . . facilities *at DOE sites*." Assuming, *arguendo*, that DOE can justify its failure to prepare an EIS based on this narrow reading of Appendix D, [2] the agency must still contend with

---

(3) Duke Energy's Cliffside Expansion in Cleveland and Rutherford Counties, NC; (4) Mississippi Power's IGCC Project in Kemper County, MS; (5) E.ON U.S.'s Advanced Coal Project in Bedford, KY; (6) Carson Hydrogen Power's Hydrogen Power Project in Carson, CA; and (7) TX Energy's Gasification and Refueling Project in Longview, TX.

[2] The undersigned hold the view that the sentence "[t]his applies to power marketing operations and to siting construction, and operation of power generating facilities at DOE sites," is meant to clarify for DOE personnel that all proposals for the "establishment and implementation of contracts, policies, marketing plans or allocation plans for the allocation of electric power that involve (1) the addition of new generation resources greater than 50 average megawatts, (2) major changes in the operating limits of generation resources greater than 50 average megawatts, or (3)

the requirement to prepare an EIS for "major new generation resources." If DOE considers 50 average megawatts to be the *significance* threshold for preparing an EIS for facilities at DOE sites, then that threshold logically applies to sources at non-DOE sites.

While, DOE could ignore the logic of this argument as well, that decision does not end the matter because

> [i]f a DOE proposal is not encompassed within the classes of actions listed in the appendices to this subpart D, or if there are extraordinary circumstances related to the proposal that may affect the significance of the environmental effects of the proposal, DOE shall either: (1) [p]repare an [environmental assessment] and, on the basis of that [environmental assessment], determine whether to prepare an EIS or a [finding of no significant impact]; or (2) [p]repare an EIS and [record of decision].

10 C.F.R. § 1021.400(d) (2007). A review of Appendices A, B and C of Subpart D (governing DOE actions that are either categorically excluded from NEPA analysis or normally require an environmental assessment) reveals that none of the nine pollution sources are "encompassed within the classes of action listed in th[ose] appendices." *Id.* Accordingly, DOE must either prepare an environmental assessment or an EIS. *See id.*

Although DOE could simply prepare an environmental assessment (EA), that option would be foolhardy insofar as the purpose of preparing an EA is to "determine whether to prepare an EIS or a [finding of no significant impact]" *id.* There is *no doubt* that each of these pollution sources has significant impacts, both individually and cumulatively. This is especially so when one considers the reasonably foreseeable human and environmental impacts of the entire lifecycle of coal.

The evidence that coal's "cradle-to-grave" effects are significant is overwhelming. Accordingly, the undersigned direct DOE's attention to the following resources as starting points for its analysis.[3] We also incorporate these resources by reference as though fully recounted herein: (1) U.S. ENVT'L PROTECTION AGENCY, ET AL., MOUNTAINTOP MINING/VALLEY FILLS IN APPALACHIA FINAL PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT (October, 2005); (2) DRISCOLL, C.T., D. EVERS, K.F. LAMBERT, N. KAMMAN, T. HOLSEN, Y-J. HAN, C. CHEN, W. GOODALE, T. BUTLER, T. CLAIR, AND R. MUNSON. MERCURY MATTERS: LINKING MERCURY SCIENCE WITH PUBLIC POLICY IN THE NORTHEASTERN UNITED STATES. HUBBARD BROOK RESEARCH FOUNDATION (Science Links Publication. Vol. 1, no. 3, 2007); (3) INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, WORKING GROUP I, CLIMATE CHANGE 2001: THE SCIENTIFIC BASIS (2001); (4) INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, WORKING GROUP II, CLIMATE CHANGE 2001: IMPACTS, ADAPTATION AND VULNERABILITY (2001); (5) INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, WORKING GROUP III, CLIMATE CHANGE 2001: MITIGATION (2001); (6) INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE CLIMATE CHANGE 2001: SYNTHESIS REPORT

---

service to discrete new loads of 10 average megawatts or more over a 12 month period," shall be subjected to scrutiny in an EIS, *including* those "power marketing operations and to siting construction, and operation of power generating facilities at DOE sites."

[3] By incorporating these resources by reference as though fully recounted herein, the undersigned do not concede the exclusivity of the issues addressed therein. Accordingly, we retain the right to comment upon any new information, issues, causes of action or other information related to DOE's NEPA analysis regarding its certification program. For a more comprehensive list of issues that should be evaluated in DOE's EIS, *see* Conclusion *infra.*

(2001); and (7) Massachusetts Institute of Technology, The Future of Coal: An Interdisciplinary MIT Study (2007).

Because the IGCC projects that DOE is proposing to subsidize do not appear to include carbon sequestration, it is unclear how this expenditure of public funds will contribute to the development of technologies that can reduce greenhouse gas emissions. The recent MIT report warns that stand-alone coal gasification projects could be costly to retrofit for sequestration, and are not good candidates for public subsidies: "Retrofitting IGCC plants, or for that matter pulverized coal plants, to incorporate CCS technology involves substantial additional investments, and a significant penalty to the efficiency and net electrical output of the plant. As a result, we are unconvinced that such financial assistance to conventional assistance without CCS is wise." (page 99)

Moreover, DOE cannot shirk its NEPA responsibilities by claiming that certifying one billion dollars of tax credits for these polluters is not a major federal action. As the Council on Environmental Quality (CEQ) explains, major federal actions include "new and continuing activities, including projects and programs entirely *or partly* financed, assisted, conducted, regulated, or approved by federal agencies . . . [but] do not include funding assistance *solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972 . . . .*" 40 C.F.R. § 1508.18(a) (2007) (emphasis added).

This subsidy program—taken from the pockets of America's taxpayers—is not appreciably different than other DOE programs that give taxpayer dollars to polluters and for which DOE prepares an EIS. *See e.g.,* DOE/EIS-0383 (January 2007) (examining the environmental impacts associated with DOE's 235 million dollar contribution for building a 285 megawatt power plant under the Clean Power Initiative); *see also,* DOE/EIS-0289 (June 2000) (examining the environmental impacts associated with DOE's 73 million dollar contribution for building a nearly 300 megawatt circulating fluidized bed combustor under the Clean Coal Technology Program); and DOE/EIS-0318 (November 2002) (examining the environmental impacts associated with DOE's nearly 60 million dollar contribution for building a 540 megawatt synthesis gas-fired combined cycle power plant under the Clean Coal Technology Program).

## Conclusion

Distilled to its essence, the gravamen of the inquiry is whether the agency has "reache[d] the critical stage of a decision which will result in 'irreversible and irretrievable commitments of resources' to an action that will affect the environment." *Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999) (*quoting Mobil Oil Corp. v. FTC,* 562 F.2d 170, 173 (2nd Cir. 1977)). Here, the conclusion is inescapable. DOE must rescind its certification and prepare a comprehensive EIS evaluating the cumulative environmental impacts of its *irreversible and irretrievable commitment of* resources under its certification program. DOE's NEPA analysis must consider the reasonably foreseeable impacts of the entire lifecycle of the coal to be incinerated at these pollution sources including, *inter alia*: deforestation associated with surface mining; problems with underground mining; endangered, threatened and rare species; blasting (including destruction of aquifers, and drinking water contamination); valley fills; toxic sludge and air pollution created during coal processing; breaches of sludge dams; injection of slurry/sludge into abandoned mines; subsidence above underground mines; transportation of coal by rail, truck and barge; carbon dioxide and other greenhouse gases produced during coal mining, and transport; acid mine drainage; sedimentation in streams, lakes and rivers; landslides; water use and pollution during processing; socio-economic

impacts of mining, combusting and disposing; air pollution from combustion (including, all criteria pollutants, greenhouse gases and toxic & hazardous air pollutants); post combustion waste storage, handling and disposal; water pollution created during and after combustion; the proposed IGCC facilities as currently designed without sequestration (including the additional pollution they will cause and the costs of retrofitting); and issues of environmental justice.

We look forward to your response and explanation, within thirty (30) days of receiving this letter, regarding DOE's decision on whether it will fulfill its NEPA duties by preparing an EIS.

If we can be of further assistance in this matter, please do not hesitate to contact our offices.

Sincerely,

_____

Scott Gollwitzer
In-house Counsel[*]
Appalachian Voices
16 Eagle Street, Suite 200
Asheville, NC 28801
828.505.1963

/s/_____

Stephanie Kodish
Environmental Integrity project
901 Eighteenth Street, NW, Suite 250
Washington, DC 20006
202.263.4442

/s/_____

Stephen H. Novak
Senior Staff Attorney
Wildlaw, Southern Appalachian Office
46 Haywood Street, Suite 323
Asheville, NC 28801
828.252.9223

_____

[*] Licensed to practice law in New York and Vermont only.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| APPALACHIAN VOICES and | ) | |
| THE CANARY COALITION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SAMUEL W. BODMAN, in his official | ) | |
| capacity as Secretary of the United States | ) | Civil Action No._____ |
| Department of Energy; HENRY M. | ) | |
| PAULSON, JR., in his official capacity as | ) | |
| Secretary of the United States Department of | ) | |
| the Treasury; VICTOR K. DER, in his official | ) | |
| capacity as Deputy Secretary for Clean Coal; and | ) | |
| JOSEPH GIOVE, III, in his official capacity | ) | |
| As Program Analyst for the Office of Clean | ) | |
| Energy Systems, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SCOTT A. GOLLWITZER

I, Scott A. Gollwitzer, declare under pain and penalty of perjury, that the following is true and correct.

1. I am a citizen of the United States residing in Buncombe County, North Carolina.

2. On 29 June 2007, I, via certified mail, return receipt requested, notified the Department of Energy that it was violating NEPA by failing to conduct any NEPA analysis regarding its allocation of tax credits under the Energy Policy Act of 2005.

3. In that letter, I also requested that the recipients to explain, within thirty days, whether, and how, the Department of Energy intended to comply with NEPA. As of today's date, the Department of Energy has not responded to this request.

Signed, under pain and penalty of perjury, at Asheville, North Carolina, this 3rd day of March 2008.


/s/ Scott A. Gollwitzer
Scott A. Gollwitzer
In-house Counsel
Appalachian Voices
16 Eagle Street, Suite 200
Asheville, NC 28801
Phone: 828.505.1963
Fax: 828.262.1540
New York Bar ID# 2890697
Vermont Bar ID# 3295

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| APPALACHIAN VOICES and<br>THE CANARY COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>SAMUEL W. BODMAN, in his official<br>capacity as Secretary of the United States<br>Department of Energy; HENRY M.<br>PAULSON, JR., in his official capacity as<br>Secretary of the United States Department of<br>the Treasury; VICTOR K. DER, in his official<br>capacity as Deputy Secretary for Clean Coal; and<br>JOSEPH GIOVE, III, in his official capacity<br>As Program Analyst for the Office of Clean<br>Energy Systems,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No._____ |

## DECLARATION OF ROGER LEELAND HAWKINS

I, Roger Leeland Hawkins, declare as follows:

1.    I own a residence at 214 California Branch Road, Union Mills, NC  28167.  My residence sits on approximately thirty-five acres, which I, along with my wife and children, enjoy exploring.  Along with my wife, I am retired.  Both my wife and I enjoy running a kennel for German Shepherds.  My two children also enjoy this often out-of-doors activity.

2.    I also enjoy spending time with my wife and children outside, especially hiking, playing and watching my children play soccer, baseball and football.  My wife and I both enjoy running out-of-doors for exercise and esthetic pleasure.  Various forms of wildlife occur on my property, and I plan to continue observing said wildlife into the future and sharing those experiences with my family and children.

3.    My concern about the proposed coal burning plant in Cliffside centers on the adverse health effects on all the people and deleterious environmental impacts within a hundred miles or more of the plant. I'm especially concerned about the effects on young children, as my wife and I have two children, six and four year old boys. It's well documented that young children are more vulnerable to the adverse effects of power plant emissions, particularly mercury than are adults.  It is truly sickening to think we bought a house twenty miles from Cliffside, not knowing the Division of Air Quality (DAQ) of North Carolina would soon approve the building of one the largest coal burning plants in the country. I am a member of the Canary Coalition, through which I've been informed of many of the reasons this proposed plant is extremely hazardous to the health of the people of North Carolina.   At one of DAQ's recent meetings in Asheville I attended, expert testimony was offered by several professionals, including UNCA professor Dot Sulock who decried the six million tons of carbon dioxide that would be emitted annually from the Cliffside plant, contributing to global warming. She cited a study indicating enough potential wind energy off the Atlantic coastal region to provide for all the energy needs of seven states.  Sulock questioned, and subsequently so do I, the rationality of ever building another coal-fired power plant.

4.    The large crowd at this recent meeting heard moving testimony from people who have suffered or have family members who have suffered from the effects of air pollution, including Amy Carson, who's son has a neurological disorder traced to mercury toxicity, a principle pollutant of coal-burning power plants. The proposed Cliffside power plant will annually release hundreds of pounds of mercury into the environment.

5.    The link between power plants and fine particles is clear. In most areas of the country, sulfate - acidic fine particles - dominate the total mass of fine particle pollution measured at monitors located throughout the United States. And from my reading and information gathering over the past few years, power plants outstrip all other polluters as the largest source of sulfate air

pollution in the U.S. In 1998, power plants were responsible for 67 percent-a full two thirds-of the annual total sulfur dioxide (SO2) and over a quarter of the nitrogen oxides (NOx) emitted in the U.S.; over 13 million tons of SO2 and over six million tons of NOx. Sulfur dioxide and NOx gas emissions from power plants form fine particles as they chemically convert in the atmosphere to form fine sulfate and nitrate particles. Power plants also emit fine carbon soot particles directly from their smokestacks, which may appear as a black plume leaving the stack. In 1999, power plants directly emitted nearly 300,000 tons of fine carbon soot particles.

6.    I read the following article in the Charlotte Observer (a local newspaper) on or about January 19th, 2008: http://www.charlotte.co m/409/sto ry/453069.html

"New coal plant could endanger our health"

LAWRENCE RAYMOND AND STEPHEN R. KEENER

*Lawrence Raymond, M.D., ScM, FCCP, is director of occupational/environmental medicine at Carolinas Medical Center. Stephen R. Keener, M.D., MPH, is medical director of the Mecklenburg County Health Department. They are members of the Medical Advisory Team of Carolinas Clean Air Coalition.*

*Duke Energy's proposed expansion of its Cliffside coal plant 50 miles west of Charlotte would exacerbate several serious problems that already threaten the health of Charlotte-area residents.  First, the draft air permit for the new coal plant would allow it to emit 296 pounds of mercury every year. Duke reported that the four very small old plants it plans to shut down emitted only approximately 28 pounds of mercury in 2005. Thus, the new coal plant would be permitted to emit over 10 times as much mercury as the four units being retired emitted. Mercury in the air settles into our water, where microorganisms change it into highly toxic methyl mercury, which then builds up -- bioaccumulates -- in fish, shellfish, animals and the people who eat them. It takes only a tiny amount of mercury to contaminate an entire lake.*

*Medical studies show that methyl mercury exposure, primarily through ingestion of contaminated fish, can cause severe central nervous system damage, as well as milder intellectual, motor and psycho-social impairments. The human fetus is particularly vulnerable and may develop irreversible lesions even if the pregnant mother shows no signs of toxicity. Children exposed prenatally to relatively low levels of methyl mercury perform less well in several cognitive tests.*

*Hundreds of miles of North Carolina rivers, lakes and coastlines are already listed as impaired under the federal Clean Water Act because their fish contain so much mercury. On Oct. 29, 2007, USA Today published a map showing Charlotte and the area around Cliff side as a mercury hotspot, with mercury levels over 10 times more than pre-industrial levels. Because mercury is so dangerous to unborn children, Duke should be required to use the best available mercury controls.*

*Particulate matter is another very dangerous pollutant produced by coal plants. Inhaling particulate matter can result in a wide range of adverse health effects, including asthma attacks, lung tissue damage, strokes, heart attacks and premature death. A report by the Clean Air Task Force in 2000 estimated that particulate matter from coal plants is responsible for nearly 24,000 deaths each year. The N.C. Division of Air Quality (DAQ) has chosen not to require Duke to reveal how much PM 2.5 -- the tiniest, deadliest particulate matter -- the proposed plant would emit. The Charlotte region's air is close to exceeding federal lim its on particulate matter already. Adding more particle pollution would make our increasingly dirty air even more dangerous to breathe.*

*Coal plants are also a major source of nitrous oxide -- a key component of ozone or smog. Our region's air quality already violates the EPA ozone standard, which is undergoing review because it doesn't go far enough to protect human health. Even under the current standard, we experienced 25 days of unhealthy air last summer.*

*Recently an official with the N.C. Division of Air Quality recommended a review of the plant's emissions of nitrous oxide and sulfur dioxide to ensure they won't significantly worsen the region's air quality. As our planet continues to warm, higher summertime temperatures will add to our ozone problems.*

*Finally, global climate change is accelerating much faster than the world's scientific community had previously predicted. The World Health Organization estimates that climate change is already causing more than 150,000 deaths annually across the globe; most of the dead are children in poorer countries. The America n public will also face increasing health risks from more frequent and severe heat waves, increasingly intense floods, droughts and hurricanes, and rising incidences of pest and waterborne diseases. By emitting over 6 million tons of carbon dioxide annually for the next 50 years, Cliffside would fuel climate change, with its devastating impacts for North Carolina and the world.*

*We realize the need for energy for our region, but it should not be produced at the expense of our human health and the spoiling of our natural resources and recreation areas.*

7.      I fully share the concerns raised by these experienced health care professionals. The concerns and issues they raise are precisely the type of real and direct impacts to me, my family, and especially my children, that the proposed expansion at Cliffside will likely result if allowed to procee d. I agreed to participate in this lawsuit because I do not think it is right that Duke Power should be allowed to create the se new and additional impacts to me and my family, or to the local environment in general. I worry for their health and well-being every day, especially owning property so close to the Cliffside power plant. I also do not feel it is right that our own federal government spurred the construction of this power plant with the nearly one billion dollars in tax credits from the 2005 Energy Bill that is the focus of this lawsuit as I understand it.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 3rd day of March 2008.

/s/ Roger Leeland Hawkins

LEXSEE 1995 U.S. DIST. LEXIS 18619

**CITIZEN'S ALERT REGARDING THE ENVIRONMENT, Plaintiff, v. UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS, and UNITED STATES DEPARTMENT OF COMMERCE, ECONOMIC DEVELOPMENT ADMINISTRATION, Defendant**

**Civil Action No. 95-1702 (GK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*1995 U.S. Dist. LEXIS 18619*

**December 8, 1995, Date
December 8, 1995, FILED**

**COUNSEL:** [*1] For plaintiff: Lynn Sfereazza & Robert G. Dreher, Washington, DC.

For defendant: Richard M. Hall, Marianne Sanders, Thomas L. Read & Russell Craig, Washington, DC.

**JUDGES:** Judge Gladys Kessler, U.S. District Court

**OPINION BY:** Gladys Kessler

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Citizen's Alert Regarding the Environment ("Citizen's Alert"), which is a non-profit conservation organization, seeks declaratory and injunctive relief pursuant to *Fed. R. Civ. P. 65(a)*. Plaintiff claims that such relief is necessary to (1) avert irreparable harm to plaintiff's interests and that of its members, and (2) protect the sensitive natural resources of Moosic Mountain. Plaintiff contends that the Bureau of Prisons ("BOP"), in its attempt to establish a site for a new minimum-security women's' prison, failed to (1) give serious consideration to using any of the many available sites in the Lackawanna Valley that had previously been mined or developed in accordance with land use planning recommendations of local agencies, (2) give due consideration in the Environmental Impact Statement ("EIS") to the impact on the environment caused by a related project (the building of a new business park), [*2] of which the prison is an integral part, and (3) consider adequately, in the EIS, the unique biological values of the Moosic Mountain site. In addition, Citizen's Alert claims that the Economic Development Administration of the Department of Commerce ("DOC") prepared only an Environ-

mental Assessment ("EA") in connection with its approval of federal economic assistance for the business park, rather than a comprehensive EIS. Plaintiff asserts that the actions of the BOP and DOC violate the National Environmental Policy Act of 1969, *42 U.S.C. Sections 4321 et seq.* ("NEPA"), NEPA's implementing regulations, and the Administrative Procedure Act, *5 U.S.C. Sections 551 et seq.* ("APA"). This matter is before the Court upon Plaintiff's Motion for Preliminary Injunction.

I. Factual Background

There are two nearly parallel mountain ranges that form a valley in the center of Lackawanna County, each of which extends in a southwest to northeast direction. The range of mountains forming the eastern boundary of the valley is known as the Moosic Mountains and the range forming the western boundary is known as West Mountains. Along the valley floor are abandoned industrial and mining sites, [*3] which offer the potential for productive redevelopment and reuse. Bounding the valley are green, undeveloped forested hillsides and mountaintops.

There are two proposed projects in Lackawanna County that are in dispute in this case. One is a business park, to be located on a 1,124-acre tract of land located on the forested ridgetop of the Moosic Mountains. The proposed business park will consist of 65 industrial sites and will employ over 5,000 people. The other project is a minimum security federal prison designed to house 512 female inmates. The current plan is to locate the prison on a 413-acre plot of land within the boundaries of the proposed business park. The site of the proposed business park is currently forested, with rare habitats likely to harbor a number of special plant and animal species. Declaration of Daniel S. Townsend ("Townsend Decl."),

Exh. 6, PP 7-10. Of particular note is the pitch pine/scrub oak dwarf-tree forest, which is listed in the Pennsylvania Atlas as one of four rare habitats in Pennsylvania out of nearly one hundred habitats which are classified. Id. at PP 3-5. The northeastern bulrush, a federally listed endangered plant species, is also likely to **[*4]** be found on the 1,124 acre site. Id. at P 9.

There is no utility service at the site. The wastewater collection system to be constructed will require a dedicated 10 to 12 inch diameter sewer line to be extended 5.7 miles to the Lackawanna River Basin Sewer Authority treatment plant. Federal Environmental Impact statement ("FEIS") at III-38, III-39. At the time the prison and industrial parks were sited, there was no road access to the project site. Construction of water lines, an access road, and a storm water management system has begun. Construction of a sewer line is imminent.

In 1992, the BOP announced its intention to build a low-security federal correctional institution in Lackawanna County, Pennsylvania. This announcement occurred at the same time that the Scranton Lackawanna Industrial Building Company ("SLIBCO"), the private development arm of the Greater Scranton Chamber of Commerce ("Chamber"), was searching for industrial development sites in Lackawanna County. In June of 1993, the Chamber announced its plans to build a new business park on the Moosic Mountain site.

It is clear that from the beginning there was close cooperation and collaboration between the BOP and **[*5]** the Chamber with respect to the business park and prison project. For instance, BOP insisted during discussions that it would only build its prison if it were given a minimum 250-acre site with full utilities for a cost of one dollar. FEIS Section VIII, Comments Upon Draft EIS, Document 47, at 10, 18, 23, 24, 29. The Chamber believed the BOP's requirements could be met within the Moosic Mountain site and that locating the prison on that site would make the park "more marketable." Id. at 45. The Chamber was clearly excited by the prospect of BOP collaboration: the Chamber's president, Austin Burke, conceded that the Chamber had chosen the Moosic Mountain site because the BOP had rated it "excellent" in June 1993. Id. at 4-5, 28. Further, Burke defended the Chamber's failure to adhere to the regional policy calling for preservation of ridgetop in siting its park, noting that "siting criteria for a federal prison rule out mined-areas . . . ." EA at Tab I (September 22, 1993 letter from Austin Burke to Rev. Joseph Quinn) at 2. Chamber officials were so certain that the BOP would choose the Moosic Mountain site that, before BOP began its environmental analysis under NEPA, Chamber officials **[*6]** termed the prison "a sure thing." Id. at 6, 12, 36.

SLIBCO entered into a loan agreement with the Lackawanna River Basin Sewer Authority ("LRBSA") in December 1993. FEIS, Section VIII, Document 47 at 6. The LRBSA, in turn, applied for a $ 4.5 million dollar loan in January 1994 from the Pennsylvania Infrastructure Investment Authority ("Pennvest"). Id. at 23. LRBSA made it clear that it would proceed with the loan only if the BOP was committed to the construction of the prison at the Moosic Mountain site. FEIS, Section VIII, Document 50 at 5.

In January 1994, SLIBCO applied to DOC for a $ 4.25 million grant to construct water lines, over two miles of access road, and a stormwater management system. SLIBCO's application acknowledged that this infrastructure would serve both the park and prison. EA, Tab B at 1. After SLIBCO received a grant of $ 2 million from the DOC in August of 1994, Burke candidly acknowledged that the "prison and park projects were used to justify approval of the EDA grant." FEIS, Section VIII, Document 47 at 24.

At a public hearing held on February 22, 1994, David Dorworth, Acting Chief of the Site Selection and Environmental Review Branch for the BOP, summarized **[*7]** the relationship between the Chamber and BOP: "The Chamber of Commerce and its industrial development arm SLIBCO is very much a partner with the BOP on this particular project." FEIS at Appendix A at 18. After many commitments and understandings had been reached among officials from BOP and the Chamber, the BOP began its NEPA process in February of 1994.

The DOC, on April 8, 1994, after completion of its review of the environmental impact of the business park, issued a six-page environmental assessment ("EA") and Finding of No Significant Impact ("FONSI"). The DOC determined that preparation of an EIS was not required for development of the business park as a whole--despite the fact that preparation of a full EIS was required for the prison project alone. The BOP had yet to begin work on that EIS. Clearly, the two agencies did not coordinate their efforts in evaluating environmental impacts.

On October 28, 1994, the BOP released a draft environmental impact statement ("DEIS") for the proposed prison project. Despite the inter-dependent nature of the prison and business park, the DEIS addressed the impact of the prison project only, ignoring the impact of the business park. The DEIS **[*8]** also cursorily mentioned only three alternative sites to the Moosic Mountain site, and compared the environmental impacts and societal benefits of the prison with only the mandatory "No Action" alternative, rather than with any or all of the alternative sites.

On February 8, 1995, Region III of the United States Environmental Protection Agency ("EPA") sent a letter

to the BOP stating that "environmental issues have not been adequately addressed in the DEIS . . . ." FEIS, Section VIII, Document 48, at 2. EPA asserted that the DEIS failed to address the relationship between the prison project and business park; failed adequately to analyze alternatives; lacked a discussion of secondary and cumulative impacts; failed to include important information regarding the ecological characteristics of the site; and failed to discuss conflicts with federal, state, regional, and local land use plans. Id. at 1-2.

The Department of Interior ("DOI") also found the DEIS inadequate. DOI claimed that because the prison project and business park were "linked", the cumulative impacts from the two projects should be considered. FEIS, Section VIII, Document 44, at 1-2. DOI further concluded that the "alternatives [*9] analysis" was incomplete and that the DEIS did not include a comprehensive survey of natural resources or wetlands. Id. at 2.

On June 9, 1995, the BOP released the *final* environmental impact statement ("FEIS") for the proposed prison project. EPA concluded that the FEIS was inadequate because it failed to correct the deficiencies cited in the DEIS, noting that "many of [EPA's] environmental concerns regarding the DEIS have not been adequately addressed in the FEIS." Exhibit 9, Letter to Dorworth, Federal BOP from Kramer, EPA Region III of July 7, 1995 ("EPA July 7, 1995 Letter") at 1.

EPA identified three central problems with the FEIS. First, EPA concluded that it does not address the impacts of the business park, stating that "since the Federal Prison Camp project is interdependent with the Business Park, we do not understand the failure of the DEIS and the FEIS to link the two projects." EPA July 7, 1995 Letter at 2.

Second, EPA determined that the alternative site analysis contained in the FEIS is virtually identical to that in the DEIS which the EPA had already found to be inadequate. EPA noted that "the FEIS still fails to adequately explain the issues and criteria for [*10] choosing a particular site over other options, and the document does not provide reasonable details as to why the alternatives that were eliminated from the study were not acceptable." EPA July 7, 1995 Letter at 1. [1]

> 1   In response to criticism over its failure to give fair consideration to sites with less impact on the pristine mountain ridge, the BOP stated that "the ability to provide a site to the Bureau at no cost, coupled with the need to ensure the provision of utility services to such a site, are critical factors in the site selection process and limit the universe of potential sites." FEIS VIII-27.

Third, EPA voiced concern that the FEIS failed to adequately address important environmental impacts resulting from the prison project. EPA noted that the FEIS fails to analyze the potential loss of rare vegetation such as pitch pine scrub oak/ridgetop dwarf-tree forest, which is indigenous to the area and is found on ridgetops along Moosic Mountain. This habitat is considered rare and deserving of protection. [*11] Townsend Decl. at PP 3-5. The FEIS does not even acknowledge that it may exist on the site. See FEIS, "Vegetation -- Project Site," at III-9 - III-11.

In addition to the deficiencies noted by the EPA, the BOP failed adequately to address secondary impacts, such as growth inducing effects and changes in land use patterns. EPA commented on these specific inadequacies of the DEIS:

> For this project, indirect effects include the industrial park, infrastructure improvement such as water, sewer, electric and gas lines, highway improvements, and other developments which may be stimulated by the presence of the prison camp. Included in this discussion should be potential development on the other side of Moosic Mountain that could result from extension of a sewer line to the county line near the top of the mountain. These impacts should be compared against existing conditions at the project site and compared against proposed land use plans.

FEIS, Section VIII, Document 48 at 4. There was little change on this point in the FEIS, as the EPA noted: "The secondary and cumulative impacts section of the FEIS is still inadequate, and the [BOP's] response to our comments on this [*12] issue regarding the DEIS missed the point on cumulative impacts completely." EPA July 7, 1995 Letter at 1.

On July 31, 1995, Kathleen M. Hawk, Director of the BOP, signed the Bureau's record of decision committing the agency to building the proposed prison at the Moosic Mountain site. At that stage in the proceedings, the Bureau's final decision removed any obstacle to full development of the Moosic Mountain site.

At this stage, there is some low-level construction proceeding on the first phase of the project. [2] There are also pending loan agreements between PennVest, the state agency involved in lending money for infrastructure development, and SLIBCO. Upon completion of this stage, the second phase will begin, which will involve much more extensive damage to the environment. It is with that potential damage in mind and the weighing of

competing interests that this Court issues this preliminary injunction.

2    According to SLIBCO, Phase I includes roadway work, sewer line and water main installation, stormwater management, underground telephone conduit installation and overhead power. EDA AR, ("SLIBCO Cost Estimate") at 809.

[*13]  II. Analysis

A. Standard for a Preliminary Injunction

To secure a preliminary injunction, plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) that other parties will not suffer substantial harm if temporary relief is granted; and (4) that the public interest will be furthered by the injunction. *Sea Containers Ltd. v. Stena AB, 281 U.S. App. D.C. 400, 890 F.2d 1205, 1208 (D.C. Cir. 1989).*

In granting a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Gambell, 480 U.S. 531, 542, 94 L. Ed. 2d 542, 107 S. Ct. 1396 (1987).* "A preliminary injunction is designed to prevent irreparable injury," *National Wildlife Federation v. Burford, 266 U.S. App. D.C. 241, 835 F.2d 305, 325 (D.C. Cir. 1987),* and to "maintain the status quo so that the relevant decision makers and the public may still have the opportunity to choose among alternatives, as NEPA requires." *Environmental Defense Fund v. Marsh, 651 [*14] F.2d 983, 1005 (D.D.C. 1981).*

B. Substantial Likelihood of Success on the Merits

This Court concludes that Plaintiff does have a substantial likelihood of prevailing on the merits because 1) BOP violated the National Environmental Policy Act by failing to issue a comprehensive EIS analysis and by failing to integrate the NEPA process into the planning of the prison project at the earliest possible time, 2) BOP arbitrarily segmented the overall project into two components, which led to an inadequate analysis of the overall, cumulative environmental impacts, and 3) the BOP and DOC failed to consider the direct and indirect effects of the projects.

1. BOP Violated the National Environmental Policy Act By Failing To Issue A Comprehensive EIS Analysis and Failing to Integrate the NEPA Process with Other Planning in the Early States of the Prison Project

The Supreme Court has observed that the policy goals of NEPA "are realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences . . . and that provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council, [*15] 490 U.S. 332, 350, 104 L. Ed. 2d 351, 109 S. Ct. 1835 (1989).* The primary "action forcing" mechanism allowing for such a hard look is the statutory requirement that, when contemplating a "major action," a federal agency must prepare an environmental impact statement.

The primary underlying purpose of NEPA is protection of the procedural integrity with which agencies consider environmental factors in the decision-making process. NEPA does not mandate particular substantive results. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 558, 55 L. Ed. 2d 460, 98 S. Ct. 1197 (1978).* The procedural provisions "establish a strict standard of compliance." *Sierra Club v. Watkins, 808 F. Supp. 852, 859 (D.C. Cir. 1971)* (citation omitted).

In particular, NEPA requires that an EIS include a detailed statement of the alternatives to the proposed action. *42 U.S.C. ß 4332(2)(c)(iii).* This statement of alternatives is the "heart of the environmental impact statement" and should "define the issues and provide a clear basis for choice among options by the decision-maker and the public." *40 C.F.R. ß 1502.14.* In order to present a clear basis for [*16] choice, agencies are required to "rigorously explore and objectively evaluate all reasonable alternatives . . . ." *40 C.F.R. ß 1502.14(a).*

The regulations of the Council on Environmental Quality ("CEQ"), which are binding on federal agencies, ³ emphasize that NEPA procedures "must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *40 C.F.R. ß 1500.1(b).* The CEQ regulations explicitly require agencies to "integrate the requirements of NEPA with other planning and environmental review procedures . . . ." 40 C.F.R. ß 15000.2(c). To accomplish this mandate, agencies are required to "integrate the NEPA process with other planning at the earliest possible time." Id. ß 1502.2.

3    The CEQ regulations are "applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act." *40 C.F.R. ß 1500.3.*

BOP violated both the spirit and the letter of these CEQ regulations [*17] and NEPA by giving only pro forma consideration to alternatives to the Moosic Mountain site, and then approving that site more than a year before even commencing the NEPA process. Given the Bureau's insistence on a site that was cost-free and its

close partnership in co-developing the Moosic Mountain site with the Scranton Chamber of Commerce, the Chamber's selection of the Moosic Mountain site made the location of the prison a fait accompli. Indeed, it is clear that development of the park could not proceed without its essential first tenant, the BOP.

There are three main reasons for reaching this conclusion. First, the BOP unnecessarily limited the alternative site search to tracts of land substantially larger than that needed to develop the prison project. Although the FEIS acknowledged that "the land required for actual construction would comprise only a small portion of the total 413-acre project site with much of the site remaining in its natural condition" (see FEIS at 3), the BOP failed to consider any smaller sites. Moreover, BOP's failure to give detailed consideration to any site other than Moosic Mountain appears to violate the region's strong policy in favor of reclaiming [*18] industrial sites and preserving undeveloped mountain ridges.

Second, the three alternatives the Bureau did address in the FEIS were summarily and arbitrarily dismissed without adequate explanation as to why the Moosic Mountain site was chosen instead. The BOP claimed that that the alternative sites were inadequate because 1) they had inadequate utility service and road access, and 2) mining activities had taken place at the sites in the past. However, the Moosic Mountain site itself lacked adequate utility service. [4] Further, the BOP rejected the alternative sites due to lack of adequate road access; yet development of the business park on the undeveloped and forested Moosic Mountain itself requires construction of over three miles of access roads.

4   For example, extension of sewer service alone will cost the Bureau $ 1.6 million, yet the Bureau dismissed the alternative sites without offering a side-by-side cost comparison of providing utility services to these sites, as required by law. See 40 C.F.R. ß 5102.14 (requiring EIS to "present the environmental impacts of the proposal and the alternatives in comparative form").

[*19] BOP's rejection of the three alternative sites due to past mining activities is equally problematic: the FEIS contains no factual information detailing any problems or additional costs the BOP may have experienced in prior prison construction on reclaimed sites. Moreover, the BOP concedes that it did not investigate the extent of the mining activities at the alternative sites, making cost predictions impossible. FEIS at II-8 - II-10. Given (1) the strong policy in the region favoring reclamation of existing mined and industrial sites and preservation of forested ridgetops in the Appalachian Mountains near Scranton, and (2) the interests of local regional planners in directing new development to vacant industrial or previously-mined sites in the valley (see, e.g., Plan for the Lackawanna Heritage Valley, Lackawanna Heritage Valley Steering Committee (April 1991), Exh. 4, Exh. 5 at 14), the BOP should have undertaken a more rigorous exploration of the feasibility and potential environmental benefits of reclaiming used sites. [5]

5   That the BOP did not consider local zoning policies or the potential societal benefits of reclaiming used sites is evidenced by its claim that it "does not have the resources available to reclaim sites and views the need to do so a local and state responsibility," FEIS VIII-32, and its declaration that "federal agencies are not subject to local/state planning." FEIS IV-21.

[*20] Third, there is ample evidence that the BOP had committed itself to the Moosic Mountain site as far back as June 1993, when the Chamber first announced its own selection of the site. See FEIS ß VIII, Comments Upon DEIS, Document 47 at 44. For example, the Chamber's Adjustment Strategy for Defense Conversion, dated June 1993, asserts that the BOP "has determined that the proposed Moosic Mountain development offers the area's only feasible prison site," EDA AR 601, and repeatedly refers to the close cooperation of the BOP in the site selection process. Id. 607, 609, 611. The Chamber's 1993 plan includes a timeline for the BOP's NEPA planning process showing, in advance, BOP's selection of the site in June 1993, and commencement of its EIS in August of 1993. Id. 636. Further, in January 1994, one month before the BOP's first public hearing which was supposed to initiate the NEPA process, the Chamber of Commerce's development arm, SLIBCO, asked the BOP to execute documents confirming to the DOC that, as the "primary beneficiary" of the proposed EDA grant, the BOP would comply with applicable employment policies and laws. BOP AR Section III, # 8. Those certifications were then executed [*21] by the Deputy Assistant Director, Administration Division, of the BOP. It is clear that, for all practical purposes, BOP had selected the Moosic Mountain site before it even began the NEPA process.

Thus, there is a substantial likelihood that Plaintiff will prove that selection of the Moosic Mountain site was a preordained conclusion, and that that conclusion led officials to engage in a superficial analysis of the environmental impact of, and possible alternatives to, the proposed projects.

2. Misguided Segmentation of the Projects

A central problem with Defendants' consideration of the environmental impacts of both the proposed business park and prison is the arbitrary segmentation of the overall project into two components, namely the park and the prison. The 1,100 acre business park received only cur-

sory attention from the Department of Commerce in a 6-page EA, while the proposed prison was the subject of a complete EIS, although with no attention paid to the impacts of the surrounding business park on the environment. Insofar as this segmentation led to a diminished and inadequate analysis of the overall environmental impacts on the sensitive resources of Moosic Mountain, **[*22]** it violated the mandates of NEPA.

Moreover, the EIS, which is required by the BOP's own regulations implementing NEPA, must encompass all "connected actions," which are defined by the Council on Environmental Quality's regulations as actions that "are closely related and therefore should be discussed in the same impact statement." *40 C.F.R. ß 1508.25.* Under the CEQ regulations, actions are connected if they (i) automatically trigger other actions which may require environmental impact statements, (ii) cannot or will not proceed unless other actions are taken previously or simultaneously, or (iii) are interdependent parts of a larger action and depend on the larger action for their justification. *40 C.F.R. ß 1508.25(a)(1).* The prison project and business park need only meet one of the three tests to qualify as "connected actions." [6]

> 6  See *Shoshone-Paiute Tribe v. U.S., 889 F. Supp. 1297, 1308 (D. Idaho 1994)*("the three subsections of the regulation [*40 C.F.R. ß 1508.25(a)(1)*] are to be read in the disjunctive, not the conjunctive").

**[*23]** The BOP made a clear commitment to siting the prison project within the business park. The BOP pledged $ 1.6 million of federal funds for sewer line construction to the business park, without which the business park could not be developed. See FEIS, Section VIII, Document 47 at 23. The BOP is also responsible for contributing $ 1.1 million for construction of the water line for the business park. See BOP AR Section V, # 4; Section IV, # 12 at Exh. 2. Conversely the Chamber's decision to develop the business park "automatically triggered" approval of the prison project because needed utility services would be supplied and the Bureau would obtain the land for free. See FEIA at II-15; FEIS VIII-27, 31, 32. In light of this essential economic interdependence, the conclusion is inescapable that the two projects are interdependently linked. Therefore, the impacts of the proposed prison project and the proposed business park must be considered in a single EIS. *40 C.F.R. ß 1508.25.*

Even if the two projects were not so plainly "connected," they would nonetheless constitute "cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts **[*24]** and should therefore be discussed in the same impact statement." *40 C.F.R. ß 1508.25(a)(2)*; see *Kleppe v. Sierra Club, 427 U.S. 390, 410, 49 L. Ed. 2d 576, 96 S. Ct. 2718*

*(1976)*("When several proposals . . . that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together.").

The two projects at the very least are "directly related to each other because of their . . . geographic proximity." *40 C.F.R. ß 1501.5(a).* The two projects' cumulatively significant impacts require single consideration in a single EIS. *40 C.F.R. ß 1508.25(a)(2).* Whether the prison project and business park are viewed as connected or cumulative actions, both projects must be, and should have been, considered together in one EIS. The failure of the BOP and the DOC to do so violated NEPA and deprived the public of any detailed, comprehensive look at the overall impacts of the combined project.

3. The Bureau and DOC/EDA Violated NEPA By Failing To Adequately Consider Environmental Impacts

NEPA requires an agency to consider both direct and indirect effects when evaluating the environmental **[*25]** impacts of a project. *40 C.F.R. ß 1508.8.* The BOP and DOC have failed to adequately address either.

Pitch pine/scrub oak dwarf tree forest is rare in the United States and is imperiled globally. Although found primarily in the Northeast, it is uncommon even in that region. Townsend Decl. at PP 5-6. Given that the ridge-top of Moosic Mountain contains pitch pine and scrub oak tree species, Id. P6; DEIS at III-10; FEIS at Appendix G, Wetland Delineation Report, Appendix A; EA at Tab 1 (Austin Burke letter), it stands to reason that these species are further imperiled by the continued development of the Moosic Mountain site. Additional direct effects of such effects include the destruction of other rare forms of vegetation found in this habitat, including the endangered Northern bulrush, slender mountain rice grass, threetooth cinquefile, and fly poison lily. Id. PP 7-9.

The DOC's EA disregards the fact that the dwarf forest is currently present on the site, that it would be destroyed by this project, and that it is rare and imperiled globally. The EA dismissed these concerns and merely noted that "the proposed project would eliminate much of the forest in the area, replacing it with **[*26]** buildings, roads, parking lots, and landscaped lawns." EA at 3. It went on to conclude summarily that "this loss of vegetation and wildlife habitat is not considered to be significant upon consideration of the vast acres of undeveloped forest surrounding the site." Id. The BOP's FEIS also did not acknowledge the existence of responsible scientific views that the rare dwarf forest exists on the site and will be damaged by the prison and business park. See FEIS Section VIII, Document 16. Neither the DOC nor the BOP addressed how many acres or what type of vegeta-

tion will be destroyed, what vegetation exists on surrounding lands, or how fragmentation of this habitat will ultimately effect viability of these plant species.

Indirect effects of the development include changes in land use patterns. *40 C.F.R. ß 1508.8.* As a result of the development of the prison project and business park, Moosic Mountain must be supplied with utility service and access roads. Thus, surrounding lands which previously were unlikely to be developed due to lack of infrastructure are now likely to be developed. The BOP failed to address these impacts. As noted by the EPA, the BOP's claim that the prison **[*27]** project is self-contained and has little potential to directly cause secondary impacts "misses the point on cumulative impacts completely." EPA July 7, 1995 Letter (Exh. 9). It seems clear that the BOP failed adequately to assess either the direct or indirect effects of the proposed project.

A related issue is DOC's failure to consider alternative sites for the proposed business park. The DOC's Environmental Assessment *("EA")* does not identify any alternative sites. Though the DOC makes passing reference to twelve alternative sites, its EA does not identify any of them nor does it give specific reasons explaining why previously mined sites cannot be developed in accordance with regional planning considerations. Thus, the EA does not satisfy the mandates of NEPA. (EA shall include a discussion of "alternatives as required by section 102(2)(E), [and] of the environmental impacts of the proposed action and alternatives." *40 C.F.R. ß 1508.9.*)

In light of (1) the BOP's failure to issue a comprehensive EIS analysis; (2) BOP's failure to integrate the NEPA process with other planning in the early stages of the project; (3) the failure of both BOP and DOC to engage in a hard look **[*28]** at the environmental consequences of, and alternatives to, the proposed action; and (4) the misguided segmentation of the projects, resulting in an inadequate environmental assessment of the proposed business park, the Court concludes that Plaintiff has demonstrated a substantial likelihood of success on the merits, thereby satisfying the first requirement for issuance of a preliminary injunction.

C. Irreparable Harm

For purposes of preliminary injunctive relief, plaintiffs bear the burden of proving that the injury they will suffer is "both certain and great; it must be actual and not theoretical." *Foundation Health Federal Services v. U.S., 1993 U.S. Dist. LEXIS 20069, *5, 1993 WL 738426 at 2 (D.D.C. 1993),* citing *Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n, 244 U.S. App. D.C. 349, 758 F.2d 669, 674 (D.C. Cir. 1985).* The plaintiffs must show that the "injury will be impossible to correct or redress after it occurs." Id. An injury is deemed to be "irrepara-

ble" if it cannot be undone through monetary remedies. *Deerfield Medical Center v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981).* Injuries in environmental cases are often effectively irreparable, for environmental disruption **[*29]** and damage can rarely be undone through monetary remedies. See *New Mexico v. Watkins, 297 U.S. App. D.C. 122, 969 F.2d 1122, 1137 (D.C. Cir. 1992)*("Money damages . . . would not be responsive to the environmental . . . concerns complainant raises."). The Supreme Court held, in *Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545, 94 L. Ed. 2d 542, 107 S. Ct. 1396 (1987),* that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often . . . irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."

The potential injury resulting from the imminent development of Moosic Mountain would clearly be irreparable. Hundreds of acres of rare vegetation are in danger of destruction; the view from the Valley would be permanently altered; and the present view of forested ridge-top would be eliminated, leaving behind a blighted landscape and forever degrading the aesthetic value of the mountain. The permanent clearing of forest, conversion of green space to buildings and paved surfaces, destruction of the view shed from the Lackawanna Valley, **[*30]** and the degradation of the groundwater would all constitute irreparable and substantial injury to the natural resources of the Moosic Mountain and to the plaintiff's members, who seek to protect and enjoy those resources in their current pristine condition.

D. Balance of Harms

The third requirement for issuance of a preliminary injunction is consideration of the harm to be suffered by others if temporary relief is granted, and a balancing of that harm against the need for injunctive relief.

This Court is well aware that the Lackawanna County area is severely economically distressed, with high unemployment and economic dislocation due to a decline in the manufacturing sector during the 1980s and cutbacks in the defense industry. The local Chamber of Commerce, DOC, and SLIBCO all have substantial interests in trying to revitalize the area economically and to stimulate new business. In particular, SLIBCO has a great stake in the outcome: it has purchased land, borrowed money from public and private sources, and expended its own funds on the first phase of the project.

In addition, BOP has a vital interest, given the conditions of severe overcrowding which exist in the federal **[*31]** prison system. This Court is keenly aware that there are inadequate facilities for women in the federal prison system and that there is a sorely felt need to build

new facilities in a timely manner. The BOP has determined that, given its mission to provide a safe, secure, and humane environment for the care, custody and control of Federal inmates, the Moosic Mountain site would meets its needs. See EDA AR, Exh. IV-F-8 at 208A. Given that determination, officials at the BOP have labored long and hard in their effort to bring this project to completion.

As serious as all these concerns are, the Court must also give due consideration to the permanent destruction of environmental values that, once lost, may never again be replicated. The prison project and business development will cause irreparable harm to those environmental values found in the natural resources of Moosic Mountain. See *National Wildlife Federation v. Marsh, 721 F.2d 767, 786 (11th Cir. 1983)*(where case involved threatened environmental injury, the court held that "failure to grant the injunction . . . will cause irreparable injury to the appellants which outweighs the threatened harm [monetary injury] to the **[*32]** appellees.").

After weighing the potential loss of revenue, jobs, and monetary investment, against the environmental values inherent in the Moosic Mountain, it is the judgment of this Court that a failure to grant the preliminary injunction would cause irreparable injury to the Plaintiffs and that that harm outweighs the threatened harm to Defendants. It is imperative that the Court ensure that the decisions of DOC and BOP to proceed with their projects comply fully with applicable law and be based on sound environmental information. Delay of the projects in order to determine whether their likely environmental impacts have been adequately evaluated will further serve this purpose.

E. Public Interest

In weighing whether to grant a preliminary injunction, the court must consider whether the public interest will be furthered. Undoubtedly, "there is a strong public interest in meticulous compliance with the law by public officials." *Fund for Animals v. Espy, 814 F. Supp. 142, 152 (D.D.C. 1993)*(issuing preliminary injunction in case of NEPA noncompliance). Such compliance is especially appropriate in light of the strong public policy expressed in the nation's environmental laws. **[*33]**

Where a plaintiff has demonstrated a likelihood of prevailing upon claims that a federal agency has failed to adequately consider environmental values pursuant to NEPA, the courts have found injunctive relief fully warranted to serve the strong public interest NEPA expresses. Our circuit has recently held:

"In most cases, . . . it is possible and reasonable for the courts to insist on strict compliance with NEPA, and actions can, consistently with the public interest, be enjoined until such compliance is forthcoming. . . . By maintaining the status quo, while additional environmental studies are performed, or additional alternatives are considered, an injunction ensures that there will be at least a 'possibility' that the agency will 'change its plans in ways of benefit to the environment. It is this possibility that courts should seek to preserve."

*State of Alaska v. Andrus, 188 U.S. App. D.C. 202, 580 F.2d 465, 485 (D.C. Cir. 1978)*, vacated in part on other grounds, *439 U.S. 922 (1978)*, quoting *Jones v. District of Columbia Redevelopment Land Agency, 162 U.S. App. D.C. 366, 499 F.2d 502, 513 (1974)*, cert. denied, *423 U.S. 937, 46 L. Ed. 2d 271,* **[*34]** *96 S. Ct. 299 (1975).* [7]

7   In considering the public interest NEPA expresses, this Court is mindful that "the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered. . . ." Wright, Miller & Kane, Federal Practice & Procedure, Civil 2d at ß 2948.1.

Issuance of a preliminary injunction here would thus directly serve the public interest by ensuring that federal agencies thoroughly consider the environmental consequences of their actions as mandated by NEPA. Preliminary injunctive relief will preserve the opportunity for the BOP and the DOC to thoroughly assess the effects of the business park and prison project and to consider alternatives that may have less impact on the sensitive resources of Moosic Mountain and Lackawanna County. [8]

8   The Court is hopeful that the mediation process that the parties to this action have begun will enable them to reach consensus on a solution that meets the needs of all individuals and entities concerned.

**[*35]** III. Conclusion

Upon review of Plaintiff's motion for preliminary injunction, Plaintiff's memorandum in support of that motion, its supporting declarations and exhibits, Defendant's opposition to the motion, and the pleadings in this action, and after careful consideration of the parties' contentions at oral argument, the Court finds that Plaintiff has demonstrated that entry of a preliminary injunction in this

matter is warranted and will further the public interest. The Court accordingly

ORDERS Defendants, their officers, agents, servants, employees, and those persons in active concert or participation with Defendants who receive actual notice of this Order, not to engage in construction, removal of vegetation, construction of utilities, roads, or other infrastructure, or other alteration of natural conditions in connection with the Federal Bureau of Prison's proposed minimum security prison camp on Moosic Mountain, or in connection with the proposed Moosic Mountain Business Park, or to assist in, provide funding for, or allow others subject to their control to engage in such construction, removal of vegetation, construction of utilities, roads, or other infrastructure, or [*36] site alteration, pending further order of this Court resolving the merits of Plaintiff's claims in this action. [9] Pursuant to *Fed. R. Civ. P. 65(c)*, Plaintiff shall be required to post security in the amount of $ 100.00. [10]

9   SLIBCO has voiced concerns about the entry of an order enjoining EDA from paying the sum of $ 338,632.32 to SLIBCO for work done by private contractors on the first phase of the MMBP development grant. The Plaintiff has argued that any funds due and owing to third-party contractors should be paid, first, from any existing funds available to SLIBCO, rather than from federal grant monies which would be disbursed in violation of federal environmental protection laws. The Court agrees with Plaintiff. Parties are free to move to modify the terms of the preliminary injunction, upon a detailed showing of inability to pay third-parties who have performed work and relied upon promises to pay.

10   *Fed. R. Civ. P. 65(c)* requires an applicant for preliminary relief to post security "in such sum as the court deems proper." "The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S.A. 569 F.2d 300, 303 (5th Cir. 1978)*. The federal courts have broadly recognized that nominal bond is sufficient and appropriate where public interest groups seek enforcement of environmental laws. See, e.g., *NRDC v. Morton, 337 F. Supp. 167, 169 (D.D.C. 1971)*, aff'd, *148 U.S. App. D.C. 5, 458 F.2d 827 (D.C. Cir. 1972)*(setting $ 100 bond for preliminary injunction against large offshore oil lease sale). Plaintiff in this case is a small, grass-roots citizens' organization, without substantial financial means. Accordingly, this Court imposes the nominal fee of $ 100.00.

[*37] 12/8/95

Date

U.S. District Court

Judge Gladys Kessler

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| APPALACHIAN VOICES and<br>THE CANARY COALITION,<br><br>    Plaintiffs,<br><br>    v.<br><br>SAMUEL W. BODMAN, in his official<br>capacity as Secretary of the United States<br>Department of Energy; HENRY M.<br>PAULSON, JR., in his official capacity as<br>Secretary of the United States Department of<br>the Treasury; VICTOR K. DER, in his official<br>capacity as Deputy Secretary for Clean Coal; and<br>JOSEPH GIOVE, III, in his official capacity<br>As Program Analyst for the Office of Clean<br>Energy Systems,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. _____ |

## ORDER (Plaintiffs' Proposed)

Upon consideration of the complaint, the briefs and oral argument, I find that: (1) Plaintiffs are likely to succeed on their claim that Defendants violated the National Environmental Policy Act by failing to assess the significant environmental impacts associated with the construction and operation of nine experimental coal-fueled power projects; (2) Plaintiffs will suffer irreparable injury in the absence of a preliminary injunction; (3) Defendants and others will not be substantially injured by a preliminary injunction; and (4) the public interest will be furthered by the injunction.

**THEREFORE, IT IS ORDERED THAT:**

1.    Defendants shall immediately suspend allocation of the 1.65 billion dollar tax credits created pursuant to Section 1307 of the Energy Policy Act of 2005.  Pub. L. No. 109-58 §§ 101–1840, 119 Stat. 593–1143 (2005);

2.      Defendants shall file the administrative record with this Court and all other parties no more than thirty (30) days after the date of this order;

3.      Plaintiffs shall file a motion for summary judgment, and memorandum of law in support thereof, no more than thirty (30) days after receiving the administrative record;

4.      Defendants shall file a response to Plaintiffs' motion for summary judgment no later than thirty (30) days after receiving said motion;

5.      Plaintiffs shall file a reply to Defendants' response no later than ten (10) days following receipt of said response; and

6.      Oral argument regarding Plaintiffs motion for summary judgment shall be conducted no more than thirty (30) days following the filing of Plaintiffs' reply.


**Date**: _____, 2008.



_____
**District Court Judge**




**Certificate of Service**

I hereby certify that on 03 March 2008, a copy of the foregoing was hand-delivered to the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

_/s/ Scott Gollwitzer_
Scott Gollwitzer