UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| APPALACHIAN VOICES and<br>THE CANARY COALITION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SAMUEL W. BODMAN, in his official | ) | |
| capacity as Secretary of the United States | ) | No. 1:08-cv-00380-RMU |
| Department of Energy; HENRY M. | ) | |
| PAULSON, JR., in his official capacity as | ) | |
| Secretary of the United States Department | ) | |
| of the Treasury; VICTOR K. DER, in his | ) | |
| official capacity as Deputy Secretary for | ) | |
| Clean Coal; and JOSEPH GLOVE, III, in | ) | |
| his official capacity as Program Analyst for | ) | |
| the Office of Clean Energy Systems, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' APPLICATION
FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      I.      Requirements for Preliminary Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . 7

      II.     National Environmental Policy Act (NEPA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      III.    APA Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      I.      Plaintiffs Cannot Show a Likelihood of Success on the Merits . . . . . . . . . . . . . 11

            A.     Plaintiffs Lack Article III Standing to Bring this Lawsuit . . . . . . . . . . . 11

                   1.     Plaintiffs' Alleged Environmental and Procedural Injuries do not Meet the Injury-in-Fact Requirement for Standing . . . . . 12

                   2.     The Environmental Injuries Alleged by Plaintiffs Cannot be Fairly Traced to the Challenged Agency Action . . . . . . . . . . . . . 16

                   3.     A Favorable Decision Would not Redress the Injuries that Plaintiffs Assert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            B.     The Allocation of Tax Credits is not a "Major Federal Action" Triggering a NEPA Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

                   1.     IRS' Administration of the Tax Credit Programs is not a "Major Federal Action" because it is Done Pursuant to a Congressional Mandate and Cannot be Meaningfully Informed by a NEPA Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                   2.     The Allocation of Tax Credits is not Sufficient to "Federalize" the Projects so as to Require a NEPA Analysis . . . . . . . . . . . . . . 28

i

II.     The Balance of Injuries Weighs in Favor of Defendants . . . . . . . . . . . . . . . . . . . 32

      A.     No Irreparable Injury Will Result if Plaintiffs' Requested Injunctive
           Relief is Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

           1.     The Harm that Plaintiffs' Assert is Remote, Speculative,
               and not Tied to the Agency Action that Plaintiffs Seek
               to Enjoin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

           2.     Plaintiffs' 15-month Delay in Filing its Emergency Motion is
               Further Evidence That There is No Emergency Here . . . . . . . . 34

      B.     An Injunction Would Harm Defendants and Be Contrary to the Public
           Interest Because it Would Halt the Administration of an Important,
           Congressionally-Mandated Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

<u>**TABLE OF AUTHORITIES**</u>

**FEDERAL CASES**

Albuquerque v. Barnhart,
    906 F.2d 1477 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Allen v. Wright,
    468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 16, 17, 19

Alliance for Bio-Integrity v. Shalala,
    116 F. Supp. 2d 166 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Amoco Production Co. v. Village of Gambell,
    480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Atlanta Coal. on the Transp. Crisis  v. Atlanta Regional Comm'n,
    599 F.2d 1333 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Baltimore Gas & Electric Co. v. Natural Res. Def. Council,
    462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bob Jones University v. Simon,
    416 U.S. 725 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

California Forestry Ass'n v. Thomas,
    936 F. Supp. 13 (D.D.C. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Camp v. Pitts,
    411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Chaplaincy of Full Gospel Churches v. England,
    454 F.3d 290 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

Chemical Weapons Working Group, Inc. v. United States Department of the Army,
    963 F. Supp.1083 (D. Utah 1997)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Citizens Against Rails-to-Trails v. Surface Transp. Bd.,
    267 F.3d 1144 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 23

Community for Creative Non-Violence v. Pierce,
    814 F.2d 663 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Dellums v. U.S. Nuclear Regulatory Comm'n,
    863 F.2d 968 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Dep't of Transp. v. Pub. Citizen,
    541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 21, 25

Di Vosta Rentals, Inc. v. Lee,
    488 F.2d 674 (5th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Environmental Rights Coalition v. Austin,
    780 F. Supp. 584 (S.D. Ind. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Flint Ridge Development Co. v. Scenic Rivers Ass'n,
    426 U.S. 776 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Florida Audubon Soc'y v. Bentsen,
    94 F.3d 658 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 14, 16-18, 36

Florida Power & Light Co. v. Lorion,
    470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Freedom Republicans, Inc. v. Fed. Election Comm'n,
    13 F.3d 412 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Friends of the Earth, Inc. v. Coleman,
    518 F.2d 323 (9th Cir.1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Fund for Animals v. Frizzell,
    530 F.2d 982 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 35

Fund For Animals v. Norton,
    281 F. Supp. 2d 209 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Fund for Animals, Inc. v. Lujan,
    962 F.2d 1391 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Grand Council of the Crees v. FERC,
    198 F.3d 950 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Granny Goose Foods, Inc. v. Brotherhood of Teamsters,
    415 U.S. 423 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Hibbs v. Winn,
    542 U.S. 88 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

International Center for Technology Assessment v. Thompson,
421 F. Supp. 2d 1 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ka Makani 'O Kohala Ohana, Inc. v. Water Supply,
295 F.3d 955 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Lujan v. Nat'l Wildlife Fed'n,
497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 14, 16

Lydo Enters. v. City of Las Vegas,
745 F.2d 1211 (9th Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Macht v. Skinner,
916 F.2d 13 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Marsh v. Oregon Natural Res. Council,
490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Nat'l Ass'n of Property Owners v. U.S.,
499 F.Supp. 1223 (D. Minn. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Pacific Legal Foundation v. Andrus,
657 F.2d 829 (6th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Piedmont Heights Civic Club v. Moreland,
637 F.2d 430 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Professional Plant Growers Association v. U. S. Dept. of Agriculture,
879 F. Supp. 130 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel,
872 F.2d 75 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

Rattlesnake Coalition v. E.P.A.,
509 F.3d 1095 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Save Barton Creek Ass'n v. Fed. Highway Admin.,
950 F.2d 1129 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

v

Save the Bay, Inc. v. U.S. Army Corps of Engineers,
    610 F.2d 322 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Scott-Blanton v. Universal City Studios Productions LLLP,
    495 F. Supp. 2d 74 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Sierra Club v. Babbitt,
    65 F.3d 1502 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Sierra Club v. Babbitt,
    69 F. Supp. 2d 1202 (E.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Simon v. Eastern Kentucky Welfare Rights Organization,
    426 U.S. 26 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

South Dakota v. Andrus,
    614 F.2d 1190 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

St. John's United Church of Christ v. FAA,
    No. 06-1386, __F.3d__, 2008 WL 746526 (D.C. Cir. March 21, 2008) . . . . . . . . . . . . 20

Texas Committee on Natural Resources v. Bergland,
    573 F.2d 201 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Tulare County v. Bush,
    306 F.3d 1138 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,
    454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Vill. of Bensenville v. FAA,
    457 F.3d 52 (D.C. Cir. 2006)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 31

Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,
    559 F. 2d 841 (D. C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Weinberger v. Romero-Barcelo,
    456 U.S. 305 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Winnebago Tribe of Nebraska v. Ray,
    621 F. 2d 269 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Wisconsin Gas Co. v. FERC,
    758 F. 2d 669 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Yakus v. U.S.,
    321 U.S. 414 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**FEDERAL STATUTES**

5 U.S.C. §§ 701-06 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

26 U.S.C. § 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

26 U.S.C. § 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*26 U.S.C. § 48A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*26 U.S.C. § 48B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

26 U.S.C. § 7421 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. § 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 22

Pub. L. 109-58, 119 Stat. 594 (August 8, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 26

**FEDERAL REGULATIONS**

10 C.F.R. § 1021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

40 C.F.R. § 1500.4(p) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 1501.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 1501.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

40 C.F.R. § 1502.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 1506.10(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

40 C.F.R. § 1508.18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 29

## TABLE OF EXHIBITS

| | |
|---|---|
| Ex. 1 | IRS Not 2006-24 "Qualifying Advanced Coal Project Program," 2006 WL 401622 (published March 13, 2006) |
| Ex. 2 | IRS Not 2006-25, "Qualifying Gasification Project Program," 2006 WL 401623 (published March 13, 2006) |
| Ex. 3 | Department of Energy, Press Release dated November 30, 2006, and Fact Sheet: Clean Coal Technology Ushers In New Era in Energy<br><br>Internal Revenue Service, Press Release dated November 30, 2006 |
| Ex. 4 | IRS Not 2008-26 "Qualifying Advanced Coal Project Program–Special Allocation Round," 2008 WL 375455 (published March 3, 2008) |
| Ex. 5 | Tampa Electric, Press Release dated October 4, 2007 |
| Ex. 6 | N.C. Utilities Comm'n Docket No. E-7, Sub 790, Duke Energy Carolinas' Advanced Clean Coal Cliffside Unit 6 Cost Estimate Report dated Feb. 29, 2008 |
| Ex. 7 | N.C. Utilities Comm'n , Order Granting Certificate of Public Convenience and Necessity with Conditions (March 21, 2007) |
| Ex. 8 | St. John's United Church of Christ v. FAA, No. 06-1386, __F.3d__, 2008 WL 746526 (D.C. Cir. March 21, 2008) |
| Ex. 9 | Treasury Directive 75-02 dated Sept. 25, 1990 |

**Introduction**

In November 2006, pursuant to Congress' mandate in the Energy Policy Act of 2005 ("EPAct"), the Department of Treasury ("Treasury") allocated tax credits to nine clean coal projects. Fifteen months later, Plaintiffs filed a Complaint and simultaneously moved for a preliminary injunction. Docket No. 1, 3. Plaintiffs argue that Treasury and the Department of Energy ("DOE") should have prepared an environmental analysis of the nine projects under the National Environmental Policy Act ("NEPA") before allocating the tax credits for investment in clean coal technology. In moving to enjoin the administration of the Internal Revenue Code ("IRC"), Plaintiffs seek extraordinary relief. Plaintiffs have not met their burden of showing that they are likely to succeed on the merits or that they will suffer irreparable harm absent a preliminary injunction.

Plaintiffs are unlikely to succeed on the merits because this Court lacks jurisdiction over their claim. Plaintiffs cannot demonstrate Article III standing because they cannot show a concrete injury to their particularized interests that is fairly traceable to the allocation of the tax credits. The generalized environmental harms alleged by Plaintiffs from the proposed clean coal projects are speculative, uncertain, and based on the acts of third parties not before this Court. As such, the alleged injury would not be redressed through the permanent relief sought, an injunction against allocation of the tax credits and preparation of a NEPA analysis. Even if they could establish standing, the Court lacks jurisdiction because Plaintiffs have not challenged a "major federal action" triggering NEPA. The Internal Revenue Service ("IRS") must allocate tax credits in accordance with the technical statutory requirements, mandated by Congress. In directing the establishment of the challenged tax credit programs, Congress set particular

performance requirements and gave priority to projects with benefits such as greenhouse gas capture capability and increased by-product utilization.  The IRS cannot withhold the tax credits if there are applicants that meet the statutory requirements nor can it disregard the criteria provided by Congress in favor of alternative criteria.  Because Defendants lack the discretion to perform a meaningful NEPA analysis of the impacts from or alternatives to allocating the tax credits, their administration of the tax credit programs is not a "major federal action" triggering NEPA.  For these reasons, among others, Plaintiffs are unlikely to succeed on the merits.

The balance of harms also weighs against the issuance of a preliminary injunction.  On one side of the balance are Congressionally-mandated tax programs, established to encourage investment in advanced clean coal projects.  Only projects that are designed to meet certain performance characteristics, such as reduced levels of emissions, and that receive the requisite environmental authorizations can claim the tax credit.  On the other side of the balance is Plaintiffs' speculative assertion that at some point well into the future one of the proposed clean coal projects, Duke Energy's proposed Cliffside project, will cause them environmental harm.  Because the proposed project is not expected to be operational for approximately four years, this alleged harm is not of such imminence to warrant emergency relief.  Moreover, the preliminary injunction sought by Plaintiffs – against the allocation of tax credits – would not prevent the clean coal project from moving forward.  In short, Plaintiffs have not shown they will suffer any irreparable harm.  Accordingly, Defendants respectfully request that this Court deny Plaintiffs' application for preliminary injunction.

## Factual Background

As part of EPAct, Congress mandated the allocation of tax credits for investment in clean coal facilities.  See Pub. L. 109-58 at § 1307, 119 Stat. 594 at 999-1006 (August 8, 2005).

EPAct Section 1307 amended the Internal Revenue Code ("IRC") to add two new investment tax credits:  the qualifying advanced coal project credit and the qualifying gasification project credit (collectively, the "tax credit programs").   See id.  The tax credit programs are codified at IRC Section 48A (Qualifying Advanced Coal Project Program ) and IRC Section 48B (Qualifying Gasification Project Program ).  See 26 U.S.C. §§ 48A -48B.

Through EPAct Section 1307, Congress authorized $800 million of tax credits for qualifying advanced coal projects using an integrated gasification combined cycle ("IGCC")[1]/; $500 million of tax credits for projects that use other advanced coal-based generation technologies; and $350 million of tax credits for qualifying gasification projects.  See 26 U.S.C. § 48A(d)(3)(B)(i)-(ii); id. at § 48B(d)(1).  For qualifying advanced coal projects using IGCC and qualifying gasification projects, the credit for a taxable year is 20 percent of the qualified investment.  See 26 U.S.C. § 48A(a)(1); id. at § 48B(a).  For qualifying advanced coal projects that do not use IGCC, the credit for a taxable year is 15 percent of the qualified investment.  See 26 U.S.C. § 48A(a)(2).  The qualified investment is the tax basis of eligible property placed into service by the taxpayer during the taxable year which is part of a qualifying project.  See 26 U.S.C. § 48A(b)(1); id. at § 48B(b)(1).  Although a taxpayer may not claim the credit for a qualifying project until the taxable year in which the eligible property is placed into service, a taxpayer may elect to claim an investment credit on qualified progress expenditures, prior to

---

[1]/     The credits for IGCC projects are further allocated in relatively equal amounts among: (1) projects using bituminous coal as a primary feedstock, (2) projects using subbituminous coal as a primary feedstock, and (3) projects using lignite as a primary feedstock.  26 U.S.C. § 48A(e)(3)(A).  In addition, in determining which IGCC projects to certify, Congress directed that Treasury give high priority to projects that it determines include greenhouse gas capture capability, increased by-product utilization, and other benefits.  Id. at § 48A(e)(3)(B).

completing the qualified project.  <u>See</u> 26 U.S.C. § 48A(b)(1), (3); <u>id.</u> at § 48B(b)(1); <u>see also</u> IRS

Not 2006-24 at § 9; IRS Not 2006-25 at § 8.  If a taxpayer makes the qualified progress

expenditures election, but subsequently fails to satisfy the certification requirements or place the

project into service within the required time period, described below, the credit will be subject to

recapture.  <u>See</u> IRS Not 2006-24 at § 9.04; IRS Not 2006-25 at § 8.04.

     To administer the tax credit programs, Congress mandated that the Secretary of

Treasury, in consultation with the Secretary of Energy, "establish a qualifying advanced coal

project program for the deployment of advanced coal-based generation technologies" and

"establish a qualifying gasification project program" for investment in qualifying gasification

projects.  26 U.S.C. § 48A(d)(1); <u>id.</u> at § 48B(d)(1).  Congress required that the programs be

established "[n]ot later than 180 days after the date of the enactment" of Section 1307.  26

U.S.C. § 48A(d)(1); <u>id.</u> at § 48B(d)(1).

     On February 22, 2006, the IRS issued two notices establishing the programs and

explaining the procedures for credit allocations.  <u>See</u> IRS Not 2006-24 "Qualifying Advanced

Coal Project Program," 2006 WL 401622 (published March 13, 2006); IRS Not 2006-25,

"Qualifying Gasification Project Program," 2006 WL 401623 (published March 13, 2006)

(attached as Ex. 1 and 2, respectively).  Pursuant to these procedures, tax credits will be

allocated to projects through annual allocation rounds, until the aggregate credits are fully

allocated.  <u>See, e.g.,</u> IRS Not 2006-24 at §§ 4.01, 4.02(5).  Plaintiffs' lawsuit is focused on the

nine projects for which the IRS allocated tax credits during the initial allocation round,

conducted in 2006.²/  See, e.g., Docket No. 1, Pls.' Compl. at ¶ 1 and "Prayer for Relief."

    As a consulting agency under the statute, DOE assisted IRS in its administration of the tax credit program by reviewing applications to determine which proposed projects meet the statutory requirements of the tax credit program and are technically and economically feasible. DOE evaluated each application and "if the project [was] determined to be feasible and consistent with energy policy goals" established by Congress, the agency then provided a "DOE certification" for the project to the IRS.  IRS Not 2006-24 at § 4.02(9); IRS Not 2006-25 at § 4.02(8).  Upon review of DOE's certification and within 60 days of submission of the applications, the IRS was required to accept or reject the applications.  See IRS Not 2006-24 at § 4.02(10); IRS Not 2006-25 at § 4.02(9) see also 26 U.S.C. § 48A(d)(2)(C) (requiring a decision be made within 60 days).

    For the 2006 allocation round, taxpayers were required to submit applications to IRS by October 2, 2006.³/  On November 30, 2006, Defendants announced that nine projects had been accepted in the first allocation round and $1 billion of tax credits had been allocated to those projects.  See DOE, Press Release dated November 30, 2006, and Fact Sheet, available at http://www.doe.gov/news/4495.htm (last visited  March 24, 2008); IRS, Press Release dated November 30, 2006, available at http://www.irs.gov/newsroom/article/0,,id=164595,00.html

---

²/     The IRS has since issued Notices setting forth procedures for subsequent allocation rounds.  See IRS Not 2007-52 "Qualifying Advanced Coal Project Program," 2007 WL 1636958 (published June 25, 2007); IRS Not 2007-53, "Qualifying Gasification Project Program," 2007 WL 1636967 (published June 25, 2007).

³/     Applications received before October 3, 2006, were deemed to be submitted by the taxpayer on October 2, 2006.  IRS Not 2006-24 at § 4.02(8); IRS Not 2006-25 at § 4.02(7).  The information that taxpayers were required to submit in their applications is detailed in the IRS Notices.  See IRS Not 2006-24 at § 5.02-5.03, App. B; IRS Not 2006-25 § 5.02-5.03, App. B.

(last visited March 24, 2008) (attached as Ex. 3).  Only one of the projects is located in North Carolina – the Duke Energy Cliffside Modernization Project ("Cliffside").  Id.

Following receipt of an acceptance letter, the taxpayer must execute a closing agreement with the IRS.  See IRS Not 2006-24 at § 4.02(11); IRS Not 2006-25 at § 4.02(11).  Then, for a qualifying gasification project under Section 48B, the taxpayer has seven years from the date of the acceptance letter to place the project into service.  IRS Not 2006-25 at § 4.02(10).  If the project is not placed in service by the end of that period, then the acceptance letter is void.  Id.

For a qualifying advanced coal project under Section 48A, the taxpayer has two years to submit evidence that additional criteria – set forth in Section 48A(e)(2) – have been met.  IRS Not 2006-24 at § 6.02; see 26 U.S.C. § 48A(e)(2).  These criteria include a determination that "the applicant for certification has received all Federal and State environmental authorizations or reviews necessary to commence construction of the project."  See 26 U.S.C. § 48A(e)(2)(A).  The IRS will then decide whether or not to certify the project and will notify the taxpayer, by letter, of that decision.  Id. at § 48A(e)(2); IRS Not 2006-24 at § 6.03.  A taxpayer that receives a certification for a qualifying advanced coal project then has five years from the date of certification to place the project into service.  26 U.S.C. § 48A(d)(2)(E); IRS Not 2006-24 at § 6.01.  If the project is not placed in service by the end of that period, then the certification is void.  IRS Not 2006-24 at § 6.01.

Although an acceptance letter will allocate tax credit to a particular project, an acceptance, allocation, or certification is not a determination that a project qualifies for the tax credit.  See IRS Not 2006-24 at § 7.03; IRS Not 2006-25 at § 6.03.  There are many events that may occur after the IRS' allocation of tax credit to a particular project that will result in the tax

credit being reduced or forfeited in relation to that project.  For example, a taxpayer may decide

not to pursue the project for which it has been awarded a tax credit.  In fact, one taxpayer that

was awarded a Section 48A tax credit in 2006 for an IGCC project using bituminous coal has

decided to terminate its project.[4]/  See Tampa Electric, Press Release dated October 4, 2007,

available at http://www.tampaelectric.com/news/article/index.cfm?article=430 (last visited

March 24, 2008) (attached as Ex. 5).  A taxpayer that does not place its project into service

within the prescribed period of time, described above, will forfeit the tax credit.  See generally

IRS Not 2006-24 at App. A; IRS Not 2006-25 at App. A (closing agreements including terms

related to forfeiture and reduction of credit).  In addition, advanced coal projects that do not

receive certification, which requires the taxpayer receive all environmental approvals necessary

to begin construction, will also forfeit the tax credit.  IRS Not 2006-24 at App. A; see also IRS

Not 2006-24 at § 4.02(11); IRS Not 2006-25 at § 4.02(11) (explaining that if closing agreement

requirements are not followed, a project's credit may be forfeited or subject to recapture).

<u>**Legal Background**</u>

**I.     Requirements for Preliminary Injunctive Relief**

A preliminary injunction is an extraordinary remedy for which the plaintiff bears the

burden of proving the prerequisites by clear and convincing evidence.  Granny Goose Foods,

Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 441 (1974); Fund for Animals v. Frizzell, 530

F.2d 982, 986 (D.C. Cir. 1976).  In order to obtain this extraordinary remedy, Plaintiffs bear the

---

[4]/      In early 2008, IRS announced that $133.5 million of credit was available for allocation
for IGCC projects using bituminous coal as primary feedstock and that a special round of credit
allocation would be held for that credit.  See IRS Not 2008-26 "Qualifying Advanced Coal
Project Program–Special Allocation Round," 2008 WL 375455 (published March 3, 2008)
(attached as Ex. 4).

burden of proving: (1) that they have a substantial likelihood of success on the merits of their claims; (2) that irreparable injury will result unless injunctive relief is provided; (3) that the threatened irreparable injury to plaintiffs outweighs the threatened harm that an injunction will cause defendants or third parties; and (4) that the issuance of a preliminary injunction is in the public interest.  Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F. 2d 841, 843 (D. C. Cir. 1977); Professional Plant Growers Association v. U. S. Dept. of Agriculture, 879 F. Supp. 130, 131 (D.D.C. 1995) (citing Randolph-Sheppard Vendors of America v. Weinberger, 795 F. 2d 90, 110 (D.C. Cir. 1986)).

     Mere threatened, speculative harm, without more, does not amount to irreparable injury for the purposes of justifying preliminary injunctive relief.  Wisconsin Gas Co. v. FERC, 758 F. 2d 669, 674 (D.C. Cir. 1985) (movants must show that irreparable injury is "both certain and great; it must be actual and not theoretical").  Furthermore, a claim that an environmental statute has been violated is insufficient to justify injunctive relief unless the plaintiff can also demonstrate irreparable harm will result from the alleged violation.  See Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545 (1987) (finding the environment can be "fully protected" without the presumption that irreparable damage occurs when an agency fails to evaluate thoroughly the environmental impact of a proposed action);  Sierra Club v. Babbitt, 69 F. Supp. 2d 1202, 1259 (E.D. Cal. 1999) (violation of NEPA did not justify grant of preliminary injunction where irreparable injury was not indicated).   Similarly, there is no presumption that, when balancing the hardships to the parties, environmental harm should presumptively outweigh other harm to the public interest.  See Chemical Weapons Working Group, Inc. v. United States Department of the Army, 963 F. Supp.1083, 1097 (D. Utah 1997).

II.    **National Environmental Policy Act ("NEPA")**

NEPA is a procedural statute; it does not mandate a particular substantive result. Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 558 (1978); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989). NEPA requires agencies to prepare an EIS to be included in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C); see 40 C.F.R. § 1502.3. The two main goals of the EIS requirement are to inject environmental considerations into the federal agency's decision-making process and to inform the public that the federal agency has considered environmental concerns. See Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 768 (2004); Citizens Against Rails-to-Trails v. Surface Transp. Bd., 267 F.3d 1144, 1151 (D.C. Cir. 2001).

The regulations implementing NEPA establish procedures to assist agencies in determining whether an EIS is required. An agency may conduct a preliminary examination of the proposed action, called an environmental assessment ("EA"), to determine whether a proposed action will have significant environmental impacts such that an EIS is required. 40 C.F.R. §§ 1501.4, 1508.9. In addition, the NEPA regulations direct agencies to identify classes of actions, referred to as "categorical exclusions" ("CE"), that normally "do not individually or cumulatively have a significant effect on the human environment" and are therefore excluded from the requirement of preparing an EA or an EIS. Id. at 1507.3(b)(2), 1508.4. The use of CEs avoids unnecessary documentation of minor effects in EAs and allows agencies to focus their environmental review efforts on major actions that will have significant effects and which are the primary focus of NEPA. See 40 C.F.R. § 1500.4(p).

9

NEPA does not apply to every activity by a federal agency. Where an agency's action is merely ministerial and the agency lacks discretion to affect the outcome of its actions, there is no "major federal action" triggering NEPA. See Citizens Against Rails-to-Trails, 267 F.3d at 1151 (observing that in such a situation, "the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable").

## III.    APA Standard of Review

Because NEPA does not provide a private right of action, judicial review of a NEPA claim is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990); Tulare County v. Bush, 306 F.3d 1138, 1143 (D.C. Cir. 2002). The APA imposes a narrow and highly deferential standard of review limited to a determination of whether the federal agencies acted in a manner that was arbitrary, capricious, an abuse of discretion or contrary to law. 5 U.S.C. § 706(2)(A); Marsh, 490 U.S. at 378.

The role of a court in reviewing agency decision making is limited. A reviewing court "is not to determine the correctness, in some ultimate sense, of an agency's actions" but "is limited to determining only the legality of the challenged action." Di Vosta Rentals, Inc. v. Lee, 488 F.2d 674, 678 (5th Cir. 1973), cert. denied, 416 U.S. 984 (1974) (emphasis in original). In short, a reviewing court may not substitute its own judgment for that of the agency. Vermont Yankee, 435 U.S. at 555. A court is only to assess whether the agency's decision is "within the bounds of reasoned decision making." Baltimore Gas & Electric Co. v. Natural Res. Def. Council, 462 U.S. 87, 105 (1983). The scope of judicial review is limited to the administrative record before the decision-maker, and the administrative decision is entitled to a presumption of

validity.  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985); Camp v. Pitts, 411

U.S. 138, 142 (1973).

**Argument**

**I.    Plaintiffs Cannot Show a Likelihood of Success on the Merits.**

   **A.    Plaintiffs lack Article III standing to bring this lawsuit.**

   Article III of the Constitution limits federal courts' jurisdiction to actual "cases" and

"controversies."  A core component of the case-or-controversy inquiry is the doctrine of

standing.  Allen v. Wright, 468 U.S. 737, 751 (1984).  Therefore, "a showing of standing 'is an

essential and unchanging' predicate to any exercise of . . . jurisdiction."  Florida Audubon Soc'y

v. Bentsen, 94 F.3d 658, 667 (D.C. Cir. 1996) (en banc) (citing Lujan v. Defenders of Wildlife,

504 U.S. 555, 560 (1992)).  To establish Article III standing, a plaintiff must show: (1) that it has

suffered an "injury in fact" – an "invasion of a legally-protected interest which is concrete and

particularized, and actual or imminent, not conjectural or hypothetical;" (2) that its injury is

fairly traceable to the challenged action of the defendant and not the result of the "independent

action of some third party not before the court;" and (3) that it is "'likely' as opposed to merely

'speculative'" that the plaintiff's injury will be "'redressed by a favorable decision.'"  See Lujan,

504 U.S. at 560-62 (citations omitted).  Plaintiffs bear the burden of demonstrating that the

standing requirements have been satisfied.  Id. at 561 ("The party invoking federal jurisdiction

bears the burden of establishing these elements.").  Plaintiffs are unlikely to succeed on the

merits because they cannot satisfy the standing requirements.

   Plaintiffs argue that the Defendants violated NEPA by failing to conduct appropriate

environmental analyses for the allocation of tax credit made by the IRS to nine clean coal

11

projects.  E.g., Pls.' PI Mem. at 1.  Plaintiffs then claim that one of the projects will cause

environmental impacts, such as air pollution, which in turn will cause adverse health impacts.

Id. at 4-10.  Plaintiffs assert that they have members who live near one of the proposed clean

coal units, and also have members that live near mines that may be used to obtain coal for the

unit.  Id. at 13-14.  This attenuated link between the tax credit and speculative, generalized injury

wholly fails to fulfill the requirements of constitutional standing.

> **1.    Plaintiffs' alleged environmental and procedural injuries do not meet the injury-in-fact requirement for standing.**

Plaintiffs cannot demonstrate an injury to their particularized interest from the tax credit

allocations.  The speculative, future "environmental injury" that Plaintiffs argue will result from

one of the nine projects approved for tax credits is insufficient to establish Article III standing.

Plaintiffs' allegations of injury are focused entirely on their speculative claim that one of

the nine projects, Duke Energy's Cliffside project – which the company does not expect to be in

service for another four years[5]/ – will cause environmental harm.  See Pls.' PI Mem. at 12-14;

Pls.' Compl. at ¶¶ 6-11, 16-18.  As explained further below, Plaintiffs cannot make the necessary

causal link between any future impacts from these proposed projects and the action they

challenge in this lawsuit – allocation of the tax credits.  In any event, Plaintiffs' allegations of

harm are insufficient to demonstrate injury-in-fact.  As the Supreme Court has explained, the

injury alleged must be "distinct and palpable, and not abstract or conjectural or hypothetical."

Allen, 468 U.S. at 751 (internal citations and quotation marks omitted).  Plaintiffs must show "a

---

[5]/    See N.C. Utilities Comm'n Docket No. E-7, Sub 790, Duke Energy Carolinas' Advanced Clean Coal Cliffside Unit 6 Cost Estimate Report dated Feb. 29, 2008 (projecting an operation date in summer 2012), available at http://www.duke-energy.com/pdfs/022908-e7-sub-7-90.pdf (last visited March 24, 2008) (attached as Ex. 6).

particularized injury–an increased risk to a personal interest." <u>Florida Audubon Soc'y</u>, 94 F.3d at 666; <u>see also</u> <u>Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 473 (1982) (citation omitted) (to establish standing,"party seeking review must allege facts showing that he is himself adversely affected").  In addition, the particularized injury must be "at least imminent in order to reduce the possibility that a court might unconstitutionally render an advisory opinion 'by deciding a case in which no injury would have occurred at all.'" <u>Florida Audubon Soc'y</u>, 94 F.3d at 663 (citation omitted).  Plaintiffs cannot meet these requirements here.

A plaintiff alleging a procedural injury as a result of a NEPA violation must show a "demonstrably increased risk of serious environmental harm" that "actually threatens the plaintiff's particular interests."[6]/ <u>Fla. Audubon Soc'y</u>, 94 F.3d 658 at 667; <u>see also</u> <u>Freedom Republicans, Inc. v. Fed. Election Comm'n</u>, 13 F.3d 412, 416 (D.C. Cir. 1994) ("In order to make out constitutionally cognizable injury, plaintiffs must demonstrate that the allegedly deficient procedures implicate distinct substantive interests as to which Article III standing requirements are independently satisfied.") (internal citations omitted); <u>Lujan</u>, 504 U.S. at 573 n. 8 (plaintiff can assert a procedural injury only where "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing").  Because Plaintiffs cannot show a concrete injury to their interests, their claims of environmental and procedural injury are insufficient to demonstrate injury-in-fact.

The environmental harm alleged by Plaintiffs is conjectural.  As a preliminary matter,

_____

[6]/     Procedural violations alone are insufficient to grant Plaintiffs' standing.  <u>See</u> <u>California Forestry Ass'n v. Thomas</u>, 936 F. Supp. 13, 19-20 (D.D.C. 1996) (citing <u>Florida Audubon Soc'y</u>, 94 F.3d at 664).

operation of the Duke Energy Cliffside project, which Plaintiffs assert will result in air pollution, is not imminent.  Duke Energy currently expects its project will be operational in the summer of 2012.  See supra at n.5.  However, it is far from certain that the proposed project will ever become operational.  A variety of different factors may lead a company to decide not to proceed with its project.  Cf., e.g., Ex. 5 (press release announcing that Tampa Electric, another 2006 tax credit recipient, will not proceed with proposed project as a result of "continued uncertainty" related to carbon dioxide regulations and the potential for related project cost increases).

Moreover, Plaintiffs have not shown that if the Cliffside project becomes operational, the advanced clean coal facility will have environmental impacts that will cause a "significantly increased risk" to their particular interests.  See Florida Audubon Soc'y, 94 F.3d at 668 (finding that "[w]hatever the possible environmental impacts" of the challenged tax credit might be, environmental organizations failed to demonstrate tax credit would lead to particular environmental impacts "so as to pose a significantly increased risk to the lands used by these" environmental organizations).  It is not sufficient to, as Plaintiffs here have done, assert a wide range of environmental impacts that may generally result from coal-fired power plants, and then assert that their members generally use an area that is near one of the proposed new units: "a court may not assume that the areas used and enjoyed by a prospective plaintiff will suffer all or any environmental consequences" caused by the agency's action.  Id. at 667.  A plaintiff claiming injury from environmental damage must show use of the area affected by the challenged activity, "not an area roughly in the vicinity."  Lujan, 504 U.S. at 566 (citation omitted).  Plaintiffs have not asserted facts from which this Court can conclude they have suffered an "actual injury."

Notably, the proposed Cliffside unit is designed to use advanced coal-based generation technology and, to be qualified for the tax credit, must be designed to meet particular performance requirements, including reduced levels of emissions. See 26 U.S.C. § 48A(f). The project must also receive all required Federal and State environmental authorizations, id. at 48A(e)(2)(A), which may involve permits related to operating, construction, water, wetlands, and/or air impacts, among others.[7]  At bottom, Plaintiffs have failed to demonstrate, as they must, that there is an increased risk of injury to their particular interests. As such, they cannot satisfy the standing requirement of injury-in-fact.

Plaintiffs do not even attempt to demonstrate, nor can they, that the IRS' allocation of tax credits to the other eight projects will result in any harm to them. At no point in their filings do Plaintiffs allege that they have any particularized interests that could even potentially be injured from these other proposed projects. One of the projects – the Tampa Electric facility in Polk County, Florida – is no longer moving forward, see Ex. 5, and therefore cannot be a basis for an allegation of injury. In addition, whereas the other announced projects are located in Indiana, Mississippi, Kentucky, California, and Texas, see Ex. 3, Plaintiffs are based in North Carolina.

_____

[7]    In November 2006, Duke Energy was allocated a tax credit of $125 million for a project at Cliffside Steam Station with a total output of 1600 megawatts (MW). Ex. 3 at DOE Fact Sheet. In March 2007, upon review of Duke Energy's proposed two-unit, 1600 MW project, the North Carolina Utilities Commission ("N.C. Commission") issued an order granting a certificate of public convenience and necessity with conditions for only one of the two proposed 800-MW units. N.C. Utilities Comm'n , Order Granting Certificate of Public Convenience and Necessity with Conditions at 8 (March 21, 2007), available at http://www.duke-energy.com/pdfs/NCUC-Cliffside-Order.pdf?sec=content (last visited March 24, 2008) (attached as Ex. 7). The N.C. Commission has required that Duke Energy retire four existing units, which total 198 MW, before the new unit is operational. Id. at 34. Duke Energy must also commit to retire older coal-fired generating units (in addition to the four units) on a MW-for-MW basis. Id.

15

Pls.' Compl. at ¶¶ 4, 14.

Because Plaintiffs have failed to establish the requisite injury-in-fact, it follows that they can not demonstrate the remaining two prongs of the standing inquiry, namely that a cognizable injury is traceable to Defendants' conduct and that the requested relief would redress the injury.

**2.    The environmental injuries alleged by Plaintiffs cannot be fairly traced to the challenged agency action.**

Plaintiffs cannot prove causation because they cannot demonstrate that any particularized injury to them is "fairly traceable" to the IRS' allocation of tax credit.  Lujan, 504 U.S. at 561. "[U]nless there is a substantial probability that the substantive agency action . . . created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff, the plaintiff lacks standing."  Florida Audubon Soc'y, 94 F.3d at 669 (internal citation omitted) (emphasis added).

Plaintiffs cannot show it is sufficiently probable that the IRS' allocation of tax credit are causally linked to Plaintiffs' alleged injury–health impacts to their members from air pollution from the proposed Cliffside project and generalized impacts from mining activities related to the Cliffside project, e.g. Pls.' PI Mem. at 13-14. The Supreme Court has rejected standing claims in analogous situations.  In Allen v. Wright, for example, parents of black children attending desegregated schools challenged the IRS' grant of tax exemptions to racially discriminatory private schools, arguing the exemptions allowed more racially discriminatory private schools to exist and permitted more white children to attend those schools rather than the desegregated public schools.  468 U.S. 737.  The Supreme Court concluded the "links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain respondents' standing."  Id. at 759.  The Court found it to be "entirely

16

speculative" whether the withdrawal of tax exemption would lead any particular school to change its policy or cause any particular parent to transfer his/her child to another school.  Id. at 758.  Similarly, here, it is entirely speculative whether any particular company will change its plans to construct a clean coal unit based on the availability of the tax credit.  Notably, Congressional predictions that a tax credit will promote a particular outcome can not be relied on to demonstrate the causal chain necessary for standing.  Florida Audubon Soc'y, 94 F.3d at 670-71.  The amount of the one-time tax credit is a small percentage of the overall costs of constructing and operating an advanced coal technology unit.  For example, according to a public document available on Duke Energy's website, the tax credit that the company anticipates claiming for one of the Cliffside units represents less than 3.5% of the projected project costs ($62.5 mil. tax credit/$1.8 bil. capital cost estimate).  See Ex. 6.  In Allen, the Court further found that even if the withdrawal of the tax exemption would lead schools to change their discriminatory policies, it was also speculative to assume that those independent school decisions would collectively have an effect on the ability of plaintiffs to receive a desegregated education.  468 U.S. at 759.  Likewise, in this case, Plaintiffs' chain of causation appears to assume that if Duke Energy decided not to complete the Cliffside project, it would have an effect on the particular areas used by the Plaintiffs.  This speculative chain of causation is insufficient to satisfy the constitutional requirements for standing.[8]/

_____

[8]/    The Supreme Court's decision in Simon v. Eastern Kentucky Welfare Rights Organization, is also instructive.  426 U.S. 26 (1976).  There, the Court held that indigents lacked standing to challenge an IRS revenue ruling that reduced the amount of free medical care hospitals must provide in order to retain tax status as a charitable institutions.  The Court found it "purely speculative whether the denials of service specified in the complaint fairly can be traced to [the IRS'] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications."  Id. at 43.

17

The D.C. Circuit's en banc decision in <u>Florida Audubon Society</u> is also on point.[2]/  94
F.3d 658.  In <u>Florida Audubon Society</u>, environmental organizations argued that Treasury and
the IRS should have prepared an EIS before authorizing a tax credit for the use of a particular
alternative fuel additive known as ethyl tertiary butyl ether ("ETBE").  <u>Id.</u> at 662.  The
organizations argued that the ETBE tax credit would encourage farmers to increase production
of the corn and sugar necessary to produce ethanol, which in turn would increase agricultural
pollution and harm wildlife areas that the organizations' members used and enjoyed.  <u>Id.</u> at 669-
70.  The D.C. Circuit held this chain of causation was speculative and, because it rested on the
independent acts of third parties, was uncertain.  <u>Id.</u> at 670 (noting that a chain that rests on the
independent acts of even one group can eliminate the possibility of proving causation).  A
similar finding is warranted here.

Where a chain of causation rests on the acts of a third party, the plaintiff "must show that
the agency's action is more than only one of the many factors whose relative influence may
affect the third parties' behavior."  <u>Community for Creative Non-Violence v. Pierce</u>,  814 F.2d
663, 669 (D.C. Cir. 1987).  Indeed, "[t]he facts alleged must show that the agency action is at
least a <u>substantial factor</u> motivating the third parties' actions against appellants."  <u>Id.</u> (emphasis
added); <u>see also</u> <u>Dellums v. U.S. Nuclear Regulatory Comm'n</u>, 863 F.2d 968, 980 (D.C. Cir.
1988) ("[C]omplainant has the burden of showing that but for the particular governmental action
that he is challenging, the injury would abate.").  Here, given the variety of independent

---

[2]/     Plaintiffs are incorrect that <u>Florida Audubon Society</u> held that "decisions regarding tax
credits are subject to NEPA . . . ."  Pls.' PI Mem. at 12.  In fact, the <u>Florida Audubon Society</u>
Court did not reach the merits of the plaintiffs' NEPA challenge to a tax credit program because
the Court held that the plaintiffs lacked standing to bring their claims.   94 F.3d 658, 665-72.

18

variables that influence the decision to build a power plant, and the resulting environmental impacts, Plaintiffs cannot meet their burden of demonstrating that the tax credit was a "substantial factor" in motivating Duke Energy to construct the Cliffside unit, a necessary link in their causal chain.  As a result, Plaintiffs can not show a "substantial probability" that the tax credit allocation caused their asserted injuries.

Because Plaintiffs cannot show that the alleged injury is fairly traceable to the allocation of tax credits, Plaintiffs can not establish standing.

> **3.    A favorable decision would not redress the injuries that Plaintiffs assert.**

Plaintiffs also fail to demonstrate Article III standing "because they are unable to show that their injury will be redressed by a favorable decision."  <u>California Forestry</u>, 936 F. Supp. at 18; <u>Allen</u>, 468 U.S. at 751 (explaining that "relief from the injury must be 'likely' to follow from a favorable decision") (citing <u>Simon</u>, 426 U.S. at 38, 41).  Here, it is "entirely speculative whether the injunction Plaintiffs seek would either prevent or remedy their alleged injuries." <u>California Forestry</u>, 936 F. Supp. at 18; <u>see</u> <u>Community for Creative Non-Violence</u>, 814 F.2d at 669-70.

The environmental harm asserted by Plaintiffs is all grounded in the operation of the Cliffside facility.  Yet Plaintiffs acknowledge that the injunctive relief they seek "will not prevent the tax recipients from moving forward with their projects."  Pls.' PI Mem. at 15. Indeed, seeing as Duke Energy's plans to construct the Cliffside facility predate the allocation of tax credit (and even the enactment of EPAct),[10]/ and that the tax credit constitutes a small

---

[10]/    <u>See</u> Ex. 7 at 3 (stating that, in May 2005, Duke Energy filed with the N.C. Utilities Commission information related to its plans to construct the Cliffside project).

percentage of the projected project costs, e.g. Ex. 6, it would be nothing more than speculation to suggest that enjoining the tax credit allocation will halt the development of the Cliffside project. A recent decision by the D.C. Circuit is on point.  In <u>St. John's United Church of Christ v. FAA</u>, the petitioners challenged the Federal Aviation Administration's grant of money to reimburse the City of Chicago for costs related to expansion of O'Hare International Airport.  No. 06-1386, __F.3d__, 2008 WL 746526 (D.C. Cir. March 21, 2008) (attached as Ex. 8).  The D.C. Circuit held that petitioners lacked standing because they had not shown that the "grant has caused their injuries, or that the court can redress those injuries."  <u>Id.</u> at *3.  The Court reasoned that even if it vacated the grant, the petitioners had not met their burden of proving that Chicago "would scrap the O'Hare project."  <u>Id.</u>; <u>see also</u> <u>Vill. of Bensenville v. FAA</u>, 457 F.3d 52, 69-70 (D.C. Cir. 2006) (finding no standing where the relief sought – a decision vacating $337 million in federal funding – would not create "a significant increase in the likelihood" that the project would be "scuttled").  Because the relief sought here would similarly not redress Plaintiffs' asserted injuries, Plaintiffs lack standing.

The remaining relief sought by Plaintiffs, an order requiring a NEPA analysis, would also not redress Plaintiffs' asserted injuries.  Even if Defendants were to prepare an EIS, they still would be required to allocate the tax credits in accordance with the statutory requirements set by Congress.  If taxpayers submit applications that meet the statutory criteria for the tax credits, the IRS does not have discretion to withhold allocation of the tax credits.  <u>See, e.g.,</u> 26 U.S.C. § 48A(d)(2)(C) (the Secretary "shall issue a determination as to whether an applicant has met the requirements under subsection (e)(1) within 60 days"); <u>see</u> <u>infra</u> at Section I.B.1.  In short, the NEPA analysis that Plaintiffs seek would not change the outcome of the tax credit allocations

20

because the IRS must base its allocations on the statutory requirements and not based on a NEPA document.[11]/

Because Plaintiffs lack Article III standing, this Court lacks jurisdiction to hear Plaintiffs' claims,[12]/ and Plaintiffs' motion for emergency relief should be denied.

### B.    The allocation of tax credits is not a "major federal action" triggering a NEPA analysis.

Under NEPA, a federal agency must prepare an EIS if the agency plans to undertake a "major federal action" significantly affecting the quality of the human environment. International Center for Technology Assessment v. Thompson, 421 F. Supp.2d 1, 8 (D.D.C. 2006) (citing 42 U.S.C. § 4332(C)); Alliance for Bio-Integrity v. Shalala, 116 F. Supp. 2d 166, 174 (D.D.C. 2000).  Under NEPA, the term "[m]ajor reinforces but does not have a meaning independent of significantly."  40 C.F.R. § 1508.18.  If an agency has not engaged in a major federal action, NEPA's  requirements are inapplicable.  Macht v. Skinner, 916 F.2d 13, 16 n.4

---

[11]/    In addition, it would not "satisfy NEPA's 'rule of reason' to require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform."  Pub. Citizen, 541 U.S. at 769.   The underlying purpose of NEPA is to ensure that an agency carefully considers the significant environmental impacts of its proposed action and other action alternatives, and that information be provided to the public.  Id. at 768.  Neither goal is met where the agency cannot act on the information contained in the EIS.  See id. at 768-69.

[12]/    The Anti-Injunction Act of the Internal Revenue Code may be another jurisdictional bar to the relief sought by Plaintiffs.  26 U.S.C. § 7421 (providing that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.");  see Bob Jones University v. Simon, 416 U.S. 725, 738-740 (1974) (finding that although the requested relief – revocation of University's tax-exempt status – was not itself an assessment or collection of taxes, it had the effect of barring assessments that would otherwise arise and the Anti-Injunction Act applied); Hibbs v. Winn, 542 U.S. 88, 99-112 (2004) (finding that Tax Injunction Act set forth in 28 U.S.C. § 1341 was not jurisdictional bar where taxpayers sought prospective relief in a constitutional challenge to an Arizona statute establishing an income tax credit for contributions to school tuition organizations).

(D.C. Cir. 1990), <u>limited on other grounds by</u> <u>Karst Environmental Education and Protection v.</u>

<u>EPA</u>, 475 F.3d 1291 (D.C. Cir. 2007) ("Unless a project involves major federal action, NEPA

does not apply.").

      Here, there is no "major federal action" requiring a NEPA analysis for two reasons.

First, because the IRS does not have the kind of discretion in its administration of the tax credit

program that might usefully be informed by further environmental review, its allocation of tax

credits is not a "major federal action."  Second, there is an insufficient level of federal control

and responsibility over the projects awarded tax credits to turn them into "major federal actions"

that require NEPA review.

      **1.**       **IRS' administration of the tax credit programs is not a "major federal action" because it is done pursuant to a Congressional mandate and cannot be meaningfully informed by a NEPA analysis.**

      The challenged action – allocation of tax credits – is not a "major federal action" within

the meaning of NEPA, 42 U.S.C. § 4332(2)(C), because Defendants lack the discretion to

perform a meaningful analysis of the impacts from or alternatives to allocating the tax credits.

As reflected in Treasury Directive 75-02, when an agency's actions "result from statutory

requirements involving little or no discretion . . ., NEPA and the CEQ regulations may not be

applicable."  <u>See</u> Treasury Directive 75-02 at § 3 (dated Sept. 25, 1990), <u>available at</u>

https://www.ustreas.gov/regs/td75-02.htm (last visited March 24, 2008) (attached as Ex. 9).

IRS' activities in administering the tax credit programs meet this description.  Indeed, the

Treasury Directive expressly identifies IRS' administration of the tax code as an example of an

action that does not require an environmental analysis be prepared under NEPA.[13]/

NEPA only applies when an agency has proposed an action and has the discretion to choose among alternative ways to accomplish its objectives. Because the "primary purpose of the impact statement is to aid agency decision making," non-discretionary acts are exempt from the NEPA requirements. South Dakota v. Andrus, 614 F.2d 1190, 1193 (8th Cir. 1980) (holding that non-discretionary acts are not subject to NEPA; listing cases that have ruled similarly). If an agency does not have discretion that might usefully be informed by a NEPA analysis, then there is no "major federal action," and no NEPA document must be prepared. See Citizens Against Rails-to-Trails, 267 F.3d at 1151; see also Grand Council of the Crees v. FERC, 198 F.3d 950, 959 (D.C. Cir. 2000) (finding lack of procedural standing under NEPA where agency was prohibited from taking environmental considerations into account during its ratemaking process). Moreover, courts have consistently held that an EIS is not required where the agency's action is "mandatory." See, e.g., Pacific Legal Foundation v. Andrus, 657 F.2d 829, 839-40 & n. 13 (6th Cir. 1981) (no EIS necessary where agency, pursuant to Endangered Species Act, was under a mandatory duty to list endangered species based on five statutory factors).

Because the IRS is required to allocate tax credits if there are applicants meeting the statutory criteria, the Agency lacks sufficient discretion to make NEPA's requirements applicable. The D.C. Circuit's decision in Natural Resources Defense Council, Inc. v. Berklund, is instructive to the case at hand. 609 F.2d 553, 558 (D.C. Cir. 1979). In that case, the plaintiffs

---

[13]/    See Ex. 9 at § 7.c.(2)(c) ("actions which are CATEGORICALLY EXCLUDED include . . . Internal Revenue Service functions in the administration of the Internal Revenue Code, such as regulations interpreting, implementing, or clarifying code provisions," among other actions); id. at § 7.c.(3) (for these actions, the agency "need not address the environmental effects of the action[s].")

brought suit for a declaratory judgment seeking to have the Secretary of Interior ("Secretary") reject coal mining lease applications until he prepared an EIS, even when an applicant had otherwise fulfilled the requirements for a lease under the Mineral Leasing Act of 1920 ("the Act"). 609 F.2d at 555. The Secretary took the position that he did not have the authority under the Act to deny lease applications once commercial quantities of coal were demonstrated, and the district court agreed. Id. at 557. The plaintiffs appealed, arguing that the district court read the Act too narrowly, and that a more broad reading gives the Secretary room to reject applications, and therefore enough "discretion" to fall within the purview of NEPA. The Court of Appeals upheld the district court ruling, stating that "certainly, an agency cannot escape the requirements of NEPA by excessively constricting its statutory interpretation in order to erect a conflict with NEPA policies. But that is not the situation here, where the plain meaning of the statute . . . leaves the Secretary no discretion to deny a lease" to a qualified applicant. Id. at 558.

In the case now before the Court, the IRS similarly has no discretion or authority to reject applicants as a result of a NEPA analysis if those applicants would otherwise be allocated a tax credit pursuant to the statutory requirements. Through EPAct, Congress has mandated which taxpayers will qualify for tax credits by establishing specific, technical requirements for the tax credit programs. In administering these programs, Defendants have no discretion to stray from Congress' mandate.[14]/

---

[14]/　　Plaintiffs argue that the projects for which IRS has allocated the tax credit "far exceed the capacity of facilities for which DOE normally requires an EIS." Pls.' PI Mem. at 12 (referring to 10 C.F.R. § 1021 App. D at D7). Plaintiffs are comparing apples to oranges; the actions described in the DOE regulation that normally require an EIS are completely different then the actions that DOE took with respect to the tax credit program. Here, DOE does not have control over or responsibility for the projects that have been allocated tax credits. See Declaration of Nelson F. Rekos ("Rekos Decl.") (attached hereto) at ¶¶ 18-21. DOE is not providing funding

24

In addition, because the environmental impacts of the projects are not an effect of the Defendants' actions, see supra at Section I.A.2, and the Defendants lack the discretion to prevent the projects, see infra at Section I.B.2, the projects themselves need not be considered in determining whether the allocation of tax credit is a major federal action. See Pub. Citizen, 541 U.S. at 770 (in determining whether an action is a "major federal action," it is not necessary to consider effects that "an agency has no ability to prevent . . . due to its limited statutory authority over the relevant actions"); Nat'l Ass'n of Property Owners v. U.S., 499 F.Supp. 1223, 1264-65 (D. Minn. 1980) (holding that because a statute "directs the Secretary of Agriculture to administer the Wilderness Area in accordance with the provisions in the Act," Congress alone was the sole determinant of how the area was to be administered, and therefore no EIS was required).

Contrary to Plaintiffs' assertions, Pls.' PI Mem. at 5, Congress' silence on NEPA in EPAct Section 1307 is not an indication that a NEPA analysis is required. Rather, a reasonable inference is that Congress did not consider the type of agency action called for under the tax credit programs to be "major federal action" that required an EIS and therefore did not address NEPA in its legislation. Notably, when Congress did expressly address NEPA in EPAct, it provided sufficient time for the agency to complete the NEPA process. For example, in EPAct Section 369, Congress mandated that the Secretary of Interior prepare an EIS for a commercial leasing program for oil shale and tar sands resources within 18 months, and provided an additional 6 months after completion of the EIS for publication of final regulations establishing

---

for the projects. Id. at ¶ 20. The projects are not located at any DOE site nor do they utilize or involve any DOE property or equipment. Id. at ¶ 21.

the program.  Pub. L. 109-58 at § 369(d)(1)-(2), 119 Stat. 594 at 728-29 (August 8, 2005).  In

contrast, in Section 1307, Congress neither ordered an EIS be prepared nor did it provide

sufficient time to prepare one before establishing the tax credit program or allocating tax credits.

Indeed, it would be impossible for the IRS to complete an EIS within the 60-day timeframe that

Congress set to review applications for the Section 48A tax credit.[15]/  See 26 U.S.C. §

48A(d)(2)(C).

　　　　Congress, which is presumed to legislate with full knowledge of NEPA, could not have

intended such a conflict.  However, if a conflict in statutory authority were found to exist, any

NEPA obligations must give way.  See Nat'l Ass'n of Property Owners, 499 F. Supp. at 1267

(holding that when it is not possible to follow NEPA's EIS requirements without conflicting with

another specific statutory mandate, then NEPA must yield); Texas Committee on Natural

Resources v. Bergland, 573 F.2d 201 (5th Cir. 1978) (stating that Congress is presumed to be

aware of NEPA when it nevertheless chooses to require immediate agency action).

　　　　The U.S. Supreme Court laid out the reasoning underlying this principle in Flint Ridge

Development Co. v. Scenic Rivers Ass'n, 426 U.S. 776 (1976), in which the Court held that if

requiring the Secretary of Housing and Urban Development Authority ("HUD") to prepare an

---

[15]/    To prepare an EIS, an agency must take a series of steps, many with mandatory minimum
timeframes.  These steps include:  scoping, preparation of a draft EIS, a public comment period
on the draft EIS, review of comments on the draft EIS, preparation of the final EIS, and review
of any comments on the final EIS.  See generally 40 C.F.R. § 1501.7 (scoping), § 1502.9-
1502.18 (preparation of draft and final EIS), §§ 1503.1, 1503.4 (inviting comments and response
to comments).  The public comment period alone must be at least 45 days.  40 C.F.R. §
1506.10(d).  The agency must then consider and respond to these comments.  Id. at § 1503.4.  No
decision on the proposed action can be made until 90 days after publication of a Federal Register
notice that the draft EIS is available, or 30 days after publication of notice of the final EIS,
whichever is later.  See 40 C.F.R. § 1506.10(b)(1)-(2).

EIS would create an irreconcilable and fundamental conflict with the Secretary's duties under the Interstate Land Sales Full Disclosure Act, then NEPA must yield and no EIS is required. See id. at 787-88. Although NEPA's section 102 requirements are "neither accidental nor hyperbolic," the Court reasoned, "where a clear and unavoidable conflict in statutory authority exists, NEPA must give way." Id.

A closer examination shows that the Supreme Court's analysis is applicable here. In Flint Ridge, environmental groups petitioned the HUD to prepare an EIS before it permitted a private real estate developer's statement of record as to a proposed subdivision project adjacent to a state-designated "scenic" river in Oklahoma to become effective. The Interstate Land Sales Full Disclosure Act required private real estate developers to file statements of record as to new subdivisions and furnish property reports to prospective purchasers. These statements of records were to become automatically effective within thirty days of their being filed with the Department, unless found to be incomplete or inaccurate. Id. at 782-87.

Because the  Disclosure Act mandated the effective date of accurate and complete statements of records at the thirtieth day after filing, the Court reasoned, an EIS could not possibly be completed within the thirty days period, and accordingly found a conflict:

> The secretary cannot comply with the statutory duty to allow statements of record to go into effect within 30 days of filing, absent inaccurate or incomplete disclosure, and simultaneously prepare impact statements on proposed developments.  In these circumstances, we find that NEPA's impact statement requirement is inapplicable.

Id. at 791.  Flint Ridge, then, instructs that when it is not possible to follow the EIS requirements without conflicting with another specific statutory mandate, NEPA must yield.

In the case currently before the Court, EPAct specifies that the Secretary must accept or

27

reject applicants within 60 days.[16]/  26 U.S.C. § 48A(d)(2)(C).  In addition, Congress mandated

that projects "shall be considered a qualifying advanced coal project" eligible for the tax credit

only if certain technical requirements and performance characteristics are met.  Id. at § 48A(e).

The IRS could not comply with Congress' mandatory instructions to act on applications within

60 days based on its particular statutory criteria, and also prepare an EIS, which requires

consideration of alternatives and takes much longer than 60 days.  As such, no NEPA analysis is

required.

      In sum, in administering the tax credit programs in accordance with the statutory

requirements, Defendants do not have discretion to alter the allocation of tax credits as a result of

a NEPA analysis.  Moreover, they do not have sufficient time to both follow Congress' mandate

and prepare a NEPA analysis.  Because Congress legislates with full knowledge of NEPA, it is

likely that Congress did not intend for NEPA to be applicable to the tax credit programs.

However, even if NEPA were triggered, because preparation of an EIS would require IRS to

disregard the requirements of EPAct, NEPA must yield.  Therefore, the allocation of tax credits

is not a "major federal action" requiring a NEPA analysis.

### 2.    The allocation of tax credits is not sufficient to "federalize'" the projects so as to require a NEPA analysis.

      Plaintiffs argue that Defendants are required to conduct a NEPA analysis to evaluate the

environmental impacts of the nine projects that have been allocated tax credits.  E.g. Pls.' PI

Mem. at 13 n.7.  However, because of the nature of the tax credits and the lack of federal

involvement in these projects, the projects are not "major federal actions" triggering NEPA.

_____

[16]/    Similar requirements have been adopted for the gasification projects.  See IRS Not 2006-25 at § 4.02(7), (9).

In order to be considered "major federal action," there must be a sufficient level of federal control and responsibility over the activity. See 40 C.F.R. § 1508.18 (defining "Major Federal action"); see also Save Barton Creek Ass'n v. Fed. Highway Admin., 950 F.2d 1129, 1134 (5th Cir. 1992) ("[T]he distinguishing feature of 'federal' involvement is the ability to influence or control the outcome in material respects.") (citation omitted); Vill. of Los Ranchos de Albuquerque v. Barnhart, 906 F.2d 1477, 1482 (10th Cir. 1990), cert. denied, 498 U.S. 1109 (1991) (finding that NEPA was not triggered because there was "no evidence that the federal government had the actual power to control this project.") (emphasis added).

Where projects involve non-federal actors, as they do here, there are no clear standards for defining the point at which federal participation transforms a project into major federal action; rather, "the matter is simply one of degree." Ka Makani 'O Kohala Ohana, Inc. v. Water Supply, 295 F.3d 955, 960 (9th Cir. 2002) (citation omitted). To determine whether a particular project qualifies as a major federal action for NEPA purposes, therefore, a court should consider both the nature of the federal funds used and the extent of federal involvement. Id. The federal agency must have some measure of control over the environmentally pertinent aspects of the project to require NEPA. See Sierra Club v. Babbitt, 65 F.3d 1502, 1512 (9th Cir. 1995) (NEPA and ESA were not triggered where Bureau of Land Management could not control development activity under a right-of-way agreement).

Here, Defendants are not directly funding any of the projects. See, e.g., Rekos Decl. at ¶ 20. Their participation is limited to following the Congressional mandate codified in the IRC to allocate tax credits. Taxpayers with investment tax credits can offset their tax liability up to the amount of the credit. 26 U.S.C. § 38. If the credit exceeds the amount of their tax liability, the

29

credits can be carried back one year to generate an overpayment, or carried forward for 20 years until it is used up.  26 U.S.C. § 39.  However the credit is used, Defendants have no control over how a taxpayer uses the money that would have otherwise paid its tax liability.  As a result, as explained above, there can be no direct causal link between the tax credits and actions by third parties that lead to the injuries the Plaintiffs allege.  In addition, the amount of the tax credit is but a small percentage of the projects' overall costs.[17]/  E.g., Ex. 6 (tax credit for Cliffside unit represents less than 3.5% of the projected project costs); see also Friends of the Earth, Inc. v. Coleman, 518 F.2d 323, 329 (9th Cir.1975) (finding federal commitment of funds that represented about 9.5% of the project costs was not sufficient to "federalize" the project for NEPA purposes).  The tax credit is thus insufficient to render the projects "major federal actions."

Indeed, even if Defendants were directly funding the projects, the relatively small amount of the contribution and the Agencies' lack of control over the projects themselves, would still require a finding that the projects are not "major federal actions" under NEPA.  See Rattlesnake Coalition v. EPA, 509 F.3d 1095, 1101-02 (9th Cir. 2007) (finding that EPA's $5 million grant toward an $88 million dollar wastewater treatment plant was not enough to turn project into a federal action; beyond mere funding, a party must  demonstrate that "Federal decisionmakers . . . retain power, authority, or control over the [project]") (citation omitted); Ka Makani O' Kohala Ohana, 295 F.3d at 960-61 (finding that despite federal agencies' direct funding of over $1 million and their participation and advisory role in project, project was not a "federal action" requiring NEPA analysis "[b]ecause the final decision-making power remained" with the State

---

[17]/     The exact percentage will likely be different for each proposed project.

agency); see also Atlanta Coal. on the Transp. Crisis v. Atlanta Regional Comm'n, 599 F.2d

1333, 1347 (5th Cir. 1979) ("[T]he presence of federal financial assistance is generally just one

factor in the analysis of whether there is sufficient federal control over, responsibility for, or

involvement with an action to require preparation of an EIS."); Environmental Rights Coalition

v. Austin, 780 F. Supp. 584, 600-01 (S.D. Ind. 1991) (stating that the key test for determining

whether project is "major federal action" is whether there is significant degree of Federal

involvement with and control over subject project); cf. Vill. of Bensenville, 457 F.3d at 65-68

(finding that plaintiffs' alleged injury under the Religious Freedom Restoration Act – relocation

of a cemetery due to redesign of Chicago's O'Hare airport–could not be attributed to FAA,

despite the agency's approval of the amended airport plan, and intent to fund approximately 12%

of the project (over $300 million dollars)).  Here, control over the proposed projects rests with

the non-federal actors.  Defendants' roles in administering the tax credit programs do not give

them control over or responsibility for the projects.[18]/  See, e.g., Rekos Decl. at ¶¶ 18-21 (DOE's

role in the tax credit program gives it "no control or authority over the projects selected"); IRS

Not 2006-24 at App. A; IRS Not 2006-25 at App. A (terms of closing agreements do not allow

IRS control over projects that generate the credits).

      In sum, Defendants' actions with respect to the projects do not rise to a level such that the

---

[18]/      In many cases, even when a federal decision can prevent a non-federal project from going
forward, courts have found that the federal involvement is so insignificant that NEPA analysis is
not required.  See, e.g., Winnebago Tribe of Nebraska v. Ray, 621 F. 2d 269 (8th Cir. 1980) (the
fact that a federal permit was required to run power lines over two-mile stretch of river does not
federalize private project to run 67 miles of power lines between Nebraska and Iowa); Save the
Bay, Inc. v. U.S. Army Corps of Engineers, 610 F.2d 322 (5th Cir. 1980) (NEPA did not require
the Corps to consider a chemical plant when issuing a permit allowing construction of a
wastewater pipeline from the plant even though plant could not be constructed without the
wastewater pipeline).

projects themselves should be deemed major federal actions that require NEPA analyses.

**II.    The Balance of Injuries Weighs in Favor of Defendants.**

> **A.    No irreparable injury will result if Plaintiffs' requested injunctive relief is denied.**

The D.C. Circuit "has set a high standard for irreparable injury." <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006). "[T]he injury 'must be both certain and great; it must be actual and not theoretical.' The moving party must show '[t]he injury complained of is of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.'" <u>Id.</u> (internal citation omitted) (emphasis in original). Here, Plaintiffs have failed to identify an imminent harm that is both "certain and great." Therefore, Plaintiffs' preliminary injunction motion should be denied. <u>See id.</u> ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other . . . factors entering the calculus merit such relief.")

> **1.    The harm that Plaintiffs' assert is remote, speculative, and not tied to the agency action that Plaintiffs seek to enjoin.**

Plaintiffs have failed to identify concrete injuries that are "of such imminence " to warrant the extraordinary injunctive relief they seek. Plaintiffs argue that a preliminary injunction is required because their members will otherwise suffer irreparable harm from Duke Energy's proposed Cliffside facility in North Carolina. Pls.' PI Mem. at 12-14. To support this assertion, Plaintiffs submit the declaration of one of their members who lives 20 miles from Duke Energy's proposed Cliffside facility. Pls.' PI Mem. at Ex. 4. Plaintiffs argue that the member's use and enjoyment of his home will be impaired as a result of "[a]dverse health effects caused by air pollution belched from the proposed Cliffside facility." Pls.' PI Mem. at

13-14.  Even assuming that Plaintiffs had provided adequate support for their claim that its

member's health "will be harmed" as a result of the proposed advanced coal project 20 miles

away, which they have not, the alleged harm is certainly not imminent.[19]/  The Cliffside project

is not expected to be operational until the summer of 2012.  See supra at n.5.  Indeed, as

Plaintiffs acknowledge, none of the projects that have been awarded tax credits have been placed

into service.  Pls.' PI Mem. at 15.  Moreover, an injunction against IRS' allocation of tax credit,

would not enjoin the projects, which are what Plaintiffs assert will cause them irreparable harm.

See Pls.' PI Mem. at 15 (acknowledging that injunction "will not prevent the tax recipients from

moving forward with their projects").  Thus, an injunction will not avoid the purportedly

imminent harm.

        Plaintiffs also note a "procedural injury" from the alleged NEPA violation, but a

procedural injury, by itself, is insufficient to constitute irreparable harm justifying a preliminary

injunction.  See Pls.' PI Mem. at 13; Fund For Animals v. Norton, 281 F. Supp. 2d 209, 222

(D.D.C. 2003); see also Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1400 (9th Cir. 1992)

("Merely establishing a procedural violation of NEPA does not compel the issuance of a

preliminary injunction.").  In short, Plaintiffs' claim of irreparable harm from a project that is not

expected to be operational for another four years is wholly insufficient to justify a preliminary

---

[19]/    Plaintiffs' speculation that their "members will be harmed by the inevitable increase in
the coal mining needed to fuel these projects" is even more attenuated.  Pls.' PI Mem. at 14.
Although Plaintiffs generally argue that coal mining in the Appalachian Mountains has had
significant environmental impacts, Pls.' PI Mem. at 2, 7-10, Plaintiffs fail to point to any specific
mining activity that would cause them actual, imminent harm.  Plaintiffs argue that "at least one"
of the proposed projects to be allocated tax credits, the Cliffside project, plans to use coal from
the Appalachian Mountains.  Pls.' PI Mem. at 5.  However, even the document that Plaintiffs cite
to support their contention reveals that Duke Energy may use a variety of different sources of
coal for its proposed facility.  See Pls. PI Mem. Ex. 1 at 1-2.

injunction.

> **2.     Plaintiffs' 15-month delay in filing its emergency motion is further evidence that there is no emergency here.**

To the extent that Plaintiffs base their claim of harm on Treasury's November 2006 allocation of tax credit to the nine projects, Plaintiffs' delay in bringing their motion for preliminary injunction weighs against a finding of irreparable injury.

In order to demonstrate irreparable injury justifying the issuance of a preliminary injunction, Plaintiffs must show that the alleged injury is imminent. Chaplaincy of Full Gospel Churches, 454 F.3d at 297. Therefore, a plaintiff's delay in initiating a proceeding for emergency relief should be considered when evaluating whether plaintiff has demonstrated irreparable harm. See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel, 872 F.2d 75, 80 (4th Cir. 1989) (upholding the district court's denial of motion for a preliminary injunction where plaintiffs waited nine months before seeking emergency relief); Scott-Blanton v. Universal City Studios Productions LLLP, 495 F. Supp. 2d 74, 80 (D.D.C. 2007) (finding that "delay in bringing the motion [for preliminary injunction] weighs against a finding of irreparable harm" where plaintiff in copyright infringement action waited over 14 months after release of defendant's motion picture to file motion). Here, Plaintiffs' long delay indicates that emergency relief is not required.

Defendants waited approximately 15 months after Treasury's allocation of tax credits to nine projects before filing an application for emergency relief. On November 30, 2006, Defendants announced that nine projects had been accepted in the first allocation round and $1 billion of tax credits had been allocated to those projects. See Ex. 3. More than seven months later, on June 29, 2007, Appalachian Voices sent DOE a letter asserting their position that the

34

DOE should have prepared an EIS before allocating the tax credits.  Pls.' PI Mem. at Ex. 2.

After sending this letter, Plaintiffs then waited more than eight months before filing this lawsuit

and immediately seeking emergency relief.  <u>See</u> Docket No. 1 (Complaint filed March 3, 2008).

When "an application for [a] preliminary injunction is based upon an urgent need for the

protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is

not required" <u>Quince Orchard</u>, 872 F.2d at 80 (citation omitted); <u>see also</u> <u>Frizzell</u>, 530 F.2d at

987 ("Our conclusion that an injunction should not issue is bolstered by the delay of the

appellants in seeking one."); <u>Lydo Enters. v. City of Las Vegas</u>, 745 F.2d 1211, 1213-14 (9th

Cir.1984) ("[a] delay in seeking a preliminary injunction is a factor to be considered in weighing

the propriety of relief.").  In sum, Plaintiffs' delay in bringing their motion for emergency

injunctive relief indicates an absence of irreparable harm and is one of many reasons why

Plaintiffs' application for preliminary injunction should be denied.

### B.    An injunction would harm Defendants and be contrary to the public interest because it would halt the administration of an important, Congressionally-mandated program.

In actions implicating government policy or regulation, courts will consider the effect on

the public interest of granting a preliminary injunction.  <u>Yakus v. U.S.</u>, 321 U.S. 414, 441 (1944)

(holding that courts may go much farther in granting and denying equitable relief in furtherance

of public interest than when only private interest is involved).  A party moving for a preliminary

injunctive relief carries a particularly heavy burden where, as here, the result of the preliminary

injunction is to impede the orderly administration of a governmental responsibility intended to

serve the public interest.  <u>Id.</u> at 440; <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312-313

(1981) (holding that when injunctive relief would harm the public interest, the Court may

withhold the relief, even if doing so would burden the movant).  Courts have long considered issues related to the environment as fitting within a "public interest" inquiry.  See, e.g., Piedmont Heights Civic Club v. Moreland, 637 F.2d 430, 439 (5th Cir. 1981) (refusing to enjoin highway construction for alleged noncompliance with environment laws when plaintiff's harm was outweighed by harm caused to the public by traffic and safety hazards on overcrowded highways).

Here, by promulgating and enacting EPAct, Congress established a clear intent to provide tax credit to power companies meeting certain rigorous standards laid out in the statute.  The tax credit program represents Congress' determination that it is in the public interest that investment in certain clean coal technologies be encouraged through the allocation of tax credits.  A preliminary injunction in this case would thwart Congress' intent.  Cf. Florida Audubon Soc'y, 94 F.3d at 672 ("The federal judiciary is not a back-seat Congress nor some sort of super-agency.").  Conversely, Plaintiffs cannot show any instance in which they have been or are threatened to be subject to imminent environmental harm.  As such, it is in the public interest to allow Defendants to follow Congress' mandate and administer the tax credit program.  The balance of interests thus favors against the issuance of a preliminary injunction.

## Conclusion

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted this 25th day of March 2008.


                        RONALD J. TENPAS
                        Assistant Attorney General
                        Environment and Natural Resources Division

                        /s/ Rachel A. Dougan
                        RACHEL A. DOUGAN, DC Bar # 485507
                        JASON BRUNO, DC Bar # 472290
                        Environment and Natural Resources Division
                        United States Department of Justice
                        Benjamin Franklin Station, P.O. Box 663
                        Washington, D.C.  20044-0663
                        Telephone: (202) 616-5082 (Dougan)
                        Facsimile: (202) 305-0506
                        Rachel.Dougan@usdoj.gov


Of Counsel:

CHARLES B. RAMSEY
Office of Associate Chief Counsel
Internal Revenue Service
U.S. Department of Treasury
Washington, D.C.
(202) 622-3110

JANET MASTERS
Office of General Counsel
U.S. Department of Energy
Washington, D.C.
(202) 586-3415

NATALIE APPETTA
Office of Chief Counsel
National Energy Technology Laboratory

U.S. Department of Energy
Morgantown, WV
(304) 285-2035

## CERTIFICATE OF SERVICE


I hereby certify that on March 25, 2008, a copy of the foregoing DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION and related exhibits, including a proposed order, was served by CM/ECF electronic filing on the following attorney of record:

Scott A. Gollwitzer

APPALACHIAN VOICES

16 Eagle Street, Suite 200

Asheville, NC 28801

(828) 505-1963

scott@appvoices.org


In addition, pursuant to this Court's Standing Order For Civil Cases at Section 3(c), a courtesy copy will be served on the Court via courier on March 26, 2008.

/s/ Rachel A. Dougan
Counsel for Defendants

39

ments. For filing season 2006 (tax year 2005), individual income taxpayers living in Maine, Massachusetts, New Hampshire, New York, Vermont, Maryland, and the District of Columbia have until Tuesday, April 18, 2006, to file documents in paper or electronic form that are otherwise due on April 17, 2006. These documents include U.S. individual income tax returns in the Form 1040 series and Form 4868, *Application for Automatic Extension of Time To File U.S. Individual Income Tax Return.* Individual income taxpayers in these states and the District of Columbia also have until April 18, 2006, to make Federal tax payments otherwise due on April 17, 2006, including the first installment of estimated tax for tax year 2006.

The principal author of this notice is John M. Moran of the Office of Associate Chief Counsel, Procedure & Administration (Administrative Provisions and Judicial Practice Division). For further information regarding this notice, contact John M. Moran at (202) 622–4940 (not a toll-free call).

## Qualifying Advanced Coal Project Program

## Notice 2006–24

### SECTION 1. PURPOSE

This notice establishes the qualifying advanced coal project program under § 48A(d) of the Internal Revenue Code. The purpose of the program is the deployment of advanced coal-based generation technologies.

### SECTION 2. BACKGROUND

.01 Section 46 provides that the amount of the investment credit for any taxable year is the sum of the credits listed in § 46. Section 1307(a) of the Energy Policy Act of 2005, Pub. L. 109–58, 119 Stat. 594 (August 8, 2005) (the "Act"), amended § 46 to add two new credits to that list: the qualifying advanced coal project credit and the qualifying gasification project credit.

.02 The qualifying advanced coal project credit is provided under § 48A, as added by § 1307(b) of the Act. Section 48A(a) provides that the qualifying advanced coal project credit for a taxable

year is an amount equal to (1) 20 percent of the qualified investment (as defined in § 48A(b)) for that taxable year in certified qualifying advanced coal projects (as defined in § 48A(c)(1) and (e)) using an integrated gasification combined cycle (IGCC) (as defined in § 48A(c)(7)), and (2) 15 percent of the qualified investment for that taxable year in other certified qualifying advanced coal projects.

.03 Section 48A(d)(3)(A) provides that the aggregate credits allowed under § 48A(a) may not exceed $1.3 billion. Section 48A(d)(3)(B) provides that (i) $800 million of credits are to be allocated to IGCC projects, and (ii) $500 million of credits are to be allocated to projects that use other advanced coal-based generation technologies (as defined in § 48A(c)(2) and (f)).

.04 Section 48A(e)(3)(A) provides that the credits for IGCC projects must be allocated in accordance with the procedures set forth in § 48A(d), and in relatively equal amounts to (i) projects using bituminous coal as a primary feedstock, (ii) projects using subbituminous coal as a primary feedstock, and (iii) projects using lignite as a primary feedstock. Further, § 48A(e)(3)(B) provides that IGCC projects that include (i) greenhouse gas capture capability (as defined in § 48A(c)(5)), (ii) increased by-product utilization, and (iii) other benefits must be given high priority in the allocation of credits for IGCC projects.

.05 The at-risk rules in § 49 and the recapture and other special rules in § 50 apply to the qualifying advanced coal project credit. Further, the qualifying advanced coal project credit generally is allowed in the taxable year in which the eligible property (as defined in § 48A(c)(3)) is placed in service by the taxpayer. Pursuant to § 48A(D)(2)(E), a taxpayer that receives a certification under § 48A(d)(2)(D) has 5 years from the date of issuance of the certification to place the qualifying advanced coal project in service.

### SECTION 3. QUALIFYING ADVANCED COAL PROJECT PROGRAM

Section 48A(d)(1) provides that the Secretary, in consultation with the Secretary of Energy, shall establish a qualifying advanced coal project program for

the deployment of advanced coal-based generation technologies. The Treasury Department and the Internal Revenue Service are establishing this program under the rules set forth in sections 4 through 9 of this notice.

### SECTION 4. ESTABLISHMENT OF QUALIFYING ADVANCED COAL PROJECT PROGRAM

.01 *In General.* The Service will consider a project under the qualifying advanced coal project program only if the U.S. Department of Energy ("DOE") provides a certification of feasibility and consistency with energy policy goals ("DOE certification") for the project. Accordingly, a taxpayer must submit, for each qualifying advanced coal project: (1) an application for certification by the DOE ("application for DOE certification"), and (2) an application for certification under § 48A(d)(2) by the Service ("application for § 48A certification"). Both applications may be submitted only during the 3-year period beginning on February 21, 2006. Certifications will be issued and credits will be allocated to projects in annual allocation rounds. The initial allocation round will be conducted in 2006. If necessary, additional allocation rounds will be conducted in 2007 and 2008.

.02 *Program Specifications.*

(1) The Service will determine the amount of the qualifying advanced coal project credits allocated to a qualifying advanced coal project at the time the Service accepts the application for § 48A certification for that project in accordance with section 4.02(10) of this notice (see section 5 of this notice for the requirements applicable to the application for DOE certification and the application for § 48A certification).

(2) The qualifying advanced coal project credits of $1.3 billion and the applications for certification will be separated into the following four pools:

(a) Projects using an advanced coal-based generation technology other than IGCC. The aggregate amount of qualifying advanced coal project credit for this pool is $500 million. The maximum amount of credits that will be allocated to a project is $125 million.

(b) IGCC projects using bituminous coal as a primary feedstock. The aggre-



DEFENDANT'S EXHIBIT 1

gate amount of qualifying advanced coal project credit for this pool is $267 million. The maximum amount of credits that will be allocated to a project is $133.5 million.

(c) IGCC projects using subbituminous coal as a primary feedstock. The aggregate amount of qualifying advanced coal project credit for this pool is $267 million. The maximum amount of credits that will be allocated to a project is $133.5 million.

(d) IGCC projects using lignite as a primary feedstock. The aggregate amount of qualifying advanced coal project credit for this pool is $266 million. The maximum amount of credits that will be allocated to a project is $133 million.

(3) For projects using an advanced coal-based generation technology other than IGCC, the aggregate credit of $500 million for this pool as described in section 4.02(2)(a) of this notice will be allocated in the initial round of allocations to projects providing the highest ratio of total nameplate generating capacity to requested allocation of credits.

(4) For each IGCC pool described in section 4.02(2)(b), (c), and (d) of this notice, the aggregate credit for that pool will be allocated as follows in the initial round of allocations:

(a) The aggregate credit will be allocated first to the projects entitled to priority under § 48A(e)(3)(B) for greenhouse gas capture capability or increased by-product utilization.

(b) If the requested allocation of credits for these priority projects exceeds the aggregate credit for the pool, the credit for that pool will be allocated to the priority projects providing the highest ratio of total nameplate generating capacity to requested allocation of credits.

(c) If the requested allocation of credits for the priority projects in a pool does not exceed the aggregate credit for the pool, the remaining amount of the credit will be allocated to the nonpriority projects providing the highest ratio of total nameplate generating capacity to requested allocation of credits.

(5) If the aggregate credit for a pool is not fully allocated in the initial round of allocations in 2006, similar allocation rounds will be conducted in 2007 and 2008 until the aggregate credit is fully allocated. Generally, the results of each year will be announced.

(6) If the same project would otherwise be allocated credits under both the qualifying advanced coal project program under this notice and the qualifying gasification project program under Notice 2006–25, 2006–11 I.R.B. 609, the following rules apply:

(a) If the project is allocated the full amount of the qualifying advanced coal project credit requested by the taxpayer, no qualifying gasification project credit will be allocated to the project;

(b) If the project is allocated the full amount of the qualifying gasification project credit requested by the taxpayer, no qualifying advanced coal project credit will be allocated to the project;

(c) If the project is allocated less than the full amount of the qualifying advanced coal project credit requested by the taxpayer, the qualifying gasification project credit may be allocated to the project with respect to the qualified investment under § 48B for which a qualifying advanced coal project credit is not allowed under § 48A; and

(d) If the project is allocated less than the full amount of the qualifying gasification project credit requested by the taxpayer, the qualifying advanced coal project credit may be allocated to the project with respect to the qualified investment under § 48A for which a qualifying gasification project credit is not allowed under § 48B.

(7) For each allocation round there will be an annual application period during which a taxpayer may file its application for § 48A certification. The Service will consider a project in an allocation round only if the application for § 48A certification for the project is submitted during the application period for that round and the DOE provides the DOE certification for the project before the end of the application period.

(8) For the initial allocation round conducted in 2006, the application period begins on February 21, 2006, and ends on October 2, 2006. Any completed application for § 48A certification received by the Service before October 3, 2006, will be deemed to be submitted by the taxpayer on October 2, 2006. For 2007, the application period begins on October 3, 2006, and ends on October 1, 2007, and any completed application for § 48A certification received by the Service after October 2, 2006, and before October 2, 2007, will be deemed to

be submitted by the taxpayer on October 1, 2007. For 2008, the application period begins on October 2, 2007, and ends on October 1, 2008, and any completed application for § 48A certification received by the Service after October 1, 2007, and before October 2, 2008, will be deemed to be submitted by the taxpayer on October 1, 2008. For purposes of this notice, an application that is submitted by U.S. mail will be treated as received by the Service on the date of the postmark and an application submitted by a private delivery service will be treated as received by the Service on the date recorded or the date marked in accordance with § 7502(f)(2)(C).

(9) See section 5.02 of this notice and Appendix B to this notice for the information to be submitted to the DOE in an application for DOE certification. Appendix B to this notice also provides the instructions and address for filing the application for DOE certification. The DOE will determine the feasibility of the project and its consistency with energy policy goals and, if the project is determined to be feasible and consistent with energy policy goals, will provide a DOE certification for the project to the Service. If an application for DOE certification is postmarked on or before June 30 of a calendar year, the DOE will determine the feasibility of the project and its consistency with energy policy goals and (for projects determined to be feasible and consistent) provide the DOE certification by October 1 of that calendar year.

(10) By November 30 of the calendar year in which an application for § 48A certification is deemed to be submitted (as determined under section 4.02(8) of this notice), the Service will accept or reject the taxpayer's application for § 48A certification and will notify the taxpayer, by letter, of its decision.

(11) If the taxpayer's application for § 48A certification is accepted, the acceptance letter will state the amount of the credit allocated to the project. If a credit is allocated to a taxpayer's project, the taxpayer will be required to execute a closing agreement in the form set forth in Appendix A to this notice. By January 31 of the following year, the taxpayer must execute and return the closing agreement to the Service at the appropriate address listed in section 5.04 of this notice or listed in later guidance published in the Internal

Revenue Bulletin. The Service will execute and return the closing agreement to the taxpayer by March 31 of such following year. The executed closing agreement applies only to the accepted taxpayer. Accordingly, any successor in interest must execute a new closing agreement with the Service. If the successor in interest does not execute a new closing agreement, the following rules apply:

(a) In the case of an interest acquired at or before the time the qualifying advanced coal project is placed in service, any credit allocated to the project will be fully forfeited (and rules similar to the recapture rules of § 50(a) apply with respect to qualified progress expenditures); and

(b) In the case of an interest acquired after the qualifying advanced coal project is placed in service, the project ceases to be investment credit property and the recapture rules of § 50(a) (and similar rules with respect to qualified progress expenditures) apply.

## SECTION 5. APPLICATIONS FOR CERTIFICATIONS

.01 *In General.* An application for § 48A certification and a separate application for DOE certification must be submitted for each qualifying advanced coal project. If an application for DOE certification does not include all of the information required by section 5.02 of this notice and meet the requirements in sections 7.01 and 7.02 of this notice, the DOE may decline to accept the application. If an application for § 48A certification does not include all of the information listed in section 5.03 of this notice and meet the requirements in sections 7.01 and 7.02 of this notice, the application will not be accepted by the Service.

.02 *Information Required in the Application for DOE Certification.* An application for DOE certification must include all of the information requested in Appendix B to this notice and all of the following:

(1) The name, address, and taxpayer identification number of the taxpayer;

(2) The name and telephone number of a contact person;

(3) The name and address (or other unique identifying designation) of the qualifying advanced coal project;

(4) A statement specifying whether the project is an IGCC project or a qualifying advanced coal project that uses another advanced coal-based technology;

(5) In the case of an IGCC project, a statement specifying the type of coal (bituminous coal, subbituminous coal, or lignite) that will be the primary feedstock. An application for DOE certification with respect to an IGCC project will not be considered unless one of these types of coal is the primary feedstock. For purposes of § 48A(e)(3)(A), a type of coal is the primary feedstock only if at all times more than 50 percent of the cumulative total fuel input (coal and any other fuel input) for the project will consist of that type of coal;

(6) The estimated total cost of the project and the estimated total qualified investment in the eligible property that will be part of the project;

(7) The amount of the qualifying advanced coal project credit requested for the project. The amount requested must not exceed the maximum amount provided in section 4.02(2) of this notice;

(8) If the taxpayer is or will be requesting an amount of the qualifying gasification project credit under § 48B for the same project, a statement specifying the credit the taxpayer prefers to receive;

(9) A statement specifying whether the project is a new electric generation unit (as defined in § 48A(c)(6)), a retrofit of an existing electric generation unit, or a repower of an existing electric generation unit; and

(10) The exact total nameplate generating capacity of the project.

.03 *Information Required in the Application for § 48A Certification.* Pursuant to § 48A(d)(2)(B), an application for § 48A certification must include all of the following:

(1) The name, address, and taxpayer identification number of the taxpayer;

(2) The name and telephone number of a contact person. If necessary, attach any required power of attorney, preferably on Form 2848, *Power of Attorney and Declaration of Representative*; and

(3) A paper copy of the completed application for DOE certification submitted with respect to the project in accordance with section 5.02 of this notice.

.04 *Instructions and Address for Filing § 48A Application.* Applications for § 48A certification should be marked: SECTION 48A APPLICATION FOR CERTIFICA-

TION. There is no user fee for these applications.

(1) Applications submitted by U.S. mail must be sent to:

Internal Revenue Service
Attn: CC:PSI:6, Room 5313
P.O. Box 7604
Ben Franklin Station
Washington, DC 20044

Applications submitted by a private delivery service must be sent to:

Internal Revenue Service
Attn: CC:PSI:6, Room 5313
1111 Constitution Ave., N.W.
Washington, DC 20224

(2) Applications may also be hand delivered Monday through Friday between the hours of 8 a.m. and 4 p.m. to:

Courier's Desk
Internal Revenue Service
Attn: CC:PSI:6, Room 5313
1111 Constitution Avenue, N.W.
Washington, DC 20224

## SECTION 6. ISSUANCE OF CERTIFICATION

.01 *In General.* Section 48A(d)(2)(D) provides that a taxpayer shall have 2 years from the date of acceptance of the § 48A application during which to provide evidence that the criteria set forth in § 48A(e)(2) have been met. Pursuant to § 48A(e)(2), a project shall be eligible for certification only if (A) the taxpayer has received all federal and state environmental authorizations or reviews necessary to commence construction of the project, and (B) the taxpayer, except in the case of a retrofit or repower of an existing generation unit, has purchased or entered into a binding contract for the purchase of the main steam turbine or turbines for the project, except that this contract may be contingent upon receipt of a certification under § 48A(d)(2). Section 48A(d)(2)(E) provides that a taxpayer that receives a certification has 5 years from the date of issuance of the certification to place the project in service and that the certification

is void if the project is not placed in service by the end of that five-year period.

.02 *Requirements for Certification.* Within 2 years from the date that the Service accepts the taxpayer's application for § 48A certification under section 4.02(10) of this notice, the taxpayer must submit to the Service documentation establishing that the requirements of § 48A(e)(2) are satisfied. See also sections 7.01 and 7.02 of this notice for other requirements that must be satisfied. The taxpayer should mark the package "SECTION 48A CERTIFICATION REQUIREMENTS" and send it to the appropriate address listed in section 5.04 of this notice or listed in later guidance published in the Internal Revenue Bulletin.

.03 *Service's Action on Certification.* After receiving the material in section 6.02 of this notice, the Service will decide whether or not to certify the project and will notify the taxpayer, by letter, of that decision. If the Service certifies the project, the date of this letter is the date of issuance of the certification.

SECTION 7. OTHER REQUIREMENTS

.01 *Signature.* Each submission under sections 5 and 6 of this notice must be signed and dated by the taxpayer. A stamped signature or faxed signature is not permitted.

.02 *Penalties of Perjury Statement.*

(1) Each submission under sections 5 and 6 of this notice must be accompanied by the following declaration: "Under penalties of perjury, I declare that I have examined this submission, including accompanying documents, and, to the best of my knowledge and belief, all of the facts contained herein are true, correct, and complete."

(2) The declaration must be signed and dated by the taxpayer. The person signing for the taxpayer must have personal knowledge of the facts. A stamped signature or faxed signature is not permitted.

.03 *Effect of an Acceptance, Allocation, or Certification.* An acceptance, allocation, or certification by the Service under this notice is not a determination that a project qualifies for the qualifying advanced coal project credit under § 48A. The Service may, upon examination (and after any appropriate consultation with

DOE), determine that the project does not qualify for this credit.

.04 *No Right to a Conference or Appeal.* A taxpayer does not have a right to a conference relating to any matters under this notice. Further, a taxpayer does not have a right to appeal the decisions made under this notice (including the acceptance or rejection of the application for DOE or § 48A certification, the amount of credit allocated to the project, or whether or not to certify the project) to an Associate Chief Counsel or any other official of the Service.

SECTION 8. REVIEW AND REDISTRIBUTION

.01 *In General.* Section 48A(d)(4)(A) provides that the credits allocated under § 48A must be reviewed not later than August 8, 2011. Pursuant to § 48A(d)(4)(B), credits available under § 48A(d)(3)(B)(i) and (ii) may be reallocated if (i) there is an insufficient quantity of qualifying applications for certification pending at the time of the review; or (ii) any certification made pursuant to § 48A(d)(2) has been revoked pursuant to § 48A(d)(2)(D). If credits under § 48A(d)(3)(B)(i) and (ii) are available for reallocation, § 48A(d)(4)(C) authorizes the conduct of an additional program for applications for certification.

.02 *Review and Redistribution of Credits.*

(1) *In general.* If, after the allocation round in 2008, the entire credit for a pool is not fully subscribed (*i.e.,* the aggregate credit for the pool has not been fully allocated), the remaining credits from that pool will be reallocated to pools that have been fully subscribed. Credits from pools not fully subscribed will be reallocated to fully subscribed pools in proportion to the aggregate amounts of credit specified for the fully subscribed pools in section 4.02(2) of this notice. Future guidance will prescribe the procedures applicable to applications for certification with respect to the reallocated credits.

(2) *Reduction or forfeiture of allocated credits.* Under the closing agreement set forth in Appendix A to this notice, the qualifying advanced coal project credits allocated under section 4 of this notice will be reduced or forfeited in certain situations. A taxpayer must notify the Service of the amount of any reduction or forfeiture required under the closing agreement.

This notification must be sent to the appropriate address listed in section 5.04 of this notice or listed in later guidance published in the Internal Revenue Bulletin.

The amount of any reduction or forfeiture of the allocated credits will be returned to the appropriate allocation pool and included in the aggregate credit remaining to be allocated in the allocation round following the reduction or forfeiture. If the reduction or forfeiture occurs after the allocation round in 2008, future guidance will prescribe procedures applicable to applications for certification with respect to the returned credits.

SECTION 9. QUALIFIED PROGRESS EXPENDITURES

.01 Section 48A(b)(3) provides that rules similar to the rules of § 46(c)(4) and (d) (as in effect on the day before the enactment of the Revenue Reconciliation Act of 1990) shall apply for purposes of § 48A. Former §§ 46(c)(4) and 46(d) provided the rules for claiming the investment credit on qualified progress expenditures (as defined in former § 46(d)(3)) made by a taxpayer during the taxable year for the construction of progress expenditure property (as defined in former § 46(d)(2)).

.02 In the case of self-constructed property (as defined in former § 46(d)(5)(A)), former § 46(d)(3)(A) defined qualified progress expenditures to mean the amount that is properly chargeable (during the taxable year) to capital account with respect to that property. With respect to a qualifying advanced coal project that is self-constructed property, amounts paid or incurred are chargeable to capital account at the time and to the extent they are properly includible in computing basis under the taxpayer's method of accounting (for example, after applying the requirements of § 461, including the economic performance requirement of § 461(h)).

.03 To claim the qualifying advanced coal project credit on the qualified progress expenditures paid or incurred by a taxpayer during the taxable year for construction of a qualifying advanced coal project, the taxpayer must make an election under the rules set forth in § 1.46–5(o) of the Income Tax Regulations. A taxpayer may not make the qualified progress expenditures election for a qualifying advanced coal project until the taxpayer

has received an acceptance letter for the project under section 4.02(10) of this notice.

.04 If a taxpayer makes the qualified progress expenditures election pursuant to section 9.03 of this notice, rules similar to the recapture rules in § 50(a)(2)(A)-(D) apply. In addition to the cessation events listed in § 50(a)(2)(A), examples of other events that will cause the project to cease being a qualifying advanced coal project are:

(1) Failure to satisfy any of the certification requirements in § 48A(e)(2) within 2 years from the date that the Service accepted the taxpayer's application for § 48A certification for the project under section 4.02(10) of this notice;

(2) Failure to receive a certification for the project in accordance with section 6.03 of this notice;

(3) Failure to place the project in service within 5 years from the date of issuance of the certification under section 6.03 of this notice; or

(4) In the case of an IGCC project that was entitled to priority under § 48A(e)(3)(B), failure to provide the priority benefit on the date the project is placed in service.

## SECTION 10. EFFECTIVE DATE

This notice is effective February 21, 2006.

## SECTION 11. PAPERWORK REDUCTION ACT

The collection of information contained in this notice has been reviewed and approved by the Office of Management and Budget in accordance with the Paperwork Reduction Act (44 U.S.C. 3507) under control number 1545–2003.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid OMB control number.

The collections of information in this notice are in sections 4, 5, 6, 7, 8, and Appendix B of this notice. This information is required to obtain an allocation of qualifying advanced coal project credits. This information will be used by the Service to verify that the taxpayer is eligible for the qualifying advanced coal project credits. The collection of information is required to obtain a benefit. The likely respondents are business or other for-profit institutions.

The estimated total annual reporting burden is 4,950 hours.

The estimated annual burden per respondent varies from 70 to 150 hours, depending on individual circumstances, with an estimated average of 110 hours. The estimated number of respondents is 45.

The estimated annual frequency of responses is on occasion.

Books or records relating to a collection of information must be retained as long as their contents may become material in the administration of any internal revenue law. Generally, tax returns and tax return information are confidential, as required by 26 U.S.C. 6103.

## SECTION 12. DRAFTING INFORMATION

The principal author of this notice is Douglas H. Kim of the Office of Associate Chief Counsel (Passthroughs & Special Industries). For further information regarding this notice, contact Mr. Kim at (202) 622–3110 (not a toll-free call).

APPENDIX A

CLOSING AGREEMENT

Under § 7121 of the Internal Revenue Code, [insert taxpayer's name, address, and identifying number] ("Taxpayer") and the Commissioner of Internal Revenue ("Commissioner") make the following closing agreement:

**WHEREAS:**

1. On or before October [insert date and year], Taxpayer submitted to the Internal Revenue Service ("IRS"), an application for certification under the qualifying advanced coal project program described in Notice 2006–24 ("Application for § 48A Certification");

2. Taxpayer's Application for § 48A Certification is for the qualifying advanced coal project (the "Project") described below—

(1) The Project will use [insert either "an integrated gasification combined cycle (as defined in § 48A(c)(7))" or "an advanced coal-based technology (as defined in § 48A(c)(2) and (f)) other than an integrated gasification combined cycle"];

(2) The Project will be located at [insert address or other identifying designation];

(3) The Project is [insert either: "a new electric generation unit (as defined in § 48A(c)(6))"; "a retrofit of an existing electric generation unit (as defined in § 48A(c)(6))"; or "a repower of an existing electric generation unit (as defined in § 48a(c)(6))";

(4) The Project will have a total nameplate generating capacity of [insert number] megawatts;

**[If the Project is an integrated gasification combined cycle project, insert:**

(5) At all times more than 50 percent of the cumulative total fuel input (coal and any other fuel input) for the Project will be [insert either: "bituminous coal"; "subbituminous coal"; or "lignite"];

(6) The Project is entitled to priority under § 48A(e)(3)(B) for [insert either: "greenhouse gas capture capability (as defined in § 48A(c)(5))"; "increased by-product utilization"; or "both greenhouse gas capture capability (as defined in § 48A(c)(5)) and increased by-product utilization"];] and

3. On or before November 30, [insert year], the IRS accepted Taxpayer's Application for § 48A Certification for the Project and allocated a qualifying advanced coal project credit under § 48A in the amount of $[insert number] to the Project.

**NOW IT IS HEREBY DETERMINED AND AGREED FOR FEDERAL INCOME TAX PURPOSES THAT:**

1. The total amount of the qualifying advanced coal project credit to be claimed for the Project under § 48A(a) must not exceed $[insert the number in WHEREAS clause #3].

2. If Taxpayer fails to satisfy any of the certification requirements in § 48A(e)(2) within 2 years of [insert date of acceptance letter issued under section 4.02(10) of Notice 2006–24], or if the IRS does not issue a certification for the Project under Notice 2006–24, the qualifying advanced coal project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited.

3. If the Project is not placed in service by Taxpayer within 5 years of the date of issuance of the certification as determined under section 6.03 of Notice 2006–24, the qualifying advanced coal project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited.

4. If the Project does not have a total nameplate generating capacity of [insert the number in WHEREAS clause #2(4)] megawatts on the date the Project is placed in service, the qualifying advanced coal project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is reduced proportionately.

**[If the Project is not an integrated gasification combined cycle project, insert:**

5. If the Project fails to satisfy any of the requirements in § 48A(e)(1) for a qualifying advanced coal project—

(1) at the time the Project is placed in service, the qualifying advanced coal project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited; and

(2) after the Project is placed in service (and after satisfying all such requirements at the time the Project is placed in service), the Project ceases to be investment credit property and the recapture rules of § 50(a) apply.]

**[If the Project is an integrated gasification combined cycle project, insert:**

5. (1) If the Project fails to satisfy any of the requirements in § 48A(e)(1) for a qualifying advanced coal project—

(a) at the time the Project is placed in service, the qualifying advanced coal project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited; and

(b) after the Project is placed in service (and after satisfying all such requirements at the time the Project is placed in service), the Project ceases to be investment credit property and the recapture rules of § 50(a) apply.

(2) If at any time more than 50 percent of the cumulative total fuel input (coal and any other fuel input) for the Project is not [insert the primary feedstock in WHEREAS clause #2(5)], the Project ceases to be investment credit property and the recapture rules of § 50(a) apply.

(3) If the Project fails to provide [insert priority benefits in WHEREAS clause #2(6)] at the time the Project is placed in service, the qualifying advanced coal project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited.]

6. Taxpayer will not claim the qualifying gasification project credit under § 48B for any qualified investment for which the qualifying advanced coal project credit is allowed under § 48A.

7. If Taxpayer elects to claim the qualifying advanced coal project credit on the qualified progress expenditures paid or incurred by Taxpayer during the taxable year for construction of a qualifying advanced coal project, rules similar to the recapture rules in § 50(a)(2)(A) through (D) apply.

8. This agreement applies only to Taxpayer. Any successor in interest must execute a new closing agreement with the IRS. If the interest is acquired at or before the time the Project is placed in service and the successor in interest fails to execute a new closing agreement, the qualifying advanced coal project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited. If the interest is acquired after the time the Project is placed in service and the successor in interest fails to execute a new closing agreement, the Project ceases to be investment credit property and the recapture rules of § 50(a) apply.

**THIS AGREEMENT IS FINAL AND CONCLUSIVE EXCEPT:**

1. The matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of a material fact;

2. It is subject to the Internal Revenue Code sections that expressly provide that effect be given to their provisions (including any stated exception for § 7122) notwithstanding any law or rule of law; and

3. If it relates to a tax period ending after the date of this Closing Agreement, it is subject to any law enacted after such date, which applies to the tax period.

By signing, the parties certify that they have read and agreed to the terms of this Closing Agreement.

**Taxpayer: [insert name and identifying number]**

**By:** _____     **Date Signed:** _____
          [insert name]

**Title:** [insert title]
          [insert taxpayer's name]

**Commissioner of Internal Revenue**

**By:** _____    **Date Signed:** _____
       [insert name]

**Title:** Associate Chief Counsel, Passthroughs and Special Industries, CC:PSI

---

**I have examined the specific matters involved and recommend the acceptance of the proposed agreement.**

(Receiving Officer) _____

(Title) _____

Date Signed _____

**I have reviewed the specific matters involved and recommend the acceptance of the proposed agreement.**

(Reviewing Officer) _____

(Title) _____

Date Signed _____

APPENDIX B

APPLICATION FOR DOE CERTIFICATION

**REQUEST FOR SUPPLEMENTAL APPLICATION INFORMATION FOR DOE**

Pursuant to Notice 2006–24 establishing the Qualifying Advanced Coal Project Program, the Internal Revenue Service ("IRS") will allocate a credit under § 48A of the Internal Revenue Code to a project only if, among other things, the IRS receives from the Department of Energy ("DOE") a certification of feasibility and consistency with energy policy goals ("DOE certification") for the project. This DOE certification shall assure that the applications selected meet the requirements of § 48A and the intent of § 48A to provide credits to projects that are both technically and economically feasible.

The IRS and DOE seek to certify applications that demonstrate a high likelihood of being successfully implemented by the applicants. To qualify, projects must be economically feasible and use the appropriate clean coal technology.

This request for submission of supplemental application information:

1. Describes the information to be provided by the applicant seeking a DOE certification, and

2. Lists the evaluation criteria, and Program Policy Factors to be used by DOE in the evaluation of applications.

In conducting this evaluation, the DOE may utilize assistance and advice from qualified personnel from other Federal agencies and/or non-conflicted contractors. DOE will obtain assurances in advance from all evaluators that application information shall be kept confidential and used only for evaluation purposes. DOE reserves the right to request clarifications and/or supplemental information from some or all applicants through written submissions and/or oral presentations.

Notice is given that DOE may determine whether or not to provide a DOE certification to the IRS at any time after the application has been received, without further exchanges or discussions. Therefore, all applicants are advised to submit their most complete and responsive application.

Applications will not be returned.

SUBMISSION INFORMATION FOR DOE CERTIFICATION APPLICATION

**A. General**

This request, together with the information in sections 5.02, 7.01, and 7.02 of Notice 2006–24 includes all the information needed to complete an application for DOE certification. All applications shall be prepared in accordance with this request in order to provide a standard basis for evaluation and to ensure that each application will be uniform as to format and sequence.

Each application should clearly demonstrate the applicant's capability, knowledge, and experience in regard to the requirements described herein.

Applicants should fully address the requirements of Notice 2006–24 and this request and **not** rely on the presumed background knowledge of reviewers. DOE may reject an application that does not follow the instructions regarding the organization and content of the application when the nature of the deviation and/or omission precludes meaningful review of the application.

**B. Unnecessarily Elaborate Applications**

Unnecessarily elaborate brochures or other presentations beyond those sufficient to present a complete and effective application are not desired. Elaborate art work, graphics and pictures are neither required nor encouraged.

**C. Application Submission for DOE Certification**

The application submission to DOE must include the information and documentation required by sections 5.02, 7.01, and 7.02 of Notice 2006–24.

A project will not be considered in the allocation round conducted in a calendar year unless the application for DOE certification of the project is postmarked by June 30 of that calendar year. Two paper copies and one electronic version on a floppy disc or a CD of the Application must be submitted to:

Melissa Robe
National Energy Technology Laboratory
3610 Collins Ferry Road
Morgantown, WV 26507

Note that under section 5 of Notice 2006–24, one paper copy must be sent to the IRS as part of the application for IRS certification. The project will not be considered in the allocation round conducted in a calendar year unless the application is submitted to the IRS by the date specified for that calendar year in section 4.02(8) of Notice 2006–24.

**THE INFORMATION REQUIRED BY THIS REQUEST MUST BE SUBMITTED USING THE FORMAT AND THE HEADINGS OF THE "PROJECT INFORMATION MEMORANDUM" AS DESCRIBED BELOW.**

To aid in evaluation, applications shall be clearly and concisely written and logically assembled. All pages of each part shall be appropriately numbered and identified with the name of the applicant and the date.

The application, including the Project Information Memorandum, MUST be formatted in one of the following software applications:

Microsoft Word$^{tm}$ 2002 or later edition

Microsoft Excel$^{tm}$ 2002 or later edition

Adobe Acrobat$^{tm}$ PDF 6.0 or later edition

Financial models should be submitted using the Excel$^{tm}$ spreadsheet and must include calculation formulas and assumptions.

The applicant is responsible for the integrity and structure of the electronic files. The DOE will not be responsible for reformatting, restructuring or converting any files submitted under this announcement.

The Project Information Memorandum, *excluding Appendices*, shall not exceed seventy-five (75) pages. Pages in excess of the page limitation will not be considered for evaluation. All text shall be typed, single spaced, using 12 point font, 1 inch margins, and unreduced 8-1/2-inch by 11-inch pages. Illustrations and charts shall be legible with all text in legible font. Pages shall be sequentially numbered. Except as otherwise noted herein the page guidelines previously set forth constitute a limitation on the total amount of material that may be submitted for evaluation. No material may be incorporated in any application by reference as a means to circumvent the page limitation.

**D. Form of Project Information Memorandum**

PROJECT INFORMATION MEMORANDUM

I. SUMMARY AND INTRODUCTION

- Description of the Project

- Financing and Ownership Structure

- Describe the main parties to the project, including background, ownership and related experience

- Current Project Status and Schedule to Beginning of Construction

II. TECHNOLOGY AND TECHNICAL INFORMATION

Provide a description of the proposed technology, including sufficient supporting information (such as process flow diagrams, equipment descriptions, information on each major process unit and the total plant, compositions of major streams, and the technical plan for achieving the goals proposed for the project) as would be needed to allow DOE to confirm that the technical requirements of § 48A could, in principle, be met. Specifically the applicant should:

- Provide evidence sufficient to demonstrate that the proposed technology meets the definition of "Advanced Coal-Based Generation Technology," either as integrated gasification combined cycle (IGCC) technology, or other advanced coal-based electric generation technology meeting the heat rate requirement of 8530 Btu/kWh

  - The applicant must provide actual heat rate and heat rate corrected to conditions specified in § 48A(f)(2)

  - For projects including existing units, the applicant must provide information sufficient to justify that the proposed technology meets heat rate requirements specified in § 48A(f)(3)

- Provide evidence sufficient to ensure that the proposed project is designed to meet the following performance requirements:

  - SO2 percent removal........99 percent

  - NOx emissions.................0.07 lbs / MMBTU

  - PM emissions...................0.015 lbs / MMBTU

  - Hg percent removal..........90 percent

- Provide evidence sufficient to demonstrate that the project meets the requirements for qualifying advanced coal projects as specified under § 48A(e)(1) including:

  - The project will power a new electric generation unit or retrofit/repower an existing electric generation unit. At least 50% of the useful output of the project is electrical power.

  - The fuel for the project is at least 75% coal (as defined in § 48A(c)(4)), on an energy input basis.

  - The project is located at one site and has a total nameplate electric power generating capacity of at least 400 MW.

- Provide information and data, including examples of prior similar projects completed by applicant, EPC contractor, and suppliers of major subsystems or equipment which support the capabilities of the applicant to construct and operate the facility.

- Include the project status and relevant information from ongoing engineering activities. Also include in an appendix any engineering report or reports used by the applicant to develop the project and to estimate costs and operating performance.

## III. PRIORITY FOR INTEGRATED GASIFICATION COMBINED CYCLE PROJECTS

For IGCC Projects, the applicant must submit information sufficient for categorization and prioritization of projects for certification, including:

- Identification of the primary feedstock (as defined in section 5.02(5) of Notice 2006–24), and all other feedstocks.

- If applicable, evidence demonstrating that the project will be capable of adding components that can capture, separate and permanently sequester greenhouse gases.

- A plan showing how project by-products will be marketed and utilized.

- Other benefits, if any.

## IV. SITE CONTROL AND OWNERSHIP

- Provide evidence that the applicant owns or controls a site in the United States of sufficient size to allow the proposed project to be constructed and operated on a long-term basis.

- Describe the current infrastructure at the site available to meet the needs of the project.

- Provide information supporting applicant's conclusion that the proposed site can fully meet all environmental, coal supply, water supply, transmission interconnect, and public policy requirements.

## V. UTILIZATION OF PROJECT OUTPUT

- A projection of the anticipated costs of electricity and other marketable by-products produced by the plant.

- Provide evidence that a majority of the output of the plant is reasonably expected to be acquired or utilized.

- Describe any energy sales arrangements that exist or that may be contemplated, *e.g.*, Power Purchase Agreement or Energy Sales Agreement, and summaries of their key terms and conditions.

- Include as an appendix any independent Energy Price Market Study that has been done in connection with this project, or if no independent market study has been completed, provide a copy of the applicant-prepared market study.

- Identify and describe any firm arrangements to sell non-power output, and provide any evidence of such arrangements. If the project produces a product in addition to power, include as an appendix any related market study of price and volume of sales expected for that product.

## VI. PROJECT ECONOMICS

Describe the project economics and provide satisfactory evidence of economic feasibility as demonstrated through the financial forecast and the underlying project assumptions.

Discuss the market potential for the proposed technology beyond the project proposed by the applicant.

Show calculation of the amount of tax credit applied for based on allowable cost.

## VII. PROJECT DEVELOPMENT AND FINANCIAL PLAN

Provide the total project budget and major plant costs, *e.g.*, development, operating, capital, construction, and financing costs. Describe the overall approach to project development and financing sufficient to demonstrate project viability. Provide a complete explanation of the source and amount of project equity. Provide a complete explanation of the source and amount of project debt. Provide the audited financial statements for the applicant for the most recently ended three fiscal years, and the unaudited quarterly interim financial statements for the current fiscal year.

For internally financed projects, provide evidence that the applicant has sufficient assets to fund the project with its own resources. Identify any internal approvals required to commit such assets. Include in an appendix copies of any board resolution or other approval authorizing the applicant to commit funds and proceed with the project.

For projects financed through debt instruments either unsecured or secured by assets other than the project, provide evidence that the applicant has sufficient creditworthiness to obtain such financing along with a discussion of the status of such instruments. Identify any internal approvals required to commit the applicant to pursue such financing. Include in an appendix, copies of any board resolution or other approval authorizing the applicant to commit to such financing.

For projects financed through investor equity contributions, discuss the source and status of each contribution. Discuss each investor's financial capability to meet its commitments. Include in an appendix, copies of any executed investment agreements.

If financing through a public offering or private placement of either debt or equity is planned for the project, provide the expected debt rating for the issue and an explanation of applicant's justification for the rating. Describe the status of any discussions with prospective investment bankers or other financial advisors.

For projects employing nonrecourse debt financing, provide a complete discussion of the approach to, and status of, such financing.

In an appendix, provide (1) an Excel based financial model of the project, with formulas, so that review of the model calculations and assumptions may be facilitated; provide *pro-forma* project financial, economic, capital cost, and operating assumptions, including detail of all project capital costs, development costs, interest during construction, transmission interconnection costs, other operating expenses, and all other costs and expenses, and (2) a report of an independent financial analyst in accordance with the instructions in Section G of this Appendix B.

## VIII. PROJECT CONTRACT STRUCTURE

Describe the current status of each of the agreements set forth below. Include as an appendix copies of the contracts or summaries of the key provisions of each of the following agreements:

- Power Purchase Agreement (if not fully explained in Section IV)

- Coal Supply: describe the source and price of coal supply for the project. Include as an appendix any studies of coal supply price and amount that have been prepared. Include a summary of the coal supply contract and a copy of the contract.

- Coal transportation: explain the arrangements for transporting coal, including costs.

- Operations & Maintenance Agreement: include a summary of the terms and conditions of the contract and a copy of the contract.

- Shareholders Agreement: summarize key terms and include the agreement as an appendix.

- Engineering, Procurement and Construction Agreement: describe the key terms of the existing or expected EPC contract arrangement, including firm price, liquidated damages, hold-backs, performance guarantees, etc.

- Water Supply Agreement: confirm the amount, source, and cost of water supply.

- Transmission interconnection agreement: explain the requirements to connect to the system and the current status of negotiations in this respect.

## IX. PERMITS INCLUDING EVIRONMENTAL AUTHORIZATIONS

- Provide a complete list of all federal, state, and local permits, including environmental authorizations or reviews, necessary to commence construction of the project.

- Explain what actions have been taken to date to satisfy the required authorizations and reviews, and the status of each.

- Provide a description of the applicant's plan to obtain and complete all necessary permits, and environmental authorizations and reviews.

## X. STEAM TURBINE PURCHASE

- If applicant plans to purchase a steam turbine or turbines for the project, indicate the prospective vendors for the turbine and explain the current status of purchase negotiations, and provide a timeline for negotiation and purchase with expected purchase date.

## XI. PROJECT SCHEDULE

- Provide an overall project schedule which includes technical, business, financial, permitting and other factors to substantiate that the project will meet the 2 year project certification and 5 year placed-in-service requirement.

APPENDICES

- Independent Financial Report.

- Copy of internal or external engineering reports.

- Copy of site plan, together with evidence that applicant owns or controls a site. Examples of evidence would include a deed, or an executed contract to purchase or lease the site.

- Information supporting applicant's conclusion that the site is fully acceptable as the project site with respect to environment, coal supply, water supply, transmission interconnect, and public policy reasons.

- Power Purchase or Energy Sales Agreement.

- Energy Market Study.

- Market Study for non-power output.

- Financial Model of project.

- Audited financial statements for the applicant for the most recently ended three fiscal years, and the unaudited quarterly interim financial statements for the current fiscal year.

- For each project contract, if no contract currently exists, provide a summary of the expected terms and conditions.

- List of all federal, state, and local permits, including environmental authorizations or reviews, necessary to commence construction.

- If an appendix listed above is not provided, include in its place a complete explanation of the reasons for the omission.

**E. Evaluation Criteria:**

Advanced coal projects: will be evaluated on whether they meet all the requirements of § 48A.

Technical: will be evaluated on whether the applicant has demonstrated the capability to accomplish the technical objectives.

Site: will be evaluated on the basis that the site requirement for ownership or control has been met, and that the site is suitable for the proposed project.

Economic: will be evaluated on whether the project has demonstrated economic feasibility, taking into consideration the submitted financial and project development and structural information and financial plan.

Schedule: will be evaluated on the applicant's ability to meet the 2 year project certification and the 5 year placed-in-service requirement.

**F. Program Policy Factors to be used by DOE in the evaluation of applications and a description of how they will be applied.**

These factors, while not indicators of the applicant's merit, *e.g.*, technical excellence, cost, applicant's ability, etc., may be essential to the process of selecting the application(s) that, individually or collectively, will best achieve the objectives of the authorizing legislation. Such factors are often beyond the control of the applicant. Applicants should recognize that some very good applications may not receive selection for certification because they do not fit within a mix of projects and technologies that maximize the probability of achieving the overall objective of deployment of advanced coal-based generation technology. Therefore, the following Program Policy Factors may be used individually or collectively by DOE following application of evaluation criteria to determine which of the applications shall receive certification by DOE.

- Diversity of technology approaches and methods

- Geographic distribution of potential markets

- Presentation of unique environmental, economic, or performance benefits

## G. Instructions for independent financial reports

The applicant shall provide an independent report by a qualified Independent Financial Analyst (such as a bank, investment bank, or other independent financial advisory firm). In the report, the Independent Financial Analyst shall describe qualifications and experience that establish the Analyst's competence to evaluate project financing for projects similar in scope and size to the Applicant's project. The Independent Financial Analyst shall provide a thorough, independent review of the Applicant's approach to project financing. The report shall include the opinion of the Independent Financial Analyst as to the Applicant's likelihood to achieve financial closure in accordance with the Applicant's financing plan.

### Required Certification by Independent Financial Analyst:

**The report shall be certified by the Independent Financial Analyst, who shall (a) acknowledge that the report has been prepared for submission to the Department of Energy as a part of an application by applicant for an investment credit, and (b) certify that the Independent Financial Analyst has no obligation to the applicant and has acted to the best of its ability as an independent expert.**

**At a minimum, the Independent Financial Analyst shall:**

- Review the financial model.

- Review the project financial assumptions, including economic, capital costs, operating assumptions, and all project development costs.

- Review the financial calculations, including rates of return and coverage ratios.

- Confirm the calculation of the amount of the tax credit applied for.

- Review the project development cost budget.

- Review and comment on the source of funding and evidence of funding.

- Review and comment on project debt and equity sources.

- Confirm that the application includes the required financial reports and debt ratings.

- Describe and comment on the capabilities of the applicant to provide the required financing for the project, and the likelihood of obtaining financing from a source other than the applicant, if such financing is required by the project.

---

## Qualifying Gasification Project Program

### Notice 2006–25

#### SECTION 1. PURPOSE

This notice establishes the qualifying gasification project program under § 48B(d) of the Internal Revenue Code. The purpose of this program is to consider and award certifications for qualified investment eligible for credits under § 48B to qualifying gasification project sponsors.

#### SECTION 2. BACKGROUND

.01 Section 46 provides that the amount of the investment credit for any taxable year is the sum of the credits listed in § 46. Section 1307(a) of the Energy Policy Act of 2005, Pub. L. 109–58, 119 Stat. 594 (August 8, 2005) (the "Act"), amended § 46 to add two new credits to that list: the qualifying advanced coal project credit and the qualifying gasification project credit.

.02 The qualifying gasification project credit is provided under § 48B, as added by § 1307(b) of the Act. Section 48B(a) provides that the qualifying gasification project credit for a taxable year is an amount equal to 20 percent of the qualified investment (as defined in § 48B(b)) for that taxable year in qualifying gasification projects. Pursuant to § 48B(d)(1), the aggregate amount of credits allocated to all qualifying gasification projects may not exceed $350 million.

.03 The term "qualifying gasification project" is defined in § 48B(c)(1) as meaning any project that (A) employs gasification technology, (B) will be carried out by an eligible entity (as defined in § 48B(c)(7)), and (C) includes a qualified investment of which an amount not to exceed $650 million is certified under the qualifying gasification program as eligible for credit under § 48B. Pursuant to § 48B(c)(2), gasification technology is any process that converts a solid or liquid product from coal (as defined in § 48B(c)(6)), petroleum residue (as defined in § 48B(c)(8)), biomass (as defined in § 48B(c)(4)), or other materials that are recovered for their energy or feedstock value into a synthesis gas composed primarily of carbon monoxide and hydrogen for direct use or subsequent chemical or physical conversion.

.04 The qualifying gasification project credit generally is allowed in the taxable year in which the eligible property (as defined in § 48B(c)(3)) is placed in service by the taxpayer. Further, the at-risk rules in § 49 and the recapture and other special

## G. Instructions for independent financial reports

The applicant shall provide an independent report by a qualified Independent Financial Analyst (such as a bank, investment bank, or other independent financial advisory firm). In the report, the Independent Financial Analyst shall describe qualifications and experience that establish the Analyst's competence to evaluate project financing for projects similar in scope and size to the Applicant's project. The Independent Financial Analyst shall provide a thorough, independent review of the Applicant's approach to project financing. The report shall include the opinion of the Independent Financial Analyst as to the Applicant's likelihood to achieve financial closure in accordance with the Applicant's financing plan.

**Required Certification by Independent Financial Analyst:**

**The report shall be certified by the Independent Financial Analyst, who shall (a) acknowledge that the report has been prepared for submission to the Department of Energy as a part of an application by applicant for an investment credit, and (b) certify that the Independent Financial Analyst has no obligation to the applicant and has acted to the best of its ability as an independent expert.**

**At a minimum, the Independent Financial Analyst shall:**

- Review the financial model.

- Review the project financial assumptions, including economic, capital costs, operating assumptions, and all project development costs.

- Review the financial calculations, including rates of return and coverage ratios.

- Confirm the calculation of the amount of the tax credit applied for.

- Review the project development cost budget.

- Review and comment on the source of funding and evidence of funding.

- Review and comment on project debt and equity sources.

- Confirm that the application includes the required financial reports and debt ratings.

- Describe and comment on the capabilities of the applicant to provide the required financing for the project, and the likelihood of obtaining financing from a source other than the applicant, if such financing is required by the project.

## Qualifying Gasification Project Program

## Notice 2006–25

SECTION 1. PURPOSE

This notice establishes the qualifying gasification project program under § 48B(d) of the Internal Revenue Code. The purpose of this program is to consider and award certifications for qualified investment eligible for credits under § 48B to qualifying gasification project sponsors.

SECTION 2. BACKGROUND

.01 Section 46 provides that the amount of the investment credit for any taxable year is the sum of the credits listed in § 46. Section 1307(a) of the Energy Policy Act

of 2005, Pub. L. 109–58, 119 Stat. 594 (August 8, 2005) (the "Act"), amended § 46 to add two new credits to that list: the qualifying advanced coal project credit and the qualifying gasification project credit.

.02 The qualifying gasification project credit is provided under § 48B, as added by § 1307(b) of the Act. Section 48B(a) provides that the qualifying gasification project credit for a taxable year is an amount equal to 20 percent of the qualified investment (as defined in § 48B(b)) for that taxable year in qualifying gasification projects. Pursuant to § 48B(d)(1), the aggregate amount of credits allocated to all qualifying gasification projects may not exceed $350 million.

.03 The term "qualifying gasification project" is defined in § 48B(c)(1) as meaning any project that (A) employs gasification technology, (B) will be carried out by an eligible entity (as defined

in § 48B(c)(7)), and (C) includes a qualified investment of which an amount not to exceed $650 million is certified under the qualifying gasification program as eligible for credit under § 48B. Pursuant to § 48B(c)(2), gasification technology is any process that converts a solid or liquid product from coal (as defined in § 48B(c)(6)), petroleum residue (as defined in § 48B(c)(8)), biomass (as defined in § 48B(c)(4)), or other materials that are recovered for their energy or feedstock value into a synthesis gas composed primarily of carbon monoxide and hydrogen for direct use or subsequent chemical or physical conversion.

.04 The qualifying gasification project credit generally is allowed in the taxable year in which the eligible property (as defined in § 48B(c)(3)) is placed in service by the taxpayer. Further, the at-risk rules in § 49 and the recapture and other special

DEFENDANT'S EXHIBIT 2

rules in § 50 apply to the qualifying gasification project credit.

## SECTION 3. QUALIFYING GASIFICATION PROJECT PROGRAM

Section 48B(d)(1) provides that the Secretary, in consultation with the Secretary of Energy, shall establish a qualifying gasification project program to consider and award certifications for qualified investment eligible for credits under § 48B to qualifying gasification project sponsors. The Treasury Department and the Internal Revenue Service are establishing the qualifying gasification project program under the rules set forth in sections 4 through 8 of this notice. Pursuant to § 48B(d)(2), certificates of eligibility may be issued under the program only during the 10-year period beginning on October 1, 2005.

## SECTION 4. ESTABLISHMENT OF QUALIFYING GASIFICATION PROJECT PROGRAM

.01 *In General.* The Service will consider a project under the qualifying gasification project program only if the U.S. Department of Energy ("DOE") provides a certification of feasibility and consistency with energy policy goals ("DOE certification") for the project. Accordingly, for each qualifying gasification project, a taxpayer must submit: (1) an application for certification by the DOE ("application for DOE certification"), and (2) an application for certification under § 48B by the Service ("application for § 48B certification"). Both applications may be submitted only during the 3-year period beginning on February 21, 2006. Certifications will be issued and credits will be allocated to projects in annual allocation rounds. The initial allocation round will be conducted in 2006. If necessary, additional allocation rounds will be conducted in 2007 and 2008.

.02 *Program Specifications.*

(1) The Service will determine the amount of the qualifying gasification project credits allocated to a qualifying gasification project at the time the Service accepts the application for § 48B certification for that project in accordance with section 4.02(9) of this notice. The qualified investment in the project will be certified as eligible for the credit to the extent such investment does not exceed the amount of the credit allocated to the project multiplied by five. See section 5 of this notice for the requirements applicable to the application for DOE certification and the application for § 48B certification.

(2) The certification for a project cannot apply to more than $650 million of the qualified investment in the project. Thus, the maximum amount of qualifying gasification project credits that will be allocated to a project is $130 million.

(3) The aggregate credit of $350 million will be allocated as follows in the initial round of allocations conducted in 2006:

(a) The aggregate credit will be allocated first to the projects that have carbon capture capability (as defined in § 48B(c)(5)), use renewable fuel, or have project teams with experience that demonstrates successful and reliable operations of the gasification technology on the domestic fuels identified in § 48B(c)(2).

(b) If the requested allocation of credits for these priority projects exceeds the aggregate credit of $350 million, the credit will be allocated to the priority projects providing the highest ratio of the total amount of synthesis gas to be supplied by the project ("nameplate capacity") to requested allocation of credits.

(c) If the requested allocation of credits for the priority projects does not exceed the aggregate credit of $350 million, the remaining amount of the credit will be allocated to the nonpriority projects providing the highest ratio of nameplate capacity to requested allocation of credits.

(4) If the aggregate credit of $350 million is not fully allocated in the initial round of allocations in 2006, similar allocation rounds will be conducted in 2007 and 2008 until the aggregate credit of $350 million is fully allocated. Generally, the results of each year will be announced.

(5) If the same project would otherwise be allocated credits under both the qualifying gasification project program under this notice and the qualifying advanced coal project program under Notice 2006–24, 2006–11 I.R.B. 595, the following rules apply:

(a) If the project is allocated the full amount of the qualifying advanced coal project credit requested by the taxpayer, no qualifying gasification project credit will be allocated to the project;

(b) If the project is allocated the full amount of the qualifying gasification project credit requested by the taxpayer, no qualifying advanced coal project credit will be allocated to the project;

(c) If the project is allocated less than the full amount of the qualifying advanced coal project credit requested by the taxpayer, the qualifying gasification project credit may be allocated to the project with respect to the qualified investment under § 48B for which a qualifying advanced coal project credit is not allowed under § 48A; and

(d) If the project is allocated less than the full amount of the qualifying gasification project credit requested by the taxpayer, the qualifying advanced coal project credit may be allocated to the project with respect to the qualified investment under § 48A for which a qualifying gasification project credit is not allowed under § 48B.

(6) For each allocation round, there will be an annual application period during which a taxpayer may file its application for § 48B certification. The Service will consider a project in an allocation round only if the application for § 48B certification for the project is submitted during the application period for that round and the DOE provides the DOE certification for the project before the end of that application period.

(7) For the initial allocation round conducted in 2006, the application period begins on February 21, 2006, and ends on October 2, 2006. Any completed application for § 48B certification received by the Service before October 3, 2006, will be deemed to be submitted by the taxpayer on October 2, 2006. For 2007, the application period begins on October 3, 2006, and ends on October 1, 2007, and any completed application for § 48B certification received by the Service after October 2, 2006, and before October 2, 2007, will be deemed to be submitted by the taxpayer on October 1, 2007. For 2008, the application period begins on October 2, 2007, and ends on October 1, 2008, and any completed application for § 48B certification received by the Service after October 1, 2007, and before October 2, 2008, will be deemed to be submitted by the taxpayer on October 1, 2008. For purposes of this notice, an application that is submitted by U.S. mail will be treated as received by the Service on the date of the postmark and an application submitted by a private delivery service will be treated as received by the Service

on the date recorded or the date marked in accordance with § 7502(f)(2)(C).

(8) See section 5.02 of this notice and Appendix B to this notice for the information to be submitted to the DOE in an application for DOE certification. Appendix B to this notice also provides the instructions and address for filing the application for DOE certification. The DOE will determine the feasibility of the project and its consistency with energy policy goals and, if the project is determined to be feasible and consistent with energy policy goals, will provide a DOE certification for the project to the Service. If an application for DOE certification is postmarked on or before June 30 of a calendar year, the DOE will determine the feasibility of the project and its consistency with energy policy goals and (for projects determined to be feasible and consistent) provide the DOE certification by October 1 of that calendar year.

(9) By November 30 of the calendar year in which an application for § 48B certification is deemed to be submitted (as determined under section 4.02(7) of this notice), the Service will accept or reject the taxpayer's application for § 48B certification and will notify the taxpayer, by letter, of its decision.

(10) A taxpayer that receives an acceptance letter under section 4.02(9) of this notice has 7 years from the date of the acceptance letter to place the project in service and if the project is not placed in service by the end of that period then the acceptance letter is void.

(11) If the taxpayer's application for § 48B certification is accepted, the acceptance letter will state the amount of the credit allocated to the project and the amount of qualified investment that is certified as eligible for the credit. If a credit is allocated to a taxpayer's project, the taxpayer will be required to execute a closing agreement in the form set forth in Appendix A to this notice. By January 31 of the following year, the taxpayer must execute and return the closing agreement to the Service at the appropriate address listed in section 5.04 of this notice or listed in later guidance published in the Internal Revenue Bulletin. The Service will execute and return the closing agreement to the taxpayer by March 31 of such following year. The executed closing agreement

applies only to the accepted taxpayer. Accordingly, any successor in interest must execute a new closing agreement with the Service. If the successor in interest does not execute a new closing agreement, the following rules apply:

(a) In the case of an interest acquired at or before the time the qualifying gasification project is placed in service, any credit allocated to the project will be fully forfeited (and rules similar to the recapture rules of § 50(a) apply with respect to qualified progress expenditures); and

(b) In the case of an interest acquired after the qualifying gasification project is placed in service, the project ceases to be investment credit property and the recapture rules of § 50(a) (and similar rules with respect to qualified progress expenditures) apply.

## SECTION 5. APPLICATIONS FOR CERTIFICATIONS

.01 *In General.* An application for § 48B certification and a separate application for DOE certification must be submitted for each qualifying gasification project. If an application for DOE certification does not include all of the information required by section 5.02 of this notice and meet the requirements in sections 6.01 and 6.02 of this notice, the DOE may decline to accept the application. If an application for § 48B certification does not include all of the information listed in section 5.03 of this notice and meet the requirements in sections 6.01 and 6.02 of this notice, the application will not be accepted by the Service.

.02 *Information Required in the Application for DOE Certification.* An application for DOE certification must include all of the information requested in Appendix B to this notice and all of the following:

(1) The name, address, and taxpayer identification number of the taxpayer;

(2) The name and telephone number of a contact person;

(3) The name and address (or other unique identifying designation) of the qualifying gasification project;

(4) A statement specifying the projected placed-in-service date of the qualifying gasification project;

(5) The estimated total cost of the project and the estimated total qualified

investment in the eligible property that will be part of the project;

(6) The amount of the qualifying gasification project credit requested for the project. The amount requested must not exceed $130 million (the maximum amount permitted under § 48B(a) and (c)(1)(C));

(7) If the taxpayer is or will be requesting an amount of the qualifying advanced coal project credit under § 48A for the same project, a statement specifying the credit the taxpayer prefers to receive;

(8) The amount of synthesis gas to be supplied by the qualifying gasification project (nameplate capacity). The synthesis gas must be composed primarily of carbon monoxide and hydrogen for direct use or subsequent chemical or physical conversion; and

(9) Documentation or other evidence establishing that the taxpayer is financially viable without the receipt of additional federal funding associated with the qualifying gasification project.

.03 *Information Required in the Application for § 48B Certification.* An application for § 48B certification must include all of the following:

(1) The name, address, and taxpayer identification number of the taxpayer;

(2) The name and telephone number of a contact person. If necessary, attach any required power of attorney, preferably on Form 2848, *Power of Attorney and Declaration of Representative*; and

(3) A paper copy of the completed application for DOE certification submitted with respect to the project in accordance with section 5.02 of this notice.

.04 *Instructions and Address for Filing § 48B Application.* Applications for § 48B certification should be marked: SECTION 48B APPLICATION FOR CERTIFICATION. There is no user fee for these applications.

(1) Applications submitted by U.S. mail must be sent to:

Internal Revenue Service
Attn: CC:PSI:6, Room 5313
P.O. Box 7604
Ben Franklin Station
Washington, DC 20044

Applications submitted by a private delivery service must be sent to:

Internal Revenue Service
Attn: CC:PSI:6, Room 5313
1111 Constitution Ave., N.W.
Washington, DC 20224

(2) Applications may also be hand de-livered Monday through Friday between the hours of 8 a.m. and 4 p.m. to:

Courier's Desk
Internal Revenue Service
Attn: CC:PSI:6, Room 5313
1111 Constitution Avenue, N.W.
Washington, DC 20224

SECTION 6. OTHER REQUIREMENTS

.01 *Signature.* Each submission under section 5 of this notice must be signed and dated by the taxpayer. A stamped signature or faxed signature is not permitted.

.02 *Penalties of Perjury Statement.*

(1) Each submission under section 5 of this notice must be accompanied by the following declaration: "Under penalties of perjury, I declare that I have examined this submission, including accompanying documents, and, to the best of my knowledge and belief, all of the facts contained herein are true, correct, and complete."

(2) The declaration must be signed and dated by the taxpayer. The person signing for the taxpayer must have personal knowledge of the facts. A stamped signature or faxed signature is not permitted.

.03 *Effect of an Acceptance or Allocation.* An acceptance or allocation by the Service under this notice is not a determination that a project qualifies for the qualifying gasification project credit under § 48B. The Service may, upon examination (and after any appropriate consultation with DOE), determine that the project does not qualify for this credit.

.04 *No Right to a Conference or Appeal.* A taxpayer does not have a right to a conference relating to any matters under this notice. Further, a taxpayer does not have a right to appeal the decisions made under this notice (including the acceptance or rejection of the application for DOE or § 48B certification or the amount of credit allocated to the project) to an Associate Chief Counsel or any other official of the Service.

SECTION 7.  REVIEW AND REDISTRIBUTION

.01 *In General.* Section 48B(d)(1) provides for the review and redistribution of credits allocated under the qualifying gasification project program under rules similar to the rules of § 48A(d)(4).

.02 *Review and Redistribution of Credits.*

(1) *In general.* If, after the allocation round in 2008, the aggregate credit of $350 million is not fully subscribed (*i.e.*, the aggregate credit is not fully allocated), an additional program for applications for certification to allocate the remaining credits will be conducted. Future guidance will prescribe the procedures applicable to applications for certification with respect to the remaining credits.

(2) *Reduction or forfeiture of allocated credits.* Under the closing agreement set forth in Appendix A to this notice, the qualifying gasification project credits allocated under section 4 of this notice will be reduced or forfeited in certain situations. A taxpayer must notify the Service of the amount of any reduction or forfeiture required under the closing agreement. This notification must be sent to the appropriate address listed in section 5.04 of this notice or listed in later guidance published in the Internal Revenue Bulletin.

The amount of any reduction or forfeiture of the allocated credits will be returned and included in the aggregate credit remaining to be allocated in the allocation round following the reduction or forfeiture. If the reduction or forfeiture occurs after the allocation round in 2008, future guidance will prescribe procedures applicable to applications for certification with respect to the returned credits.

SECTION 8. QUALIFIED PROGRESS EXPENDITURES

.01 Section 48B(b)(3) provides that rules similar to the rules of § 46(c)(4) and (d) (as in effect on the day before the enactment of the Revenue Reconciliation Act of 1990) shall apply for purposes of § 48B. Former §§ 46(c)(4) and 46(d) provided the rules for claiming the investment credit on qualified progress expenditures (as defined in former § 46(d)(3)) made by a taxpayer during the taxable year for

the construction of progress expenditure property (as defined in former § 46(d)(2)).

.02 In the case of self-constructed property (as defined in former § 46(d)(5)(A)), former § 46(d)(3)(A) defined qualified progress expenditures to mean the amount that is properly chargeable (during the taxable year) to capital account with respect to that property.  With respect to a qualifying gasification project that is self-constructed property, amounts paid or incurred are chargeable to capital account at the time and to the extent they are properly includible in computing basis under the taxpayer's method of accounting (for example, after applying the requirements of § 461, including the economic performance requirement of § 461(h)).

.03 To claim the qualifying gasification project credit on the qualified progress expenditures paid or incurred by a taxpayer during the taxable year for construction of a qualifying gasification project, the taxpayer must make an election under the rules set forth in § 1.46–5(o) of the Income Tax Regulations. The taxpayer may not make the qualified progress expenditures election for a qualifying gasification project until the taxpayer has received an acceptance letter for the project under section 4.02(9) of this notice.

.04 If a taxpayer makes the qualified progress expenditures election pursuant to section 8.03 of this notice, rules similar to the recapture rules in § 50(a)(2)(A)–(D) apply. In addition to the cessation events listed in § 50(a)(2)(A), examples of other events that will cause the project to cease being a qualifying gasification project are:

(1) Failure to place the project in service within 7 years from the date of the acceptance letter under section 4.02(9) of this notice; or

(2) In the case of a project that was entitled to priority for carbon capture capability, failure to provide that priority benefit on the date the project is placed in service.

SECTION 9. EFFECTIVE DATE

This notice is effective February 21, 2006.

SECTION 10.  PAPERWORK REDUCTION ACT

The collection of information contained in this notice has been reviewed and approved by the Office of Management and

Budget in accordance with the Paperwork Reduction Act (44 U.S.C. 3507) under control number 1545–2002.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid OMB control number.

The collections of information in this notice are in sections 4, 5, 6, 7, and Appendix B of this notice. This information is required to obtain an allocation of qualifying gasification project credits. This information will be used by the Service to verify that the taxpayer is eligible for the qualifying gasification project credits. The

collection of information is required to obtain a benefit. The likely respondents are business or other for-profit institutions.

The estimated total annual reporting burden is 1,700 hours.

The estimated annual burden per respondent varies from 50 to 125 hours, depending on individual circumstances, with an estimated average of 85 hours. The estimated number of respondents is 20.

The estimated annual frequency of responses is on occasion.

Books or records relating to a collection of information must be retained as long as their contents may become material in the administration of any internal revenue

law. Generally, tax returns and tax return information are confidential, as required by 26 U.S.C. 6103.

SECTION 11. DRAFTING INFORMATION

The principal author of this notice is Jennifer Bernardini of the Office of Associate Chief Counsel (Passthroughs & Special Industries). For further information regarding this notice, contact Douglas H. Kim at (202) 622–3110 (not a toll-free call).

APPENDIX A

CLOSING AGREEMENT

Under § 7121 of the Internal Revenue Code, [insert taxpayer's name, address, and identifying number] ("Taxpayer") and the Commissioner of Internal Revenue ("Commissioner") make the following closing agreement:

**WHEREAS:**

1. On or before October [insert date and year], Taxpayer submitted to the Internal Revenue Service ("IRS"), an application for certification under the qualifying gasification project program described in Notice 2006–25 ("Application for § 48B Certification");

2. Taxpayer's Application for § 48B Certification is for the qualifying gasification project (the "Project") described below—

(1) The Project will be located at [insert address or other identifying designation];

(2) The Project will supply [insert number] mcf of synthesis gas that is composed primarily of carbon monoxide and hydrogen for direct use or subsequent chemical or physical conversion;

(3) The fuels identified in § 48B(c)(2) will at all times cumulatively comprise at least 90 percent of the total fuels (fuels identified in § 48B(c)(2) and any other fuel input) required by the Project for the production of chemical feedstocks, liquid transportation fuels, or co-production of electricity;

**[If the Project is a priority project, insert:**

(4) The Project is entitled to priority under Notice 2006–25 [insert either: "for carbon capture capability (as defined in § 48B(c)(5)) or use of renewable fuels"; "because the project team has experience that demonstrates successful and reliable operations of the gasification technology on domestic fuels identified in § 48B(c)(2)"; or "both for carbon capture capability (as defined in § 48B(c)(5)) or use of renewable fuels and because the project team has experience that demonstrates successful and reliable operations of the gasification technology on domestic fuels identified in § 48B(c)(2)"];] and

3. On or before November 30, [insert year], the IRS accepted Taxpayer's Application for § 48B Certification for the Project and allocated a qualifying gasification project credit under § 48B in the amount of $[insert number] to the Project.

**NOW IT IS HEREBY DETERMINED AND AGREED FOR FEDERAL INCOME TAX PURPOSES THAT:**

1. The total amount of the qualifying gasification project credit to be claimed for the Project under § 48B(a) must not exceed $[insert the number in WHEREAS clause #3].

2. If the Project is not placed in service by Taxpayer within 7 years of [insert date of acceptance letter issued under section 4.02(9) of Notice 2006–25], the qualifying gasification project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited.

3. If the Project does not supply synthesis gas in the amount of [insert the number in WHEREAS clause #2(2)] on the date the Project is placed in service, the qualifying gasification project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is reduced proportionately.

**[If the Project is not a priority project for carbon capture capability, for use of renewable fuels, or because the project team has experience that demonstrates successful and reliable operations of the gasification technology on domestic fuels identified in § 48B(c)(2), insert:**

4. (1) If the Project fails to use gasification technology as defined in § 48B(c)(2) or is not carried out by an eligible entity as defined in § 48B(c)(7), the qualifying gasification project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited.

(2) If, at any time, the fuels identified in § 48B(c)(2) with respect to the gasification technology for the Project do not cumulatively comprise at least 90 percent of the total fuels (fuels identified in § 48B(c)(2) and any other fuel input) required by the Project for the production of chemical feedstocks, liquid transportation fuels, or co-production of electricity, the Project ceases to be investment credit property and the recapture rules of § 50(a) apply.]

[If the Project is a priority project for carbon capture capability, for use of renewable fuels, or because the project team has experience that demonstrates successful and reliable operations of the gasification technology on domestic fuels identified in § 48B(c)(2), insert:

4. (1) If the Project fails to use gasification technology as defined in § 48B(c)(2) or is not carried out by an eligible entity as defined in § 48B(c)(7), the qualifying gasification project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited.

(2) If, at any time, the fuels identified in § 48B(c)(2) with respect to the gasification technology for the Project do not cumulatively comprise at least 90 percent of the total fuels (fuels identified in § 48B(c)(2) and any other fuel input) required by the Project for the production of chemical feedstocks, liquid transportation fuels, or co-production of electricity, the Project ceases to be investment credit property and the recapture rules of § 50(a) apply.

(3) If the Project fails to provide [insert priority benefits in WHEREAS clause #2(4)] on the date the Project is placed in service, the qualifying gasification project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited.]

5. Taxpayer will not claim the qualifying advanced coal project credit under § 48A for any qualified investment for which the qualifying gasification project credit is allowed under § 48B.

6. If Taxpayer elects to claim the qualifying gasification project credit on the qualified progress expenditures paid or incurred by Taxpayer during the taxable year for construction of a qualifying gasification project, rules similar to the recapture rules in § 50(a)(2)(A) through (D) apply.

7. This agreement applies only to Taxpayer. Any successor in interest must execute a new closing agreement with the IRS. If the interest is acquired at or before the time the Project is placed in service and the successor in interest fails to execute a new closing agreement, the qualifying gasification project credit in the amount of $[insert the number in WHEREAS clause #3] allocated to the Project is fully forfeited. If the interest is acquired after the time the Project is placed in service and the successor in interest fails to execute a new closing agreement, the Project ceases to be investment credit property and the recapture rules of § 50(a) apply.

**THIS AGREEMENT IS FINAL AND CONCLUSIVE EXCEPT:**

1. The matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of a material fact;

2. It is subject to the Internal Revenue Code sections that expressly provide that effect be given to their provisions (including any stated exception for § 7122) notwithstanding any law or rule of law; and

3. If it relates to a tax period ending after the date of this Closing Agreement, it is subject to any law enacted after such date, which applies to the tax period.

By signing, the parties certify that they have read and agreed to the terms of this Closing Agreement.

**Taxpayer: [insert name and identifying number]**

**By:** _____    **Date Signed:** _____
    [insert name]

**Title:** [insert title]
    [insert taxpayer's name]

**Commissioner of Internal Revenue**

**By:** _____    **Date Signed:** _____
    [insert name]

**Title:** Associate Chief Counsel, Passthroughs and Special Industries, CC:PSI

**I have examined the specific matters involved and recommend the acceptance of the proposed agreement.**

(Receiving Officer) ——————————————

(Title) ——————————

Date Signed ————————————————

**I have reviewed the specific matters involved and recommend the acceptance of the proposed agreement.**

(Reviewing Officer) ——————————————

(Title) ——————————

Date Signed ————————————————

APPENDIX B

APPLICATION FOR DOE CERTIFICATION

**REQUEST FOR SUPPLEMENTAL APPLICATION INFORMATION FOR DOE**

Pursuant to Notice 2006–25 establishing the Qualifying Gasification Project Program, the Internal Revenue Service ("IRS") will certify that the investment in a project is eligible for a credit under § 48B of the Internal Revenue Code only if, among other things, the IRS receives from the Department of Energy ("DOE") a certification of feasibility and consistency with energy policy goals ("DOE certification") for the project. This DOE certification shall assure that the applications selected meet the requirements of § 48B and the intent of § 48B to provide credits to projects that are both technically and economically feasible.

The IRS and DOE seek to certify applications that demonstrate a high likelihood of being successfully implemented by the applicants. To qualify, projects must be economically feasible and use the appropriate gasification technology.

This request for submission of supplemental application information:

    1. Describes the information to be provided by the applicant seeking a DOE certification, and

    2. Lists the evaluation criteria, and Program Policy Factors to be used by DOE in the evaluation of applications.

In conducting this evaluation, the DOE may utilize assistance and advice from qualified personnel from other Federal agencies and/or non-conflicted contractors. DOE will obtain assurances in advance from all evaluators that application information shall be kept confidential and used only for evaluation purposes. DOE reserves the right to request clarifications and/or supplemental information from some or all applicants through written submissions and/or oral presentations.

Notice is given that DOE may determine whether or not to provide a DOE certification to the IRS at any time after the application has been received, without further exchanges or discussions. Therefore, all applicants are advised to submit their most complete and responsive application.

Applications will not be returned.

SUBMISSION INFORMATION FOR DOE CERTIFICATION APPLICATION

**A. General**

This request, together with the information in sections 5.02, 6.01, and 6.02 of Notice 2006–25 includes all the information needed to complete an application for DOE certification. All applications shall be prepared in accordance with this request in order to provide a standard basis for evaluation and to ensure that each application will be uniform as to format and sequence.

Each application should clearly demonstrate the applicant's capability, knowledge, and experience in regard to the requirements described herein.

Applicants should fully address the requirements of Notice 2006–25 and this request and **not** rely on the presumed background knowledge of reviewers. DOE may reject an application that does not follow the instructions regarding the organization and content of the application when the nature of the deviation and/or omission precludes meaningful review of the application.

**B. Unnecessarily Elaborate Applications**

Unnecessarily elaborate brochures or other presentations beyond those sufficient to present a complete and effective application are not desired. Elaborate art work, graphics and pictures are neither required nor encouraged.

**C. Application Submission for DOE Certification**

The application submission to DOE must include the information and documentation required by sections 5.02, 6.01, and 6.02 of Notice 2006–25.

A project will not be considered in the allocation round conducted in a calendar year unless the application for DOE certification of the project is postmarked by June 30 of that calendar year. Two paper copies and one electronic version on a floppy disc or a CD of the Application must be submitted to:

Melissa Robe
National Energy Technology Laboratory
3610 Collins Ferry Road
Morgantown, WV 26507

Note that under section 5 of Notice 2006–25, one paper copy must be sent to the IRS as part of the application for IRS certification. The project will not be considered in the allocation round conducted in a calendar year unless the application is submitted to the IRS by the date specified for that calendar year in section 4.02(7) of Notice 2006–25.

**THE INFORMATION REQUIRED BY THIS REQUEST MUST BE SUBMITTED USING THE FORMAT AND THE HEADINGS OF THE PROJECT INFORMATION MEMORANDUM AS DESCRIBED BELOW.**

To aid in evaluation, applications shall be clearly and concisely written and logically assembled. All pages of each part shall be appropriately numbered and identified with the name of the applicant and the date.

The application, including the Project Information Memorandum, MUST be formatted in one of the following software applications:

Microsoft Word[tm] 2002 or later edition

Microsoft Excel[tm] 2002 or later edition

Adobe Acrobat[tm] PDF 6.0 or later edition

Financial models should be submitted using the Excel[tm] spreadsheet and must include calculation formulas and assumptions.

The applicant is responsible for the integrity and structure of the electronic files. The DOE will not be responsible for reformatting, restructuring or converting any files submitted under this announcement.

The Project Information Memorandum, *excluding Appendices*, shall not exceed seventy-five (75) pages. Pages in excess of the page limitation will not be considered for evaluation. All text shall be typed, single spaced, using 12 point font, 1 inch margins, and unreduced 8-1/2-inch by 11-inch pages. Illustrations and charts shall be legible with all text in legible font. Pages shall be sequentially numbered. Except as otherwise noted herein the page guidelines previously set forth constitute a limitation on the total amount of material that may be submitted for evaluation. No material may be incorporated in any application by reference as a means to circumvent the page limitation.

**D. Form of Project Information Memorandum**

PROJECT INFORMATION MEMORANDUM

I. SUMMARY AND INTRODUCTION

- Description of the Project

- Financing and Ownership Structure

- Describe the main parties to the project, including background, ownership and related experience

- Current Project Status and Schedule to Beginning of Construction

II. TECHNOLOGY AND TECHNICAL INFORMATION

Provide a description of the proposed technology, including sufficient supporting information (such as process flow diagrams, equipment descriptions, information on each major process unit and the total plant, compositions of major streams, and the technical plan for achieving the goals proposed for the project) as would be needed to allow DOE to confirm that the technical requirements of § 48B could, in principle, be met. Specifically, the applicant should:

- Provide evidence sufficient to demonstrate that the proposed technology will employ gasification technology as defined in § 48B(c)(2).

- Present information sufficient to justify the total amount of synthesis gas (as defined in § 48B(c)(2)) to be produced by the project (nameplate capacity).

- Provide evidence sufficient to ensure that fuels defined in § 48B(c)(2) will comprise at least 90 percent of the total fuel input (fuels defined in § 48B(c)(2) and any other fuel input) for the project.

- Identify the domestic industry for which the proposed project is intended to be used.

- Identify the specific products and quantities produced by the proposed project, providing sufficient evidence to support claims.

- Provide information and data, including examples of prior similar projects completed by applicant, EPC contractor, and suppliers of major subsystems or equipment, which support the capabilities of the applicant to construct and operate the facility.

- Provide evidence that indicates, for projects using nonrenewable fuels, the gasification technology design reflects reasonable consideration for, and is capable of, accommodating equipment necessary to capture carbon dioxide for later use or sequestration. Include the project status and relevant information from ongoing engineering activities. Also include in an appendix any engineering report or reports used by the applicant to develop the project and to estimate costs and operating performance.

## III. SITE CONTROL AND OWNERSHIP

- Provide evidence that the applicant owns or controls a site in the United States of sufficient size to allow the proposed project to be constructed and operated on a long-term basis.

- Describe the current infrastructure at the site available to meet the needs of the project.

- Provide information supporting applicant's conclusion that the proposed site can fully meet all environmental, feedstock supply, water supply, transportation, and public policy requirements.

## IV. UTILIZATION OF PROJECT OUTPUT

- Provide evidence that a market exists for the products of the proposed project as evidenced by contracts or written statements of intent from potential customers.

- Describe any sales arrangements that exist or that may be contemplated and summaries of their key terms and conditions.

- Include as an appendix any independent Market Study that has been done in connection with this project, or if no independent market study has been completed, provide a copy of the applicant-prepared market study.

## V. PROJECT ECONOMICS

Describe the project economics and provide satisfactory evidence of economic feasibility as demonstrated through the financial forecast and the underlying project assumptions.

Discuss the market potential for the proposed technology beyond the project proposed by the applicant.

Show calculation for the amount of tax credit applied for based on allowable cost.

## VI. PROJECT DEVELOPMENT AND FINANCIAL PLAN

Provide the total project budget and major plant costs, *e.g.*, development, operating, capital, construction, and financing costs. Describe the overall approach to project development and financing sufficient to demonstrate project viability. Provide a complete explanation of the source and amount of project equity. Provide a complete explanation of the source and amount of project debt. Provide the audited financial statements for the applicant for the most recently ended three fiscal years, and the unaudited quarterly interim financial statements for the current fiscal year. Applicant should demonstrate that the award recipient is financially viable without the receipt of additional federal funding associated with the proposed project.

For internally financed projects, provide evidence that the applicant has sufficient assets to fund the project with its own resources. Identify any internal approvals required to commit such assets. Include in an appendix copies of any board resolution or other approval authorizing the applicant to commit funds and proceed with the project.

For projects financed through debt instruments either unsecured or secured by assets other than the project, provide evidence that the applicant has sufficient creditworthiness to obtain such financing along with a discussion of the status of such instruments. Identify any internal approvals required to commit the applicant to pursue such financing. Include in an appendix, copies of any board resolution or other approval authorizing the applicant to commit to such financing.

For projects financed through investor equity contributions, discuss the source and status of each contribution. Discuss each investor's financial capability to meet its commitments. Include in an appendix, copies of any executed investment agreements.

If financing through a public offering or private placement of either debt or equity is planned for the project, provide the expected debt rating for the issue and an explanation of applicant's justification for the rating. Describe the status of any discussions with prospective investment bankers or other financial advisors.

For projects employing nonrecourse debt financing, provide a complete discussion of the approach to, and status of, such financing.

In an appendix, provide (1) an Excel based financial model of the project, with formulas, so that review of the model calculations and assumptions may be facilitated; provide *pro-forma* project financial, economic, capital cost, and operating assumptions, including details of all project capital costs, development costs, interest during construction, transmission interconnection costs, other operating expenses, and all other costs and expenses, and (2) a report of an independent financial analyst in accordance with the instructions in Section G of this Appendix B.

## VII. PROJECT CONTRACT STRUCTURE

Describe the current status of each of the agreements set forth below. Include as an appendix copies of the contracts or summaries of the key provisions of each of the following agreements:

- Raw Material Input Supply: describe the source and price of raw material inputs for the project. Include as an appendix any studies of price and amount of raw materials that have been prepared. Include a summary of any supply contracts and a copy of the contracts.

- Transportation: explain the arrangements for transporting project inputs and outputs, including costs.

- Operations & Maintenance Agreement: include a summary of the terms and conditions of the contract and a copy of the contract.

- Shareholders Agreement: summarize key terms and include the agreement as an appendix.

- Engineering, Procurement and Construction Agreement: describe the key terms of the existing or expected EPC contract arrangement, including firm price, liquidated damages, hold-backs, performance guarantees, etc.

- Water Supply Agreement: confirm the amount, source, and cost of water supply.

## VIII. PERMITS INCLUDING EVIRONMENTAL AUTHORIZATIONS

- Provide a complete list of all federal, state, and local permits, including environmental authorizations or reviews, necessary to commence construction of the project.

- Explain what actions have been taken to date to satisfy the required authorizations and reviews, and the status of each.

- Provide a description of the applicant's plan to obtain and complete all necessary permits, and environmental authorizations and reviews.

## IX. PROJECT SCHEDULE

- Provide an overall project schedule which includes technical, business, financial, permitting and other factors to substantiate that the project will meet the 7 year requirement for placing the plant in service.

APPENDICES

- Independent Financial Report.

- Copy of internal or external engineering reports.

- Copy of site plan, together with evidence that applicant owns or controls a site. Examples of evidence would include a deed, or an executed contract to purchase or lease the site.

- Information supporting applicant's conclusion that the site is fully acceptable as the project site with respect to environment, raw material supply, water supply, and public policy reasons.

- Project Market Study.

- Financial Model of project.

- Audited financial statements for the applicant for the most recently ended three fiscal years, and the unaudited quarterly interim financial statements for the current fiscal year.

- Project contracts or summary of thereof.

- If no contract currently exists, provide a summary of the expected terms and conditions.

- List of all federal, state, and local permits, including environmental authorizations or reviews, necessary to commence construction.

- Copies of any contract or written statements from customers of intent to purchase project products.

If an appendix listed above is not provided, include in its place a complete explanation of the reasons for the omission.

**E. Evaluation Criteria:**

Industrial Gasification Projects: will be evaluated on whether they meet all the requirements of § 48B.

Technical: will be evaluated on whether the applicant has demonstrated the capability to accomplish the technical objectives.

Site: will be evaluated on the basis that the site requirement for ownership or control has been met, and that the site is suitable for the proposed project.

Economic: will be evaluated on whether the project has demonstrated economic feasibility, taking into consideration the submitted financial and project development and structural information and financial plan.

Schedule: will be evaluated on the applicant's ability to meet the 7 year placed-in-service requirement.

**F. Program Policy Factors to be used by DOE in the evaluation of applications and a description of how they will be applied.**

These factors, while not indicators of the applicant's merit, *e.g.*, technical excellence, cost, applicant's ability, etc., may be essential to the process of selecting the application(s) that, individually or collectively, will best achieve the objectives of the authorizing legislation. Such factors are often beyond the control of the applicant. Applicants should recognize that some very good applications may not receive selection for certification because they do not fit within a mix of projects and technologies that maximize the probability of achieving the overall objective of deployment of industrial gasification technology. Therefore, the following Program Policy Factors may be used individually or collectively by DOE following application of evaluation criteria to determine which of the applications shall receive certification by DOE.

- Diversity of technology approaches and methods

- Geographic distribution of potential markets

- Presentation of unique environmental, economic, or performance benefits

### G. Instructions for independent financial reports

The applicant shall provide an independent report by a qualified Independent Financial Analyst (such as a bank, investment bank, or other independent financial advisory firm). In the report, the Independent Financial Analyst shall describe qualifications and experience that establish the Analyst's competence to evaluate project financing for projects similar in scope and size to the Applicant's project. The report shall provide a thorough, independent review of the Applicant's approach to project financing. The report shall include the opinion of the Independent Financial Analyst as to the Applicant's likelihood to achieve financial closure in accordance with the Applicant's financing plan.

**Required Certification by Independent Financial Analyst:**

**The report shall be certified by the Independent Financial Analyst, who shall (a) acknowledge that the report has been prepared for submission to the Department of Energy as a part of an application by applicant for an investment credit, and (b) certify that the Independent Financial Analyst has no obligation to the applicant and has acted to the best of its ability as an independent expert.**

**At a minimum, the Independent Financial Analyst shall:**

- Review the financial model.

- Review the project financial assumptions, including economic, capital costs, operating assumptions, and all project development costs.

- Review the financial calculations, including rates of return and coverage ratios.

- Confirm the calculation of the amount of the tax credit applied for.

- Review the project development cost budget.

- Review and comment on the source of funding and evidence of funding.

- Review and comment on project debt and equity sources.

- Confirm that the application includes the required financial reports and debt ratings.

- Describe and comment on the capabilities of the applicant to provide the required financing for the project, and the likelihood of obtaining financing from a source other than the applicant, if such financing is required by the project.

---

## Credit for Nonbusiness Energy Property

## Notice 2006–26

### SECTION 1. PURPOSE

This notice sets forth interim guidance, pending the issuance of regulations, relating to the credit for nonbusiness energy property under § 25C of the Internal Revenue Code. Specifically, this notice provides procedures that manufacturers may follow to certify property as either an Eligible Building Envelope Component or Qualified Energy Property, as well as guidance regarding the conditions under which taxpayers seeking to claim the § 25C credit may rely on a manufacturer's certification (or, in the case of certain windows, an Energy Star label). The Internal Revenue Service and the Treasury Department expect that the regulations will incorporate the rules set forth in this notice.

### SECTION 2. BACKGROUND

.01 Section 1333 of the Energy Policy Act of 2005, Pub. L. No. 109–58, 119 Stat. 594 (2005), added § 25C to the Internal Revenue Code. Section 25C provides a credit against tax for the taxable year in an amount equal to the sum of—

(1) Ten percent of the amount paid or incurred by the taxpayer for qualified energy efficiency improvements (that is, property described in section 4.01 of this notice) installed during the taxable year; and

(2) The amount of expenditures for residential energy property (that is, property described in section 5.01 of this notice) paid or incurred by the taxpayer during the taxable year.

.02 Under § 25C(b), the maximum amount of the credit allowable to a taxpayer under § 25C(a) for all taxable years is $500 ($200 in the case of amounts paid or incurred for exterior windows (including storm windows and skylights)). In addition, the maximum amount of credit allowed is—

(1) $50 for any advanced main air circulating fan;

(2) $150 for any qualified natural gas, propane, or oil furnace or hot water boiler; and

(3) $300 for any item of energy-efficient building property (that is, property described in section 5.01(1)–(7) of this notice).

.03 Section 25C(g) and § 1333(c) of the Energy Policy Act provide that the credit applies to property placed in service after December 31, 2005, and before January 1, 2008.



DEFENDANT'S
EXHIBIT
3
PENGAD-Bayonne, N. J.

United States Department of Energy

# Office of Public Affairs

*Washington, D.C. 20585*

**News Media Contact(s):**
Craig Stevens, (202) 586-4940
Terry Lemons, (202) 622-4000

**For Immediate Release**
November 30, 2006

## Energy Secretary and Secretary of the Treasury Announce the Award of $1 Billion in Tax Credits to Promote Clean Coal Power Generation and Gasification Technologies
*First Round of Credits Will Help Spur Rapid Deployment of Gasification Technologies*

**WASHINGTON, DC** —U.S. Department of Energy (DOE) Samuel W. Bodman and Secretary of the Treasury Henry Paulson today announced the awarding of $1 billion in federal tax incentives to nine companies to bring about rapid deployment of advanced coal-based power generation and gasification technologies. The technological improvements will bring us closer to the next step in the development of near-zero emission power plants. Secretary Bodman made the announcement in remarks at the National Coal Council's Annual Fall meeting, in Washington, DC.

"There is more energy available in U.S. coal than in nearly all of the oil in the world, and these tax credits will help us find ways to use coal in an environmentally sensitive way," Secretary Bodman said "The combination of government incentives and private sector innovation will harness America's technological strength to ensure clean, secure, affordable, and reliable energy."

The Energy Policy Act of 2005 (EPAct) authorized the Department of Treasury to provide tax credits as incentives to move advanced technologies to the marketplace. EPAct focuses on clean energy, efficient energy use, energy conservation, and advanced technologies.

Advanced coal technologies face cost, integration and reliability hurdles that must be overcome if they are to be widely deployed. DOE believes deployment incentives, such as tax credits, will accelerate the widespread use of these technologies and assist in driving down their overall cost.

The coal technologies fall under two different tax credit programs: One for Qualifying Advanced Coal Projects and another for Qualifying Gasification Projects. Congressional authorizations included a total of $1.65 billion in tax credits to spur investment in the advanced clean coal facilities, including $350 million in tax credits for advanced gasification projects.

Initially, a total of 49 applications were received. DOE analyzed the proposed projects for technical and economic feasibility and for consistency with energy policy goals. DOE then passed along this data to the Internal Revenue Service, who made the tax credit certifications.

The first round of tax incentive winners, who chose to have their selection acknowledged publicly, are:

Duke Energy – Edwardsport IGCC Project, Edwardsport, IN
Tampa Electric Company, Polk County, FL
Southern Company -- Mississippi Power Company, Kemper County, MS
Duke Energy Cliffside Modernization Projects, Cleveland and Rutherford County, NC
E.ON U.S., Louisville Gas and Electric and Kentucky Utilities Co., Bedford, KY
Carson Hydrogen Power, LLC: Carson Hydrogen Power Project, Carson, CA
TX Energy, LLC: Longview Gasification and Refueling Project, Longview, TX

Clean Coal Tax Credit Fact Sheet

Department of the Treasury Clean Coal Tax Credit Press Release

**U.S. Department of Energy, Office of Public Affairs, Washington, D.C.**



## Fact Sheet: Clean Coal Technology Ushers In New Era in Energy

*"Coal is by far the most abundant and affordable energy resource…so we're developing clean coal technology."*

-President Bush, May 24, 2006

**Today, Energy Secretary Samuel Bodman and Secretary of the Treasury Secretary Henry Paulson announced that $1 billion in tax credits are being allocated to support the construction of nine clean coal and advanced gasification projects.**

The Bush Administration's award of these tax credits is only one part of a comprehensive strategy to further promote the development, demonstration and deployment of emissions-free energy for the nation and, eventually, the world. Once we are successful in developing and commercializing these and other clean coal technologies, we will be able to slow, stabilize, and eventually reverse atmospheric trends caused by greenhouse gas emissions.

Section 1307 of the Energy Policy Act of 2005 (EPAct) authorized $1.65 billion in tax credits for clean coal projects:
- $800 million of credits to support Integrated Gasification Combined Cycle (IGCC) projects for electricity generation. The credits in this category were to be allocated in relatively equal amounts among IGCC projects that use bituminous coal, sub-bituminous coal, and lignite;
- $500 million to support advanced coal electricity generation projects that utilize innovative technologies other than IGCC; and
- $350 million to gasification projects that support activities other than electricity generation such as the production of gases used in chemical production.

The advanced coal technologies being supported by these awards currently face cost, integration and reliability hurdles that must be overcome if they are to be widely deployed. DOE believes deployment incentives, such as tax credits, will accelerate the widespread use of these technologies and assist in driving down their overall cost.

$1 billion in tax credits will be awarded today; the remaining $650 million will be available in 2007.

**Nine Planned Clean Coal Facilities Will Be Awarded $1 Billion In Tax Credits.**
*The names of the tax credit recipients are considered confidential taxpayer information. The following recipients chose to publicly acknowledge their award. Two recipients in the Gasification category chose not to have their awards announced.*

| | | | |
|---|---|---|---|
| Duke Energy – Edwardsport IGCC Project | Edwardsport, IN | 795 MW | $133.5 million |
| Tampa Electric | Polk County, FL | 789 MW | $133.5 million |
| Mississippi Power Company | Kemper County, MS | 700 MW | $133 million |
| Duke Energy Cliffside Modernization Projects | Cleveland and Rutherford Counties, NC | 1600 MW | $125 million |

-MORE-

## We Must Maximize The Benefits Of Our Domestic Coal Resources.

**Coal Is, and Will Continue To Be, One of Our Nation's Most Secure Energy Resources.**
Today, 50 percent of the electricity generated in the U.S. comes from coal. Total electricity demand is
expected to grow by 39 percent by 2030, at which time, coal will account for 57 percent of our electricity
generation. Coal is expected to remain the lowest-cost source of electricity for the foreseeable future.

The United States has more than 27 percent of the world's coal reserves, 267 billion tons according to
DOE's Energy Information Administration. Last year we used a little more than 1 billion tons to generate
electricity. Without it we would have had to import the energy equivalent of an additional 10 million
barrels of oil a day or an additional 22 trillion cubic feet of natural gas to meet the same energy needs.

**The Bush Administration is Supporting Clean Coal Technologies Every Step of the Way, Making it
Possible for Americans To Use Our Domestic Coal Resources In An Environmentally Sensitive
Manner.** Since President Bush took office in 2001, we have spent or requested about $2.2 billion to fund
clean coal projects from the research and development phase to demonstration to wide-scale
commercialization.

**Research and Development:**
- The Coal Research Initiative supports research at DOE's National Energy Technology Laboratory
  that is helping to develop innovative pollution controls, gasification technologies, advanced
  combustion systems, turbines and carbon capture and storage technologies.

**Demonstration:**
- The Clean Coal Power Initiative creates industry/government partnerships to support the
  development of promising new advanced Clean Coal Technologies on a demonstration scale.
- DOE's Carbon Sequestration Program is investing $450 million over the next 10 years in 7 Regional
  Partnerships throughout the U.S. to validate the fact that the capture, transportation, injection, and
  long term storage of carbon dioxide ($CO_2$) can be done safely, permanently, and economically.

**Commercialization:**
- Today's tax credit awards promote the wide-scale commercialization of technologies that have been
  successfully demonstrated, but need support to be cost competitive with currently available
  technologies.

Each of these programs are contributing to our efforts to develop, demonstrate and deploy
FutureGen, the first ever zero-emissions coal fired electric generation plant.

**Our Clean Coal Goal Is To Build on Progress That Has Already Been Made and Achieve Greater
Efficiency, More Competitive Costs And Lower Emissions.**
- The efficiency of coal-based electricity generation plants has increased from about 5 percent in
  1900 to around 35 percent today, meaning that we've increased the amount of energy we extract
  from coal by 700%.

-MORE-

And while the most recent pulverized coal technology achieves above 40 percent efficiency, IGCC technologies should one day enable plants to reach 55 percent efficiency.

- Coal use increased by more than 30 percent while the average U.S. price of electricity declined by 20 percent after passage of the Clean Air Act of 1990.
- Improved coal technologies have helped reduce emissions: sulfur dioxide decreased 68 percent; nitrogen oxide decreased 46 percent over the last 30 years.

## The Path Forward:  A Roadmap For The Present And The Future

**Today we have an aggressive strategy of early technology deployment and accelerated technology development that breaks the link between rising coal use and environmental concerns.**  Our roadmap includes the following steps:
(1) Retrofit existing power plants with clean coal technologies that eliminate nine-tenths of pollution and curb greenhouse gases by raising efficiency;
(2) Begin commercial deployment of cleaner higher efficiency technologies as old plants are retied and new ones are built to meet rising demand; and
(3) Accelerate research, development and demonstration of next-generation technologies that will lead to the operation in 2012 of FutureGen – the world's first emissions-free coal plant.

**Step One: Complete the clean-up of existing plants by updating equipment and retrofitting.**  We can slow the growth greenhouse gases by improving existing coal plants.
- Clean coal technologies available today for retrofit eliminate up to 95 percent of a plant's sulfur dioxide and 90 percent of nitrogen oxides.
- First-ever mercury removal technologies are in demonstration.
- Technology can also raise the generating efficiencies of existing plants.  Every 1 percent efficiency gain means about 2 percent less $CO_2$ per kilowatt hour.
- The National Coal Council estimates that raising the efficiency of existing plants can deliver the equivalent of more than 40,000 megawatts of new, cleaner, low-cost power.

**Step Two: Ensure that new plants have the best and most efficient equipment available.**  Over the next 25 years we can expect to add at least 150,000 megawatts of new coal-based generating capacity.  It is important to begin working the most advanced of present-day clean coal technologies into the mix as we add capacity, which is one purpose behind EPAct's incentives.
- Advanced technologies such as ultra-super-critical generation with pulverized coal and IGCC can virtually eliminate harmful pollution and will deliver generating efficiencies of up to 60 percent.
- $1.65 billion in tax credits, of which we announced $1 billion today, are being made available to companies that meet criteria outlined in EPACT for the construction of Clean Coal and Advanced Gasification projects.
- EPAct also authorized DOE to establish a loan guarantee program to support new or improved technologies that are good for the environment and our energy security.  DOE has begun the process of soliciting proposals for up to $2 billion in projects, but needs additional Congressional action to supply funds and ensure that DOE has appropriate legal authorities to proceed.  We look forward to working with Congress to resolve those issues.
- DOE continues to support the development of carbon capture and sequestration technology that can be applied to future coal-fired power plants.  In addition to the $450 million dollars that was recently awarded to the Regional Partnerships to validate carbon capture, transportation and sequestration technologies, on October 23, Secretary Bodman announced a total of $24 million to nine organizations to develop novel and cost-effective technologies to capture and then safely and permanently sequester carbon dioxide.

-MORE-

**Step Three: Building and operating the first-ever virtually emissions-free coal power plant, FutureGen.** The $1 billion FutureGen Project will integrate a range of technologies in to one plant for the first time. It will establish the technical and economic feasibility of carbon capture and safe, long-term geologic storage.

- FutureGen will deliver electric power at competitive prices, and it will be the prototype for new classes of ever-improving zero-emissions plants to follow.
- Four potential sites were chosen for FutureGen – two in Texas, two in Illinois. Final site selection will be made next year. Construction is expected to begin in 2009 and operations are planned for 2012.
- FutureGen will deliver commercial quantities of hydrogen at competitive costs for potential use in fuel cells that can begin eliminating $CO_2$ emissions in transportation.
- FutureGen will virtually eliminate the pollutants sulfur dioxide, nitrogen oxide and mercury. It will capture and store 90 percent of $CO_2$ initially and 100 percent eventually.

**The success of FutureGen will extend around the world**. The original FutureGen Industrial Alliance that will build and operate the plant has been joined by China's major power producer, a large United Kingdom mining company and the U.S. affiliate of Europe's largest power producer. India and South Korea are members of the government steering committee and have committed $10 million each. China has announced its intention to join and other nations are showing interest.

**-DOE-**

## $1 Billion in Tax Credits Allocated to Clean Coal Projects

IR-2006-184, Nov. 30, 2006

WASHINGTON — The Internal Revenue Service announced that it has allocated nearly $1 billion of tax credits to nine planned clean coal projects.

The Energy Policy Act of 2005 authorized $1.65 billion in tax credits for clean coal projects. The Act allocated $800 million of credits to integrated gasification combined cycle (IGCC) projects, $500 million to non-IGCC advanced coal electricity generation projects and $350 million to gasification projects. The $800 million allocated to IGCC projects is required to be allocated in relatively equal amounts among bituminous coal, sub-bituminous coal and lignite projects. Within these caps, the IRS is required, after consultation with the Department of Energy, to allocate the credit to specific projects.

The projects receiving credits are located in nine different states. Credits were allocated to two IGCC bituminous coal projects ($133.5 million each), an IGCC lignite project ($133 million), two non-IGCC advanced coal electricity generation projects ($125 million each) and four gasification projects (amounts ranging from $40.663 million to $130 million).

Approximately $650 million of additional tax credits will be available for allocation to clean coal projects in 2007. Of this total, $267 million will be available for IGCC sub-bituminous coal projects, $133 million will be available for IGCC lignite projects, $250 million will be available for non-IGCC advanced coal electricity generation projects and $337,000 will be available for gasification projects. The application period for the 2007 allocation is now open and will remain open until Oct. 1, 2007. IRS Notices 2006-24 and 2006-25 provide complete instructions for submitting an application for the 2007 credit allocation. Under those notices, the application for DOE certification for the 2007 allocation is due to DOE on or before June 30, 2007. The IRS expects, however, that the notices will be modified to provide that the application for DOE certification for the 2007 allocation is due to DOE on or before June 1, 2007.

Subscribe to IRS Newswire

[1/ (1 - .02247)], multiplied by 2.5/12) (determined as if no GO Zone additional first year depreciation deduction was claimed for the New Orleans building). Thus, the adjusted depreciable basis of the Hancock building at the time of the like-kind exchange for the Texas building is $3,786,752 (depreciable exchanged basis of $3,888,753, less the depreciation deduction allowable of $80,751 in 2008, less the depreciation deduction allowable of $21,250 in 2009) (determined as if no GO Zone additional first year depreciation deduction was claimed for the New Orleans building).

(iii) For 2009, $K$ decides to use the optional depreciation table to calculate depreciation on the depreciable exchanged basis of the Texas building. Thus, pursuant to § 1.168(i)–6(e)(2)(ii), $K$'s depreciation deduction allowable in 2009 for the depreciable exchanged basis of $3,786,752 for the Texas building is $80,746 (the depreciable exchanged basis of $3,786,752 multiplied by the annual depreciation rate of .02564 for the recovery year 3 as modified by the transaction coefficient of 1.0505 [1 / (1 - .02247+.02564)], multiplied by 9.5/12).

## SECTION 4. EFFECT ON OTHER DOCUMENTS

Section 6 of Notice 2006–77, 2006–40 I.R.B. 590, is clarified and amplified to read as provided in section 3 of this notice.

## SECTION 5. EFFECTIVE DATE

This notice is effective February 11, 2008.

## SECTION 6. DRAFTING INFORMATION

The principal author of this notice is Ruba Nasrallah of the Office of Associate Chief Counsel (Income Tax & Accounting). For further information regarding this notice, contact Ms. Nasrallah or Douglas Kim at (202) 622–4930 (not a toll-free call).

---

# Qualifying Advanced Coal Project Program—Special Allocation Round

# Notice 2008–26

## SECTION 1. PURPOSE

This notice updates and amplifies the procedures for the allocation of credits under the qualifying advanced coal program of § 48A of the Internal Revenue Code by announcing the immediate beginning of a special allocation round. This

special allocation round applies only to the pool of investment credits available for integrated gasification combined cycle (IGCC) projects using bituminous coal as primary feedstock. This notice provides that, except as specifically provided in this notice, this special allocation round will be conducted in the same manner and under the same procedures as provided under Notice 2007–52 (including Appendices A, B, and C), 2007–26 I.R.B. 1456, which updated and modified the advanced coal project program established under Notice 2006–24, 2006–1 C.B. 595. To be considered in this special allocation round, applications must be submitted to the Department of Energy (DOE) on or before May 2, 2008, and to the Internal Revenue Service before June 3, 2008. See section 3 of this notice for additional rules regarding applications for § 48A and DOE certification.

## SECTION 2. BACKGROUND

.01 Section 46 provides that the amount of the investment credit for any taxable year is the sum of the credits listed in § 46. This list includes the qualifying advanced coal project credit.

.02 Section 48A(a) provides that the qualifying advanced coal project credit for any taxable year includes 20 percent of the qualified investment (as defined in § 48A(b)) for that taxable year in certified qualifying advanced coal projects (as defined in § 48A(c)(1) and § 48A(e)) using an integrated gasification combined cycle (as defined in § 48A(c)(7)). Section 48A(d)(3) provides that $800 million of credits are to be allocated to IGCC projects. Section 48A(e)(3)(A) provides that the credits for IGCC projects must be allocated in accordance with the procedures set forth in § 48A(d), and in relatively equal amounts to (i) projects using bituminous coal as a primary feedstock, (ii) projects using subbituminous coal as a primary feedstock, and (iii) projects using lignite as a primary feedstock. Further, § 48A(e)(3)(B) provides that IGCC projects that include (i) greenhouse gas capture capability (as defined in § 48A(c)(5)), (ii) increased by-product utilization, and (iii) other benefits must be given high priority in the allocation of credits for IGCC projects.

.03 Section 48A(d)(1) provides that the Secretary, in consultation with the Secretary of Energy, shall establish a qualifying advanced coal project program for the deployment of advanced coal-based generation technologies. The Treasury Department and the Service established this program in Notice 2006–24. Under section 4.02(2)(b) of Notice 2006–24, $267 million of qualifying advanced coal project credit was available for allocation from the pool for IGCC projects using bituminous coal as a primary feedstock and the maximum amount that could be allocated to such a project was $133.5 million.

.04 Section 4.02(2)(b) of Notice 2007–52 provides that no allocation round will be conducted in 2007–08 for IGCC projects using bituminous coal as a primary feedstock.

.05 At this time, $133.5 million of credit is available for allocation from the pool for IGCC projects using bituminous coal as a primary feedstock. Under Notice 2007–52, the allocation of the credit for this pool would not occur before the allocation round conducted in 2008–09. To avoid this delay, this notice provides a special allocation round for IGCC projects using bituminous coal as a primary feedstock.

## SECTION 3. SPECIAL ALLOCATION ROUND FOR IGCC PROJECTS USING BITUMINOUS COAL AS A PRIMARY FEEDSTOCK

.01 Except as otherwise specifically provided in this notice, this special allocation round will be conducted in the same manner and under the same procedures as provided under Notice 2007–52 including Appendices A, B, and C. This notice restates or references certain provisions in Notice 2007–52 as a convenience to taxpayers. The restatement or referencing of these provisions does not diminish the effect of provisions that are not restated or referenced.

.02 This special allocation round applies only to the pool of qualifying advanced coal project credit for IGCC projects using bituminous coal as a primary feedstock. The aggregate amount of credits available for allocation from this pool is $133.5 million. The entire $133.5 million is available for allocation in this

DEFENDANT'S EXHIBIT 4    PENGAD-Bayonne, N. J.

special allocation round and may be allocated to a single project.

.03 For this special allocation round, the application period begins on February 13, 2008 and ends on June 2, 2008. During the application period, an application for § 48A certification and a separate application for DOE certification must be submitted for each qualifying advanced coal project. See section 3.07 for the date by which the application for DOE certification must be submitted to the DOE. Any completed application for § 48A certification for an IGCC project using bituminous coal as a primary feedstock that is received by the Service on or after February 13, 2008, and before June 3, 2008, will be deemed to be submitted by the taxpayer on June 2, 2008.

.04 For this special allocation round, the Service will consider a project only if the application for § 48A certification for the project is submitted during the application period for this round and the DOE provides the DOE certification and the DOE ranking (if any) for the project before July 4, 2008.

.05 If an application for DOE certification does not include all of the information required by section 5.02 of Notice 2007–52 and meet the requirements in sections 7.01 and 7.02 of Notice 2007–52, the DOE may decline to accept the application. If an application for § 48A certification does not include all of the information listed in section 5.03 of Notice 2007–52 and meet the requirements in sections 7.01 and 7.02 of Notice 2007–52, the application will not be accepted by the Service.

.06 An application for § 48A certification must be submitted in the manner provided in section 5.04 of Notice 2007–52.

.07 For this special allocation round, the DOE will consider an application for DOE certification only if the application is postmarked on or before May 2, 2008. The DOE will determine the feasibility of each project for which it receives a timely application for DOE certification and, if the project is determined to be feasible, will provide a DOE certification for the project to the Service. If the DOE certifies two or more projects, the DOE also will rank each of the projects it certifies (for example, first, second, third, etc.) relative to other certified projects. The DOE will pro-

vide the DOE certification for projects determined to be feasible and the DOE ranking (if any) to the Service on or before July 3, 2008.

.08 By July 31, 2008, the Service will accept or reject the taxpayer's application for § 48A certification and will notify the taxpayer, by letter, of its decision.

.09 If the taxpayer's application for § 48A certification is accepted, the acceptance letter will state the amount of the credit allocated to the project. If a credit is allocated to a taxpayer's project, the taxpayer will be required to execute an agreement in substantially the form set forth in Appendix A to Notice 2007–52. By September 8, 2008, the taxpayer must execute and return the agreement to the Service at the appropriate address listed in section 5.04 of Notice 2007–52 or listed in later guidance published in the Internal Revenue Bulletin. The Service will execute and return the agreement to the taxpayer by September 29, 2008. The executed agreement applies only to the accepted taxpayer.

.10 If the amount available for allocation from the pool for IGCC projects using bituminous coal as a primary feedstock is not fully allocated in the special allocation round, the remaining amount in the pool will be treated for purposes of Notice 2007–52 as an amount that is not fully allocated in the 2007–08 allocation round. The remaining amount in the pool will be available for allocation in the allocation round conducted in 2008–09 under the provisions of Notice 2007–52. The provisions of Notice 2007–52 relating to the allocation round conducted in 2008–09 will be applied with respect to this pool by substituting June 3, 2008, for March 3, 2008. Thus, the application period for this pool begins on June 3, 2008, and ends on March 2, 2009, and any completed application for § 48A certification for IGCC projects using bituminous coal as a primary feedstock received by the Service after June 2, 2008, and before March 3, 2009, will be deemed to be submitted by the taxpayer on March 2, 2009. As under Notice 2007–52, an application to the DOE for IGCC projects using bituminous coal as a primary feedstock will not be considered in the allocation round conducted in 2008–09 unless it is postmarked by October 31, 2008.

## SECTION 4. EFFECTIVE DATE

This notice is effective February 13, 2008.

## SECTION 5. PAPERWORK REDUCTION ACT

The collection of information contained in this notice has been reviewed and approved by the Office of Management and Budget in accordance with the Paperwork Reduction Act (44 U.S.C. § 3507) under control number 1545–2003.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid OMB control number.

The collections of information in this notice are in section 3 (and in sections 4, 5, 6, 7, 8, and Appendix B of Notice 2007–52). This information is required to obtain an allocation of qualifying advanced coal project credits. This information will be used by the Service to verify that the taxpayer is eligible for the qualifying advanced coal project credits. The collection of information is required to obtain a benefit. The likely respondents are business or other for-profit institutions.

The estimated total annual reporting burden is 4,950 hours.

The estimated annual burden per respondent varies from 70 to 150 hours, depending on individual circumstances, with an estimated average of 110 hours. The estimated number of respondents is 45.

The estimated annual frequency of responses is on occasion.

Books or records relating to a collection of information must be retained as long as their contents may become material in the administration of any internal revenue law. Generally, tax returns and tax return information are confidential, as required by 26 U.S.C. § 6103.

## DRAFTING INFORMATION

The principal author of this notice is Jaime C. Park of the Office of Associate Chief Counsel (Passthroughs & Special Industries). For further information regarding this notice, contact Jaime C. Park at (202) 622–3110 (not a toll-free call).

—————————



This is a printer-friendly format. The navigation and other graphical elements have been removed.

## News Release

RSS News Feed

### Tampa Electric awarded IRS tax credits for proposed advanced clean coal project

TAMPA, November 30, 2006

United States Department of Energy Secretary Samuel W. Bodman announced today at the National Coal Council meeting in Washington, D.C., that Tampa Electric has been awarded $133.5 million in Internal Revenue Service clean coal tax credits for the proposed Polk Unit 6, a 630-megawatt Integrated Gasification Combined Cycle facility that would be located on the site of the current Polk Power Station in Polk County, Florida. The purpose of the tax credit program is the deployment of clean coal-based generation technologies.

If the plant moves forward and receives the needed approvals from state regulators, environmental agencies and others, it would be in service in 2013.

"I congratulate Tampa Electric for being awarded a $133.5 million tax credit as part of the Bush Administration's commitment to support the deployment of the most advanced technologies currently available to utilize coal in the cleanest, most efficient manner," Bodman said.

In March 2006, the IRS in conjunction with the Department of Energy, under the Energy Policy Act statutes, announced two programs under the Internal Revenue Code to award certain clean coal technology projects investment tax credits to a maximum amount of $133.5 million.

"This state-of-the-art IGCC plant would utilize coal, an abundant lower-cost resource to produce reliable electric power for our customers in the most environmentally sensitive manner possible," said Tampa Electric President Chuck Black. "These tax credits would also represent significant customer savings."

Tampa Electric was the first utility in the nation to commercialize IGCC technology in partnership with the Department of Energy's clean coal technology program by developing the Polk Power Station in 1996. Tampa Electric is now recognized as the world leader in clean coal technology. The Polk Power Station has been named as the cleanest coal-fired power plant in North America by Canada's Energy Probe Research Foundation.

The new Polk Unit 6 would allow Tampa Electric to continue to build capacity to meet the future needs of its customers for safe, reliable and affordable electricity with an environmental stewardship that is an integral part of the company's business plans for the future of the communities it serves.

Tampa Electric Company is the principal subsidiary of TECO Energy, Inc. (NYSE: TE), an integrated

DEFENDANT'S EXHIBIT
5

PENGAD-Bayonne, N. J.

energy-related holding company with core businesses in the utility sector, complemented by a family of unregulated businesses. Tampa Electric Company is a regulated utility with both electric and gas divisions (Tampa Electric and Peoples Gas System). Other subsidiaries are engaged in waterborne transportation, coal and synthetic fuel production and independent power.

TECO Energy, Inc. (NYSE: TE) is an integrated energy-related holding company with regulated utility businesses, complemented by a family of unregulated businesses. Its principal subsidiary, Tampa Electric Company, is a regulated utility with both electric and gas divisions (Tampa Electric and Peoples Gas System). Other subsidiaries are engaged in waterborne transportation, coal and synthetic fuel production and electric generation and distribution in Guatemala.

*Note: This press release contains forward-looking statements, which are subject to the inherent uncertainties in predicting future results and conditions. Factors that could impact actual results include: unforeseen regulatory actions by federal, state or local authorities; the prices of commodities such as coal or natural gas that would impact the economics of an IGCC power plant; the availability of and prices for materials and labor necessary to construct an IGCC power plant; unexpected capital needs or unanticipated reductions in cash flow that affect the ability to finance the construction of an IGCC power plant; and general economic conditions in Tampa Electric's service area affecting energy sales and demand growth and the need for additional generating plants. Additional information is contained under "Risk Factors" in TECO Energy, Inc.'s Annual Report on Form 10-K for the period ended Dec. 31, 2005.*

Please note TECO Energy's privacy policy and legal notices.
Copyright © 2008 TECO Energy. All rights reserved.

LAW OFFICE OF

**ROBERT W. KAYLOR, P.A.**

225 HILLSBOROUGH STREET, SUITE 160

RALEIGH, NORTH CAROLINA 27603

(919) 828-5250

FACSIMILE (919) 828-5240

**FILED**

FEB 2 9 2008

Clerk's Office
N.C. Utilities Commission

February 29, 2008

Ms. Renne C. Vance, Chief Clerk
North Carolina Utilities Commission
4325 Mail Service Center
Raleigh, North Carolina 27699-4325

      RE:    February 2008 Advanced Clean Coal Cliffside Unit 6 Cost Estimate
                  Docket No. E-7, Sub 790

Dear Ms. Vance:

      Pursuant to Condition No. 5 of the Commission's March 21, 2007 Order Granting Certificate of Public Convenience and Necessity with Conditions, I enclose the original and twenty-five copies of Duke Energy Carolinas, LLC's updated cost estimate for the advanced clean coal Cliffside Unit 6 for filing in connection with the referenced matter.

      Appendix 1, consisting of 3 pages, is <u>Confidential</u> and is being filed in a sealed envelope.

                Sincerely,

                Robert W. Kaylor

Enclosures

cc:    Parties of Record

**DEFENDANT'S
EXHIBIT
6**

PENGAD-Bayonne, N. J.

**FILED**

Duke Energy Carolinas' Advanced Clean Coal Cliffside Unit 6 Cost Estimate Report
February 29, 2008   Docket No. E-7, Sub 790

FEB 2 9 2008

Clerk's Office
N.C. Utilities Commission

On February 20, 2008, Duke Energy Carolinas, LLC ("Duke Energy Carolinas") entered into an amended and restated engineering, procurement, construction and commissioning services agreement with Shaw North Carolina, Inc, ("SNC") a Shaw Group Company for the construction of one new nominally-rated 800MW state-of-the-art supercritical pulverized coal unit ("Unit 6") at Duke Energy Carolinas' coal-fired Cliffside Generating Station. The amended and restated agreement is substantially similar in form and substance to the original agreement signed between the parties in July 11, 2007; but it reflects a significant reduction in uncertainty due to refinements to the scope, schedule, and pricing which have occurred since the time of execution of the original agreement. The amended agreement provides for a commercial operation date for Unit 6 in the summer of 2012. As part of the scope of work under the amended agreement, Duke Energy Carolinas has engaged SNC to integrate and construct a related and previously-approved flue gas desulfurization ("FGD") system on Unit 5 at the Station. The Cliffside Unit 5 FGD is planned to be in service by late 2010. The final air permit from the North Carolina Department of Environment and Natural Resources ("NC DENR") was issued for Unit 6 on January 29, 2008. SNC has started construction, and Duke Energy Carolinas is in the process of issuing a full notice to proceed with the Unit 6 work. A full notice to proceed was issued in July 2007 for the Unit 5 FGD work.

During February, we continued the process of supplier/subcontractor evaluations and selection. To date, we have made commitments for the primary engineering and construction contractor, major owner-furnished equipment (boiler, turbine generator, and air quality control system), feedwater pumps, feedwater pump turbines, feedwater heaters, hotwell pumps, condenser, high energy piping, large circulating water piping, circulating water pumps, chimney, entrance road bridge, cooling tower, structural steel supply and concrete supply and pumping. Evaluations of proposals for the ash handling equipment, main step-up transformers, distributed control system, and other engineered equipment are on-going.

We continue to work with the SNC project team to perform detailed engineering and procurement activities to support the project schedule. Cost and quantity estimates are tracking close to earlier estimates. The project schedule was updated in the amended and restated agreement. Also, we continue to work with suppliers and contractors for work that Duke Energy Carolinas will contract directly (rather than through SNC) to finalize their scope, schedule, terms and pricing and will issue timely purchase orders or contracts to support the project schedule.

This cost and schedule data was used to update AFUDC projections. The current estimate of AFUDC based on currently anticipated financing costs, projected cash flow, and commercial operation date is between $550 million and $600 million. The updated project cost estimate summary is provided in Confidential Appendix 1. Based on current information, we remain reasonably confident that Unit 6 can be completed within the current capital cost estimate of $1.8 billion. The pro rata portion of the federal advanced clean coal tax credits will reduce the overall project cost to customers by approximately $62.5 million.

Construction of the Unit 5 FGD system and the new Unit 6 advanced clean coal facility is ongoing. Site grading is well under way and the first major concrete pour is complete.

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of Duke Energy Carolinas, LLC's February 2008 Advanced Clean Coal Cliffside Unite 6 Cost Estimate in Docket No. E-7, Sub 790, has been served by electronic mail (e-mail), hand delivery or by depositing a copy in the United States Mail, first class postage prepaid, properly addressed to parties of record.

This the 29th day of February, 2008.

Law Office of Robert W. Kaylor, P.A.

BY: _Robert W. Kaylor_
Robert W. Kaylor
Law Office of Robert W. Kaylor, P.A.
225 Hillsborough Street, Suite 160
Raleigh, North Carolina  27603
(919) 828-5250
North Carolina State Bar No. 6237

**STATE OF NORTH CAROLINA**
**UTILITIES COMMISSION**
**RALEIGH**

DOCKET NO. E-7, SUB 790

BEFORE THE NORTH CAROLINA UTILITIES COMMISSION

| | | |
|---|---|---|
| In the Matter of | | |
| Application of Duke Energy Carolinas, LLC, | ) | ORDER GRANTING |
| For Approval for an Electric Generation | ) | CERTIFICATE OF |
| Certificate of Public Convenience and | ) | PUBLIC CONVENIENCE |
| Necessity to Construct Two 800-MW State- | ) | AND NECESSITY |
| Of-the-Art Coal Units for Cliffside Project | ) | WITH CONDITIONS |

HEARD IN:   Charlotte-Mecklenburg Government Center, 600 E. Fourth Street, Charlotte, North Carolina on August 30, 2006; Council Chambers, Shelby City Hall, 300 S. Washington Street, Shelby, North Carolina on August 31, 2006; Commission Hearing Room, Dobbs Building, 430 N. Salisbury Street, Raleigh, North Carolina on September 12-14, 2006; and
Public Library of Charlotte and Mecklenburg County, Francis Auditorium, 310 N. Tryon Street, Charlotte, North Carolina on January 10, 2007; Council Chambers, Shelby City Hall, 300 S. Washington Street, Shelby, North Carolina on January 11, 2007; Commission Hearing Room, Dobbs Building, 430 N. Salisbury Street, Raleigh, North Carolina on January 17-19, 2007

BEFORE:   Commissioner Sam J. Ervin, IV, Presiding, and Commissioners Robert V. Owens, Jr., Lorinzo L. Joyner, James Y. Kerr, II, Howard N. Lee, and William T. Culpepper, III

APPEARANCES:

    For Duke Energy Carolinas, LLC:

        Lawrence B. Somers, Assistant General Counsel, Duke Energy Corporation, 526 S. Church Street, Charlotte, North Carolina 28202

        Robert W. Kaylor, Law Office of Robert W. Kaylor, PA, 225 Hillsborough Street, Suite 160, Raleigh, North Carolina 27603

        Kevin C. Greene and Brandon F. Marzo, Troutman Sanders, LLP, Bank of America Plaza, 600 Peachtree Street, N.E., Suite 5200, Atlanta, Georgia 30308-2216



DEFENDANT'S
EXHIBIT
7

PENGAD-Bayonne, N.J.

For the Using and Consuming Public:

        Antoinette R. Wike, Chief Counsel, Robert S. Gillam and William E. Grantmyre, Staff Attorneys, Public Staff - North Carolina Utilities Commission, 4326 Mail Service Center, Raleigh, North Carolina 27699-4326

        Leonard G. Green, Assistant Attorney General, North Carolina Department of Justice, Post Office Box 629, Raleigh, North Carolina 27602-0629

For Carolina Utility Customers Association, Inc.:

        James P. West, West Law Offices, P.C., 434 Fayetteville Street Mall, Suite 1735, Raleigh, North Carolina 27601

For Carolina Industrial Groups for Fair Utility Rates:

        Ralph McDonald, Bailey & Dixon, L.L.P., Post Office Box 1351, Raleigh, North Carolina 27602-1351

For Carolina Power & Light Co., d/b/a Progress Energy Carolinas, Inc.:

        Len S. Anthony, Deputy General Counsel, Progress Energy Carolinas, 410 S. Wilmington Street, Raleigh, North Carolina 27602

For North Carolina Waste Awareness and Reduction Network, Inc.:

        John Runkle, Post Office Box 3793, Chapel Hill, North Carolina 27515

For Environmental Defense and Southern Environmental Law Center:

        Marily Nixon and Gudrun Thompson, Southern Environmental Law Center, 200 W. Franklin Street, Suite 330, Chapel Hill, North Carolina 27516

For North Carolina Sustainable Energy Association:

        T. LaFontine Odom, Sr., The Odom Firm, PLLC, 1109 Greenwood Cliff, Charlotte, North Carolina 28204

For Southern Alliance for Clean Energy:

        Gary A. Davis, Gary A. Davis & Associates, Post Office Box 649, Hot Springs, North Carolina 28743

For Wells Eddleman:

    Pro se

    BY THE COMMISSION:  On May 11, 2005, Duke Power, a division of Duke Energy Corporation, filed with the North Carolina Utilities Commission (Commission) preliminary information pursuant to Commission Rule R8-61(a) concerning plans to seek a certificate of public convenience and necessity authorizing the construction of two 800-megawatt (MW) coal-fired electric generating facilities to be located at the existing Cliffside Steam Station, situated on the border of Cleveland and Rutherford Counties, North Carolina, together with certain related transmission facilities.

    On June 2, 2006, acting pursuant to G.S. 62-110.1(a) and Commission Rule R8-61(b), Duke Power Company LLC d/b/a Duke Energy Carolinas, LLC (Duke or the Company)[1] filed an application seeking the issuance of a certificate for construction of the proposed generation and transmission facilities described in the May 11, 2005 informational filing.  Duke's application was accompanied by the prefiled testimony and exhibits of James E. Rogers, President and Chief Executive Officer of Duke Energy Corporation; Ellen T. Ruff, President of Duke Energy Carolinas; Janice D. Hager, Vice President of Rates and Regulatory Affairs for Duke Energy Carolinas; Mark R. Griffith, a Vice President of Global Energy Advisors, a business unit of Global Energy Decisions; and William R. McCollum, Jr., Group Vice President of Regulated Fossil/Hydro Generation for Duke Energy Corporation.

    On July 6, 2006, the Commission entered an order scheduling public hearings and an evidentiary hearing, establishing deadlines for the filing of petitions to intervene and testimony, and requiring appropriate public notice.

    The following organizations filed petitions to intervene and were authorized to intervene:  Carolina Utility Customers Association, Inc. (CUCA); North Carolina Waste Awareness and Reduction Network, Inc. (NCWARN); Carolina Industrial Groups for Fair Utility Rates (CIGFUR III); Carolina Power & Light Company, d/b/a Progress Energy Carolinas, Inc.; Southern Alliance for Clean Energy (SACE); Environmental Defense (ED); Southern Environmental Law Center (SELC); North Carolina Municipal Power Agency Number 1; North Carolina Eastern Municipal Power Agency, Inc.; and North Carolina Sustainable Energy Association, Inc. (NCSEA).  The Attorney General filed notice of

---

[1] In connection with the merger of Duke Energy Corporation and Cinergy Corporation approved in Docket No. E-7, Sub 795, Duke Energy Corporation was converted into a limited liability company, Duke Power Company LLC, d/b/a Duke Energy Carolinas, LLC.  On October 4, 2006, the Company notified the Commission of its formal name change to Duke Energy Carolinas, LLC.

intervention under G.S. 62-20, and the intervention of the Public Staff has been recognized under G.S. 62-15(d) and Commission Rule R1-19(e).

On August 17, 2006, SACE filed a motion for an extension of time to file its testimony and a postponement of the evidentiary hearing. On August 18, 2006, ED and SELC filed a joint motion seeking similar relief, and on August 22, 2006, NCWARN moved to postpone the evidentiary hearing. On August 22, 2006, Duke filed a response opposing these motions. On August 24, 2006, the Commission entered an order granting extensions of time for the filing of intervenor testimony and rebuttal testimony but declining to postpone the evidentiary hearing.

Public hearings were held as scheduled on August 30, 2006, in Charlotte and on August 31, 2006, in Shelby. The following public witnesses testified at the Charlotte hearing: Dave Barnhardt, Bob Thomason, Beth Henry, Sally Thomas, Chatham Olive, June Blotnick, Christal Wagner, Liz Veazey, Kathryn Kuppers, Bob Morgan, Elyse Hillegass, Angie Lawry, Willie Dodson, Summer Rose, Robin Koch, Rita Heath, Nick Hendricks, Todd Glasier, Susan Tompkins, Maarten Pennink, John Avery, Diana Movius, Tracey Crowe, Renee Reese, Katie Oates, Ivory Clabaugh, Tom Lannin, Tammy Bostick, Colin Hagan, Harry Taylor, and Faeiz Hindi. The following public witnesses testified at the Shelby hearing: Walter Dalton, Harold Stallcup, Bob England, Rick Roper, Tim Moore, Bill Hall, Jerry Self, Charles Hill, Robert Hawkins, Mary Accor, Vic Sarratt, Johnny Hutchins, Adelaide Craver, Stuart Gilbert, Louis Zeller, Anne Fischer, Gwen Veazey, Bill Fisk, William Frykberg, Christian Burley, Jason Byrd, Yancey Ellis, and Richard McDaniel.

On September 6, 2006, NCWARN filed the testimony and exhibits of John O. Blackburn, Professor Emeritus of Economics at Duke University, and the testimony of William H. Schlesinger, Dean of the Nicholas School of the Environment and Earth Sciences; SACE filed the testimony and exhibits of Stephen A. Smith, Executive Director of SACE; and the Public Staff filed the testimony of John R. Hinton, a Public Utilities Financial Analyst; Thomas S. Lam, a Public Utilities Engineer; and Michael C. Maness, Supervisor of the Electric Section of the Public Staff Accounting Division. On September 7, 2006, SACE, ED, and SELC filed the joint testimony and exhibits of David A. Schlissel, a Senior Consultant, and Anna Sommer, a Research Associate, with Synapse Energy Economics, Inc. On September 11, 2006, Duke filed the rebuttal testimony and exhibit of Janice D. Hager.

On September 6, 2006, Wells Eddleman (Eddleman) filed a late petition to intervene. Duke filed an objection to Eddleman's intervention the following day, and on September 11, 2006, Eddleman filed a response to Duke's objection. In a ruling from the bench at the beginning of the evidentiary hearing in Raleigh, the Commission allowed Eddleman to intervene.

4

The evidentiary hearing in Raleigh began as scheduled on September 12, 2006, and continued through September 14, 2006. Duke presented the testimony of witnesses Rogers, Ruff, and McCollum and a panel consisting of witnesses Hager and Griffith. NCWARN presented the testimony of witnesses Blackburn and Schlesinger. SACE, ED, and SELC presented the joint testimony of witnesses Schlissel and Sommer, testifying as a panel. SACE presented the testimony of witness Smith. The Public Staff presented the testimony of witnesses Hinton, Lam, and Maness, testifying as a panel.

Following the hearing, briefs and proposed orders were filed by the parties on October, 13, 2006.

On October 25, 2006, Duke filed a Notice of Updated Cost Information in which the Company indicated that the estimated cost of the proposed generating facilities had increased. On November 1, 2006, the Presiding Commissioner held a conference of the parties, and on November 3, 2006, the Commission issued an order reopening the record and scheduling a second hearing in Raleigh to receive evidence concerning the appropriateness of the updated cost estimate and the cost effectiveness of the proposed facilities as compared to alternatives.

On November 9, 2006, NCWARN, SELC, ED, SACE, and NCSEA filed a motion asking for the release of non-confidential cost information relating to the Cliffside project. On November 16, 2006, Duke filed a response providing a non-confidential revised cost estimate of approximately $3.0 billion.

On November 29, 2006, Duke filed the supplemental testimony and exhibits of witnesses Hager, McCollum, and Rogers, and the testimony and exhibits of Judah Rose, a Managing Director of ICF International. On January 8, 2007, CUCA filed the testimony of Kevin W. O'Donnell, President of Nova Energy Consultants, Inc.; ED, SACE, and SELC filed the testimony and exhibits of Douglas H. Cortez, an independent energy consultant, and the joint supplemental testimony and exhibits of witnesses Schlissel and Sommer; and the Public Staff filed the supplemental testimony and exhibits of witnesses Hinton, Lam, and Maness. On January 12, 2007, Duke filed rebuttal testimony of witnesses Hager and McCollum.

By order issued December 7, 2006, acting on motion of NCWARN, the Commission scheduled additional hearings in Charlotte and Shelby for the purpose of receiving testimony from the public concerning the issues identified in the November 3, 2006 order. This order further provided that public witness testimony would be heard at the beginning of the second evidentiary hearing in Raleigh.

The following public witnesses testified at the second Charlotte hearing: Lloyd Scher, Ronnie Bryant, Paul Woodson, Rick Roper, Veronica Waldthausen,

Elizabeth Donovan, Bill Glass, Sally Kneidel, Fred Allen, Kelly Katterhagen, Mark Levine, Harry Taylor, Bob Perkowitz, Anne Jackson, Rick Bolen, Dale Brentrup, Todd Glasier, Mickey Aberman, Robert Coleman, Bernie Hargadon, Scott Lurie, Andrew Zerkle, Ivy Zerkle, Bob Thomason, Chatham Olive, Lisa Zerkle, June Lambla, Isabella Lacki, Tom Strini, Brian Staton, Tracey Crowe, Robert Perkins, Scott Spivak, Gene Stewart, Clarie Harbold, Chris Buchanan, Merrick Teichman, Greg Augspurger, and Gregg Jocoy.  The following public witnesses testified at the second Shelby hearing:  Walter Dalton, Tim Moore, Brownie Plaster, Chivous Bradley, Bill Frykberg, Stuart Gilbert, Bill McCarter, Robert McGahey, Barbara Land, John Brotherton, John Jackson Hunt, Victor Shaw Sarrat, Brett Keeter, Beth Henry, June Blotnick, Matt Wasson, and Yancey Ellis.

In addition to the public witnesses who testified, the Commission allowed others to submit written statements in lieu of oral testimony.

The second hearing in Raleigh began as scheduled on January 17, 2007, and continued through January 19, 2007.  At the beginning of the hearing, the following public witnesses testified:  Beth Kuehnert, Laura Combs, Beverly D'Aquanni, Nancy Petty, Alice Loyd, Jim Senter, David Welch, Jim Melnyk, Robert Cox, Lilian Royal, Audrey Schwankl, Andrea Vizoso, John Haebig, Marywinne Sherwood, Katie Kenlen, Barbara Janeway, Lyle Adley-Warrick, Henry Elkins, Lynice Williams, Cindy Moore, Aniko Gaal, Sally Buckner, Daniel Morris, Thomas Henkel, Maria Kingery, Helen Tart, Susan Tideman, Alison Carpenter, Chatham Olive, and Herman Jaffe.

Following the presentation of public witness testimony, Duke presented the testimony of witnesses Hager, McCollum, Rogers, and Rose, and CUCA presented the testimony of witness O'Donnell.  ED, SACE, and SELC presented the testimony of witness Cortez and the joint testimony of witnesses Schlissel and Sommer.  The Public Staff presented the testimony of witnesses Hinton, Lam, and Maness, testifying as a panel.

On January 26, 2007, the Presiding Commissioner issued a Notice of Receipt of Communication giving all parties notice that a communication had been received by the Commission that pertained to the testimony presented by Duke at the January 17-19, 2007 hearing and that appeared on its face to have been sent by a party to the docket.  Duke made no filing in response to this notice, and the Commission finds that Duke was not prejudiced by the communication.

Following the hearing, further briefs and proposed orders were filed by the parties on February 7 and 13, 2007.

In addition to the testimony and statements of many public witnesses, the Commission has received an unprecedented number of letters and e-mails expressing intense public interest in this matter.

On February 28, 2007, the Commission issued a Notice of Decision advising the parties of its decision, to be set forth more fully in the present order.

On March 14, 2007, the Commission issued an order requesting that Duke consider disclosing approximate cost information for construction of one unit, similar to Duke's November 16, 2006 letter cited above. On March 14, 2007, Duke filed a letter authorizing the Commission to use in its order the cost estimate given by Duke witness Hager during a confidential portion of the January 19, 2007 hearing.

Based upon the foregoing, the verified application, the evidence and exhibits presented at the hearings, and the entire record in this matter, the Commission makes the following:

## FINDINGS OF FACT

1.    Duke is a public utility providing electric utility service to customers in its service area in North Carolina subject to the jurisdiction of the Commission.

2.    The Commission has jurisdiction over this application. Pursuant to G.S. 62-110.1 and Commission Rule R8-61(b), a public utility must receive a certificate of public convenience and necessity prior to constructing electric generating facilities in North Carolina.

3.    G.S. 62-110.1 is intended to provide for the orderly expansion of electric generating capacity in order to create a reliable and economical power supply and to avoid the costly overbuilding of generation resources. The Commission must consider many factors, including the present and future needs for power in the area; the extent, size, mix, and location of the utility's existing plants; arrangements for pooling or purchasing power; and the construction and fuel costs of the project and of alternatives, before granting a certificate of public convenience and necessity for a new generating facility.

4.    Duke filed an application on June 2, 2006, seeking a certificate of public convenience and necessity for the construction of two 800-MW supercritical pulverized coal (SCPC) units, together with certain related transmission facilities, at the site of the existing Cliffside Steam Station on the border of Cleveland and Rutherford Counties (the Cliffside project), to provide baseload capacity, with the first unit to begin commercial operation by 2011. As part of the project, Duke plans to retire existing Cliffside Units 1 through 4, which total 198 MW.

5.    Duke tested various long-range resource portfolio options against a range of sensitivities and scenarios in connection with its 2005 and 2006 Annual Plans and in an updated analysis prompted by the increased costs indicated in the October 25, 2006 Notice of Updated Cost Information. Duke

concluded that the Balanced Cliffside portfolio, the portfolio upon which the application is based, performed well under varying sensitivities and that the Cliffside project is the Company's best option at this time.

6.    Duke's 2005 and 2006 Annual Plans filed with the Commission in Docket Nos. E-100, Sub 103 and Sub 109, show substantial load growth and the need for capacity additions over the next 15 years. However, during the pendency of this proceeding, Duke's need for additional generating capacity in the 2011-12 time frame, as reflected in its 2005 and 2006 Annual Plans, decreased from 3400 MW to 2120 MW. The 2120 MW figure includes a need for 800 MW of coal-fired baseload capacity.

7.    At the second hearing in this proceeding, Duke revealed that it is considering the sale of up to 800 MW of the proposed two-unit, 1600-MW Cliffside project.

8.    Duke has not carried its burden of proof to show that it needs 1600 MW of baseload generating capacity in the 2011-12 time frame. Duke does need 800 MW of baseload generating capacity beginning in 2011.

9.    Duke has initiated a process of collaborative workshops with various stakeholders, including customers and other interested persons, and these collaboratives are expected to provide recommendations for new demand side management (DSM) programs by the middle of 2007.

10.    Duke has committed to invest, on an annual basis, 1% of its annual retail revenues from the sale of electricity in energy efficiency and demand side programs, subject to completion of the ongoing collaborative workshops with stakeholders and subject to such appropriate regulatory treatment for the costs associated with those programs as the Commission may determine to be just and reasonable. Duke has further committed to retire older coal-fired generating units (in addition to Cliffside Units 1 through 4) on a MW-for-MW basis, considering the impact on the reliability of the entire system, to account for actual load reductions realized from these new programs, up to the MW level added by the Cliffside project as certificated by the Commission.

11.    Cost-effective DSM programs and reliance upon renewable energy resources are both in order; however, Duke cannot rely upon DSM and renewables to eliminate or delay its need for additional baseload generating capacity beginning in 2011.

12.    Duke cannot rely upon new nuclear generating facilities to supply its need for additional baseload generating capacity beginning in 2011.

13.    Duke cannot rely upon integrated gasification combined cycle (IGCC) technology, a new and emerging coal-fired generation technology, to supply its need for additional baseload generating capacity beginning in 2011.

14.    Natural gas-fired combined cycle (CC) generation is the only viable generation alternative to SCPC generation for supplying Duke's additional baseload generating capacity needs beginning in 2011.

15.    It is unreasonable for Duke to rely upon natural gas-fired CC generation to supply all of its additional baseload generating capacity needs beginning in 2011.

16.    The construction of one 800-MW SCPC unit at Cliffside and the retirement of Cliffside Units 1 through 4 will make for a more diverse and secure generation fleet and will allow Duke to increase its baseload generating capacity without significantly increasing its environmental footprint.

17.    Duke appropriately conducted a comprehensive siting process to select the existing Cliffside Steam Station as the site for the additional baseload generation that it needs.

18.    Duke has estimated the construction cost of one 800-MW unit at Cliffside.    The Commission approves this estimate subject to the reporting requirements ordered herein.

19.    The public convenience and necessity require the construction of one 800-MW SCPC generating unit, together with related transmission facilities, at the site of the existing Cliffside Steam Station, conditioned upon the retirement of existing Cliffside Units 1 through 4 and conditioned upon Duke's commitment to invest 1% of annual retail electricity revenues in energy efficiency and demand side programs and to retire older coal-fired generating units (in addition to Cliffside Units 1 through 4) on a MW-for-MW basis, considering the impact on reliability, for actual load reductions realized from these new programs up to the MW level added by the Cliffside unit.    As a result, Duke is hereby granted a certificate of public convenience and necessity pursuant to G.S. 62-110.1 authorizing construction of one 800-MW SCPC generating unit subject to the conditions enumerated above.

EVIDENCE AND CONCLUSIONS FOR FINDINGS OF FACT NOS. 1 AND 2

The evidence in support of these findings of fact is found in the certificate application for the Cliffside project, the testimony and exhibits in this docket, and the statutes and rules governing the authority and jurisdiction of the Commission. These findings are informational, procedural, and jurisdictional in nature.

EVIDENCE AND CONCLUSIONS FOR FINDING OF FACT NO. 3

This finding of fact is based upon the statutes and case law of North Carolina.

The ED/NCSEA/NCWARN/SACE/SELC brief argues that the Commission must consider the issues of need and cost. The Commission's mandate in this proceeding is broader than that. G.S. 62-2(a)(3) and (3a) declare it policies of the State, among others, to promote adequate, reliable, and economical utility service and to require energy planning "to result in the least cost mix of generation and demand-reduction measures which is achievable..." The Utilities Commission is given authority to regulate public utilities in accordance with these policies. G.S. 62-110.1(a) provides that no public utility shall begin the construction of any electric generating facility to be directly or indirectly used for furnishing public utility service without first obtaining a certificate of public convenience and necessity from the Commission. G.S. 62-110.1(c) requires the Commission to develop and keep current an analysis of the long-range needs for expansion of electric generating facilities in the State and to "consider such analysis in acting upon any petition by any utility for construction."

G.S. 62-110.1 is intended to provide for the orderly expansion of electric generating capacity in order to create a reliable and economical power supply and to avoid the costly overbuilding of generation resources. State ex rel. Utilities Comm. v. Empire Power Co., 112 NCApp 265, 278 (1993), disc. rev. denied, 335 NC 564 (1994); State ex rel. Utilities Comm. v. High Rock Lake Ass'n, 37 NCApp 138, 141, disc. rev. denied, 295 NC 646 (1978). A public need for a proposed generating facility must be established before a certificate is issued. Empire, 112 NCApp at 279-80; High Rock Lake, 37 NCApp at 140. Beyond need, the Commission must also determine if the public convenience and necessity are best served by the generation option being proposed. The standard of public convenience and necessity is relative or elastic, rather than abstract or absolute, and the facts of each case must be considered. State ex rel. Utilities Comm. v. Casey, 245 NC 297, 302 (1957). "[Chapter 780 of the 1975 Session Laws], codified as G.S. 62-110.1(c)-(f), directs the Utilities Commission to consider the present and future needs for power in the area, the extent, size, mix and location of the utility's plants, arrangements for pooling or purchasing power, and the construction costs of the project before granting a certificate of public convenience and necessity for a new facility." High Rock Lake, 37 NCApp at 140-1.

As hereinafter discussed in this order, the Commission has considered all of these factors — need, the size and mix of existing plants, pooling, purchases, DSM, alternative technologies including renewables, fuel costs, and construction costs -- in determining whether the public convenience and necessity are served by Duke's proposal in this docket.

EVIDENCE AND CONCLUSIONS FOR FINDINGS OF FACT NOS. 4 AND 5

The evidence supporting these findings of fact is contained in the testimony and exhibits of Duke witnesses Rogers, Rose, McCollum, Griffith, and Hager and Public Staff witnesses Maness and Hinton.

Duke offered considerable testimony as to the process used to determine that it is appropriate to add baseload capacity in the 2011-12 time frame and that the Cliffside project is the best option.  Witness Hager testified that the Company develops and files an annual resource plan based upon a 15-year forecast and a target reserve margin of 17%.  The decision to pursue the Cliffside project was one component of the action plan resulting from the 2005 planning process.  In the 2005 Annual Plan, Duke identified potential supply-side resources and performed an economic screening process.  The technologies that passed all of the screens in 2005 were combustion turbine, coal, combined cycle, and nuclear.  Renewable technologies were tested, but did not pass the screening.  Using the initial screening results, Duke developed resource portfolios that were tested under baseline assumptions and then subjected to analysis of their sensitivity to factors such as changes in fuel costs, load growth, and climate change policy.  The results showed that a combination of new peaking, intermediate, and baseload generation, as well as DSM resources, is needed over the next 15 years.  The generation portfolios including 1600 MW of baseload coal capacity consistently outperformed alternative portfolios during Duke's initial analysis.

Duke witness Griffith offered a more detailed explanation of the process at the September 2006 hearing.  He testified that the process consisted of two sub-processes, a screening process and a more detailed portfolio analysis.  The screening process examines the economics of a wide range of resource alternatives, using such tools as a busbar screening curve.  The screening assists in developing specific portfolio strategies that can be analyzed further.  Witness Griffith testified that his firm, Global Energy, determined a series of portfolio strategies that could then be analyzed in more detail in the portfolio analysis process.  Global Energy used its Capacity Expansion Model (CEM), which evaluates the economics of every possible combination of resources available and identifies the lowest cost strategy given the future envisioned by the scenario or sensitivity case.  The CEM produced ten alternative resource portfolios.  These portfolios were then analyzed using the Planning and Risk (PAR) simulation model.  The PAR model, which is more detailed than the CEM, analyzed all ten portfolios under baseline assumptions.  Six portfolios were then chosen and subjected to sensitivity analyses.  According to witness Griffith, the PAR model clearly indicated that a portfolio with 1600 MW of coal generation was dominant in the base case and in the majority of the sensitivity analyses.

The six portfolios, which have been analyzed in one form or another since the 2005 planning process, are as follows:

(1)    Balanced Cliffside -- coal (1600 MW), nuclear (1734 MW), combustion turbines (2771 MW), and retirement of Cliffside Units 1-4;

(2)    Balanced Single Unit Cliffside -- coal (800 MW), nuclear (1734 MW), combined cycle (585 MW), combustion turbines (2990 MW), and retirement of Cliffside Units 1-4;

(3)    Balanced Cliffside with Retirements -- coal (1600 MW), nuclear (1734 MW), combustion turbines (3345 MW), retirement of Cliffside Units 1-4, and retirement of 577 MW of older coal capacity;

(4)    All Gas and Nuclear -- nuclear (1734 MW), combined cycle (1170 MW), and combustion turbines (3010 MW);

(5)    All Gas -- combined cycle (2925 MW) and combustion turbines (2990 MW); and

(6)    Cliffside and Gas -- coal (1600 MW), combined cycle (1755 MW), combustion turbines (2756 MW), and retirement of Cliffside Units 1-4.

At the September 2006 hearing, Duke and Public Staff witnesses concluded that the Cliffside project, which is based upon the Balanced Cliffside portfolio, is the best option given the needs of Duke customers.  Subsequent to the September 2006 hearing and the cost increases that Duke reported to the Commission, witness Hager updated the cost data for all of the supply-side alternatives considered in the screening process in the 2006 Annual Plan and performed additional analysis to determine if the Cliffside project remained the best choice.  The portfolios evaluated in the updated analysis were the same as those evaluated in the 2006 Plan with the addition of a seventh portfolio that considered a sale of 800 MW of the Cliffside project to a third party.  The new Balanced Cliffside Shared Ownership portfolio included coal (1600 MW with 800 MW owned by an outside entity), nuclear (1734 MW), combined cycle (585 MW), combustion turbines (2990 MW), and retirement of Cliffside Units 1-4.[2]

The result of Duke's updated analysis was that the All Gas and Nuclear portfolio had the lowest present value revenue requirements (PVRR) under base assumptions over a 35-year study period.  The Balanced Cliffside portfolio was second.  The difference in PVRR between the top two portfolios would result in average rates less than 0.3% higher each year over the study period.  However, the Balanced Cliffside portfolio was robust under various key sensitivities, including high gas prices, high load, high gas and coal prices, $CO_2$ tax and high gas prices, and high gas and coal prices coupled with a 20% increase in nuclear capital costs.  At the January 2007 hearing, Hager stated that the Cliffside project provides a balance of reliability, timeliness, and cost-effectiveness.  The Public Staff witnesses also continued to support the Cliffside project.

---

[2] Note that the two portfolios that add 800 MW at Cliffside, the Balanced Single Unit and the Shared Ownership, both include retirement of Cliffside Units 1-4, leaving a net of 600 MW gained at Cliffside.  Duke's remaining needs are obviously satisfied by the other generation included in these portfolios.

The Commission concludes that it was appropriate for Duke to conduct the long-range computer analyses of various supply-side resource options, and the Commission has considered these in its deliberations herein. The matter presently before the Commission is the application for the Cliffside project. The Commission cannot commit, and is not called upon to commit, to a complete portfolio of new construction running years into the future. The Commission must take from these analyses the information that is helpful in making the present decision as to whether the public convenience and necessity are served by Duke's application for a certificate for the Cliffside project. It is appropriate for the Commission to consider many factors in making this decision, including the overall integrated resource plan of the utility, but the Commission is not bound by the results of any single least-cost computer study.

EVIDENCE AND CONCLUSIONS FOR FINDINGS OF FACT NOS. 6-8

The evidence supporting these findings of fact is contained in Duke's 2005 and 2006 Annual Plans and in the testimony and exhibits of Company witnesses Rogers, Ruff, and Hager; Public Staff witness Hinton; and SACE/ED/SELC witnesses Schlissel and Sommer.

At the September 2006 hearing, Duke witness Rogers testified that the Company's most important overall objective is to ensure that its customers have access to reliable and reasonably priced electricity to meet their needs. Achievement of this objective enables businesses to feel secure in locating and maintaining facilities in North Carolina, fosters economic growth, and contributes to the quality of life for all citizens of the State.

Duke witness Ruff testified that the Company's 2005 Annual Plan "demonstrates the need for 3400 additional MW of capacity in 2011, which increases to 4360 MW in 2014." She stated that Duke performed a least-cost study of potential supply-side and demand-side resources and "determined that new coal capacity is the best option for meeting the earliest baseload generation needs." She further stated that this new coal capacity should be in the form of two 800-MW units at Duke's existing Cliffside plant, with the first unit on line in 2011.

Witness Hager testified that Duke's annual planning process begins with a 15-year forecast of the Company's peak demands and energy sales. She noted that Duke's average annual load growth is between 300 MW and 400 MW. Duke is adding about 40,000 to 60,000 new customers each year and, in addition, needs to replace certain existing purchase power agreements that expire during the planning horizon. Hager also testified that the 2005 Annual Plan indicated a need for 3400 MW of cumulative resource additions by 2011 and that approximately 2841 MW of these additions would be peaking capacity and 800 MW would be baseload capacity. In Duke's 2006 Annual Plan, which was prepared after Duke's initial testimony herein was filed, the comparable need by year 2011 is 2120 MW. The change from the 2005 Plan is largely attributable to

13

Duke's purchase of the 825-MW Rockingham generating facility and the decision by Energy United, an electric membership cooperative, not to enter into a power purchase agreement with Duke.  Witness Hager testified that, under Duke's 2006 Annual Plan, the 2120 MW need would be satisfied by 64 MW of additional nuclear capacity at the Catawba plant, two 564-MW gas combustion turbine or combined cycle units, and 800 MW of coal capacity.  She testified that the second 800-MW Cliffside unit in 2012 achieves a reserve margin of at least 17%.

Public Staff witness Hinton testified that he believes the peak load and energy sales forecasts contained in Duke's 2005 and 2006 Annual Plans are reasonable.

SACE/ED/SELC witnesses Schlissel and Sommer testified that Duke has not adequately demonstrated a need for 1600 MW of baseload capacity in 2011. They maintained that, at most, Duke has demonstrated that additional capacity is needed in the peak summer hours and that the high reserve margins in the 2005 Annual Plan for winter peak hours suggest that Duke does not need any baseload capacity until 2013.  Witness Schlissel testified that Duke's failure to present evidence concerning its load duration curve, together with the lack of evidence that the Company fully investigated buying capacity from other utilities, leaves doubt as to whether there is a need for the additional baseload capacity. He argued that Duke should have looked at a wider range of alternatives -- not just coal, natural gas, and nuclear -- and should have also considered a range of energy efficiency programs, renewable technologies, and purchases from the market.  He opined that, if Duke had adopted this approach, it might well have projected a need for peaking capacity in 2011, rather than baseload capacity.

At the January 2007 hearing, Duke introduced for the first time the possibility of selling up to half of the proposed 1600-MW capacity of the Cliffside project.  Witness Hager presented an analysis of a Shared Ownership portfolio. She testified that partial ownership almost always outperforms full ownership, that the Shared Ownership portfolio achieves savings over the Single Unit portfolio because there are substantial economies of scale in building both units, and that "the Company will pursue a partial sale of up to 50% of the Cliffside Project if it is determined that such a sale will improve the economics for the Company and its customers."  Hager denied that consideration of such a sale reveals a lack of need for the full 1600 MW as proposed.  She testified, "It's just a matter of which units get dispatched when and at what rate" and, "If we have it, it has benefits."  In the event of such a sale, an additional 585 MW of intermediate gas-fired combined cycle capacity would be added to the Duke system in addition to the new coal-fired capacity.

Witness Rogers testified, "I'm open to doing [the Cliffside project] with a partner and building a regional plant."  He presented shared ownership as a matter of "good business sense to explore spreading those costs, risks, and benefits among more than one electric provider in the region."  Duke customers

14

would receive "a 'volume' discount – 800 or so MW, built at the lower 1600 MW cost."

Duke and the Public Staff both argue that Duke's 2005 and 2006 Annual Plans demonstrate the need for a substantial amount of additional supply-side capacity beginning in the 2011-12 time frame, and that the plans support granting a certificate for the Cliffside project; however, the Commission is not convinced that these plans establish a need for the entire project. Duke's certificate application filed on June 2, 2006, was based upon the projected load requirements in Duke's 2005 Annual Plan. The application states that "the need for the Cliffside Project is demonstrated in Duke Energy Carolinas' 2005 Annual Plan filed with the Commission on November 1, 2005, in Docket No. E-100, Sub 103....Duke Energy Carolinas' 2005 Annual Plan identifies the need for an additional 3,400 MW of new resources to meet customers' energy needs by 2011 and 3,810 MW by 2012." Although the 2005 plan projected a need for an additional 3400 MW from 2007 through 2011, a large portion of this additional 3400 MW was to accommodate four anticipated wholesale contracts with North Carolina cooperatives, which were expected to begin in September 2006 and continue through 2021. Shortly after the filing of the Cliffside application, Duke filed its 2006 Annual Plan in Docket No. E-100, Sub 109, on September 1, 2006 (corrected on September 11 and updated on October 31). In its 2006 plan, Duke states that only three of the four cooperatives decided to sign wholesale contracts with Duke. Duke's 2006 plan projected that additional load from 2007 through 2011 had declined from the 3400 MW figure cited in the 2005 plan to 2120 MW, a significant reduction of 1280 MW.

At the first evidentiary hearing in September 2006, some Duke witnesses continued to cite the 3400 MW figure, even though the 2006 plan had been filed by that time. Duke witness Hager acknowledged the reduction reflected in the 2006 plan and explained that the reduction resulted primarily from Duke's purchase of the Rockingham Power, LLC, plant, which has a capacity of about 825 MW, and the decision of the fourth cooperative not to enter into a wholesale contract with Duke. This fourth contract, which did not materialize, had been expected to involve about 500 MW. Hager testified that the 2120 MW figure set forth in the 2006 plan represents the amount of capacity beyond existing generation (including Rockingham) and existing and projected DSM needed to meet a 17% reserve margin. She explained that the 2120 MW of projected need would be satisfied by 64 MW of additional nuclear capacity at the Catawba plant, two 564-MW combustion turbines or combined cycle units, and 800 MW of coal capacity. When asked to justify the proposed 1600 MW of coal capacity from Cliffside, Hager testified that adding the second Cliffside unit in 2012 would raise the reserve margin, which was projected as 16.3% in 2011, to 18.5% in 2012.

For purposes of this proceeding, the Commission accepts the 2120 MW need projected in Duke's 2006 plan, but the projections in the 2006 plan make, at best, a weak case for the full Cliffside project. They show a need for only 800

MW of coal-fired baseload capacity in 2011. While the projected reserve margin falls below the 17% goal in 2011, it is only slightly below. The reserve margin would fall further in subsequent years, but only if nothing else were done. In fact, there are many options besides a second Cliffside unit for making up the difference and regaining the desired reserve margin. For example, construction of intermediate gas-fired combined cycle capacity could be moved up (which is what Duke proposes to do in the event that ownership of Cliffside is shared). Other options include purchases (Hager testified that Duke is always looking for purchase opportunities), and renewables (Rogers testified to a probability that a renewable portfolio standard will be enacted into law).

The case for certification of a second Cliffside unit was weakened further during the second hearing in January 2007 by the introduction, for the first time, of the possibility that Duke might sell up to 800 MW of the proposed Cliffside capacity. Under the Shared Ownership portfolio that Duke presented, up to one-half of the proposed capacity would be owned by another company and used for that other company's purposes; there would be no buyback by Duke.

Several reasons were given in support of a sale. One was the economies of scale realized from building both units: Duke customers would get a "volume discount," 800 MW built at a lower per/MW cost. Hager testified that these economies of scale were significant; however, a similar argument could be made for almost any construction project. Economies of scale, in and of themselves, do not establish a need for the capacity, and the need for the capacity is the Commission's initial consideration under G.S. 62-110.1.

Other reasons in support of a sale were the sharing of risks and the regional approach to building generation suggested by witness Rogers. The record is simply insufficient for the Commission to rely upon these arguments for two reasons. First, G.S. 62-111(d) provides that no person shall obtain a "franchise" for the purpose of transferring it to another. A "franchise" includes certificates. G.S. 62-3(11). G.S. 62-110.1 does not envision the Commission granting a certificate for a second Cliffside unit with the knowledge or expectation that Duke will promptly sell it. Second, although G.S. 62-110.1(d) speaks to "pooling of plant," shared ownership is not the basis upon which Duke filed its application herein, and there is no evidence of any regional or joint need that such shared ownership would serve.

Witness Hager was asked at the hearing whether Duke's consideration of a sale demonstrates that the second Cliffside unit is not needed. In response, she discussed the dispatch of plant and explained, "If we own the full 1600, think about [sic] everything else drops a certain percentage in terms of its capacity factors. If we only own 800, they drop a little less....If we have it, it has benefits." The Commission is not convinced that a level of improved dispatch that Duke can either take or manage without is enough to meet the standard of public convenience and necessity.

The Public Staff argues in its brief that the Commission should not consider a possible sale because "such a transaction would be subject to separate review by the Commission" in the future. However, the Commission does not believe that it can determine whether a second 800-MW unit is required by the public convenience and necessity without knowing who would own the second unit, what need would be served, and how the costs of operation would be allocated. The Public Staff would leave such matters to a subsequent proceeding, but the Commission believes that these matters are essential considerations under G.S. 62-110.1 that must be resolved in this proceeding in order for a certificate to be granted.

The Attorney General contends in his brief that the evidence of a possible sale shows that Duke has not demonstrated a need for the second 800-MW Cliffside unit. "If Duke is prepared to sell half of the proposed 1600 MW, then it must not need that capacity." Relying heavily on this contention, the Attorney General urges the Commission to grant a certificate for only one Cliffside unit at this time. The Commission agrees.

Given the baseload capacity needs shown in Duke's 2006 Annual Plan, given Duke's consideration of selling up to half of the proposed Cliffside capacity, and given uncertainty over the ownership and use of a second 800-MW unit, the Commission concludes that Duke has not shown a need for a second 800-MW unit sufficient for present purposes. In summary, the Commission concludes that Duke has not carried its burden of proof to show that it needs 1600 MW of baseload generating capacity in the 2011-12 time frame. Duke has shown that it needs 800 MW of baseload generating capacity beginning in 2011.

EVIDENCE AND CONCLUSIONS FOR FINDINGS OF FACT NOS. 9-11

The evidence supporting these findings of fact is found in the testimony of Duke witnesses Rogers and Hager; SACE/ED/SELC witnesses Schlissel and Sommer; Public Staff witnesses Lam, Maness, and Hinton; NCWARN witness Blackburn; and SACE witness Smith.

Duke witness Hager testified to Duke's commitment to DSM, which includes both demand response and energy efficiency. The existing demand response programs include time-of-use programs and interruptible programs, and these programs are believed to have reduced the summer 2006 peak by 766 MW. The existing energy efficiency programs include Energy Star, which promotes more energy efficient homes; a loan program to encourage increased energy efficiency in existing homes; and a comparable loan program for low-income customers.

Hager stated that the only new DSM programs included in the 2005 Annual Plan were 100 MW of new demand response programs. In its 2006

Annual Plan, Duke added 101 MW of new energy efficiency programs, which, Hager testified, is indicative of what can be achieved by future cost-effective energy efficiency programs. The total amount of new DSM in the 2006 plan was therefore 201 MW. She testified that the Company did not include any additional DSM in its recent, updated analyses because it had no new information. However, she stated that Duke is currently participating in collaborative workshops with various stakeholders to develop new DSM programs, and it is thought that the results from those sessions will be available in mid-2007. Hager is hopeful that these DSM collaborative workshops will produce new information to incorporate into the 2007 modeling. Stakeholders involved in these collaboratives include, among others, Environmental Defense, Lowe's Home Center, Food Lion, the University of North Carolina, the North Carolina Housing Authority, the State Energy Office, the Attorney General, and the Public Staff.

Hager noted that, while there has been much discussion about the potential for additional energy efficiency programs, no one has proposed a set of programs that Duke could run on its system, and she asserted that the Company cannot ignore forecasted demand in favor of speculation regarding the ability of DSM to reduce some of the need. Hager was cross-examined about the suggestion in the December 2006 GDS Associates study[3] that North Carolina could reduce its electric energy use by 14% by 2017 through energy efficiency programs. She expressed skepticism that such results could, in fact, be achieved on Duke's system, and she stated that the study depends on certain simplifying assumptions that may not be appropriate. She testified that, regardless of what the GDS report may say, one cannot reasonably assume that there will be sufficient energy efficiency available to offset the proposed Cliffside units in the time frame when they will be needed.

With respect to renewable generation, witness Hager referred to the December 2006 report of La Capra Associates on the feasibility of a renewable portfolio standard in North Carolina,[4] and she noted that Jonathan Winer of La Capra has been quoted as saying that, even if a renewable portfolio standard were adopted, the coal plants now being planned would likely still be needed. Witness Hager testified that installation of a MW of renewable generation does not automatically eliminate the need for a MW of conventional generation and that, if all the renewable generation contemplated by the La Capra study is installed, there might be 1000 MW of renewable generation added to Duke's system but only about 300 or so MW of conventional generation displaced.

---

[3] A Study of the Feasibility of Energy Efficiency as an Eligible Resource as Part of a Renewable Portfolio Standard for the State of North Carolina, GDS Associates, Inc., December 2006.

[4] Analysis of a Renewable Portfolio Standard for the State of North Carolina, La Capra Associates, December 2006.

SACE/ED/SELC witnesses Schlissel and Sommer asserted that the efficiency programs outlined in Duke's 2005 Annual Plan are woefully inadequate compared to energy efficiency programs across the nation. Witness Schlissel testified that an aggressive energy efficiency program would mimic the results of the low-load scenario used in Duke's cost studies, a scenario in which gas-fired generation costs less than coal. Witness Sommer testified that the low-load scenario is achievable if one were to apply an aggressive energy efficiency program as discussed in the GDS study. She testified that the GDS study's goal of a 14% reduction by 2017 from energy efficiency measures was conservative and that the potential might be higher. Witness Schlissel stated that energy efficiency programs are more comparable to a baseload resource and that new energy efficiency programs would displace baseload capacity. He testified that adding 1600 MW of baseload capacity through construction of the Cliffside project would lessen Duke's incentive to increase the use of energy efficiency and that Duke should re-run its cost studies to reflect energy efficiency portfolios based on the GDS report.

Witnesses Schlissel and Sommer also described ways in which they believe that Duke's implementation of the CEM model was flawed. First, they stated that Duke should have used a different programming mode in its CEM modeling. Duke operated the CEM model in a programming mode which does not require the addition of capacity in the discrete amounts that would normally be built. Running the CEM model in a different mode would produce different results and might add less capacity than the runs presented by Duke. Second, the witnesses testified that Duke eliminated all but fossil and nuclear options in its busbar screening analysis. Alternative options were never passed to the CEM for analysis and could not be selected. Alternative options include DSM and renewable options, which, according to the witnesses, could have been analyzed by the CEM and which might have been attractive as hedges against the uncertainties of future fuel prices, capital costs, and greenhouse gas regulation.

They also testified that Duke should have considered biomass and wind power as alternatives to coal, citing a July 2004 report by the North Carolina Solar Center finding that biomass is a commercially proven and viable option for North Carolina. Additionally, they stated that they have seen estimates of the potential for perhaps 1700 to 2000 MW of biomass generation in North Carolina and that actual experience and studies have shown that wind power can reduce the need for other capacity and provide low-cost energy.

Witnesses Schlissel and Sommer testified at the January 2007 hearing that they had not had sufficient time to fully review Duke's updated quantitative analysis results, but that, even after a relatively brief review, the updated results do not support the addition of the Cliffside project in 2011-12. In the updated analysis, the CEM generally added less coal capacity. However, due to time constraints, Duke simply used the portfolios analyzed in the original 2006 analysis to evaluate the impact of the updated Cliffside costs, rather than using

the results of the new CEM runs to develop new resource portfolios. There is, therefore, a "disconnect" between the updated CEM results and the portfolios used in the updated PAR analysis.

Responding to witnesses Schlissel and Sommer, witness Hager testified that she believes it is inappropriate to compare DSM to supply-side resources using screening curves; use of a detailed production model is necessary to capture the interactions between such different resource options. She stated that there was not enough information available on the details of potential DSM programs to include them in the CEM as a flexible resource, but that Duke hoped to do so in the future as a result of the work of the collaboratives. For purposes of the 2006 analysis, Duke included a level of DSM resources that it considers indicative of what can be achieved. She does not believe that there will be enough DSM to offset the need for the Cliffside project, and the risk of delay until more data is available is too great. Additionally, witness Hager testified that the low-load scenario contains a greater reduction in load than the energy efficiency savings shown in the La Capra study.

Witness Hager testified that Duke prefers to run the CEM model in the mode that identifies exactly the various types of capacity needed in each time period. The CEM analysis is still a high-level screening process, not as rigorous as the more detailed analysis that the Company then proceeds to perform. The Company uses the results of each run, or perhaps several CEM runs, to create possible portfolios with reasonable sizes and construction dates.

Witness Hager disagreed with Schlissel and Sommer's conclusion that the updated CEM runs do not support the Cliffside project. She indicated that the updated CEM results, set forth in Table 1 of Schlissel and Sommer's testimony, included outcomes with various amounts of new coal capacity being added, and some of the new CEM runs show coal capacity being added in 2011. She testified that the portfolios evaluated by the updated PAR were appropriate to help management decide whether to proceed with the Cliffside project and that additional analysis was unnecessary.

With respect to wind and biomass, Duke witness Hager testified that the Company included 75 MW of wind power in its 2005 analysis and 100 MW each of wind and biomass in its 2006 analysis. She stated that Duke's analysis is focused on which resource technologies will result in the least cost being charged to its customers. She indicated that, to the extent renewable technologies can provide power on a least-cost basis, they will be included in Duke's portfolio of resources.

Duke witness Rogers is co-chair of the National Action Plan for Energy Efficiency. He testified that DSM is a useful tool, but that DSM alone cannot completely address increased load demand and that energy efficiency programs cannot offset the need for the Cliffside project. Although other states provide

examples of new DSM programs that may help improve energy efficiency in North Carolina, one cannot accurately predict how well programs will transfer from one state to another. Rogers testified that he has created a special group to focus on building energy efficiency programs in all of the states where Duke Energy operates. Rogers stated that, when a utility decides to reinvigorate its DSM process, three to five years may be required before the process "gets rolling." Furthermore, after a specific energy efficiency program is implemented, one or two years are required in order to determine by how much the program has reduced customer demand. There is, too, a point of diminishing returns with investments in DSM; in other words, there is a point at which increasing the amount of money devoted to such programs becomes inefficient and impractical.

Duke committed $2 million to conservation and customer education programs as part of its merger with Cinergy Corporation. Witness Rogers testified that, subject to completion of the Company's ongoing collaborative process to develop new energy efficiency programs and subject to appropriate regulatory treatment of the Company's energy efficiency investments, Duke is now willing to commit to invest 1% of its annual revenues in energy efficiency programs. He stated that 1% of annual revenues is approximately $50 million. Witness Rogers further testified that, upon commercial operation of the Cliffside project and subject to appropriate regulatory approvals and in the absence of compelling customer or system reliability needs, Duke will retire generation from its older, less efficient coal units on a MW-per-MW basis for every MW saved by new energy efficiency programs up to the level added by the Cliffside project. Rogers testified that "in the event that we end up with only one unit, [the commitment to retire older coal plants based on energy efficiency gains] would be contingent on that 800 megawatt, tied to that 800 number." Rogers explained that such new programs would include both demand response and energy efficiency programs. With respect to what constitutes "appropriate regulatory treatment," he proposed that the Commission take a fresh look at incentives for energy efficiency and come up with a more modern approach; however, he agreed that Duke will accept whatever treatment the Commission decides to be appropriate. Witness Rogers stated that Duke is "not tying [the commitment to invest in energy efficiency programs] to approval of the Cliffside Project but we thought it was important in the context of rolling out – where Cliffside is the central part of our plan to also show the Commission that we have other parts of our plan."

Rogers agreed that, should renewable portfolio standard legislation with energy efficiency language come from Congress or the North Carolina legislature, he would be willing to discuss that statute with third parties.

Public Staff witnesses Lam, Maness, and Hinton testified that many of the DSM options suggested by intervenors are not cost-effective. The Public Staff contacted commission staffs in other states to compare Duke's DSM programs to others, and the Public Staff believes that the ongoing DSM collaboratives will be useful.

NCWARN witness Blackburn suggested that a more detailed study of energy efficiency programs is needed. He estimated that Duke could save six to seven billion kilowatthours of electricity from residential sales over the next ten years. Witness Blackburn maintained that Duke's failure to consider any conservation or energy efficiency programs that might cause non-participating customers to pay higher rates was inappropriate.

SACE witness Smith testified that Duke has not done an adequate job of aggressively pursuing energy efficiency. He stated that Duke does not have to build a new plant immediately since it has a 17% reserve margin, and that the Commission should deny the application and instruct Duke to give greater weight to energy efficiency and renewable resources. He did not rule out other resources, but stated that Duke should fully exploit DSM and renewables first.

The Commission has carefully considered the evidence as to the role of DSM and renewables in the present docket. The Commission recognizes that the approval of new programs and the appropriate regulatory treatment of costs are matters to be decided in other proceedings. The matters at issue in this proceeding are whether more aggressive DSM programs and greater reliance on renewable sources of generation could delay or replace the Cliffside project and whether Duke has properly analyzed and pursued the true potential of DSM and renewables in planning the Cliffside project.

Some parties have raised questions as to the timeliness and thoroughness of Duke's DSM analyses, especially in light of the Commission's August 31, 2006 order in Docket No. E-100, Sub 103, requiring electric utilities to file "a comprehensive analysis of their DSM plans, activities, and relevant cost/benefit information" as part of, or as a supplement to, their 2006 plans. Some parties have raised even more fundamental questions as to the propriety of Duke's cost modeling techniques. The ED/NCSEA/NCWARN/SACE/SELC brief argues that Duke improperly screened out energy efficiency and renewables from further analysis by assuming levels much lower than their true potential; that Duke should have used the CEM model in a different programming mode, in which case it might have chosen less coal; and that Duke failed to carry forward its latest CEM runs, which also chose less coal, to the latest PAR analysis. The Attorney General's brief questions why Duke found the expertise and resources to conduct three comprehensive analyses of generation portfolios, but not even one analysis of specific, new DSM programs. Duke cites its collaboratives as its means of complying with G.S. 62-2(a)(3a), but the Attorney General views these as too little and too late since construction of baseload generation is being proposed.

The Commission shares certain of these questions and concerns. Duke's estimates in its 2006 plan of an additional 100 MW of demand-response and an additional 101 MW of energy efficiency seem to have been essentially

placeholders. The Commission believes that Duke may well be able to accomplish substantially more than these levels – especially in light of the fact that Duke's chief executive officer has taken an aggressive, national leadership position in support of energy efficiency. Despite the Commission's concerns as to Duke's DSM analysis, the Commission cannot conclude that the weaknesses suggested by the intervenors are sufficient to justify a delay while new cost studies are required. Duke witnesses indicated that, while Duke has not negotiated firm contracts for components to be used in the Cliffside units, it has reached preliminary arrangements whereby it has been given a "place in the queue" of utilities shopping for equipment. If Duke has to perform new studies while its application is denied or held in abeyance, it would likely lose its place in the vendors' queues. The result could well be higher costs and delays resulting in later completion dates if the units are ultimately approved. Later completion dates create a risk that insufficient generation will be in place when needed and at its present estimated cost. Complex studies are never perfect, and they can always be improved. The Commission acknowledges that revised cost studies could provide valuable new information; however, given the circumstances of this case, the Commission does not believe that the benefits to be gained from requiring Duke to redo its studies outweigh the possible delays and cost increases resulting from the loss of Duke's preliminary arrangements with vendors. Thus, on the present record, the Commission concludes that Duke cannot rely upon either DSM measures or additional renewable generation in the short term to eliminate or delay construction of additional supply-side resources.

Although the Commission does not believe that cost-effective DSM and renewables can eliminate or delay Duke's need for additional baseload generating capacity in 2011, the Commission does believe that the public convenience and necessity require Duke to take reasonable and cost effective, but aggressive, steps to reduce demand and to retire its older, less efficient coal plants. The granting of the certificate for the Cliffside project must, in the Commission's view, be tied to implementation of energy efficiency and demand side programs that will allow Duke to realize sufficient MW savings to retire its older, less efficient coal plants as rapidly as reasonably practicable, as witness Rogers committed in his testimony. Accordingly, the Commission will require Duke to honor its commitment to invest, on an annual basis, 1% of its annual retail revenues from the sale of electricity in energy efficiency and demand side programs, subject to the ongoing collaborative workshops and subject to Commission approval and to such appropriate regulatory treatment as the Commission may determine to be just and reasonable, and to retire older coal-fired generating units on a MW-for-MW basis, considering the impact on the reliability of the entire system, to account for actual load reductions realized from these new programs, up to the MW level added by the Cliffside unit certificated by this order. Duke will be required to submit a comprehensive plan for verifying MW savings from new energy efficiency programs and identifying the exact number of MW and the specific coal units to be retired pursuant to this commitment.

The Commission is eager for the uncertainty regarding the future of DSM to be resolved. The Commission is pleased with Duke's commitment to dramatically increase investment in cost effective energy efficiency and demand side programs in North Carolina, and the Commission urges Duke to pursue its collaboratives to a prompt and productive conclusion. With Duke CEO Rogers providing the leadership and with the stakeholder collaboratives providing the process, the Commission fully expects that Duke will have more meaningful data in its future filings and that Duke will achieve greater levels of DSM savings than those factored into its recent plans. The Commission believes that, for present purposes, the best approach is to act on the basis of the present record, to encourage Duke to pursue its stakeholder collaboratives, and to require that Duke adhere to its commitment to invest 1% of annual retail electricity revenues in energy efficiency and demand side programs and to match load reductions on a MW-for-MW basis with retirements of its older coal-fired generating units.

EVIDENCE AND CONCLUSIONS FOR FINDING OF FACT NO. 12

The evidence supporting this finding of fact is found in the testimony of Duke witness Rogers, SACE/ED/SELC witness Schlissel, and Public Staff witness Lam.

Witness Rogers testified that it would not be a good idea to substitute nuclear generation for the Cliffside project because a nuclear unit cannot be completed by the time that Duke needs baseload capacity. He stated that Duke is considering the possibility of building nuclear units in addition to the Cliffside project, but that there are many contested issues surrounding nuclear power, particularly the issue of waste disposal, and that there can be no certainty that a nuclear unit will ever be built. In the second hearing, Rogers testified that the ability of new nuclear power plants to achieve commercial operation by the year 2016 is uncertain. No nuclear plant has been licensed under the new regulations of the Nuclear Regulatory Commission (NRC) that permit a combined construction and operating license. While this new NRC approach is promising, it has not yet been tested, and the regulations continue to be revised. There is also uncertainty as to the ultimate cost of new nuclear units.

In the second hearing, SACE/ED/SELC witness Schlissel testified that it is highly uncertain when the new generation of nuclear plants will be built and how much they will cost.

Public Staff witness Lam testified that Duke's proposed in-service date of 2016 for future nuclear units is likely to be delayed because Duke would be among the first in over 30 years to seek a license and begin construction in the United States.

The Commission concludes that Duke cannot rely upon new nuclear generating facilities to meet its need for additional baseload capacity in 2011. The NRC's regulations are still being revised, and no new nuclear plant has yet been licensed. The new nuclear generating units anticipated by Duke would be among the first in the United States in the last 30 years, and it is uncertain whether Duke will be able to place such a unit in commercial operation by 2016, much less by 2011.

EVIDENCE AND CONCLUSIONS FOR FINDING OF FACT NO. 13

The evidence supporting this finding of fact is found in the testimony of Duke witnesses Rogers, McCollum, and Hager; NCWARN witness Schlesinger; SACE witness Smith; SACE/ED/SELC witness Cortez; CUCA witness O'Donnell; and Public Staff witness Lam.

Another alternative available to Duke is the construction of an IGCC plant. IGCC is an emerging coal technology that causes less pollution than other forms of coal-fired generation. Witness Rogers testified that Duke considered IGCC technology instead of SCPC technology for the Cliffside project but that Duke ultimately chose not to use IGCC at Cliffside for the following reasons. The initial capital costs of IGCC are expected to be approximately 15% higher than SCPC generation. Although IGCC is more efficient than SCPC in controlling pollutants, it is still a developing technology. There are presently only two operating IGCC units in the United States, both of which are small compared to the proposed Cliffside units. New SCPC plants control pollution very well, even if not as well as IGCC, and they represent the state of the art in commercially available coal-fired generation today. As technology progresses and $CO_2$ scrubbers become cost-effective for SCPC units, they can be installed at the Cliffside plant. Rogers testified that Duke Energy Indiana will be using IGCC at a plant to be built in Indiana. However, Indiana is a coal-producing state where there is strong government support for IGCC, and Indiana provides tax benefits for IGCC; North Carolina does not. Further, if IGCC plants are to achieve their full potential for controlling $CO_2$ emissions, the emissions must be sequestered by piping them into an underground geological formation. Suitable formations have been identified in Indiana, but not in North Carolina.

Duke witness McCollum testified that IGCC is a promising, but still developing, technology and that it presents issues of higher initial costs, limitations on load following and cycling capability, and the lack of suitable geological formations in the Carolinas for carbon sequestration. There are only two operational IGCC generating plants in the United States. IGCC plants involve "some very complex and finicky pieces of equipment," and IGCC demonstration plants have taken six to eight years to reach 80% capacity factors. At the second hearing, McCollum testified that the 600-MW Edwardsport IGCC plant that Duke Energy Indiana is planning for 2011 would be the first operational unit of that size in the world. The Edwardsport project is still in a conceptual

25

design phase.  Specific bids for major pieces of equipment have yet to be obtained.  He stated that there would be a minimum two-year delay to replace the Cliffside project with an IGCC plant.  Witness McCollum asserted that IGCC is not the right technology to meet Duke's needs at this time.  To the extent that some intervenors suggest building a pipeline to haul $CO_2$ from the plant to regions where sequestration would be viable, McCollum testified that construction of such a pipeline could easily cost hundreds of millions of dollars.  McCollum also testified that Duke is participating in a pilot demonstration project to capture $CO_2$ from SCPC plants through chilled ammonia technology, and that this technology may bring the cost of carbon capture from SCPC units more in line with the projected cost of IGCC carbon capture.

Duke witness Hager testified that, as compared to a 1600-MW SCPC plant on a brownfield site, the capital cost for a new 600-MW IGCC plant is estimated to be 36% more expensive on a $/kW basis.  In preparing the 2006 Annual Plan, it was found that the capital-cost advantage of SCPC was over 50% on a $/kW basis.  IGCC was not selected as the most cost-effective option under any scenario analyzed in the 2005, 2006, or the updated modeling, including scenarios that included a carbon tax.  Witness Hager testified that IGCC is a potentially viable commercial technology, even in North Carolina where carbon sequestration is not possible, but that it can only be considered as a developing technology, not as a viable option, at present.

NCWARN witness Schlesinger testified that, because of its greater efficiency and lower emissions, IGCC is a potentially attractive option for baseload plants.  Even if $CO_2$ sequestration is not now available in North Carolina, the construction of an IGCC plant would preserve the option of piping the $CO_2$ to some distant location or sequestering it in some other manner in the future.

SACE witness Smith testified that IGCC can be an excellent baseload generation technology if the $CO_2$ emissions are sequestered, and that the Eason Chemical Company[5] is successfully operating an IGCC plant in Tennessee.  On cross-examination, he acknowledged that the Eason plant is not an electric generating plant.

SACE/ED/SELC witness Cortez testified regarding the relative costs of SCPC and IGCC generation and the impact of carbon capture on those costs, based on a statistical study of published studies by independent investigators.  Based on his review and Duke's updated cost information, he was confident that an "apples to apples" comparison of building similarly sized IGCC and SCPC units at Cliffside would reveal that IGCC is the lower cost resource.  With respect to carbon sequestration, he stated that moving $CO_2$ a distance of 500 miles to sites in central Appalachia does not appear to be an economic barrier to IGCC.

_____

[5] Although the transcript reads Eason Chemical Company, the witness more likely referred to the Eastman Chemical Company.

On cross-examination, witness Cortez testified that, while he generally believed IGCC to be superior to SCPC, it was not his testimony that the Commission should choose one technology over the other in this case. He stated that he had not attempted to directly compare the viability of IGCC units and SCPC units at the Cliffside site. Cortez stated his opinion that IGCC is an improving technology and that it has not proven to be as reliable as SCPC.

Public Staff witness Mr. Lam testified that IGCC generation facilities do not have the established reliability history of SCPC facilities and have higher capital costs.

The Commission concludes that Duke cannot rely upon IGCC technology to supply its need for additional baseload generating capacity beginning in 2011. IGCC units have yet to be constructed as a large-scale electric generating resource. Even if such units could be built, they would achieve commercial operation at least two years later than the Cliffside project. Given the geology of North Carolina, a cost effective method for carbon sequestration is, at best, an unresolved issue. Further, IGCC may not operate as effectively as its proponents anticipate. Reliability issues and the higher capital costs associated with IGCC may outweigh any advantages in pollution control; it is too early to know at present. IGCC is still a developing technology, and it is not a reliable alternative to the Cliffside project.

Notwithstanding this conclusion, the Commission is not at all hostile to IGCC technology. In fact, the Commission views IGCC as a promising technological option for the future. G.S. 62-2(a)(5) provides for public utility regulation to "encourage and promote harmony between public utilities . . . and the environment," and the Commission encourages the State's electric utilities to give serious consideration to IGCC as it develops.

EVIDENCE AND CONCLUSIONS FOR FINDINGS OF FACT NOS. 14-16

The evidence supporting these findings of fact is contained in the testimony of Duke witnesses Rogers, McCollum, and Hager and Public Staff witness Lam.

The only truly viable alternative to SCPC generation, under the evidence in this case, is the construction of gas-fired CC units. Duke witness Hager testified that the choices for meeting Duke's load in the 2011-12 time frame are either the Cliffside project or CC generation. She stated that Duke has discussed replacing a portion of the Cliffside project with CC if part of the project is sold; however, she strongly believes that it would not be in customers' best interests to replace the entire Cliffside project with CC generation.

Duke witness Rogers testified that, if Duke were to build no more coal generation, i.e., only natural gas generation and nuclear generation, 6% of the Company's energy would come from natural gas and Duke's fuel factor would be 30% higher than it is today. If Duke were to build all gas and no nuclear, 15% of its energy would come from natural gas, and its fuel factor would be 70% higher. He further testified that 50% of the electricity in the United States currently comes from coal and that 50% of the new generation to be built over the next 15 years is projected to be coal-fired, even with carbon regulation, for reasons of energy security. He stated that the country is in the same place with respect to the importation of natural gas today as it was with respect to the importation of oil in the 1960s. Consequently, he questioned whether it makes sense for the country's electric grid to be dependent on imports for its gas supply, in the same way that other sectors of the economy are dependent on foreign oil. Further, if $CO_2$ emissions are federally regulated in the future, and large numbers of gas-fired units are in use, gas demand will rise faster than gas supply, driving prices up.

Public Staff witness Lam testified that the only viable alternative to SCPC generation for supplying Duke's baseload capacity needs in the 2011-12 time frame is gas-fired CC generation. Witness Lam stated, however, that reliance on this option is inferior to the proposed SCPC units for the following reasons. The use of natural gas will result in an increased system fuel cost compared to SCPC and will rely on a currently decreasing domestic gas supply. Because CC units operate at lower capacity factors than baseload coal units, relying on them as a resource option would necessitate timely completion of the proposed nuclear units by 2016. Further, reliance on CC units would cause current non-emission-controlled, older coal units to operate at higher capacity factors than today, with the potential for expensive pollution control equipment and decreased system reliability.

With respect to the advantages of SCPC, Duke witness Rogers testified that the Cliffside project represents state-of-the-art technology in terms of emissions control as well as operational efficiency. By using SCPC technology at Cliffside and retiring Cliffside Units 1-4, Duke can substantially increase its baseload capacity without significantly increasing its environmental footprint. He further stated that the Cliffside project will give Duke the flexibility to run its older, highest-emitting coal units less frequently and to accelerate the retirement of some of those units on a MW-for-MW basis as demand reduction goals are met. Witness Rogers asserted that, as the proposed Cliffside SCPC units displace an equivalent capacity of older coal units, Duke will be able to burn less coal and produce more electricity.

Witness McCollum testified that the Cliffside project, including the retirement of Units 1-4, will reduce total current $SO_2$ emissions at the Cliffside site by nearly two-thirds, reduce total site $NO_x$ emissions under normal operations, reduce water withdrawal from the Broad River, and eliminate the existing thermal

discharge into the river. He further testified that new Cliffside generation would be the first coal generation dispatched on the Duke system and would have a beneficial impact on overall emissions from the entire Duke coal-fired fleet.

Witness Lam testified that use of new, highly efficient SCPC technology will keep Duke's overall system emission levels neutral, or potentially lower, on a per-unit-of-delivered-energy basis, because these units will displace less efficient coal units.

The Commission concludes that gas-fired CC generation is less attractive than SCPC generation for meeting Duke's baseload capacity needs and that Duke should not rely upon gas-fired CC for all of the 800-MW baseload need identified beginning in 2011. The Commission reaches this conclusion for several reasons. CC generation technology is well established and commercially available; however, there are several practical reasons why CC technology must be considered less desirable than SCPC technology in this case. One of these reasons is the greater volatility of natural gas prices compared to coal prices. Obviously, it is impossible to predict future fuel prices with any certainty, but it is clear that gas prices tend to vary over a wider range than coal prices. Duke's fuel factor could be adversely impacted if Duke builds only CC generation. Further, CC plants typically operate at lower capacity factors than SCPC plants. This is appropriate for intermediate or peaking needs, but less so for baseload capacity. Gas-fired CC generation has its appropriate place in a balanced generation portfolio, but if CC generating units were built for baseload generation (instead of SCPC at Cliffside), Duke would have to run its older coal-fired units more often and would not be able to retire Cliffside Units 1-4.[6] Greater use of the older coal units will lead to increased emissions or increased cost for pollution control. Finally, the United States' future supply of natural gas is expected to become increasingly dependent on imports. Over-reliance on gas in baseload applications would not be prudent.

The best remaining alternative available to Duke is SCPC technology as proposed for Cliffside, and the Commission concludes that use of SCPC has significant advantages and is the most desirable technology for Duke under the present circumstances. There is an abundant, domestic supply of coal. The fact that coal prices are not as volatile as gas prices makes coal a more attractive choice for baseload generation. Duke is already planning to build considerable gas-fired generation for intermediate needs, and fulfilling the present baseload needs with coal adds to the company's overall fuel diversity and security. As witness Hager testified, "History has shown that 'putting all your eggs in one basket' or, in this case, relying on a single fuel to meet all future demand is not the most prudent course of action for customers." Under the Shared Ownership portfolio, which is equivalent to our present decision in terms of fuel diversity, Duke would end up depending on gas-fired generation for only 25% of capacity

---

[6] Duke's All Gas and Nuclear and its All Gas portfolios did not include retirement of Cliffside Units 1-4.

and 3% of energy in 2021.  Finally, coal plants typically operate at a higher capacity factor than gas plants, allowing Duke greater flexibility to accelerate the retirement of older coal units.  The Commission concludes that use of modern SCPC technology, together with the retirement of Cliffside Units 1-4, will make for a more diverse and secure generation fleet and will allow Duke to increase its baseload generating capacity without significantly increasing its environmental footprint.

Duke's commitment to retire Cliffside Units 1-4 applies in the present case, where the Commission has certificated only one Cliffside unit.  One of the original portfolios presented by witness Hager, the Balanced Single Unit Cliffside portfolio, included the retirement of Cliffside Units 1-4 along with construction of only one 800-MW unit at Cliffside.  At the second hearing, Hager presented the Shared Ownership portfolio.  During cross examination by the Attorney General, witness Hager testified that the Shared Ownership portfolio assumes that a partner would own 800 MW, that Duke would not buy back any of the partner's capacity, and that Cliffside Units 1-4 would still be retired.  She testified, "So we would own 800 of it, but we would retire 200, leaving us with a net [of] 600 for the analysis."  At another point, witness Hager testified that "you get the same megawatts out of [both the Balanced Single Unit Cliffside portfolio and the Shared Ownership portfolio]."  Duke's testimony foresaw that it may end up owning only one unit, that it would nonetheless retire Cliffside Units 1-4, and that it would gain 600 MW of capacity in such an event.  The retirement of Cliffside Units 1-4 will, therefore, be made a condition of the certificate granted herein.

EVIDENCE AND CONCLUSIONS FOR FINDING OF FACT NO. 17

The evidence supporting this finding of fact is contained in the testimony of Duke witness McCollum and Public Staff witness Lam.

Duke witness McCollum testified to the comprehensive three-phase siting study that Duke conducted to determine the optimum location for its new baseload generation.  The study identified the Cliffside site and an alternate site in South Carolina as the recommended locations for the new generating units.  Duke selected the Cliffside site because it received the highest combined ranking in the siting study and because its existing critical infrastructure will keep construction and operating costs low and will minimize environmental impacts.  The Company has a long-established presence in the community and has received strong support for the project from both Rutherford and Cleveland Counties.

Public Staff Witness Lam testified that the Cliffside site is an "excellent" choice, due to its existing infrastructure and available land.  No party introduced evidence challenging the selection of the Cliffside site.

The Commission concludes that Duke appropriately selected the site for the Cliffside project.

30

EVIDENCE AND CONCLUSIONS FOR FINDING OF FACT NO. 18

The evidence supporting this finding of fact is contained in the testimony of Duke witnesses McCollum, Rose, and Hager; and Public Staff witnesses Maness and Lam.

Duke submitted confidential cost estimates for the Cliffside project, under seal pursuant to G.S. 132-1.2, in Attachment 1 to McCollum Exhibit 1.  At the September hearing, McCollum testified that the Company evaluated proposals from four leading power engineering, procurement, and construction contractors and compared these proposals to industry-standard EPRI data and to Duke's own experience to formulate the cost estimate for the Cliffside project.  Duke selected Shaw Stone & Webster as contractor to develop firm scope, schedule, terms, and pricing for the project.

Public Staff witnesses Maness and Lam testified that they reviewed and found the estimated construction cost to be reasonable.

Duke provided updated cost information to the Commission in its October 25, 2006 filing that showed a significant increase in the bid prices from vendors.  At the second hearing, witness McCollum testified that Shaw Stone & Webster and Duke have received and evaluated bids for the boiler, steam turbine generator, and air quality system controls and that these bids suggest that the capital costs for major components of the Cliffside project could be 40 percent higher than estimated at the first hearing.  Witness Rose explained that there has been a rapid increase in steel and other prices.  He attributed this to a substantial increase in demand for the materials both domestically and internationally.  After receiving the certificate and air permit, Duke will receive firm bids and enter into contracts with various equipment vendors.

Duke witness Hager was asked about the construction cost of the Balanced Single Unit Cliffside portfolio during the second hearing, and she testified as to the cost of building one 800-MW unit at Cliffside.  She testified that the cost "for a single unit is $1.53 billion without AFUDC, and the AFUDC is $400 million."[7]

The granting of a certificate requires Commission approval of the cost estimate for the construction being proposed and a finding that the construction is consistent with the Commission's plan for expansion of electric generating capacity.  We find that the Company has reasonably forecasted the costs associated with the Cliffside project vis-a-vis alternatives.  Witness Hager testified as to the cost of building one 800-MW unit at Cliffside.  We find her estimate to be reasonable, and it is approved for purposes of this proceeding.  The Commission notes that its approval is made only in the context of this proceeding, which is

---

[7] This testimony was given during a confidential portion of the January 19, 2007 hearing, but Duke authorized its use in this order by its March 14, 2007 letter.

31

concerned with approving whether or not Duke can proceed with the construction of the plant, and does not apply to any ratemaking determination or proceeding.

The Commission further notes that Duke is required by G.S. 62-110.1(f) to provide the Commission with an annual progress report and any revisions to the cost estimate. Witness Maness noted that the estimated costs of the project are expected to be finalized shortly after the first quarter of 2007. He recommended that Duke be directed to file a special report within 30 days after the estimate is finalized, but in no event later than May 31, 2007, and that Duke be given the opportunity to file supplemental reports updating the estimate every 30 days after the initial report. The Commission agrees with Maness's recommendations on the filing of cost estimates by Duke. The ordering paragraphs set out below will provide for these reports.

EVIDENCE AND CONCLUSIONS FOR FINDING OF FACT NO. 19

Duke witness Hager testified about a time in the 1960s when Duke had to build a new generating plant. Least cost planning showed that an oil-fired plant with a pipeline to Charleston would be the best choice. However, Hager testified, Duke management was uncomfortable with that course and, instead, "we built the Marshall plant which...has consistently won the most efficient coal plant in the country many times over...we used management judgment and I think our customers are significantly better off because we did that." The Commission now finds itself in a similar situation. The Commission is charged with responsibility for certificating new electric generating plants. This has been a particularly complex undertaking in this case and a difficult decision, but the Commission has used its best judgment based upon the evidence presented.

First, the Commission examined the need that the proposed generation must serve. Based upon Duke's most recent plan and upon Duke's consideration of selling up to half of the generation it proposes, the Commission cannot find that Duke has shown a need for 1600 MW of new baseload capacity. Duke presented no evidence of a regional or joint need, beyond its own need, to be served by the proposed plant. Duke did present evidence that it needs 800 MW of baseload generating capacity beginning in 2011, which it proposes to meet with coal.

Next, given a need for 800 MW of baseload capacity, the Commission has examined the various alternatives available to Duke. Each of them presents difficulties. If Duke takes no action, it would become dependent on purchases, and other utilities may have insufficient power available for sale in periods of peak demand. Duke did not issue a request for proposals (RFP) for its 2011 baseload capacity needs. Duke witness Hager testified that Duke has used the wholesale market for peaking and intermediate capacity, but that baseload capacity is fundamentally different. Hager cited possible transmission interruptions outside its control area ("there is no baseload merchant generation

in our service area or even in the …region that we're aware of") and supplier defaults ("monetary compensation for failure to perform under a baseload contract [is] a poor substitution for the energy that a baseload unit would produce") are key concerns with using the wholesale market for baseload capacity.  On the present record, without setting a precedent for other cases, the Commission cannot conclude that Duke should have issued an RFP for the capacity at issue herein.  Duke is expanding its DSM initiative and has committed to invest significant funds in this effort, but the Commission cannot conclude that cost effective DSM programs can eliminate or delay the need for new generation facilities in 2011.  The main benefits of Duke's DSM efforts will be realized in the years beyond that time.  Similarly, the Commission cannot conclude that there are sufficient renewable resources to eliminate the need for construction of a more conventional generating plant by 2011.  Furthermore, Duke will not be able to bring a nuclear plant into operation by 2011.  Although Duke has offered evidence that a nuclear facility might be completed by 2016 at a favorable cost, it is entirely possible that such construction may be delayed and its costs may increase.  IGCC causes less pollution than other forms of coal-fired generation, but carbon sequestration has not yet been perfected, there are no suitable geological formations for sequestration in North Carolina, and IGCC is an emerging technology that is not currently viable.

Finally, Duke -- and the Commission -- are left with a choice between natural gas CC generation and SCPC.  The Commission concludes that there are several practical reasons why natural gas CC must be considered less desirable.  One of these reasons is that gas prices tend to vary over a wider range than coal prices.  A second reason is that natural gas CC plants typically operate at lower capacity factors than coal plants.  If Duke builds gas-fired generation now, Duke will have to run its older coal-fired units more often than if it builds coal-fired generation now.  The United States' natural gas supply is expected to become increasingly dependent on imports and, thus, not as secure for baseload applications as the domestic supply of coal.  Finally, Duke is planning to build a number of gas-fired generating plants in the coming years, and using coal for its baseload capacity needs in 2011 will tend to diversify its generation fleet.  Even without the economies of scale that would have been associated with building two SCPC units at Cliffside, the Commission believes that SCPC generation is the appropriate choice for all of the above reasons.  One final advantage of the present decision is that technology appears to be moving forward in the areas of pollution control and IGCC generation.  Approving one unit now will allow time for these technologies to develop before Duke needs to build more baseload generation.  Approving one unit now, together with the retirement of older, coal-fired units, limits Duke's carbon footprint and serves as a hedge against the prospect of carbon regulation.

At one point, Hager testified that "we won't know which was the right decision for many, many years ultimately."  That is true with respect to this order; however, given the level of need demonstrated by Duke's testimony and 2006

33

plan, the size and mix of Duke's existing capacity, the estimated construction costs, the uncertainties of the future, the various risks as to plant costs and fuel costs, the costs and benefits of alternative technologies and developing technologies, and the necessity to make a decision now for commercial operation of coal-fired generation in 2011, the Commission concludes that approval of one 800-MW coal-fired unit is the best of the alternatives available and is consistent with the Commission's plan for expansion of electric generating capacity.

IT IS, THEREFORE, ORDERED as follows:

1.    That a certificate of public convenience and necessity should be, and is hereby, granted to Duke Energy Carolinas, LLC for the construction of one 800-MW supercritical pulverized coal electric generating facility to be located at the existing Cliffside Steam Station situated on the border of Cleveland and Rutherford Counties, North Carolina, together with related transmission facilities, subject to the following ordering paragraphs, and the present order shall constitute the certificate.

2.    That Duke shall retire existing Cliffside Units 1 through 4 no later than the date of the commercial operation of the one 800-MW unit certificated herein.

3.    That Duke shall honor its commitment to invest, on an annual basis, 1% of its annual retail revenues from the sale of electricity in energy efficiency and demand side programs, subject to the results of the ongoing collaborative workshops and subject to such appropriate regulatory treatment as the Commission may determine to be just and reasonable, and that Duke shall retire older coal-fired generating units (in addition to Cliffside Units 1 through 4) on a MW-for-MW basis, considering the impact on the reliability of the entire system, to account for actual load reductions realized from these new programs, up to the MW level added by the one Cliffside unit certificated herein.

4.    That all such energy efficiency and demand side programs shall be submitted to the Commission for approval and shall be accompanied by a comprehensive plan for verifying MW savings. Duke shall file an annual report with the Commission on March 1 of each year setting forth the investment in each approved program for the preceding year. In addition, on March 1 of each year, Duke shall submit an annual plan for identifying the number of MW saved and the coal units to be retired.

5.    That, within 30 days after the estimated cost of the Cliffside project is finalized, but in no event later than May 31, 2007, Duke shall file with the Commission a report detailing such estimated costs, and Duke may file with the Commission a report updating the initial report every 30 days thereafter, until the filing of the first annual report provided in the following ordering paragraph.

6.    That, during the month of February of each year, beginning in 2008, Duke shall file with the Commission a progress report which shall provide information upon which the Commission may evaluate the current status of the construction of the unit certificated herein, including the cost thereof and any revisions to the cost estimate, and the time at which it is anticipated that said unit will become operational.

7.    That the unit certificated herein shall be constructed and operated in strict accordance with all applicable laws and regulations, including the provisions of all permits issued by the North Carolina Department of Environment and Natural Resources.

8.    That issuance of this order does not constitute approval of the final costs associated herewith for ratemaking purposes and this order is without prejudice to the right of any party to take issue with the ratemaking treatment of the final costs in a future proceeding.

9.    That, should renewable portfolio standard legislation be enacted either by the United States Congress or the North Carolina General Assembly, Duke shall discuss such legislation with the parties to this docket.

ISSUED BY ORDER OF THE COMMISSION.

This the  21st  day of March, 2007.

NORTH CAROLINA UTILITIES COMMISSION

*Gail L. Mount*

Gail L Mount, Deputy Clerk

Commissioner Robert V. Owens, Jr. dissents.

Ah032107.01

DOCKET NO. E-7, SUB 790

**Commissioner Robert V. Owens, Jr., dissenting:**

There comes a point, as one young lady public witness said in Charlotte, when you must quit talking the talk and begin walking the walk, when you just have to put your foot down and say "Enough!"  For me, as one commissioner, in the building of coal-fired electric generating facilities, that time is now.

Much of the history of the United States is marked by innovation to meet necessity, by sacrifice of the comfortable and expedient in order to meet a glaring need or deficiency.  Nowhere in our society is the need for that characteristic greater today than in energy production.  Until we put our foot down and say "It's Time!" and, as a society, make the hard decisions and sacrifices required, we will not begin the process of remaking our energy production process into one which will not continue to destroy the environment.  We are regulators, chosen and governed by a process and laws designed to let us to make independent decisions, decisions which are not politically expedient.  We are uniquely situated to make the hard decisions which the industry or other, more politically directed, decision makers cannot or will not make.  As John Kennedy asked:  "If not us, who?  If not now, when?"

If we are to approach the current environmental crisis like President Jimmy Carter said we should attack the energy crisis of the late 70's, as "the moral equivalent of war," then we must prepare ourselves to make sacrifices for our survival on this earth.  The American public, if not the American shareholder, have proven time after time to be remarkably resilient and willing to make such sacrifices when necessary and when the goals are worthy and clear.  There is no clearer need and no worthier goal than trying to reduce the damage we continue to do to the environment and to preserve a livable planet for our children and grandchildren.

So far, American industry in general, and the electric power industry in particular, has been reluctant to participate in environmental and green power programs.  Management, directed by its investors, has pursued profits at the expense of the long-term health of our world.  Sometimes, it has given token attention to the environmental destruction it causes, and sometimes has given lip service to reducing its impact.  But it's usually only when the government steps in that industry can be forced to act.  Only when the legislature threatened harsh legislation did the industry negotiate the clean smokestack bill, for instance.  That is understandable because if a power industry manager were to take some kind of courageous pro-environmental stand which would cause his or her shareholders to sacrifice profit and the public to pay higher rates, he or she would be unemployed virtually instantly.  That is neither new nor unique.  Since the Industrial Revolution, industry has had to be forced to act in anything other than its own selfish interest.  Safety, labor and environmental improvements in industry have come only when

36

they have been forced upon industry by popular will, by collective force or by government. From the latter half of the 20th century, it has more often than not been government who has stepped in to force industry to clean up its impact on our air and water and other natural resources. The free market, as much as I and others love it and work hard to protect it, has not led to the kind of innovation we absolutely must employ in this struggle. Besides, our electric industry does not operate in a free market. It is regulated by its investors and by the government. Its investors are not willing to make the kind of sacrifices required to preserve the environment over the long term. Government must act if it is to be done. As the direct regulators of the industry and the closest government agency to the problem, we have the authority and the legal and moral responsibility to do something about it.

We have forced our electric utilities to adopt demand-side management programs, integrated resource management programs, energy efficiency programs and green power programs throughout the years. In this order, the majority requires more such efforts from Duke (although any actual program is still in someone's mind) to the tune of one per cent of its annual retail revenues. As the kids of today say: "Say What!" Such efforts are laudable but woefully inadequate. The efforts made up to now and which the majority will require in this case amounts to a band-aid on a gaping wound. It might help stop a little bit of the bleeding, but it doesn't do much to correct the problem.

The problem is so well-documented and universally acknowledged by scientists worldwide that it is not even seriously debated anymore. The burning of fossil fuels pollutes our air and leads to global warming. The results are dramatic and drastic and its long-term effects potentially catastrophic for future generations. The only way to stop it is to stop burning fossil fuels. We will fail in our legal responsibilities to the people of North Carolina and in our moral responsibilities to our children and grandchildren if we do not take bold, decisive action to address the problem, not just deal with the symptoms.

North Carolina General Statute §62-110 and §62-110.1 set out the legal standards for granting a certificate of public convenience and necessity for constructing a plant to generate electricity. Neither of those statutes repeals, changes or modifies §62-2, the General Assembly's declaration of policy. In addition to the provisions about protecting the public interest and ensuring fair treatment for the utilities and the public, there is provision (5) which directs us to "[e]ncourage and promote harmony between public utilities, their users and the environment". It is not a subservient or secondary provision. It stands on equal footing with the other provisions. §62-2 gives us the authority and the responsibility to regulate public utilities to carry out the General Assembly's policy. The continued burning of fossil fuel to generate electricity does nothing to encourage or promote harmony between the utilities and the environment, in fact is does just the opposite. I see it as my legal duty to do all I can to prevent it.

I do not dispute Duke's need for 800 megawatts of new generating capacity and I applaud the majority's decision to cut the 1600 megawatt request in half. Where I differ with the majority is in the building of a coal-fired facility to achieve the new capacity. Certainly the retirement of older coal-fired units as required by the majority is desirable and must be accomplished. But replacing, megawatt for megawatt, coal-fired generation with coal-fired generation, no matter how much cleaner the new generation, continues to contribute to the problem.

The GDS Associates and La Capra Associates studies prepared for us and included in the record of this docket indicate that sufficient savings from energy efficiency and existing renewable energy sources could eliminate the need for this new coal-fired plant. Duke fails to adequately account for either resource and completely ignores available renewable energy resources in its analysis. The time and effort spent on developing new pollution sources would more wisely be spent on developing non-polluting sources of generation; just as the time and money spent trying to recover nuclear development costs early could more efficiently be spent developing the resource.

Governments, state and federal, are going to force utilities to reduce their contributions to global warming eventually. It is as inevitable as the companies' resistance to such change. The companies will try to negotiate a smaller reduction or a less costly alternative just like always. But if we are serious about the environmental impact of generating electricity, we will prohibit coal-fired plants being built to replace coal-fired plants. While we may not in our lifetimes see coal completely replaced as a fuel of choice for electricity production, and while we may not see fossil-fuel completely eliminated as a fuel source, nuclear-powered plants and the growing abundance of renewable resources can and, I think, eventually will replace coal in electricity generation. We should encourage such replacement when we can and require it when we can. The surest way to speed it up, however, is to begin here and now; to walk the walk, to put our collective foot down and say "Enough!"

Because I believe we should prohibit the building of another coal-fired generating facility in North Carolina, I respectfully dissent.

\s\ Robert V. Owens, Jr.
Commissioner Robert V. Owens, Jr.

38

Westlaw.

--- F.3d ----                                                      Page 1
--- F.3d ----, 2008 WL 746526 (C.A.D.C.)
**(Cite as: --- F.3d ----)**

**H**
St. John's United Church of Christ v. F.A.A.
C.A.D.C.,2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,District of
Columbia Circuit.
ST. JOHN'S UNITED CHURCH OF CHRIST, et
al., Petitioners
v.
FEDERAL AVIATION ADMINISTRATION and
Marion C. Blakely, Administrator, Respondents
City of Chicago, Intervenor for Respondent.
**No. 06-1386.**

Argued Feb. 11, 2008.
Decided March 21, 2008.

On Petition for Review of an Order of the Federal
Aviation Administration.

Joseph V. Karaganis argued the cause for petition-
ers. With him on the briefs were A. Bruce White,
John W. Kalich, Robert E. Cohn, and Christopher
T. Handman.
M. Alice Thurston, Attorney, U.S. Department of
Justice, argued the cause for respondent. With her
on the brief was Todd S. Aagaard, Attorney. Lisa E.
Jones and John A. Bryson, Attorneys, entered ap-
pearances.
Benna R. Solomon, Deputy Corporation Counsel,
Corporation Counsel of the City of Chicago, argued
the cause for intervenor. With her on the brief were
Christopher M. Grunewald, Assistant Corporation
Counsel, and Sean H. Donahue, David T. Goldberg,
and Michael G. Schneiderman.

Before ROGERS, BROWN and GRIFFITH, Circuit
Judges.

Opinion for the Court filed by Circuit Judge
BROWN.

BROWN, Circuit Judge:

*1 Petitioners seek review of the Federal Aviation
Administration's (FAA's) grant of money to the
City of Chicago, reimbursing costs of certain work
performed as part of the City's expansion of O'Hare
International Airport. We dismiss the petition for
lack of standing.

I

Chicago plans on acquiring land in nearby Elk
Grove Village and the Village of Bensenville for
the expansion of O'Hare Airport. Petitioner Bensen-
ville complains Chicago's acquisition will destroy
its parkland and affordable housing while petitioner
Elk Grove complains the acquisition will destroy
many businesses and deprive it of tax revenue and
other economic benefits. In addition, one of the
project's runways will require Chicago to "relocate"
St. Johannes Cemetery-a disturbance which peti-
tioners St. John's United Church of Christ, Helen
Runge, and Shirley Steele claim will substantially
burden their religious exercise.

In an earlier case, the petitioners challenged the
FAA's approval of the project's airport layout plan
(ALP)-an order the FAA calls the "Record of De-
cision" (ROD)-and the FAA's letter of intent
(LOI).*Vill. of Bensenville v. FAA,* 457 F.3d 52
(D.C.Cir.2006). The LOI established a 15-year
schedule under which the FAA will reimburse
Chicago for the Government's share of project
costs, and stated the government's intention to ob-
ligate from future budget authority a maximum of
$337 million, paid by annual grants of $20 to $29
million. Before issuing the LOI, the FAA con-
sidered whether the O'Hare project met the require-
ments for airport improvement project (AIP) grants.
Analysis and Review of City of Chicago's Applica-
tion for Letter of Intent AGL 06-01, at 8-9 (Nov.
18, 2005), 10 J.A. 5451-52. But "final application"
of those requirements would occur when FAA
made "a final decision on the award of a specific
amount of funding."*Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DEFENDANT'S
EXHIBIT
8
PENGAD-Bayonne, N. J.

We dismissed petitioners' challenges to these findings, holding the LOI unreviewable because it was not an "order" under 49 U.S.C. § 46110(a).[FN1] The LOI was not an order because it was not final. The LOI did not obligate the government to pay the grants; Chicago still had to apply each year, and Congress still had to appropriate the money. *Vill. of Bensenville,* 457 F.3d at 68-69. In any event, petitioners lacked standing because vacating the LOI would not redress their injuries. Chicago could complete the project even without the $337 million–a mere fraction of the costs of the project.*Id.* at 69-70.

> FN1. We also rejected the petitioners' challenges to certain determinations in the ROD, and their claim that FAA's approval of the ALP violated the Religious Freedom and Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.Vill. of Bensenville,* 457 F.3d at 65, 70-72.

Chicago applied for the first annual grant in the middle of 2006. In September 2006, Chicago accepted FAA's offer of $29.3 million to reimburse Chicago for certain work performed on land not affecting the petitioners. The two concluded a standard grant agreement containing various conditions, among which Chicago must "complete all AIP funded projects without undue delays and in accordance with the terms" of the grant and FAA regulations. Terms and Conditions of Accepting Airport Improvement Grants 8 (June 2005), 10 J.A. 5692. About a year later, the FAA authorized Chicago to collect $1.3 billion in passenger facilities charges (PFC's) to help finance the O'Hare project. Notice of Passenger Facility Charge (PFC) Approvals and Disapprovals, 72 Fed.Reg. 61,204, 61,205-06 (Oct. 29, 2007).

**\*2** Petitioners seek review of the single $29.3 million AIP grant. They claim that certain FAA determinations were flawed, and that the FAA violated RFRA.

II

To establish Article III standing, petitioners must show a "substantial probability" they have been injured, the FAA's grant to Chicago caused their injuries, and the court could redress those injuries. *Sierra Club v. EPA,* 292 F.3d 895, 899 (D.C.Cir.2002). Because FAA's $29.3 million grant reimburses Chicago for completed work that did not affect the petitioners, how the grant causes their injuries is a mystery. Perhaps realizing this, petitioners try to characterize the order they challenge as "more than $2 billion in federally approved funding assistance."Petr.'s Br. 21. To reach this figure, petitioners add the $337 million LOI and the $1.3 billion in PFC's. They also add federal funding they expect Chicago will seek because of a $400 million cost overrun.

"It's clear," say petitioners, "Chicago cannot construct the [project] ... without massive AIP and PFC financial assistance."*Id.* at 20-21.There is, however, nothing "clear" about this. The LOI is not before the court. Chicago's acceptance of the first of the LOI's fifteen grants, does not authorize review of the fourteen grants the FAA has not yet offered.

Nor is the $1.3 billion in PFC's before the court.FN2Petitioners think otherwise because the determinations FAA made in awarding the AIP grant here are supposedly the same ones FAA makes when authorizing Chicago to collect PFC's. But the determinations are not the same. While a project is eligible for PFC funding when the project is for "airport development or airport planning," as the AIP statute uses those terms, the project need not meet the same standards for approving an AIP grant. *Air Transp. Ass'n of Am. v. FAA,* 169 F.3d 1, 9 (D.C.Cir.1999). Thus, an FAA order stating "AIP and PFC eligibility of projects is identical" does not support the petitioners. *See*Passenger Facility Charge, FAA Order 5500.1, at 51 (Aug. 9, 2001). That phrase simply means a project meeting the definition of "airport development or airport planning" is eligible for PFC funding.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2008 WL 746526 (C.A.D.C.)

**(Cite as: --- F.3d ----)**

FN2. And needless to say, FAA funding the petitioners speculate Chicago will seek is not now at issue.

Next, petitioners assert the grant agreement between FAA and Chicago "contains an FAA-imposed clause that compels Chicago to complete the [project] (necessarily destroying St. Johannes ... and parklands, homes and businesses in Bensenville and Elk Grove Village)." Petr.'s Br. 21. Petitioners apparently focus on the following grant condition: Chicago "shall carry out and complete all AIP funded projects without undue delays."But the "[f]ailure to comply with grant conditions" can result only "in suspension or termination of the grant."Airport Improvement Program Handbook, FAA Order 5100.38C, at 208 (June 28, 2005). FAA cannot "compel" Chicago to complete the O'Hare project. Nor does Chicago need any compelling. Chicago designed the plan for the project; it submitted that plan to the FAA and fought for its approval. *Vill. of Bensenville,* 457 F.3d at 65. Chicago will provide most of the funding and is prepared to obtain funding from other sources if federal money is unavailable.*Id.* So even if the FAA could compel Chicago to complete the project, vacating the grant condition would not redress the petitioners' injuries because Chicago is committed to completing the project anyway.

**\*3** In addition, the court has already concluded that vacating the $337 million in the LOI would not redress petitioners' injuries because federal money plays a "minor role" and Chicago could replace it with other sources of funding. That conclusion alone seems to sink the petitioners' challenge to the $29.3 million grant. However, petitioners argue that redressability conditions have changed because of a $400 million cost overrun and the majority-in-interest airlines refusing Chicago's request to issue more bonds. Thus, according to petitioners, if the court overturns AIP and PFC funding, Chicago can no longer replace that funding. Petitioners again err by adding the PFC authorization and the LOI to the single AIP grant they challenge here.

Moreover, they have not shown a "substantial probability" that Chicago would scrap the O'Hare project if the court vacated the $29.3 million grant.

Petitioners claim they need not demonstrate such "high probability" of redressability because 49 U.S.C. § 46110(a) and RFRA gives them a "procedural right" to protect their interests, which they may assert "without meeting all the normal standards for redressability and immediacy,"*Massachusetts v. EPA,* 127 S.Ct. 1438, 1453 (2007) (quoting *Lujan v. Defenders of Wildlife,* 504 U .S. 555, 573 n. 7 (1992)). However, that rule applies only when a party challenging an agency's procedural failure cannot "establish with any certainty" that the *agency* would reach a different decision. *Lujan,* 504 U.S. at 573 n. 7;*see also Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664 (D.C.Cir.1996). But the redress-ability obstacle the petitioners face is uncertainty over what *Chicago* would do-not the FAA. Thus, the petitioners must satisfy the normal standard for redressability. They have not. "[I]t is entirely conjectural whether the nonagency activity that affects [petitioners] will be altered or affected by the agency activity they seek to" overturn. *Lujan,* 504 U.S. at 571 (plurality opinion).

### III

Petitioners have not shown that the single $29.3 million grant has caused their injuries, or that the court can redress those injuries. We therefore dismiss their petition for lack of standing.

*So ordered.*

C.A.D.C.,2008.
St. John's United Church of Christ v. F.A.A.
--- F.3d ----, 2008 WL 746526 (C.A.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TREASURY DIRECTIVE:** 75-02

**Date:** September 25, 1990

**Sunset Review:** TBD

**Expiration:** TBD

**SUBJECT:** Department of the Treasury Environmental Quality Program

1. <u>PURPOSE</u>. This directive states policy, standards, and procedures for implementing the Council on Environmental Quality (CEQ) regulations on the National Environmental Policy Act (NEPA).

2. <u>SCOPE</u>. This directive applies to all bureaus, the Departmental Offices, and the Office of Inspector General.

3. <u>POLICY</u>. It is the policy of the Department of the Treasury to fully evaluate its actions, as necessary, in accordance with the requirements of the CEQ regulations and NEPA. However, certain actions may result from statutory requirements involving little or no discretion on the part of the Department, and, in the case of such actions, NEPA and the CEQ regulations may not be applicable.

4. <u>BACKGROUND</u>. NEPA established national policies and goals for the protection of the environment. Section 102(2) of NEPA contains requirements directed toward the attainment of such goals. On November 29, 1978, CEQ issued regulations implementing the procedural provisions of NEPA. The regulations were binding on all Federal agencies and required that, effective July 30, 1979, each agency adopt implementing procedures to supplement the CEQ regulations.

5. <u>RESPONSIBILITIES</u>.

    a. <u>The Assistant Secretary (Management)</u> is the Departmental Environmental Quality Officer (EQO) and the liaison official for the Department with the Council on Environmental Quality (CEQ), the Environmental Protection Agency (EPA), and other departments and agencies concerning environmental matters, and is responsible for the following functions:

        (1) insure that the actions of the Departmental Offices and bureaus (hereafter referred to as bureaus), with respect to the fulfillment of NEPA and the CEQ regulations, are duly coordinated;

        (2) provide guidance to bureaus on environmental policy and requirements;

        (3) assist bureaus in review and assessing the environmental impact of proposed Treasury actions;

        (4) provide guidance in the preparation, scoping, processing, and distribution of environmental assessments (EAs) and environmental impact statements (EISs);

        (5) receive for clearance action all EAs and EISs, draft and final, originating in the Department;

DEFENDANT'S EXHIBIT 9

PENGAD-Bayonne, N. J.

(6) receive all EAs and EISs submitted by other agencies to the Department and coordinate the appropriate review and reply; and

(7) perform such other functions as are specified in this directive or are appropriate under the CEQ regulations or other instructions or recommendations of CEQ or EPA concerning environmental matters.

b. The Departmental Environmental Programs Officer, Office of Management Support Systems is designated as the Departmental NEPA liaison and, under the general guidance of the Director, Office of Management Support Systems shall provide program support to the Assistant Secretary (Management) in carrying out the responsibilities set forth in this directive.

c. Assistant Secretaries and Heads of Bureaus shall:

(1) prepare, and circulate for the consideration of others, EAs and EISs when an action or policy area in question falls under their jurisdiction;

(2) issue any supplementary procedures consistent with this directive for the implementation of NEPA which the bureau deems necessary. Any such procedures which were issued after July 30, 1979, shall be submitted for review and concurrence by the Departmental EQO. Procedures which were in existence at such date shall be revised in accordance with the CEQ regulations and this directive and also shall be submitted for review and concurrence. Such procedures shall be published in the bureau directives system;

(3) assure that communications with CEQ, EPA, and other Government agencies or individuals on matters concerning Treasury compliance with NEPA and the relevant CEQ regulations are signed by, or coordinated with, the Departmental EQO. Examples of such communications are letters transmitting EAs and EISs, and reports and all Departmental contacts relevant to Department of the Treasury compliance with NEPA and the CEQ regulations. Unless special circumstances indicate that a different officer should act, communications announcing decisions to prepare EAs or EISs, requesting comments on draft statements, or transmitting final statements for the information of agencies or persons commenting on draft statements, shall also be signed by the Departmental EQO and, in the case of a Federal agency, shall be addressed to its Departmental EQO or equivalent official;

(4) designate a Bureau Environmental Quality Officer (BEQO) and alternate in their respective bureaus;

(5) perform such other functions as specified in this directive; and

(6) be responsive to requests from the CEQ and EPA for reports or other information in connection with the implementation of NEPA, and for the preparation and circulation of EISs as required by Section 1506.9 of the CEQ regulations.

d. Bureau Environmental Quality Officers shall:

(1) identify bureau actions requiring an EA or EIS;

(2) ensure each required assessment or statement is prepared timely and with the prescribed

content by appropriate bureau staff;

(3) ensure the bureau's compliance with the requirements of NEPA, the CEQ regulations, and this directive, in particular, by coordinating the review within the bureau of such statements and assessments, and by maintaining compliance with all applicable scheduling, scoping, consultation, circulation, public hearing, and publicity requirements; and

(4) maintain effective communication and consultation with the Departmental EQO and inform key bureau officials of current developments in environmental policy and programs; and

(5) ensure the assessment of the environmental impact of actions concerning various areas of Treasury policy and operations as specified below, and the preparation of EAs and EISs relating thereto, shall be coordinated in consultation with the Departmental EQO and the official having primary responsibility as follows:

| Action Area | Official Responsible for Coordination |
|---|---|
| Administration of facilities, physical operations, procurement, contracts, leases, etc. | Assistant Secretary (Management) |
| Tax policy recommendations and legislation. | Assistant Secretary (Tax Policy) |
| Non-tax legislative recommendations and reports. | General Counsel |
| International environmental matters. | Assistant Secretary (International Affairs) |
| Energy and natural resource matters. | Assistant Secretary (Economic Policy) |

6. TERMINOLOGY. Part 1508 of the CEQ regulations requires that the terminology contained therein shall be uniform throughout the Federal Government. Therefore the terminology in Part 1508 shall be employed for purposes of this directive.

7. THE NEPA PROCESS.

    a. Integrating NEPA Process With Bureau Planning and Decision making.

        (1) The ultimate purpose of the NEPA is to ensure that public officials make decisions based on an understanding of the environmental consequences of proposed Federal actions. The means provided by NEPA to achieve its goals is called the "NEPA process" and is outlined in Section 102(2) of NEPA.

        (2) To comply with NEPA, bureaus must ensure that the NEPA process is integrated with bureau planning and decision making as early as possible (Sections 1501.2 and 1505.1, CEQ Regulations). Accordingly, bureaus shall:

(a) make sure that, where necessary, final EAs or EISs and related documents accompany proposals through the entire review process;

(b) consider and balance pertinent nonenvironmental factors with those relating to the environment and consider all practicable alternatives and mitigation measures identified in the environmental documents;

(c) make no decision on a proposed action until the timing requirements outlined in paragraph 9.d.(1) of this directive have been met; and

(d) prepare a concise public record of the decision at the time it is made, or, for a legislative EIS, at the time of its recommendation to Congress. This record will be prepared in accordance with Section 1505.2 of the CEQ regulations.

b. Early Involvement of the Bureaus in Actions Initiated by Non-Federal Entities.

(1) Section 1501.2(d) of the CEQ regulations requires agencies to provide for early involvement in actions which, while planned by private applicants or other non-Federal entities, require some form of Federal approval.

(2) To implement these requirements with respect to these kinds of actions (for example, permits or approvals in connection with national banks or wineries) each bureau shall:

(a) prepare, where practicable, generic guidelines describing the scope and level of environmental information required from applicants as a basis for evaluating their proposed actions and make these guidelines available;

(b) provide such guidance on a project-by-project basis to applicants seeking assistance from the bureau; and

(c) upon receipt of an application for bureau approval, or notification that an application will be filed, consult as required with other appropriate parties to initiate and coordinate any necessary environmental analyses.

(3) The bureau shall independently evaluate the information submitted by the applicant and shall be responsible for its accuracy. If the bureau chooses to use the information submitted by the applicant in an EA or EIS, it must include the names of the persons responsible for the independent evaluation in a list of preparers (Section 1506.5(a), CEQ regulations).

(4) To facilitate compliance with the requirements above, private applicants and other non-Federal entities should be advised to:

(a) contact the bureau as early as possible in the planning process for guidance on the scope and level of environmental information which may be required to be submitted in support of their application;

(b) conduct any studies which are deemed necessary and appropriate by the bureau to determine the impact of the proposed action on the human environment;

(c) consult with appropriate Federal, regional State and local agencies and other potentially interested parties during preliminary planning stages to ensure that all environmental factors are identified;

(d) submit applications for necessary Federal, regional, State and local approvals as early as possible in the planning process;

(e) notify the bureau as early as possible of any other Federal, regional, State, local and Indian tribe actions required for project completion so that the bureau may coordinate all Federal environmental reviews; and

(f) notify the bureau of any known parties potentially affected by, or interested in, the proposed action.

c. Classes of Action Requiring Similar Treatment Under NEPA.

(1) Actions undertaken by the Department of the Treasury may be broken down into three main classes of action consisting of actions:

(a) normally requiring EISs;

(b) normally requiring EAs but not necessarily EISs; and

(c) requiring neither an EIS nor an EA (i.e., "categorical exclusions").

(2) The Department of the Treasury does not, in general, have responsibility for actions which will normally have a significant effect on the quality of the human environment and, therefore, it is difficult to establish detailed criteria for determining what proposed actions within the Department of the Treasury may require an EA or EIS. Decisions as to whether environmental documentation is required shall be made on a case-by-case basis by the head of the bureau involved in conjunction with the BEQO and the Departmental EQO. The following are examples of bureau actions which fall within one of the classes of actions listed in paragraph 7.c.(1), and which might be used as an indication of the treatment which may be given to similar actions in the future.

(a) Bureau actions normally requiring EISs include proposals for major Treasury building projects involving land acquisition and construction of new facilities, or for major tax expenditure legislation by the Office of Tax Policy which may have a significant effect on the environment.

(b) Bureau actions normally requiring EAs, but not necessarily EISs, include proposals to build new border stations by the U.S. Customs Service, significant program changes at the Federal Law Enforcement Training Center, or approval of plastic liquor bottles by the Bureau of Alcohol, Tobacco and Firearms.

(c) Bureau actions which are CATEGORICALLY EXCLUDED include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972 (31 U.S.C. 1221, et seq.), with no Federal control over the subsequent use of such funds; and Internal Revenue Service functions in the administration of the Internal Revenue Code, such as regulations interpreting, implementing, or clarifying code provisions, revenue and letter rulings and memorandums, revenue procedures, and forms and publications to assure proper record retention,

reporting, and payment of tax as due.

(3) In the event a proposed bureau action falls within either category (a) or (b) of paragraph 7.c.(1), the bureau should take the appropriate steps outlined in this directive in paragraphs 8. and 9. If the proposed action is "categorically excluded" then the bureau need not address the environmental effects of the action.

## 8. ENVIRONMENTAL ASSESSMENTS (EAs).

a. NEPA requires that for all proposals for legislation or other major Federal actions significantly affecting the quality of the human environment, the environmental implications of the proposal are to be explored.

b. Whenever it appears that a bureau matter, including the continuance of any action or program already initiated, could constitute a major action significantly affecting the quality of the human environment, whether beneficially or adversely, an EA shall be prepared as soon as possible, and at all times prior to the decision to take or to continue the action. Consistent with the views of the Departmental EQO, the head of the bureau, or an officer specifically designated by the bureau head for the purpose, shall prepare the assessment. The bureau EQO shall participate as appropriate in this preparation. The assessment shall be submitted to the Departmental EQO for review and approval.

c. To the extent practicable, other agencies, applicants, and the public should be involved in preparing the EA (see also Section 1501.7, CEQ regulations). Bureau responsibility for information provided by applicants for use in preparing an EA or for assessments prepared by an applicant for a bureau, is outlined in Section 1506.5(b) of the CEQ regulations.

d. In accordance with Section 1508.9 of the CEQ regulations, the EA shall:

(1) describe the proposed action and the need for it;

(2) briefly describe the environmental impacts of, and alternatives to, the proposed action, including mitigation measures;

(3) list the agencies and persons consulted; and

(4) provide a brief analysis, based upon the above evidence, for determining whether to prepare an EIS, or a finding of no significant impact.

e. The bureau shall make EAs and findings of no significant impact available to the public in keeping with paragraph 10.

f. An EA need not be prepared if a bureau has decided to prepare an EIS on a proposed action.

## 9. ENVIRONMENTAL IMPACT STATEMENTS (EISs).

a. Once it is determined that a bureau shall be responsible for preparing an EIS, a notice of intent shall be promptly published in the Federal Register. The Departmental EQO will provide the BEQO with a sample of such notice and information on the procedures to be followed.

b. The scoping process, outlined in Section 1501.7 of the CEQ regulations, shall be used for determining the scope of issues to be addressed and for identifying the significant issues related to the proposed action. The bureau involved and the Departmental EQO shall be responsible for carrying out the scoping process in accordance with the CEQ regulations.

c. Section 1501.5(a) of the CEQ regulations provides that a lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either proposes or is involved in the same action, or is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity (see also Section 1506.2, CEQ regulations). In the event the preparation of an EIS for a proposed bureau action requires the designation of a lead agency for either of these reasons, the head of the bureau shall contact the Departmental EQO for guidance. Any communications with other agencies which deal with lead agency designations shall be coordinated with the Departmental EQO. The criteria and responsibilities for lead and cooperating agencies are outlined in Section 1501.5 and 1501.6 of the CEQ regulations, respectively.

d. EISs shall first be issued in draft, for comment by Government agencies and the public as appropriate. Final EISs responsive to substantive comments received shall then be issued. Requirements for preparing and circulating draft and final statements (Part 1502 of the CEQ regulations) are as follows:

(1) Timing.

(a) The timing of the preparation, circulation, submission, and public availability of EISs is of great importance. EISs are not intended to be justification documents for proposed actions but are to be objective evaluations of proposed actions and their alternatives in light of all reasonably pertinent environmental considerations (Section 1502.2(g), CEQ regulations).

(b) EISs are then filed with the EPA. The EPA, in turn, publishes a weekly notice in the Federal Register of the EISs filed during the preceding week. No decisions on the proposed action may be made by the bureau until the following time periods calculated from the publication date of the EPA notice have been observed.

1 Not less than 45 days for comment on draft statements (Section 1506.10(c), CEQ regulations).

2 Not less than 90 days and 30 days, respectively, for public availability of draft and final statements prior to administrative actions. These periods may run concurrently (Section 1506.10(b) and (c), CEQ regulations).

3 Not less than 15 days for public availability of draft statements prior to any relevant hearing on proposed administrative actions (Section 1506.6(c)(2), CEQ regulations).

4 The time periods prescribed in paragraphs through 3 may be extended or reduced, in specific instances, in accordance with Section 1506.10 of the CEQ regulations.

(2) Securing Information.

(a) The full resources of the Department of the Treasury should be utilized in developing the factual and analytic information and reference sources required in the preparation of an EIS. The assistance of other agencies, Federal, State, or local, with jurisdiction by law or special expertise concerning the environmental impacts involved should also be sought. Further, in accordance with Section 1506.3 of the CEQ regulations, bureaus may adopt, in whole or in part, a draft or final EIS prepared elsewhere in the Department or by another Federal agency.

(b) If BEQOs have difficulties in securing requisite information or need guidance in making necessary analyses, they should consult the Departmental Environmental Programs Officer, who will assist in locating needed information through the CEQ, EPA, or other appropriate sources.

(3) Writing and Content.

(a) EISs are to be written in plain language, and may include appropriate graphics, so that bureau decisionmakers and the public can readily understand them (Section 1502.8, CEQ regulations).

(b) The "scoping" process, as discussed in paragraph 9.b., shall be utilized so that only significant issues related to the proposed action are analyzed in depth.

(c) EISs should be as concise as possible while still providing adequate, meaningful, and factual information and analysis to permit an evaluation of the proposed action from the environmental standpoint. Their length shall normally be less than 150 pages, and for proposals of unusual scope or complexity, less than 300 pages (Section 1502.7, CEQ regulations). "Tiering" (Section 1502.20, CEQ regulations) and "incorporation by reference" (Section 1502.21, CEQ regulations) should be used, where appropriate, to insure that statements are kept concise.

(d) Quantitative information about the proposed action, including actual or estimated data on its probable effects, should be included to the greatest extent practicable. If a cost-benefit analysis of the proposed action has been prepared, it should be incorporated by reference or appended to the EIS as an aid in evaluating the environmental consequences (Section 1502.23, CEQ regulations).

(e) All reasonable alternatives and their environmental impacts shall be addressed, regardless of whether or not they are not within the authority of the Department (Section 1502.14(c), CEQ regulations). Appropriate mitigation measures shall also be discussed (Section 1502.14(f), CEQ regulations). See also paragraph 16.

(f) The basic content requirements for EISs are set forth in Section 1502.10-25 of the CEQ regulations. Bureaus shall follow the prescribed outline and content requirements described therein as closely as is feasible in each particular case.

(g) Draft and final statements should refer to the underlying studies, reports, and other documents considered by the preparing bureau and indicate how such documents may be obtained. With the exception of standard reference documents, such as congressional materials, the bureau should maintain a file of the respective documents which may be consulted by interested persons. If especially significant documents are

attached to the EIS, care should be taken to insure that the statement remains an essentially self-contained instrument easily understood without the need for undue cross-reference.

(4) Utilizing Contractors. A contractor may be selected to prepare the EIS. Bureau responsibility, in the event a contractor is employed, is outlined in Section 1506.5© of the CEQ regulations.

(5) Circulation. The entire draft and final EIS shall be circulated in accordance with Section 1502.19 of the CEQ regulations. Appendices and unchanged statements may be treated in accordance with Sections 1502.18(d) and 1503.4(c). If the statement is unusually long, the bureau may circulate the summary instead (Section 1502.12, CEQ regulations), except that the entire statement shall be furnished as specified in Section 1502.19.

(6) Commenting.

(a) With respect to draft EISs, it is essential that the bureaus consult with, and take account of the comments of, appropriate Federal, State and local agencies. This shall involve the formal solicitation of review and comments on the draft statement (Section 1503.1, CEQ regulations). When appropriate, procedures for obtaining State and local comments shall be utilized (Section 1503.1(a)(2), CEQ regulations).

(b) Comments should also be requested from individuals or organizations which appear to have a special interest in some significant environmental aspect of the proposed action (Section 1503.1(a)(4), CEQ regulations).

(c) All substantive comments received on draft EISs (or summaries thereof where the comments are exceptionally long), should be attached to final EIS, whether or not each such comment is thought to merit individual discussion in the text of the statement (Section 1503.4(b), CEQ regulations).

(d) Section 102(2)(C) of NEPA requires that the final EIS shall accompany the proposal to which it relates through the agency review process. See paragraph 7.a. for the proper utilization of final statements.

10. PROPOSALS FOR LEGISLATION.

a. Legislative EISs are required in recommendations or reports on legislative proposals to Congress which significantly affect the quality of the human environment. A legislative EIS shall be considered part of the formal transmittal of a legislative proposal to Congress; although it may be sent to Congress up to 30 days later to allow time for completion and accuracy. In all instances, the legislative statement must be available in time for Congressional hearings and deliberations in order that it may serve as a basis for public and Congressional debate (Section 1506.8(a), CEQ regulations).

b. Bureaus with primary responsibility for legislative proposals originating in the Department, which will significantly affect the quality of the human environment, shall be responsible for preparing legislative EISs.

c. Preparation of a legislative EIS shall conform to the requirements for EISs as provided in

paragraph 9. of this directive except as follows:

    (1) There need not be a "scoping" process.

    (2) The legislative EIS, although prepared in the same manner as a draft EIS, shall be considered that "detailed statement" required by statute. Provided that, when any of the following conditions exist, both a draft and final legislative EIS shall be prepared and circulated as provided in Sections 1503.1 and 1506.10 of the CEQ regulations.

        (a) A congressional committee with jurisdiction over the proposal has a rule requiring both draft and final EISs.

        (b) The proposal results from a study process required by statute.

        (c) Legislative approval is sought for Federal or federally assisted construction or other projects which the bureau recommends be located at specific geographic locations. For proposals requiring an EIS for the acquisition of space by the General Services Administration (GSA), draft and final EISs shall be provided to GSA for use during the approval process.

        (d) The bureau decides to prepare draft and final statements.

    d. Close coordination shall be maintained between the Departmental EQO and Office of the General Counsel with regard to the latter's normal responsibility concerning Departmental legislative proposals.

11. <u>PUBLIC INVOLVEMENT</u>. Section 1506.6 of the CEQ regulations requires public involvement in the NEPA process. To comply with this requirement bureaus shall:

    a. Provide for public hearings whenever appropriate. Whenever, under the normal policies or procedures of a bureau, a hearing would be held on a matter requiring the preparation of an EIS, the environmental aspects should be included in the hearing. In other cases, the question of whether a hearing should be held with respect to an environmental matter shall be determined in accordance with the criteria set forth in Section 1506.6© of the CEQ regulations. Normally, all hearings contemplated in this paragraph should be based on a draft EIS which should be made available to the public at least 15 days before the hearing.

    b. Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents. The notice should be provided by the means most likely to inform those persons and agencies who may be interested or affected.

        (1) Section 1506.6(b) of the CEQ regulations provides notification methods that may be used, including publication in local newspapers of general circulation, notice to State and local clearinghouses, and notice by mail.

        (2) A notice of the filing and availability of each EIS, draft and final, shall be inserted in the <u>Federal Register</u> by the responsible bureau. The Departmental Environmental Programs Officer will supply a sample outline of such notices and information on the procedures to be followed.

c. Make EISs and EAs, along with any comments and underlying documents, available to the public pursuant to the Freedom of Information Act (5 U.S.C. 552), the Department's regulations thereunder (31 CFR Part 1), and the disclosure regulations of the bureau (Section 1506.6(f), CEQ regulations).

> (1) These materials are to be placed in the public reading room of the Treasury Library in the Main Treasury Building, Washington, D.C., and the public reading rooms of the bureaus if any are maintained. The documents may be read or copied during working hours.

> (2) Copies to be made available to the public shall normally be provided without charge. However, when such costs are significant, the bureau may, in accordance with Section 1506.6(f) of the CEQ regulations, establish a fee which shall not exceed the actual cost of reproducing the copies.

d. Provide for public involvement as specified elsewhere in this directive.

12. <u>FILING AND DISTRIBUTION OF EISs AND SUPPLEMENTAL STATEMENTS.</u>

> a. Five copies of draft and final EISs, comments, and responses shall be filed with EPA, Attention: Office of Federal Activities, 401 M Street, S.W., Washington, D.C. 20460.

> b. At the same time as they are filed with EPA, EISs shall also be sent to commenting agencies and made available to the public (Section 1506.9, CEQ regulations).

> c. Any supplement to an EIS shall be made a part of the formal record, if such a record exists, before a final decision on the proposal is made (Section 1502.9(c)(3), CEQ regulations).

13. <u>MITIGATION.</u> Bureaus shall ensure that mitigation measures that have been identified in EAs and EISs are carried out. Bureaus shall institute procedures, in coordination with the Departmental EQO, to ensure that the mitigation measures are carried out (Sections 1505.2© and 1505.3, CEQ regulations).

14. <u>COMMENTING ON OTHER AGENCIES' STATEMENTS.</u>

> a. As set forth in paragraph 5.a.(6), the Departmental EQO shall receive all EAs and EISs submitted by other agencies for comment and coordinate the appropriate review and reply.

> b. If any bureau receives a request for comment directly from another agency, the request, together with the respective documents, shall be referred to the Departmental EQO for appropriate action.

> c. Comments should be confined to matters within the jurisdiction or expertise of the Department of the Treasury. However-, comments need not be limited to environmental aspects, but may relate to fiscal, economic, and non-governmental matters of concern to the Department.

15. <u>EMERGENCIES.</u> In the event of emergencies which may prevent bureau compliance with this directive or the CEQ regulations, the CEQ may be consulted, through the Departmental EQO, about alternative arrangements (Section 1506.11, CEQ regulations).

16. <u>OTHER REQUIREMENTS.</u>

a. Integrating Departmental Procedures With Other Environmental Review and Consultation Requirements.

(1) Section 1501.7(a)(6) of the CEQ regulations requires that, as part of the scoping process, agencies identify other environmental review and consultation requirements so that any other required analyses or studies may be prepared concurrently and integrated with EAs and EISs.

(2) The attention of the bureaus is directed particularly to the analyses and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661, et seq.); the National Historic Preservation Act of 1966, as amended, (16 U.S.C. 470, et seq.); the Endangered Species Act of 1973 (16 U.S.C. 1531, et seq.); E.O. 11988, "Floodplain Management," dated May 24, 1977; E.O. 11990, "Protection of Wetlands," dated May 24, 1977; CEQ Memorandum, "Interagency Consultation to Avoid or Mitigate Adverse Effects on Rivers in the Nationwide Inventory," dated August 10, 1980; CEQ Memorandum, "Analysis of Impacts on Prime or Unique Agricultural Lands in Implementing the National Environmental Policy," dated August 11, 1980; and other similar requirements.

b. EPA Review.

(1) Section 309 of the Clean Air Act (42 U.S.C. 7609) provides that the Administrator of EPA shall comment in writing on the environmental impact of any matter within the area of EPA responsibility. Those areas include air and water quality, noise abatement and control, pesticide regulation, solid waste disposal, and generally applicable environmental radiation criteria and standards. Whenever an applicable bureau action is involved in one of these areas, the bureau is required to submit five copies of the respective EIS to EPA for review and comment, in addition to the five copies required in paragraph 12.a.

(2) If the Administrator of EPA determines that the matter "is unsatisfactory from the standpoint of public health or welfare or environmental quality," the matter is to be referred to the CEQ in accordance with the criteria and procedures outlined in Sections 1504.2 and 1504.3 of the CEQ regulations.

(3) Under Section 102(2)(C) of NEPA, other Federal agencies are authorized to make similar reviews and referrals in accordance with the criteria and procedures in Section 1504.2 and 1504.3 of the CEQ regulations.

17. REQUIREMENTS FOR FLOODPLAIN MANAGEMENT AND PROTECTION OF WETLANDS.

a. E.O. 11988, "Floodplain Management," and E.O. 11990, "Protection of Wetlands," direct Federal agencies to ensure that the potential effects of any proposed actions they may take in a floodplain or wetland are considered and evaluated in their decision making.

b. In a Federal Resister notice of May 24, 1978 (43 FR 22311), the Department of the Treasury advised, as a general rule, it does not engage in activities which would impact on floodplain or wetlands. It was further stated that no separate Treasury procedures implementing these E.O.s would be issued, but rather that such procedures would be incorporated in this directive.

c. Procedures for floodplain management and protection of wetlands are as follows:

1) To the extent possible, bureaus are to avoid actions which would result in modification or destruction of floodplain and wetlands and, wherever there is a practicable alternative, are to avoid direct or indirect support of new development or construction in floodplain or wetlands.

(2) In the case of any proposed Departmental action which may involve floodplain or wetlands, and which may require the preparation of and EA or EIS, the assessment or statement shall include necessary data on the floodplain or wetlands in keeping with these procedures. In the event the proposed action does not require an assessment or impact statement, these procedures shall still be followed as concerns the floodplain or wetlands.

(3) In the event of floodplain or wetlands involvement, the following procedural steps are to be followed. Although these steps specifically mention floodplain, they are also applicable to wetlands involved as appropriate.

(a) Determine if the proposed action is in a floodplain.

(b) Provide for public involvement in a floodplain management decision making process by informing the public of the intent to locate in the floodplain, and by encouraging public comments thereon.

(c) Identify and evaluate practicable alternatives to locating in a floodplain, including alternative sites, alternative actions, or no action.

(d) If determined that the only practicable alternative is to locate in a floodplain, identify the impacts of the proposed action using the NEPA process and EA or EIS procedures in this directive. Focus especially on the adverse impacts of the proposed action on lives and property in the area, and on natural and beneficial floodplain values.

(e) If harm to, or within, a floodplain may result from the proposed action, determine ways to minimize the harm and to restore and preserve the floodplain values.

(f) Reevaluate the proposed alternatives, based on the information obtained from paragraphs 17.c.(2)(c), (d), and (e), and consider whether the proposed action is still feasible at the site or should be limited.

(g) A statement of findings and public explanation, including a brief comment period, must be provided for the proposed action if reevaluation determines that the proposed action is the only practicable alternative.

18. CANCELLATION. Treasury Directive 75-02, "Department of the Treasury Environmental Quality Program," dated January 3, 1980, is superseded.

19. AUTHORITIES.

a. Public Law 91-190, National Environmental Policy Act of 1969, as amended, (42 U.S.C. 4321, et sea.).

b. E.O. 11514, "Protection and Enhancement of Environmental Quality," dated March 5, 1970, as

amended by E.O. 11991, dated May 24, 1977.

c. Council on Environmental Quality, "National Environmental Policy Act Regulations," 40 CFR Parts 1500-1508 (43 FR 55978), dated November 29, 1978.

d. Section 309 of the Clean Air Act, as amended (42 U.S 7609).

e. E.O. 11988, "Floodplain Management," dated May 24, 1977.

f. E.O. 11990, "Protection of Wetlands," dated May 24, 1977.

20. <u>OFFICE OF PRIMARY INTEREST</u>. Office of Management Support Systems, Management Programs Directorate, Office of the Deputy Assistant Secretary for Departmental Finance and Management, Office of the Assistant Secretary (Management).

Linda M. Combs

Assistant Secretary (Management)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| APPALACHIAN VOICES, and<br>CANARY COALITION,<br><br>          Plaintiffs,<br><br>    v.<br><br><br>SAMUEL W. BODMAN, in his official<br>capacity as the Secretary of the United<br>States Department of Energy; HENRY M.<br>PAULSON, JR., in his official capacity<br>As Secretary of the United States<br>Department of Treasury, et al.,<br><br>          Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CIVIL ACTION<br>No.: 1:08-cv-00380-RMU |

DECLARATION OF NELSON F. REKOS

I, Nelson F. Rekos, state as follows:

1. Since October of 2007, I have served as the Director (acting) Major Project Division for the U.S. Department of Energy (DOE), National Energy Technology Center (NETL). Prior to becoming the Director (acting) Major Project Division, I was a Senior Project Manager working in the Major Projects Divisions. I was a Senior Project manager for over 10 years and have been employed with the DOE, NETL for twenty-six (26) years working on coal-related R&D and demonstration programs.

2. As the Director (acting) Major Project Division, I am responsible for managing (1) the Clean Coal Power Initiative Demonstration Power Program, (2) NETL's involvement in the

EPACT Section 1307 tax incentive program, and (3) ongoing coal-based power projects. I also supervise other employees.

3. As a Senior Project Manager in the Major Projects Division, I was also responsible for managing the Clean Coal Power Initiative Demonstration Power Program, the EPACT tax incentive program, and ongoing coal-based power projects.

4. As background, EPACT Section 1307 required that the Secretary of the Treasury, in consultation with the Secretary of Energy, establish a qualifying advanced coal project credit program for the deployment of advanced coal-based generation technologies. Section 1307 specifically amended sections 48(A) and 48 (B) of the Internal Revenue Code of 1986 providing Qualifying Advanced Coal Project Credit and the Qualifying Gasification Project Credit, respectively (collectively "tax credit programs").

5. In accordance with the mandate of EPACT Section 1307, beginning in about January 2006, DOE/NETL began providing technical advice and assistance to the Secretary of Treasury and the Internal Revenue Service ("IRS") in their administration of the tax credit programs. As part of its role in providing technical assistance, the DOE/NETL was asked to review applications submitted under the tax credit programs on behalf of the U.S. Department of Treasury (DOT)/IRS for technical and economic feasibility under the criteria of EPACT Section 1307. I was assigned to assist in the fulfillment of these roles on behalf of DOE/NETL.

6. As part of my duties as a Senior Project Manager in the Major Projects Division, I served as the primary contact and coordinator for the DOE/NETL to provide consultation assistance to Treasury/IRS. From January 2006 through at least September 2006, I participated in regular discussions with the DOT/IRS offering technical assistance as necessary in the establishment of the tax credit programs.

7. On February 21, 2006, the IRS issued Notice 2006-24 titled "Qualifying Advanced Coal Project Program Credit," and Notice 2006-25 titled, "Qualifying Gasification Program," (collectively, "IRS Notices") setting forth IRS guidance on the tax credit program. The IRS Notices each included a short appendix which provided certain DOE guidance related to its role in providing a review of the applications for technical and economic feasibility under the criteria of EPACT Section 1307 to the IRS.

8. In accordance with the published IRS Notices, each applicant submitted an application to both the DOT/IRS and DOE/NETL.

9. I served as the chairman of the DOE/NETL Review Board (Board), assembled by DOE/NETL to review applications for the Tax Credit Program. My responsibilities with respect to the Board included overseeing the DOE/NETL's review of all applications for tax credits under Sections 48A and 48 B of the Internal Revenue Code to assess the technical and financial feasibility of the proposed projects against the requirements of EPACT Section 1307.

10. From July to September of 2006, the DOE/NETL Board conducted its review of the applications for tax credits.

11. Once DOE/NETL's review was complete, in late September to early October 2006, a list of those projects that the Board found both technically and economically feasible under the criteria mandated by EPACT Section 1307, was forwarded to the IRS.

12. IRS subsequently selected which of the applications to approve for receipt of tax credits and allocated credits accordingly.

13. Once the letters providing the list of projects that satisfied the technical and economic criteria of EPACT was forwarded to the IRS, the DOE/NETL's role with respect to the review of applications was concluded. DOE/NETL did provide additional consultation services.

14. The decision as to which projects to certify for receipt and award of tax credits was made by the IRS.

15. DOE/NETL did not notify any of the applicants that were selected by the DOT/IRS for receipt of tax credits.

16. It is my understanding that, subsequent to the selection of recipients for the tax credits, the IRS executed closing agreements with each of the applicants it selected for certification of tax credits. The DOE/NETL had no role in execution of the closing agreements.

17. The DOE's Congressionally mandated role throughout the tax credit process was to serve as a technical consultant or advisor to the DOT/IRS with respect to the administration of the section 1307 tax credit programs.

18. As a result of its role in the tax credit program, DOE/NETL has no control or authority over the projects selected by DOT/IRS for allocation of tax credits.

19. As a result of its role in the tax credit program, DOE has no monitoring, oversight or other responsibility with respect to the projects selected by DOT/IRS for allocation of tax credits.

20. As a result of its role in the tax credit program, DOE does not provide any funding for the projects selected by DOT/IRS for allocation of tax credits.

21. The projects selected for receipt of tax credits under the tax credit program are not located at any DOE site or DOE controlled site nor do any utilize or involve any DOE property or equipment.

I hereby certify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on <u>March 25, 2008</u>

Nelson F. Rekos
Director (acting), Major Project Division
U.S. Department of Energy, NETL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APPALACHIAN VOICES and<br>THE CANARY COALITION,<br><br>             Plaintiffs,<br><br>    v.<br><br>SAMUEL W. BODMAN, in his official<br>capacity as Secretary of the United States<br>Department of Energy; HENRY M.<br>PAULSON, JR., in his official capacity as<br>Secretary of the United States Department<br>of the Treasury; VICTOR K. DER, in his<br>official capacity as Deputy Secretary for<br>Clean Coal; and JOSEPH GLOVE, III, in<br>his official capacity as Program Analyst for<br>the Office of Clean Energy Systems,<br><br>             Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 1:08-cv-00380-RMU<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**[PROPOSED] ORDER DENYING PLAINTIFFS' APPLICATION
FOR PRELIMINARY INJUNCTION**

    This matter is presently before the Court upon Plaintiffs' application for preliminary injunction. Having considered the parties' briefs and oral argument, the Court holds that Plaintiffs are not likely to succeed on the merits of their lawsuit and that Plaintiffs will not suffer irreparable harm without an injunction. The Court hereby ORDERS that Plaintiffs' application for preliminary injunction is DENIED. It is so ORDERED.

DATED this ____ day of _____, 2008.

                                   _____

                                   **Ricardo M. Urbina**
                                   United States District Court Judge