UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APPALACHIAN VOICES *et al.*,    ) | |
| )  | |
| Plaintiffs,    ) | |
| )  | |
| v.    ) | No.  1:08-cv-00380-RMU |
| )  | |
| SAMUEL W. BODMAN *et al.*,    ) | |
| )  | |
| Defendants.    ) | |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**I.      INTRODUCTION**

The National Environmental Policy Act ("NEPA") is a critically important statute that aids this nation in fulfilling its legal and moral responsibilities to reduce or eliminate the devastating impacts thrust upon the people, communities and environments in which the coal we use to generate half our electric power is mined, processed, burned and discarded.  When evaluating proposals for major federal actions that may significantly affect the quality of the human environment, see 42 U.S.C. § 4332(C), the Council on Environmental Quality—created by Congress to promulgate NEPA's implementing regulations—requires federal agencies to: (1) analyze the costs and benefits of the proposal; (2) assess reasonable alternatives thereto, see 40 C.F.R. § 1508.9; and (3) consider mitigation measures that will avoid or minimize environmental damage.  See 40 C.F.R. § 1508.20.

Defendants' opposition to Plaintiffs' motion for a preliminary injunction represents little more than a post hoc rationalization excusing their disdain for complying with NEPA. Defendants' assertion that NEPA is "meaningless" in the context of allocating tax credits under

1

the Energy Policy Act of 2006 ("EPAct"), ignores this Circuit's long-held view that the allocation of tax credits is subject to NEPA where the tax credit is "substantially likely to cause [a] demonstrable increase in risk to [a plaintiff's] particularized interest."). See <u>Florida Audubon Soc'y v. Bentzen</u>, 94 F.3d 658, 665 (D.C. Cir. 1996) (<u>en banc</u>) (citation omitted).  As explained herein, NEPA's presumptive preliminary relief, see <u>Realty Income Trust v. Eckerd</u>, 564 F.2d 447, 456 (D.C. Cir. 1977), is warranted because: (1) Plaintiffs are substantially likely to succeed on the merits; (2) allocation of the tax credits is substantially likely to increase risks to Plaintiffs' interests; (3) Plaintiffs will suffer irreparable injury in the absence of injunctive relief; and (4) the balance of harms tips decidedly in favor of Plaintiffs and the public interest.

## II.    PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED

### A.    NEPA Would Meaningfully Inform the Shape and Requirements of the Tax Credit Programs—and Individual Projects—Because Defendants Possess Ample Discretion to Reject or Modify an Applicant's Proposal and No Irreconcilable Statutory Conflict Exists Such that NEPA is "Meaningless"

Distilled to its essence, Defendants' argument is that complying with NEPA would be a meaningless endeavor because: (1) the EPAct provides them no discretion to reject or modify an application meeting EPAct's minimum performance criteria; and (2) an irreconcilable conflict exits such that NEPA must yield. See Defs.' PI Mem. at 22–28.  Defendants' position cannot be squared with the D.C. Circuit's unequivocal prohibition against an agency "escap[ing] the requirements of NEPA by excessively constricting its statutory interpretation in order to erect a conflict with NEPA policies." <u>Natural Resources Defense Council, Inc. v. Berklund</u>, 609 F.2d 553, 558 (D.C. Cir. 1979).

The plain language of the EPAct provides Defendants a wide berth for mooring its tax credit certification programs—and individual projects—to NEPA's dock.  Admittedly, Congress mandated that the advanced coal tax credit programs be established within 180 days after

2

enactment, 26 U.S.C. §§ 48A(d)(1) and 48B(d)(1), and that final applications under the advanced coal program be certified within 60 days of submittal.  26 U.S.C. § 48A(d)(2)(C).  While these time frames may be non-discretionary, they neither limit Defendants' discretion to reject or modify an application nor do they create irreconcilable conflicts with NEPA.  Notwithstanding these short mandatory time frames, Congress created ample time and discretion in the EPAct for Defendants to fulfill their moral and legal obligations, as expressed in NEPA, to the people, communities and environments in which coal is mined, processed, burned and discarded as air pollution and post-combustion waste.

      For example, applicants were given three years from the date of establishing the program to "submit an application meeting the requirements of subparagraph (B)."  26 U.S.C. § 48A(d)(2)(A).  Subparagraph (B), in turn, allows Defendants "<u>to accept or reject an application</u> as meeting the requirements under subsection (e)(1)."  26 U.S.C. § 48A(d)(2)(B) (emphasis added).  Heaping discretion upon discretion, subsection (e)(1) allows the Secretary to reject an application even if the applicant satisfies the minimum criteria established in the EPAct.  <u>See</u> 26 U.S.C. § 48A(e)(1) ("a project shall be considered a qualifying advanced coal project that <u>the Secretary may certify under subsection (d)(2) if the Secretary determines that, at a minimum</u> …") (emphasis added).  Moreover, in prioritizing which integrated gas combined cycle ("IGCC") projects to certify, the Secretary must, <u>inter alia</u>, "give high priority to projects which include, as determined by the Secretary--(i) greenhouse gas capture capability; (ii) increased by-product utilization; and (iii) <u>other benefits</u>."  26 U.S.C. § 48A(e)(2)(B) (emphasis added).  It defies reason to believe, as Defendants suggest, that NEPA—a statute designed to eliminate or reduce environmental harm—would not have meaningfully informed Defendants' prioritization of these projects.  Defendants' position is especially befuddling because the Secretary of the

Treasury is to evaluate—and give high priority to—projects with other benefits. How better to identify such projects than by reviewing applications through NEPA's lens? A lens specifically designed to identify environmental benefits by requiring federal agencies to consider, inter alia, the impacts of a proposal, alternatives thereto, see 40 C.F.R. § 1508.9, and mitigation measures. See 40 C.F.R. §1508.20.

    Not only does Defendants' litigation position violate the D.C. Circuit's prohibition against "excessively constricting its statutory interpretation" in order to avoid NEPA, see Natural Resources Defense Council, Inc. v. Berklund, 609 F.2d at 558, so too do the very regulations they jointly promulgated in implementing EPAct's tax credit programs. Specifically, Defendants arbitrarily constricted the time frame within which the Department of Energy ("DOE") is to complete its pre-application review process. See IRS Not 2006-24 at § 4.02(9) and IRS Not 2006-25 § 4.02(8) (both limiting DOE's pre-application review period to roughly 90 days if an applicant files on or before June 30). As explained by Defendants, prior to submitting a final application for tax credit certification to the IRS, DOE must review each project for technical and economic feasibility. See Defs.' PI Mem. at 5. Had Defendants taken their NEPA obligations seriously, they would have applied its analytic framework during this "pre-application" review process. In so doing, Defendants would have, as Congress intended, meaningfully informed their decision-making because they could have rejected the application or modified the application to include terms and conditions aimed at reducing or eliminating environmental damage. See, e.g., 26 U.S.C. § 48A(d)(2)(B) ("[a]n application under subparagraph (A) shall contain such information as the Secretary may require in order to make a determination to accept or reject an application …"); see also, 26 U.S.C. § 48A(e)(1) (establishing minimum criteria); and 26 U.S.C. § 48A(e)(3)(B) (requiring the Secretary to

compare various applications and technologies and give high priority to projects with other environmental benefits). Clearly NEPA would have, and still will, meaningfully inform Defendants' decision-making.

Moreover, Defendants' litigation position that an irreconcilable conflict exists, such that NEPA must yield, is based on impermissibly constricting the plain language of the timelines Congress established for implementing the EPAct. Defendants were given 180 days to establish programs for deploying advanced coal-based generation technologies, see 26 U.S.C. § 48A(d)(1), and gasification projects. See 26 U.S.C. § 48B(d)(1). Once established, however, applicants for the tax credits must obtain pre-application certification from DOE. See Defs.' PI Mem. at 5 (citing IRS Not 2006-24 at § 4.02(9) and IRS Not 2006-25 § 4.02(8)). Under the advanced coal project program, 26 U.S.C. § 48A, if DOE approves the pre-application, the application is then submitted to IRS for certification within 60 days of submission. See Defs.' PI Mem. at 5 (citing IRS Not 2006-24 at § 4.02(10) and IRS Not 2006-25 § 4.02(9) and 26 U.S.C. § 48A(d)(2)(C)). All applications must be submitted within three years of the date the advanced coal program was established (i.e. not later than 02 February 2009), see 26 U.S.C. § 48A(d)(2)(A), and all IRS approvals must be made no later than sixty days thereafter. See 26 U.S.C. § 48A(d)(2)(C). In sum, Defendants had roughly three years and eight months to fulfill their obligations under both NEPA and the EPAct (from passage of the EPAct on 08 August 2006 through 08 April 2009 which is IRS's final deadline to approve all applications). See id.

Assuming, arguendo, that all of the initial applications were submitted as part of DOE's pre-application approval on 02 October 2006, see Defs.' PI Mem. at 5, rather than before 30 June 2006, see IRS Not 2006-24 at § 4.02(9) and IRS Not 2006-25 § 4.02(8), then Defendants had roughly two and one-half years to subject those projects to NEPA before the EPAct's deadline

5

for final certification by the IRS on 02 February 2009.  See 26 U.S.C. § 48A(d)(2)(A).  As such, Defendants' current position that they didn't have time to comply with NEPA, see Defs.' PI Mem. at 28, is little more than a poorly-veiled, post hoc rationalization excusing their disdain for complying with NEPA.

Defendants further err in relying on Treasury Directive 75–02 § 3 to support their position that the EPAct provides no discretion to comply with NEPA, see Defs.' PI Mem. at 22, because that Directive is—on its very face—couched in discretionary terms.  See Treasury Directive 75–02 § 3 ("where an agency's actions 'result from statutory requirements involving little or no discretion …, NEPA and the CEQ regulations may not be applicable.'") (emphasis added).  Likewise, Defendants' reliance on Treasury Directive 75–02 § 7.c(2)(c), to excuse their failure to comply with NEPA, see Defs.' PI Mem. at 23, n. 13, misses the mark.  To the extent that this directive applies—a point Plaintiffs do not concede—it applies to the IRS, not to the DOE.  As Plaintiffs have previously explained, under regulations promulgated by the Council on Environmental Quality, "the Department of Energy would be designated as the 'lead' agency for complying with the National Environmental Policy Act." Pls.' PI Mem. at 1, n. 1 (citing 40 C.F.R. §1501.5 (2007)).  Defendants also misapprehend those judicial opinions excusing agencies from NEPA due to non-discretionary or mandatory Congressional directives.

For instance, Defendants' reliance on Pacific Legal Foundation v. Andrus, 657 F.2d 829, 839–40 (6th Cir. 1981), neglects to address the rationale underpinning that holding.  See id. at 838 ("Though not without ambiguity, the legislative history [of the Endangered Species Act] suggests that NEPA was not intended to be applied to agencies whose function was to protect the environment.") (emphasis added).  Unlike other federal agencies, such as the Fish and Wildlife and the National Park Services, it strains credulity to believe that Congress created the DOE and

IRS to be champions of environmental protection. Defendants' use of the ellipsis to square its current litigation position with Natural Resources Defense Council, Inc. v. Berklund, 609 F.2d 553, 558 (D.C. Cir. 1979), is similarly incredulous because the Mineral Leasing Act of 1920 and its implementing practices pre-dated NEPA by fifty years. See id. ("… where the plain meaning of the statute as well as undisturbed administrative practice for nearly 60 years leaves the Secretary no discretion to deny a lease.") (emphasis added).

In sum, the plain language of the EPAct belies Defendants' argument that NEPA is meaningless in the context of the EPAct. The EPAct gave Defendants ample discretion to reject or modify applications and did not create an irreconcilable conflict with NEPA. If upheld by this Court, Defendants' interpretation of these laws would have the perverse effect of paring down its choice among various technologies to the lowest common denominator. Defendants' impermissible post hoc attempts to avoid NEPA by excessively constricting its statutory interpretation of the EPAct is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law. Accordingly, Plaintiffs have a substantial likelihood of succeeding.

**B.  Defendants' Discretionary Control Over the Tax Credits Makes Their Allocation a "Major Federal Action" Subject to NEPA**

Defendants' argument that allocating these tax credits does not constitute a "major federal action" because they have no control over the projects is equally dubious. In addition to providing Defendants copious time and discretion to shape a particular project such that environmental harms can be reduced or eliminated, see, supra, Section II.A., the EPAct gives the Secretary of the Treasury continuing oversight authority to ensure that, inter alia, the "applicant for certification has received all Federal and State environmental authorizations or reviews necessary to commence construction of the project." 26 U.S.C. § 48A(e)(2)(A). Such reviews necessarily include NEPA analysis conducted by DOE as the "lead" agency, see 40 C.F.R. §

1501.5(c), or by both Departments, jointly.  See 40 C.F.R. § 1501.5(b).  As Plaintiffs have previously explained, had Congress intended to exempt or expedite the NEPA process, they would have explicitly done so as they did in other sections of EPAct.  See, eg., Pub. L. No. 109-58 § 390, 119 Stat. 747–48 (exempting); see also, Pub. L. No. 109-58 §§ 362(a)(1)(A), 119 Stat. 721 and § 369(d), 119 Stat. 728 (expediting).  In any event, no matter who conducts the analysis, NEPA serves a critically important function for evaluating alternatives—whether to a particular proposal or among various applicants—and mitigation measures.  See 40 C.F.R. §§ 1508.9 and 1508.20, respectively.  It is only through this process that Defendants can breathe life into the EPAct.  Without such an analysis, Defendants have no objective, meaningful mechanisms for deciding to reject, see 26 U.S.C. § 48A(d)(2)(B), or modify a proposal to make it acceptable by requiring terms and conditions necessary for obtaining final certification.  See 26 U.S.C. § 48A(e)(1) (establishing minimum certification standards).  Likewise, the NEPA process would be invaluable in defining the highest common denominator by identifying projects and technologies that might exceed the minimum standards for advanced coal-based generation technology.  See 26 U.S.C. § 48A(f)(1)(B).

More evidence of Defendants' ability to control particular projects can be found in their opposition memorandum.  Specifically, in claiming that Plaintiffs' allegations of harm from increased coal mining is speculative, Defendants rely on Duke Energy's application for an air pollution permit for the proposition that even though Duke Energy admits that it plans to use coal from the Appalachian Mountains, the company "may use a variety of different sources of coal …" Defs.' PI Mem. at 33, n. 19 (emphasis added).  Again, had Defendants taken their legal and moral obligations under NEPA seriously, they might have discovered unacceptable social and

environmental consequences that could be reduced or eliminated by requiring Duke Energy to obtain its coal from different sources.

### III.    PLAINTIFFS POSSESS ARTICLE III STANDING

#### A.    Standard of Review

When reviewing matters on the pleadings the reviewing court "'presumes that general allegations embrace those specific facts that are necessary to support the claim.'"  Florida Audubon Soc'y, 94 F.3d at 672 (quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 889 (1990)).  Plaintiffs' pleadings demonstrate that they satisfy the requirements of Article III standing because: (1) they have suffered an injury-in-fact; (2) that injury is fairly traceable to Defendants' illegal allocation of tax credits; and (3) a favorable decision will redress these injuries.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–62 (1992).

#### B.    The Environmental and Procedural Injuries Caused by Defendants' Failure to Comply with NEPA Satisfy the Injury-in-Fact Requirement of Standing

Where, as here, "a party 'has been accorded a procedural right to protect his concrete interests,' the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury."  Florida Audubon Soc'y, 94 F.3d at 664 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 n. 7 (1992)).  As such, "[t]o demonstrate standing, then, a procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest."  Id. at 664–65.  Here, Defendants' violation of Plaintiffs' procedural rights under NEPA will cause essential injury to Plaintiffs' interests.  See Pls.' PI Mem. at 12–14; Pls.' Compl. At ¶¶ 6–11, 16–18.

9

Because Plaintiffs must demonstrate "an increased risk to a personal interest," Florida Audubon Soc'y, 94 F.3d at 666, logic dictates that Defendants' failure to use NEPA to evaluate terms and conditions, see supra, Section II, that reduce or eliminate environmental damage, see Dep't of Transp. v. Public Citizen, 541 U.S. 752, 756 (2004), is a "procedural breach [that] will cause the essential injury to plaintiff's own interest." Id. at 664–65. Similarly, a proper NEPA analysis that compares the environmental costs and benefits of each facility to those of other applicants could result in denial of the tax credit to a particular applicant—in favor of another—due to the discovery of unacceptable and unavoidable consequences. See, 26 U.S.C. § 48A(e)(1) (Establishing the minimum requirements for qualifying advanced coal project and broad discretion to add additional requirements—requirements that should be identified through the NEPA process); see also, 26 U.S.C. § 48A(e)(2)(A) (Conditioning full certification on receiving "all Federal and State environmental authorizations or reviews [including NEPA] necessary to commence construction of the project."); and 26 U.S.C. § 48A(e)(3)(B) (Requiring the Secretary of the Treasury to "give high priority to projects which include, as determined by the Secretary-- (i) greenhouse gas capture capability, (ii) increased by-product utilization, and (iii) other benefits.").

Defendants next challenge Plaintiffs' injury-in-fact by alleging that Plaintiffs' have not demonstrated use of the area affected, as opposed to "an area roughly in the vicinity." See Defs.' PI Mem. at 14 (quoting Lujan, 504 U.S. at 566). To turn a southern phrase, "that dog don't hunt," because air pollutants have impacts far beyond the property boundaries of the emission source and Mr. Hawkins, along with his wife and two young sons, own and enjoy property just twenty miles from the site of the new unit at Duke's Cliffside facility. See Exh. 4: Declaration of Roger Hawkins, at ¶ 3. The Hawkins' proximity to this facility gives rise to injuries not common

to all members of the public. See Florida Audubon Soc'y, 94 F.3d at 664 (quotation omitted); see also, Lujan, 504 U.S. at 572 n. 7 (hypothetically conferring standing upon an individual living adjacent to a proposed federally licensed dam that may not be constructed for many years; while hypothetically denying standing to those clear across the country from that dam).

Defendants' attempts to diminish Plaintiffs' injuries by relying on allegations that deploying advanced coal-based generation technologies is somehow better for them and the environment, see Defs.' PI Mem. at 15, is equally flawed. While Defendants correctly note that the advanced coal-based generation technologies subject to the tax credit must meet specific performance standards and other federal and state environmental authorizations, see id. (citing 26 U.S.C. § 48A(f), they fail to understand that NEPA, coupled with the Secretary of the Treasury's discretion to reject applications or impose terms and conditions on certifications, has independent utility for reducing or eliminating environmental harm.

Moreover, Defendants' reliance on the actions of the North Carolina Utilities Commission to further marginalize Plaintiffs' injuries, see Defs.' PI Mem. at 15 n. 7, is absurd for at least two reasons. First, the fact that the Utilities Commission is requiring Duke to retire four units at Duke's Cliffside facility is meaningless because retiring those units—totaling 198 Megawatts—results in a net increase of 602 Megawatts. Second, Defendants' reliance on the fact that "Duke Energy must also commit to retire older coal-fired generating units (in addition to the four units) on a MW-for-MW basis," id., wholly ignores the possibility that Duke Energy could well retire units at facilities having no ameliorative effects on Plaintiffs' injuries.

Furthermore, Defendants' argument that allocating tax credits to the other recipients does not harm Plaintiffs because they are based in North Carolina, see Defs.' PI Mem. at 15, ignores the allegations in Plaintiffs' complaint and PI memorandum. Specifically, Plaintiffs have

11

members who not only live in North Carolina, but in the coalfields of the southern and central Appalachian Mountains.  See Pls.' Compl. at ¶¶ 6, 9 and 16.  As explained above,

> logic dictates that Defendants' failure to use NEPA to evaluate terms and conditions … that minimize or reduce risks to their personal interests … is a "procedural breach [that] will cause the essential injury to plaintiff's own interest." [citations omitted]. Similarly, a proper NEPA analysis that compares the environmental costs and benefits of each facility to those of other applicants could result in denial of the tax credit to a particular applicant due to unacceptable social and environmental consequences.

Supra, Section II.B. at 9 (citations omitted).  As explained more fully infra, at Section III.C, there is little doubt that by promoting a 602 Megawatt expansion at Duke Energy's Cliffside facility, vis a vis approving the tax credit, Defendants actions will increase coal mining and its ill effects throughout Appalachia.

Finally, Defendants' contention that Plaintiffs and their members must also be harmed by the other recipients of the tax credits in order to establish standing, see Defs.' PI Mem. at 15, is also incorrect.  While Plaintiffs face immediate harm from Duke Energy's Cliffside project, they seek an injunction suspending the allocated tax credits simply because doing otherwise would be inconsistent with both NEPA and the EPAct insofar as each requires an analysis of, inter alia, alternative projects in order to certify the best performing projects.  See e.g., 26 U.S.C. § 48A(e)(3)(B) (giving "high priority to projects which include, as determined by the Secretary--(i) greenhouse gas capture capability, (ii) increased by-product utilization, and (iii) other benefits."); see also, 40 C.F.R. § 1508.9 (requiring an analysis of alternatives); and 40 C.F.R. § 1508.20 (requiring an evaluation of mitigation measures).

### C. Plaintiffs' Injuries Are Fairly Traceable to Defendants' Failure to Comply With NEPA

Plaintiffs, despite Defendants' use of ellipsis to depict their position otherwise, see Defs.' PI Mem. at 18, understand full-well "that decisions regarding tax credits are subject to NEPA

12

where the tax credit is 'substantially likely to cause [a] demonstrable increase in risk to [a plaintiff's] particularized interest.'" Pls.' PI Mem. at 12 (quoting Florida Audubon Soc'y, 94 F.3d at 665) (emphasis added).

Here, unlike Florida Audubon Soc'y, the causal link betwixt allocation of the tax credits and Plaintiffs' injuries is more than sufficient to support Article III standing. In explaining the latest iteration of the standing analysis, the D.C. Circuit held that "[t]he example suggested by the Supreme Court in Defenders of Wildlife, 504 U.S. at 572 n.7--an EIS suit by a party whose home lies directly upstream of a proposed dam that was approved without an EIS--would still easily clear the standard articulated here." Florida Audubon Soc'y, 94 F.3d at 666 (emphasis added). While the Hawkins family does not live upstream from Duke Energy's Cliffside facility, they too "easily clear the standard" because they own, use and enjoy property located approximately twenty miles downwind from the site. Accordingly, where, as here, Plaintiffs' injuries are fairly traceable to the acts or omissions of Defendants, id. (citation omitted), then they have Article III standing.

Unlike Florida Audubon Soc'y, the causal link between Defendants' acts and omissions and Plaintiffs' injuries in this case, is not based on "a lengthy chain of conjecture." Id. There, the appellants claimed "that the tax credit will cause more ETBE production, which in turn will cause more ethanol production, which consequently will cause more production of the corn and sugar necessary for ethanol, which will then cause more agricultural pollution, which, as this pollution is likely to occur on farmland bordering wildlife areas appellants visit, is also likely to harm the areas visited by appellants." Id. Here, individual coal-based generation companies have responded affirmatively to the tax credit by moving forward with plans to significantly increase power production and, concomitantly, the environmental impacts associated with such

energy production. More specifically, Duke Energy will, at a minimum, triple its power production at its facility lying some twenty miles upwind from the Hawkins' property. In fact, had the Florida Audubon Soc'y plaintiffs "demonstrated that individual corn or sugar farmers in these areas will affirmatively respond to the tax credit by significantly increasing production," they too would have established the requisite causal connection for Article III standing. See id. at 667. Similarly, the Florida Audubon Soc'y plaintiffs would have had Article III standing by demonstrating

> that corn farmers in particular areas of Minnesota or Michigan or sugar producers in particular regions of Florida will grow their crops in such a fashion as to lead to greater quantities of pesticide use and erosion than already exist so as to pose a significantly increased risk to the lands used by these appellants because of the presence of that credit.

Id. at 668. Reason dictates that if Duke Energy is going to triple its output of electricity at its new facility, then it will need to significantly increase the amount of coal it incinerates and the pollution it generates. Likewise, because Duke Energy plans to continue obtaining coal from the regions in which Plaintiffs' members currently and prospectively fulfill their legally protected interests, see Exh. 1: at E-2–3; see also, Pls.' Compl. ¶¶ 9–13, the only logical conclusion is that coal mining will increase accordingly. Currently, Duke Energy obtains coal for its Cliffside facility from fifteen different surface and mountaintop removal mines in Appalachia. See, e.g., http://www.ilovemountains.org/myconnection/show_powerplants_mines.php?plant_no=2721 (last visited on 01 April 2008).

IV.  **THE BALANCE OF INJURIES WEIGHS IN FAVOR OF PLAINTIFFS**

    A.  **Plaintiffs' Harm is Inextricably Tied to Defendants' Actions**

Defendants' assertion that an injunction suspending the tax allocation program would not enjoin any of these projects, see Defs.' PI Mem. at 33, ignores the central importance of these tax

credits to the proponents of these power plants. To be sure, while an injunction suspending the programs will not prevent third parties from moving forward with any particular project vis a vis an order of this Court, suspension of the programs until Defendants fully comply with both NEPA and EPAct may force some project proponents or permitting authorities to suspend or abandon the projects due to the financial uncertainty of not being certified as a tax credit recipient. Indeed, the importance of the tax credits to Duke Energy were underscored in an interview with the Vice President of Environment, Health and Safety, John Stowell, published in a November 2006 edition of the Argus Air Daily:

> We have a milestone coming up with Edwardsport in Indiana and Cliffside. Both facilities applied for investment tax credits November 2006 (ITCs) under the Energy Policy Act of 2005. The applications have been reviewed by DOE and are now being reviewed by the Department of Treasury. We should know by the end of November if either or both of these plants receive ITCs. This is particularly important for the IGCC plant because it would help in our efforts to narrow the cost differential between a PC and an IGCC facility, but the tax credit is also very important to the PC plant due to higher than expected construction costs.

Exh. 6. Even if suspension of the tax credits does not prompt the project proponents to halt or delay their projects, state regulatory authorities may. For instance, in a regulated utility market like North Carolina's, the ratepayers ultimately pay for the new power plant through guaranteed rates of return. Should this Court suspend the tax credits or if Defendants reject an application pursuant to its discretionary authority in the EPAct, the additional costs that must be passed onto the ratepayers may prompt utilities commissions to reevaluate the fiscal efficacy of, and panoply of devastating environmental impacts associated with, a proposed power plant.

    **B.    Plaintiffs' Timing in Filing is no Evidence That the Harm is not Imminent**

Defendants make much ado about the fact that Plaintiffs did not file suit until fifteen months after the initial round of tax credit allocations. See Defs.' PI Mem. at 34. What

Defendants fail to acknowledge in making this argument is that Duke Energy's Cliffside facility had not been permitted to begin construction until 29 January 2008. As such, Defendants ignore the Supreme Court's holding in Lujan explaining that in procedural rights cases, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an [EIS], even though he cannot establish with any certainty that the [EIS] will cause the license to be withheld or altered, and even though the dam will not be completed for many years." Lujan v. Defenders of Wildlife, 504 U.S. at 572 n. 7 (1992) (emphasis added). Here, Plaintiffs did not act until Duke's construction was imminent and filed their suit just thirty-four days after that permit issued. To the extent that Plaintiffs' actions can be characterized as "delay," thirty-four days is an insufficient amount of time to constitute prejudicial delay for purposes of issuing a preliminary injunction.

## COCLUSION

Because the people, communities and environments in which coal is mined, processed, incinerated and discarded are indispensable, extraordinary national assets, they are equally deserving of the extraordinary, indeed presumptive, preliminary injunction, see Realty Income Trust v. Eckerd, 564 F.2d at 456, in those rare instances where, as here, the Federal government refuses to fulfill its reciprocal legal and moral obligations under NEPA.

Dated at Asheville, North Carolina this first day of April 2008.

/s/ Scott Gollwitzer
Scott Gollwitzer

ATTORNEY FOR PLAINTIFFS

Scott Gollwitzer
In-house Counsel
Appalachian Voices
16 Eagle Street, Suite 200
Asheville, NC 28801

Ph:  828.505.1963  
Fax: 828.262.1540  
E-mail: scott@appvoices.org  
D.D.C. Bar No. TN0003


OF COUNSEL

| | |
|---|---|
| Benjamin J. Wakefield | Stephen H. Novak |
| Counsel | Senior Staff Attorney |
| Environmental Integrity Project | Wildlaw |
| 1920 L Street, N.W., Suite 800 | 46 Haywood Street, Suite 323 |
| Washington, DC 20036 | Asheville, NC 28801 |
| Phone: 202.263.4442 | Ph: 828.252.9223 |
| Fax:    202.296.8822 | Fax: 828.252.9074 |
| E-mail: bwakefield@environmentalintegrity.org | E-mail: wildlawNC@aol.com |
| D.C. Bar No. 482984 | NC Bar No.  23411 |


### Certificate of Service

I hereby certify that on 01 April 2008, notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's electronic filing system.

/s/ Scott Gollwitzer  
Scott Gollwitzer


### Additional Certificate of Serving a Courtesy Copy

Pursuant to Section 3 of this Court's Standing Order for Civil Cases, a courtesy copy will be served on this Court via U.S. Postal Service overnight mail on 02 April 2008.

 /s/ Scott Gollwitzer  
Scott Gollwitzer

# Argus Air Daily

www.argusmediagroup.com

**US Emissions Market Prices, News and Analysis**                                             November 2006

## *Argus* Q&A with Duke's Stowell

*Argus interviewed John Stowell, vice-president of Environment, Health and Safety for Duke Energy, formed from the merger of Cinergy and Duke Energy announced in May 2005.*

Cinergy's James Rogers has taken over as president and chief executive of Duke Energy , while Duke's Paul Anderson will serve as a non-executive chairman of Duke Energy's natural gas operations, to be named Spectra Energy beginning January 1, 2007.  Rogers is also chairman of the Edison Electric Institute.

Both Cinergy and Duke Energy were proponents of a mandatory carbon cap for the US, and their combined generating assets make them well placed in a future greenhouse gas trading scheme as Cinergy's heavy coal fleet is balanced by Duke's lower-carbon intensive gas and nuclear assets.

Stowell talked about Cinergy's voluntary GHG commitment and how the newly formed company will reconcile the two executives' different views on how best to manage a carbon mitigation program.

**Can you outline Cinergy's GHG reduction target?**

The legacy Cinergy operation had a goal of a 5 pct reduction below 2000 levels from 2010-2012, bringing total greenhouse emissions from Cinergy-owned assets down 3.4 million metric tonnes/yr to 63 million mt/yr, assuming 1.0 pct growth over the next 15 years.

**Does the new Duke Energy have a commitment?**

We are in the process of evaluating that — the intent is we will have one. It's been a busy year putting together the merger and now spinning off the gas transmission and processing business! A committee has been working on a plan and we will shortly be putting our recommendations for a new Duke Energy committee to Jim Rogers.

**What is your motivation behind having a voluntary GHG program?**

We were motivated by several things. In the first term of the Bush presidency, the administration proposed the Department of Energy program that became Climate Leaders. They challenged industries to come up with voluntary commitments and we wanted to do our part to support the president's plan.  At that time, in mid-2003, it became obvious that there would not be a legislated requirement any time soon, although we believed there would be at some point. In addition to wanting to support the administration's early goals, we also wanted to figure out how to run our business in a carbon constrained world. While voluntary measures do not even come close to what it would be like under a mandatory program, it gave our strategic planners and power plant operators some good experience in how one might operate under carbon constraints.  It was a bit like doing calisthenics before a big game. We also believed we could identify some low-hanging fruit in terms of improving our efficiency and gaining experience with sequestration, mostly tree-planting, as well as introducing some renewables.

**What are the most important lessons you learned from your climate initiative?**

What we did find was really interesting.  Many of the efficiency projects we selected actually paid for themselves.  We used less fuel  and the power plant efficiencies had the effect of creating more $SO_2$ and $NO_x$ allowances. As we moved deeper into the program, the lower-hanging fruit got higher and so the projects were more expensive.  In the real world of mandatory carbon regulation, we expect that the costs we'll incur will be higher than what we saw in the voluntary program.  But, as we expected, we learned some lessons internally that I think will be important as we move forward.  We also built awareness in the communities we serve as we did projects we probably would not have done, certainly not from an economic standpoint, such as solar. We did a small wind demonstration project which led to a contract with Orion for up to 100 megawatts of wind in Indiana. But for our greenhouse gas program, we probably would not be where we are today in trying to move into renewables.  Renewables are not as cheap as fossil fuel generation and you cannot think of them in same way as baseload coal but they still make sense, and customers there are interested in buying them.  I believe when carbon has a value, the delta between renewables and fossil fuels will narrow.

**What were your average costs?**

Averaged over one year they were $8.28/mt in 2004 and $12.49/mt in 2005, but spread over the five-year life of the pro-

                                              Copyright © 2006 Argus Media Inc.

gram they are $1.66/mt. Of course, as I said before, in a mandatory program the number of entities involved will affect the cost. In the voluntary program, too, these costs were not passed on to the ratepayer, but the ratepayer gets the full advantage of any fuel saving.

**I see you achieved 349,882 tons reduction from heat rate improvements, costing just $1.11. Are there more opportunities to do this?**

Most of the coal-fired plants Cinergy owned outright were considered for heat rate improvements, but we had to be careful not to trigger New Source Review. Nothing has been done yet in the Carolinas, and the Duke plants there are known for their low heat rates.  But, our engineering and power plant operating groups have already come up with several ideas for on-system improvements. Once we get our budget finalized, we will organize a GHG management committee to consider projects on a case-by-case basis.

**Do you support a price cap for a potential US trading program?**

Yes.  A cap addresses economic concerns by fixing a price for carbon. The science we leave to the experts, but we start with the premise that man-made GHGs are a problem. In our view it is inevitable there will be a GHG management program, and we like cap-and-trade. We know how it works. What we are looking for is a carbon price signal so we can plan for the future. We need to begin factoring in $CO_2$ as a cost so we can consider it in our least cost resource planning. We also support a price cap at least in the early years of the program, which is often referred to as a "safety valve".  A safety valve allows for emissions growth to be slowed, stopped and reversed in such a manner as to not cause disruption to the economy.  We would be concerned to see Congress enact a program that tries to do too much, too fast and run the risk of damaging the economy.  We are also concerned that Congress be careful to not cause a disproportionate economic hardship on any region of the country.  This is especially important in the Midwest where coal dominates electric generation.  The Midwest is already lagging behind the rest of the country economically and a disproportionate hit on coal would further damage the fragile economy.

**Where would you set the price cap?**

The price cap needs to be high enough to drive action but not too high to get economic dislocation which we worry could cause Congress to pull back from its commitment because of angry voters. Sen. Bingaman suggested $7/mt with a 5 pct/yr escalation for a safety valve. It will be interesting to see if that price holds. But it will probably come off in five to seven years, it is just to get us started.

**How could such a price signal drive a change in the energy mix?**

It had better not in the short term. You cannot change the generation mix by snapping your fingers. There are hundreds or thousands of megawatts of coal, some still being paid for. Do we want to say it cannot be used? Think of the reliability issue if all of a sudden this generation is made obsolete. We have to think of addressing climate change like a long-term war. Where we want to be in 2050 and not in 2015 is what policymakers should be thinking about. The price signal will, over the long haul, have an impact on both the energy mix and technology.

**Where do you see investments being made first?**

Think of high efficiency, low intensity equipment. We talk about the need for energy efficiency. We recently created a new department of energy efficiency led by a vice-president, Ted Schultz . But you still have to have a place for coal so technology is vital. And you will not get the technology without a price signal.

We are proposing two fossil fuel plants and some renewables. One integrated-gasification combined-cycle (IGCC) plant in Indiana, and a supercritical pulverized coal (PC) plant in North Carolina, that also includes the retirement of four older coal units. We hope there will be the ability to capture and sequester $CO_2$. We are in the front end engineering and design phase for the IGCC facility. For the supercritical plant we reasoned they need generation in North Carolina desperately, but the geology there is not conducive to sequestration. We are looking for the most efficient way as that still remains the lowest cost. As for renewables, we are developing wind in Indiana and looking at biomass, and doing a little bit of work with solar, and some wood waste in St Paul, Minn. The kind of thing if you were to ask us 15 years ago, we would not have been doing.

**Are you looking at any of the emerging back end $CO_2$ control technologies for pulverized coal plants?**

In the design for the supercritical plant we have made room for placement of  back end controls or what we might think of as a "carbon scrubber".  Right now, it appears it will be easier to extract $CO_2$ from IGCC, but with all the PC plants being planned and so many that will still be in operation for the foreseeable future, there will be a critical need for development of technology that will address $CO_2$ emission reduction from PC plants. Again, we believe this technology will be jump started only if there's a regulatory program that develops a carbon price signal.

**How are the IGCC projects progressing?**

We have a milestone coming up with Edwardsport in Indiana and Cliffside. Both facilities applied for investment tax credits



## Methodology

*Argus* publishes daily $NO_X$ allowance prices for current vintage (spot), forward market prices for three additional years and previous year (banked) allowances. It also publishes spreads between the spot and forward and banked allowances. *Argus* publishes daily $SO_2$ allowance prices for current vintage (spot). Each Friday on a weekly basis, *Argus* publishes forward market prices for seven additional years. The forward $SO_2$ prices reflect the value on the Friday assessed, not a value representative of the entire week.

The *Argus* prices published daily are intelligent assessments of the bid/ask range at the timestamp of 5:00pm Eastern Time. The "price" represents the midpoint between the assessed bid and ask. The assessed range takes into account deals done, bids, offers, spreads between current and future vintages, and other assessments of the market gathered through a wide survey of participants. The assessment represents the range within which deals traded or could have traded at the close of the trading day for that particular vintage. *Argus* holds as a guiding principle that our assessments should be the product of intelligence, skill, and diligent investigation.

Each week on Friday, *Argus* publishes a Weekly Index for $SO_2$ and $NO_X$. These indices are the arithmetic average of the daily "Price" published for current vintage allowances for each day on which prices were published during that week. On the last business day of each calendar month, *Argus* publishes a Monthly Index for $SO_2$ and $NO_X$. These indices are the arithmetic average of the daily "Price" published for current vintage allowances for each day on which prices were published during that month. Monthly indices for forward and previous year $NO_X$ vintages are also published. *Argus* publishes a monthly Broker Index as well, based on a methodology suggested by the Emissions Marketing Association.

The US Environmental Protection Agency (EPA) publishes transfers of $SO_2$ and $NO_X$ allowances every business day. *Argus* publishes details on daily transfers between non-affiliated companies or organizations. Separately, *Argus* collects details on transactions completed in the over-the-counter market for emission allowances and publishes them in the "Deals Done" table in *Argus Air Daily* each business day. These transactions are typically completed two weeks or more before they are finalized and processed through the EPA's allowance tracking system. Therefore volume and type of trades in the "Deals Done" table will not match up with the same day's transfers in the EPA tables.

For more information, go to http://www.argusonline.com

(ITCs) under the Energy Policy Act of 2005. The applications have been reviewed by DOE and are now being reviewed by the Department of Treasury. We should know by the end of November if either or both of these plants receive ITCs. This is particularly important for the IGCC plant because it would help in our efforts to narrow the cost differential between a PC and an IGCC facility, but the tax credit is also very important to the PC plant due to higher than expected construction costs.

**How will the merger with Duke affect your climate position? How will you reconcile the trade vs. tax opinions of the two companies?**

Our positions were more similar than dissimilar. Both proposals expressed the need for a mandatory program now. While Jim Rogers spoke about a cap and trade program and Paul Anderson a carbon tax, both plans went after the same thing: the need for a carbon price signal. From Cinergy's standpoint, we talked about a cap and trade because we believed that would be easier to get through Congress. A tax would be very hard. Look at President Clinton's Btu tax proposal that ripped the Democrats apart in 1994. That was a lesson well learned. It's very hard to pass a tax. Paul Anderson's idea was revenue neutral. You would raise a carbon tax but there would be a repeal of some payroll taxes and maybe other taxes. I would not say this idea is off the table going forward, but my fear is that from a practical standpoint, it would prolong the debate. What is important is both Jim and Paul agree that we need to move forward.

**How do you know early action will be credited in any future regime?**

We do not. Sometimes you've got to gamble. We have tried to be very transparent and taken opportunities to publicly disclose our reductions. But when it comes down to it you do not know what the baseline will be, that's why our GHG program had to be modest and why you cannot rely on a voluntary program.

# Argus Air Daily

airdaily@argusmediagroup.com

**Senior Editor:** Caroline Gentry
**Editors:** Mike Ball, Carrie Sisto, Kim Krieger
**Production Editor:** Andrew Sutton
**Contributing Editors:** Abby Caplan, Peter Gardett, Jamie Webster, Funda Saygin, Christopher Newman, Milena Yordanova, Elizabeth Rosenberg, Anne O'Neil, Claire Pickard-Cambridge, Amery Pore, Brian Megali, Conway Irwin
**Washington Bureau Chief:** Ross Allen

**Business Development:**
Miles Weigel, Daniel Massey
**Publisher:**
Adrian Binks
**Chief Executive:**
Euan Craik

**Argus Media Inc.**
**1012 14th Street, N.W., Suite 1500**
**Washington, D.C.  20005**
**(202) 775-0240  (202) 872-8045 fax**
**www.argusmediagroup.com**

**Subscriptions**: For information on multiple subscription rates or site licensing contact Sekani Williams at 202-349-2884.

**Customer Service**: For questions regarding subscriptions or circulation, please contact Zach Rhonheimer at (202) 775-0240 x255.

© Copyright 2006 by Argus Media Inc. All rights reserved (ISSN 0732-8397). Reproduction, retransmission or storage of this publication in any form is forbidden without prior written permission from Argus Media.

