**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **APPALACHIAN VOICES** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No. 1:08-cv-00380-RMU** |
| | ) | |
| **SAMUEL W. BODMAN** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

---

## I.    INTRODUCTION

Defendants' motion to dismiss should be denied as no more than another ladle-full of cold pablum served up by a competent advocate zealously defending her clients' refusal to comply with NEPA. Jurisprudentially, much of Defendants' arguments are based on irrelevant cases interpreting inapplicable statutes. Factually, Defendants' attempts to defeat standing by labeling Plaintiffs' allegations of injury, cause and redressability as speculative and conjectural are themselves, ironically, based upon speculation and conjecture. As explained herein, Plaintiffs' members are threatened with palpable injuries, traceable to Defendants' refusal to comply with NEPA that are redressable by this Court.

## II.  STATEMENT OF FACTS[1]

### A.    Duke Energy's Experimental Power Plant Will Have Severe Environmental Impacts at Distances Greater Than Two Hundred Miles From its Smokestack

In a letter dated 31 October 2007, Mr. John Bunyak, Chief of the National Park Service's Policy, Planning and Permit Review Branch, submitted comments to the N.C. Division of Air Quality stating, <u>inter alia</u>, that Duke Energy's proposed power plant would have "severe impacts upon air quality and air quality related values at Great Smoky Mountains National Park."  Exh. 8 (attached hereto).  The Great Smoky Mountains National Park ("GSMNP") is located some 200 miles from the site of Duke Energy's experimental power plant. <u>Id.</u> According to the engineering analysis accompanying this letter, the impacts on the GSMNP will be ruinous:

> The Cliffside project will increase atmospheric deposition of pollutants, including sulfur, nitrogen, and mercury, to Great Smoky Mountains National Park. Predicted impacts exceed the Deposition Analysis Thresholds (DAT) for total sulfur in the park and are therefore not considered insignificant.  In addition to contributing to acidification of forest soils and streams, sulfur deposition contributes to the formation of methylmercury in the environment, if mercury is present.  Methylmercury is extremely toxic and bioaccumulates in fish and wildlife and park managers have identified mercury as a significant threat to park ecosystems.  Because no additional controls specific to mercury capture are proposed, mercury emissions from the project could reach 460 lb/yr, the resulting increase in mercury deposition, coupled with the increase in sulfur deposition could impact park resources, including threatened and endangered species.

Exh. 9 at 10 (attached hereto).  Moreover, the new plant will "have impacts on visibility that have typically been considered adverse for other proposed sources."  <u>Id.</u> at 12.

---

[1] In the interest of judicial economy, Plaintiffs incorporate as though fully recounted herein their statements of facts contained in their Memorandum of Law In Support of Preliminary Injunction, Docket No. 3, and their Reply, Docket No. 7.

B.    **Plaintiffs' Members**

1.    Mr. Roger Hawkins

Mr. Roger Hawkins, a member of the Canary Coalition, owns a residence situated on approximately thirty-five acres located some twenty miles from Duke Energy's experimental facility.  See Docket No. 3, Exh. 4 at ¶¶ 1 and 3.  Along with his wife and two young boys, Mr. Hawkins uses and enjoys his property to operate a kennel for German Shepherds, which oft requires the family to be out-of-doors.  Id. at ¶ 1.  The Hawkins family also engages in hiking, running and playing soccer, baseball and football on this property.  Id. at ¶ 2.  In addition to these more rigorous activities, Mr. Hawkins enjoys the aesthetic values of his property, as well as observing wildlife with members of his family.  Id.  Mr. Hawkins is not only concerned about how Duke Energy's new facility will negatively affect his health, but the health of his neighbors, his wife and, especially, his two young sons.  Id. at ¶ 3.

While Mr. Hawkins is concerned about each pollutant to be emitted by this project, he is particularly concerned about how mercury emission may affect his sons' developing neurological systems.  See id. at ¶¶ 3–4.  Moreover, Mr. Hawkins expressed concern that alternatives, such as wind energy, had not been evaluated in approving the tax credits For Duke Energy's Cliffside project.  Id. at ¶¶ 3 and 7.  Finally, Mr. Hawkins identified fine particulate matter, sulfur dioxide and oxides of nitrogen as other pollutants of concern.  Id. at ¶ 5.

2.    Ms. Tracy Davids

Ms. Davids lives in Asheville, North Carolina and has been a member of Appalachian Voices since 2004.  See Exh. 10 at ¶ 1 (attached hereto).  Ms. Davids is an avid enthusiast of a variety of outdoor activities including: hiking; backpacking; camping; and wildlife viewing.  Id. at ¶ 2.  Ms. Davids spends a considerable amount of time exploring the state and national parks

and forests of western North Carolina.  Id. at ¶¶ 3–5.  In addition to the recreational opportunities provided by these parks and forests, Ms. Davids enjoys the spiritual, see id. at ¶ 5, and aesthetic qualities of these wild places, see id. at ¶ 9, as well as searching for and viewing endangered, threatened, rare, sensitive and declining species such as the Pink Lady Slipper, the Cerulean Warbler and the Carolina Northern Flying Squirrel.  Id. at ¶ 7.  Because of its incredible biological diversity and longstanding protection as a national park, Ms. Davids has a special affinity for the Great Smoky Mountains National Park which she has visited 6–10 times per years since moving to North Carolina in 1998.  See id. at ¶¶ 3–4.

While Ms. Davids plans to continue using and enjoying the state and national parks and forests of western North Carolina until she's physically unable to, see id. at ¶ 7, Ms. Davids, like the National Park Service, see supra, is concerned about the severe impacts of this power plant on the air quality and air quality related values of the Great Smoky Mountains National Park. See id. at ¶¶ 8–11.  Specifically, Ms. Davids worries about how increased pollution in the park will affect her physical ability to continue to engage in rigorous activities such as hiking and backpacking, especially during the summer ozone seasons.  See id. at ¶¶ 8–9.  In addition to being concerned about her physical well-being, Ms. Davids is apprehensive about how air pollution will destroy the aesthetically pleasing views and vistas she's accustomed to finding in the Park.  See id. at ¶ 9.  Likewise, Ms. Davids harbors fears that her spiritual fulfillment will be harmed as the evidence of human activity, in the form of haze and other air pollution, becomes more and more prominent in these wild oases.  See id. at ¶ 11.  Finally, Ms. Davids is anxious about how increased air pollution will injure plants and animals in the park, see id. at ¶ 10, especially threatened endangered, rare, declining and sensitive species—species of which she is particularly fond, both personally and professionally.  See id. at ¶ 6.

     3.    Ms. Judith Hallock

Ms. Hallock recently moved to Asheville, North Carolina and has been a member of Appalachian Voices since 2003 and the Canary Coalition since its inception.  See Exh. 11 at ¶¶ 1–2 (attached hereto).  Ms. Hallock has been visiting the Great Smoky Mountains National Park ("GSMNP") since she was a child, see id. at ¶ 10, and plans on using the park as she has customarily done.  See id. at ¶ 15.   Ms. Hallock uses the GSMNP for a variety of activities including: picnicking; annual wildflower hikes; inner-tubing; camping; backpacking; day-hiking; playing capture the flag; annual bike rides; education for herself and children about stream biology, geology and monitoring; and spiritual fulfillment  See id. at ¶¶ 5–11.

While Ms. Hallock plans to continue using and enjoying the GSMNP, see id. at ¶ 15, she like Ms. Davids and the National Park Service, see supra, is concerned about the severe impacts of this power plant on the air quality and air quality related values of the Great Smoky Mountains National Park.  See id. at ¶¶ 12–16.  Specifically, Ms. Hallock worries about how increased pollution in the park will affect her ability to "enjoy and be spiritually sustained by these lands."  Id. at ¶ 15.  In addition to being concerned about her physical well-being, Ms. Hallock is apprehensive about how air pollution will destroy the aesthetically pleasing views and vistas she's accustomed to finding in the Park.  See id. at ¶ 13.  Finally, Ms. Hallock is anxious about how increased air pollution will injure plants and animals in the park.  See id. at ¶ 15.

## III. DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED BECAUSE PLAINTIFFS POSSESS ARTICLE III STANDING IN THIS PROCEDURAL RIGHTS CASE

### A. The Irreducible Minimum and the Special Nature of Procedural Rights Cases

To satisfy the "'irreducible constitutional minimum of standing,'" Plaintiffs must demonstrate that they have suffered a "'concrete and particularized'" injury that is: (1) actual or imminent; (2) fairly traceable to an act or omission of the Defendants; and (3) redressable by this Court. See Florida Audubon Soc'y v. Bentzen, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc). Courts have identified and developed special considerations regarding a litigant's standing to sue in procedural rights cases.

For instance, a party may assert a procedural right "without meeting all the normal standards for redressability and immediacy." Id. at 668 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 n.7 (1992)). Moreover, in cases involving NEPA and tax credits, to "demonstrate injury sufficient for standing, [a plaintiff] must show that the omission or insufficiency of an EIS may cause the agency to overlook the creation of a demonstrable risk not previously measurable (or the demonstrable increase of an existing risk) of serious environmental impacts that imperil [the plaintiff's] particularized interest." Florida Audubon Soc'y, 94 F.3d at 666 (citation omitted).

### B. Plaintiffs are Threatened With Concrete and Particularized Injuries

Defendants have challenged Plaintiffs' standing by claiming, inter alia, that Mr. Hawkins will not be harmed by air pollution emitted from Duke's experimental facility because the geographic proximity of the property—some twenty miles from the smokestack—makes Mr. Hawkins' injuries speculative. See generally, Defs.' Motion to Dismiss at 18–21. Defendants' dubious argument is based on a fundamental misapprehension of Article III standing in NEPA

cases and the "real world" impacts of air pollution from Duke Energy's new power plant.  See Exhs. 9 & 10.  Indeed, Mr. Hawkins' property's proximity to the power plant is sufficient to establish a concrete and particularized injury satisfying Article III.  As recently explained by the D.C. Circuit:

> The idea behind NEPA is that if the agency's eyes are open to the environmental consequences of its actions and if it considers options that entail less environmental damage, it may be persuaded to alter what it proposed. -- Countless lawsuits in which this court and others upheld a plaintiff's standing were predicated on that understanding. The plaintiffs in some of those cases had standing because they lived -- as do the plaintiffs here -- near where the federal action would occur and would feel the environmental effects of that action if it went forward.

 Lemon v. Geren, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 572–73, at nn. 7–8 (1992); City of Dania Beach Fla. v. FAA, 485 F.3d 1181, 1186 (D.C. Cir. 2007); City of Waukesha v. EPA, 320 F.3d 228, 235 (D.C. Cir. 2003)).

While Plaintiffs' budgets have prevented them from hiring an air pollution expert to model the effects of the new power plant on Mr. Hawkins' property and his family's health, this Court may assume that his family and property will suffer the alleged environmental consequences in determining whether the increased risks actually threaten his interests.  See Florida Audubon Soc'y, 94 F.3d at 667 (a court may "assume that the areas used and enjoyed by a prospective plaintiff will suffer all or any environmental consequences …" where the challenged government action is located at a particular site as opposed to broad rule making).

Buttressing this assumption is the fact that the federal government's own air pollution experts have found that the new power plant will have severe impacts on air quality approximately two hundred miles away.  See Exhs. 9 & 10.  Anyone who's experienced a smoky campfire or grill knows that the further away from it you are, the less likely your lungs and eyes will burn.  It can scarcely be denied that the same is true about emissions from a power plant's

smokestack.   Accordingly, this Court should assume that the environmental impacts to the Hawkins' family and property will be at least as severe as those in the GSMNP located more than 200 miles from the smokestack.  See Exh. 9.  Whether or not this Court finds that Mr. Hawkins will suffer injury-in-fact, the severe impacts to air quality and air quality related values at the GSMNP also threaten Plaintiffs' members with palpable harm sufficient to establish standing.  See supra, Sections II.B.2–3.

Defendants' next argument that Plaintiffs lack standing because the plant is not expected to become operational until 2012 can swiftly be defeated by looking to the Supreme Court's decision in Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).  There, the Court hypothetically conferred standing upon an individual living adjacent to a proposed dam that may not be constructed [i.e. operational] for many years.  Id. at 572 n. 7.  Similarly, Defendants' speculative argument that the plant may never be put into service due to uncertainty "related to carbon dioxide regulations and the potential for related project cost increases," Defs.' Motion to Dismiss at 20, is no more than a red herring ultimately betraying their position that the tax credit "is unlikely to be a substantial factor in a company's decision about whether or not to proceed with the project."  Defs.' Motion to Dismiss at 10 n.4.[2]  As Plaintiffs have previously noted, the tax credits are critically important to project proponents.  See e.g., Docket No. 7, Exh. 6; Docket 16, Exh. 7.

Defendants' assertion that Plaintiffs will suffer no injury because the Cliffside plant is somehow better for the environment, id. at 20–21, is conjectural and belied by the government's own air pollution experts.  See e.g., Exh. 9 at 1 ("the real-world effect of [the new plant] by itself would be severe impacts upon air quality and air quality related values at Great Smoky

---

[2] For a detailed discussion, see Pls.' Reply to Defs.' Resp. in Opp. to Pls.' Mot. for Prelim. Injunc., Docket No. 7 at 14–15 (incorporated herein by reference).

Mountains National Park."). Finally, Defendants continue to confuse the nature of Plaintiffs' injuries with the appropriate remedy under NEPA. Once this Court orders Defendants to comply with NEPA, the agencies will have to assess, <u>inter alia</u>: the direct and indirect effects of each plant, <u>see</u> 40 C.F.R. §§ 1502.16(a)–(b); alternatives and their effects, <u>see</u> 40 C.F.R. § 1502.16(d); mitigation measures, <u>see</u> 40 C.F.R. § 1502.16(h); and the amalgamated, cumulative effects of all the experimental projects. <u>See</u> 40 C.F.R. §§ 1508.7–8. To do otherwise would be inconsistent with both NEPA and the EPAct insofar as each requires an analysis of, <u>inter alia</u>, alternative projects in order to certify the best performing projects. <u>See e.g.</u>, 26 U.S.C. § 48A(e)(3)(B) (giving "high priority to projects which include, as determined by the Secretary--(i) greenhouse gas capture capability, (ii) increased by-product utilization, and (iii) other benefits."); <u>see also</u>, 40 C.F.R. § 1508.9 (requiring an analysis of alternatives).

**C.    Plaintiffs' Injuries are Fairly Traceable to Defendants' Refusal to Comply With NEPA**

Defendants' reliance on <u>Florida Audubon Soc'y</u> for the proposition that Plaintiffs' injuries are not substantially probable to result from Defendants' omission misapprehends the fundamental holding of that seminal decision.[3]  In defining this Circuit's irreducible minimum requirements for standing to sue under NEPA, the <u>en banc</u> Court in <u>Florida Audubon Soc'y</u> held that in order to establish a fairly traceable link betwixt a defendant's omission and a particularized injury, a plaintiff "must show that the omission or insufficiency of an EIS <u>may</u>

---

[3] While Defendants go to great lengths arguing that Plaintiffs must show that the agency action is a substantial factor spurring a third party to act, <u>see</u> Defs.' Motion to Dismiss, 9–12, they fail to cite any cases involving alleged violations of NEPA to support this labored claim. Accordingly, Plaintiffs will not waste this Court's time detailing the distinguishing characteristics of: <u>Cmty. for Creative Non-Violence v. Pierce</u>, 814 F.2d 663 (D.C. Cir. 1987); <u>Dellums v. United States Nuclear Regulatory Comm'n</u>, 863 F.2d 968 (D.C. Cir. 1988); <u>Allen v. Wright</u>, 468 U.S. 737 (1984); and <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26 (1976). Plaintiffs, however, reserve their right to file a surreply addressing any additional cases cited by Defendants in reply.

cause the agency to overlook the creation of a demonstrable risk not previously measurable (or the demonstrable increase of an existing risk) of serious environmental impacts that imperil [plaintiff's] particularized interest."  Florida Audubon Soc'y, 94 F.3d at 666 (citation omitted) (emphasis added).

Plaintiffs' have standing because Defendants' refusal to comply with NEPA caused the agencies to overlook a cornucopia of demonstrable risks having potentially serious effects on Plaintiffs' concrete and particularized interests.  See supra Sections II.A–B.  In sum, Defendants' refusal to comply with NEPA threatens Plaintiffs' individualized interests with significant impacts that are obvious or capable of being proven (i.e. demonstrable).  See THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE at 497 (3d ed. 1992) (defining demonstrable as: "1. Capable of being demonstrated or proved: demonstrable truths.  2.  Obvious or apparent: demonstrable lies."); see also, Florida Audubon Soc'y, 94 F.3d at 666 (explaining that in NEPA cases which involve particular sites, a court may assume that the areas used and enjoyed by a plaintiff will suffer the alleged environmental consequences in determining whether the increased risk actually threatens the plaintiff's particular interests).  Defendants' attempts to analogize the failed causal link in Florida Audubon Soc'y to the case at bar is equally flawed.

As explained by the D.C. Circuit, a causal chain sufficient to confer standing in NEPA cases "must contain at least two links: one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an EIS and one connecting that substantive decision to the plaintiff's particularized injury."  Florida Audubon Soc'y, 94 F.3d at 668.  Here, it is obvious that Defendants' refusal to comply with NEPA resulted in a "government decision that may have been wrongly decided."  Id.  Because "[t]he second link addresses what often proves the more critical causation question in this type of case,"

10

id., Plaintiffs will address this prong of the inquiry in greater detail.  In finding the protracted causal chain insufficient to confer standing, the Florida Audubon Soc'y Court found that "[m]ost, if not all, of the individual links in the chain alleged by appellants depend on some allegation that cannot be easily described as true or false." Id. at 670.

Here, the four-link causal chain binding Defendants' refusal to comply with NEPA and Plaintiffs' particularized interests rests on allegations that are easily described as true.  First, Plaintiffs' members use and will continue to use the Great Smoky Mountains National Park for a variety of legally protected interests.  See supra, Sections II.B.2–3.  Second, the government's own air pollution experts have unequivocally concluded that, in the absence of mitigation measures, the new power plant will have severe impacts on air quality and air quality related values of the GSMNP located roughly 200 miles from the smokestack.  See Exhs. 9 & 10.  Third, Defendants have all but admitted their refusal to comply with NEPA.  Finally, Defendants' refusal to comply with NEPA threatens Plaintiffs' members with harm to their particularized interests—harm that could readily be eliminated or reduced through the imposition of conditions requiring various mitigation measures in order to qualify for a tax credit.[4]  Indeed, Defendants' unfettered discretion to impose conditions aimed at mitigating the severe effects of Duke's power plant distinguishes this case from those cited by Defendants in which there was no standing due to the government's inability to control the actions of independent third parties.

**D.    Plaintiffs' Injuries Will be Redressed by a Favorable Decision of this Court**

While "a court should not review redressability [or imminence in NEPA cases]," see Florida Audubon Soc'y, 94 F.3d at 669 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 n.7 (1992)), Plaintiffs will, out of an abundance of caution, address Defendants' redressability

---

[4] For a detailed discussion, see Pls.' Reply to Defs.' Resp. in Opp. to Pls.' Mot. for Prelim. Injunc., Docket No. 7, at 2–9 (incorporated herein by reference).

argument by first reminding this Court that Defendants possess unfettered discretion in reducing or eliminating environmental harm under the tax credit programs enacted by Congress. <u>See supra</u>, n.4. In addition, Defendants' argument that "Plaintiffs' asserted injury would still not be redressed … because there is no way to know whether or how the third party power plant companies would respond," Defs.' Motion to Dismiss, at 14, misses the mark by ignoring nearly forty years of NEPA jurisprudence. <u>See Lemon v. Geren</u>, 514 F.3d at 1315 ("The idea behind NEPA is that if the agency's eyes are open to the environmental consequences of its actions and if it considers options that entail less environmental damage, it may be persuaded to alter what it proposed. -- <u>Countless lawsuits in which this court and others upheld a plaintiff's standing were predicated on that understanding</u>.") (citations omitted) (emphasis added).

Instead, Defendants' seek refuge for their position in a case challenging a grant made by the Federal Aviation Administration and a footnote deeply rooted in a bed of flawed logic:

> In a typical NEPA case, plaintiffs generally argue that the challenged agency action, for example an agency proposal to approve highway construction or a timber sale, has resulted in environmental harms. Because … the agency <u>may alter</u> or even withdraw its proposed action as a result of a NEPA analyses [sic], the courts will generally find the redressability element is satisfied. Here, however, the environmental harms asserted by Plaintiffs are not a result of the agency action but rather the actions of third party power plant companies.

Defs.' Motion to Dismiss at 15, n.8 (emphasis added). Defendants' reasoning is perplexing insofar as many, if not all, agency proposals to approve timber sales or a highway construction projects necessarily involve the actions of independent third party contractors. Therefore, if an agency can alter the proposed actions of third parties in these situations, then Defendants can alter the behavior of third parties seeking tax credits under the EPAct through the imposition of conditions, identified through a NEPA, aimed at reducing or eliminating unacceptable environmental consequences. <u>See Save Our Cumberland Mountains v. Kempthorne</u>, 453 F.3d

334, 344 (6th Cir. 2006) ("That the agency may 'require[] modification of' the application [i.e. terms and conditions] of course presents the quintessential alternative to granting or denying the application, and consistent with the National Environmental Protection Act it would permit the agency to identify alternatives that are more environmentally considerate than the application's proposed course of action.") (quoting 30 C.F.R. § 773.7(a)); see also, RESTORE: The North Woods v. United States Dep't of Agriculture, 968 F. Supp. 168, 175 (D. Vt. 1997) (holding that "where [an agency] has discretion to impose terms and conditions on the transaction and to approve or disapprove the transaction based on the acceptability" of the lands to be acquired, the proposed land exchange is not exempt from NEPA. The Forest Service's determination to the contrary must be set aside as arbitrary and capricious and an abuse of discretion").

Assuming arguendo that Defendants' footnote meant to argue that the federal agency was constructing a highway or felling timber in its own right, the result is exactly the same. So long as an agency has a scintilla of discretion in shaping its behavior or that of a third party vis a vis NEPA, a plaintiff's injuries are redressable and must be reviewed. This rule has been a bedrock principal of NEPA jurisprudence for more than three decades: "[a]bsent very strong evidence in the legislative history demonstrating a congressional desire to repeal NEPA, or a direct contradiction between that Act and the new legislation, claims under NEPA should be reviewed." Izaak Walton League v. Marsh, 655 F.2d 346, 367–68 (D.C. Cir. 1981) (emphasis added) (citing Flint Ridge Development Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 785–793 (1976) (clear conflict must be found before NEPA gives way); Environmental Defense Fund, Inc. v. EPA, 160 U.S. App. D.C. 123, 489 F.2d 1247 (D.C.Cir.1973); and Note, The Environmental Impact Statement Requirement in Agency Enforcement Adjudication, 91 Harv. L. Rev. 815, 825 (1978)). See also, Natural Resources Defense Council v. Lujan, 768 F.Supp.

870, 880–81 (D.D.C. 1991); <u>Save Our Cumberland Mountains</u>, 453 F.3d at 344; <u>RESTORE: The North Woods</u>, 968 F. Supp. at 175.

Defendants' strained policy argument that standing here would open the floodgates of NEPA litigation because "litigants could argue that particular tax incentives, by encouraging economic development, contribute to environmental problems," <u>see</u> Defs.' Motion to Dismiss at 12, is similarly flawed. NEPA requires agency compliance for actions that may significantly affect the environment, <u>see</u> 42 U.S.C. §§ 4332(2)(A)–(B), not, as Defendants blithely suggest, to actions that may "contribute to environmental problems." Unless Congress has explicitly excused NEPA compliance, or compliance is impossible, federal agencies must abide by NEPA to the fullest extent possible. <u>See</u> <u>Izaak Walton League</u>, 655 F.2d at 367–68 ("[a]bsent very strong evidence in the legislative history demonstrating a congressional desire to repeal NEPA, or a direct contradiction between that Act and the new legislation, claims under NEPA should be reviewed.").

## IV. DOE's REFUSAL TO PERFORM ANY NEPA ANALYSIS PRIOR TO GRANTING ITS PRE-APPLICATION APPROVAL CONSTITUTES FINAL AGENCY ACTION SUFFICIENT FOR REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT

DOE's pre-application approval of the tax credit applications constitutes final agency action sufficient for review under the Administrative Procedure Act ("APA"). While review of finality is a "pragmatic" and "flexible" analysis for which no "bright-line" rule exists, courts have identified guidelines for the process. <u>National Association of Homebuilders v. US Army Corps of Engineers</u>, 417 F.3d 1272, 1279 (D.C. Cir. 2005). A final agency action "(1) 'marks the consummation of the agency's decision making process - it must not be of a merely tentative or interlocutory nature'; and (2) the action 'must be one by which rights or obligations have been determined or from which legal consequences will flow.'" <u>Karst Envtl. Educ. & Prot., Inc. v.</u>

EPA, 403 F. Supp. 2d 74, 80 (D. D.C. 2005) (citing Domestic Secs. v. SEC, 333 F.3d 239, 246 (D.C. Cir. 2003)).  Agency actions that lead to a plaintiff's injury, even if they are not the final step in the entire regulatory process, can be considered the "consummation" of the agency's actions.  See National Association of Homebuilders, 417 F.3d at 1279 (finding that "[t]here is nothing 'tentative' or 'interlocutory' about the [Army Corps'] issuance of" more restrictive nationwide 404 permits even though plaintiffs had yet to be impacted and were free to seek individual permits).

DOE's grant of pre-application approval consummated its decision making process and determined Plaintiffs' rights under NEPA.  This action was neither "tentative" nor "interlocutory"—it's a final decision. Karst Envtl. Educ. & Prot., Inc., 403 F. Supp. 2d at 80. DOE's role in the tax credit application process was to review each project for technical and economic feasibility before giving its approval to the IRS. See Defs.' PI Mem. at 5.  As such, the DOE's decision making processes were "consummated" the moment it approved the pre-application plans.

DOE's grant of approval without performing any NEPA analysis not only consummated its decision making process, but also determined—and ultimately denied—Plaintiffs' rights under NEPA.  DOE had a duty to perform a NEPA analysis, taking into account all of the detrimental human and environmental effects of the proposed coal-fired power plants and evaluating alternatives to those projects, before approving the pre-application plans.  See 40 C.F.R. §§ 1508.9 and 1508.20. Under NEPA's implementing regulations promulgated by the Council on Environmental Quality, the DOE would have been the lead agency for the NEPA analysis due to its technical expertise. See 40 C.F.R. §1501.5. Thus, by approving the initial plans with no

analysis of the environmental effects or inquiry into possible less harmful alternatives, DOE violated Plaintiff's procedural rights under NEPA.

Defendants' assertions that the DOE's actions were not final because the agency performed only a "consulting" role, see Defs.' Motion to Dismiss at 23, are misplaced.  The Supreme Court holds that agency actions may be "final" under the APA even when they are only precursors to another authority's actions that directly cause a plaintiff's injury.  See Bennett v. Spear, 520 U.S. 154, 178 (1997); see also, National Wildlife Federation v. Clark, 630 F. Supp. 412, 417 (D. D.C. 1985) (holding that the Water Resource Council's "pre-authorization agency planning process for water resource development projects" was a final agency action requiring a NEPA analysis even though Congress still had to authorize and fund the projects).  In Bennett, the Supreme Court found a Fish and Wildlife Service Biological Opinion concerning the Endangered Species Act to be a final agency action, even though the Plaintiffs' injuries stemmed from the Bureau of Reclamation's future interpretation and application of the Opinion, in which the Bureau had wide discretion.  Bennett, 520 U.S. at 178.  Defendants' argument closely mirrors the failed defense in Bennett:

> Whatever the practical likelihood that the [Bureau] would adopt the reasonable and prudent alternatives (including the higher lake levels) identified by the Service, the Bureau was not legally obligated to do so. Even if the Bureau decided to adopt the higher lake levels, moreover, nothing in the biological opinion would constrain the [Bureau's] discretion as to how the available water should be allocated among potential users.

Id. at 177 (citing Respondent's brief at 33).  In rejecting this argument, the Supreme Court distinguished the Fish and Wildlife Service's Opinion from the non-binding recommendations in Dalton v. Specter, 511 U.S. 462, 469 (1994) and Franklin v. Massachusetts, 505 U.S. 788, 796-97 (1992)—upon which Defendants rely, see Defs.' Motion to Dismiss at 22—because the Opinion "alter[ed] the legal regime to which the action agency is subject."  Bennett, 520 U.S. at

178.  The DOE's pre-application approval similarly alters the legal regime to which the "action agency," here the IRS, is subject. As the appropriate lead agency for NEPA analysis, <u>see</u> 40 C.F.R. §1501.5, the DOE has a responsibility to consider the environmental effects of the plans it reviews and to seek less harmful and destructive alternatives.  <u>See</u> 40 C.F.R. §§ 1508.9 and 1508.20.   Here, the DOE altered the legal regime under which the IRS' analysis took place and violated Plaintiffs' rights by approving the plans without any NEPA analysis. Because the applications had to be certified within 60 days of final submittal, <u>see</u> 26 U.S.C. § 48A(d)(2)(C), which could only take place after DOE approval, the DOE's actions removed any opportunity for meaningful NEPA review and public participation in that process. Consequently, the pre-application approval was a final agency action subject to APA review.

Defendants' assertion that "[i]t is well established that the 'refusal to prepare an [Environmental Impact Statement] is not itself a final agency action for purposes of APA review,'" <u>see</u> Defs.' Motion to Dismiss at 21 (quoting <u>Coalition for Underground Expansion v. Mineta</u>, 333 F.3d 193, 196 (D.C. Cir. 2003) (citing <u>Pub. Citizen v. Office of U.S. Trade Reps.</u>, 970 F.2d 916, 918 (D.C. Cir.1992)), is misleading and irrelevant. Here the DOE's failure to apply NEPA before granting pre-application approval is at issue, not simply its failure to draft an EA or EIS.  In both <u>Underground Expansion</u> and <u>Public Citizen</u>, there was no federal action to trigger the NEPA requirement.  In <u>Underground Expansion</u>, the plaintiffs were challenging the failure to draft an EIS for a transit project that was not federally funded. <u>See</u> <u>Coalition for Underground Expansion,</u> 333 F.3d at 195, while in <u>Public Citizen</u> the plaintiffs challenged the failure to apply NEPA during trade negotiations before any agreement had been reached.   <u>See</u> <u>Public Citizen</u> 970 F.2d at 917.  Thus, it was the failure to draft the EIS <u>itself</u>—the key word in the court's opinion ignored by Defendants—underpinning the plaintiffs' challenges in those

cases.  In contrast, the DOE failed to carry out any NEPA analysis before taking the definitive action of approving the pre-application plans.  As such, the DOE's actions are final.

While Defendants correctly note that "'[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties,'" See Defs.' Motion to Dismiss at 22 (quoting Franklin v. Massachusetts, 505 U.S. 788, 797 (1992)), it is evident that the DOE "completed its decisionmaking process" when it approved the pre-application plans.  Furthermore, its failure to evaluate the environmental harm of the projects and consider less harmful alternatives "directly affect[s]" Plaintiffs by allowing increased air pollution in their immediate vicinity and more destruction from surface mining in the coalfields of Appalachia.  Accordingly, the court should deny the Defendants' motion to dismiss the claims against the DOE for lack of jurisdiction.

## CONCLUSION

Contrary to Defendants' specious arguments, Plaintiffs' standing is unassailable.  Plaintiffs are threatened with concrete and particularized injuries that are traceable to Defendants' refusal to comply with NEPA and redressable through a favorable ruling from this Court.  Defendants' motion is little more than a poorly veiled attempt to enlist this Court's assistance in shirking its legal and moral obligations to the people, communities and ecosystems wherever coal is mined, transported, processed, burned and disposed as air pollution and other post-combustion waste. As such, Defendants' motion should be denied.

Dated this 3rd day of June 2008 at Asheville, North Carolina.

/s/ Scott Gollwitzer
Scott Gollwitzer

ATTORNEYS FOR PLAINTIFFS

Scott Gollwitzer                    Stephen H. Novak
In-house Counsel                    Senior Staff Attorney
Appalachian Voices                  Wildlaw
16 Eagle Street, Suite 200          46 Haywood Street, Suite 323
Asheville, NC 28801                 Asheville, NC 28801
Ph:  828.505.1963                   Ph:  828.252.9223
Fax: 828.262.1540                   Fax: 828.252.9074
E-mail: scott@appvoices.org         E-mail: wildlawNC@aol.com
D.D.C. Bar No. TN0003               NC Bar No. 23411
On behalf of Appalachian Voices     On behalf of The Canary Coalition


OF COUNSEL                          ALSO ON THE BRIEF

Eric V. Schaffer                    Benjamin A. Luckett
Executive Director                  2nd Year Student
Environmental Integrity Project     Lewis and Clark Law School
1920 L Street, N.W., Suite 800
Washington, DC 20036
Phone: 202.263.4442
Fax:    202.296.8822
D.C. Bar No. 427669


**Certificate of Service**

I hereby certify that on 03 June 2008, notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's electronic filing system.

/s/ Scott Gollwitzer
Scott Gollwitzer

October 31, 2007

N3615 (2350)

Mr. Ed Martin
North Carolina Department of Environment and Natural Resources,
Division of Air Quality
1641 Mail Service Center
Raleigh, NC  27699-1641

Attention: Permits Section.

Dear Mr. Martin:

Thank you for providing a copy of the draft permit for the proposed Duke Energy
Cliffside Unit #6 project which would be located 130 km east-southeast of Great Smoky
Mountains National Park (NP), a Class I area administered by the National Park Service
(NPS). Emissions from this project have triggered PSD review for pollutants which could
impact Air Quality Related Values at Great Smoky Mountains NP. Our detailed
comments regarding potential impacts at the park are enclosed.

We are especially concerned that your agency has proceeded to process this application
with no apparent consideration given to the outstanding federal enforcement action that
could considerably alter the scope of the permit analysis and its conclusions. Considering
the impacts of emissions from this plant upon Great Smoky Mountains NP, we believe
that this enforcement issue must be resolved before your agency takes final action on the
Unit #6 project. If the netting is ultimately not allowable, Duke Energy should reassess its
impacts at Great Smoky Mountains NP and implement appropriate mitigation measures
to lower its impacts to acceptable levels. Regardless of whether or not the netting is
allowed, the real-world effect of Unit #6 by itself would be severe impacts upon air
quality and air quality related values at Great Smoky Mountains National Park.

If you have any questions, please feel free to contact Don Shepherd of my staff at 303-969-2075.

Sincerely,


John Bunyak, Chief
Policy, Planning and Permit Review Branch

Enclosures


cc:
Bill Jackson
Air Resource Specialist
USDA Forest Service
160 Zillicoa Street, Suite A,
Asheville, NC 28801

Jim Little
Permits and Technical Assessment Branch
United States Environmental Protection Agency
Region 4
Sam Nunn Atlanta Federal Center
61 Forsyth Street, SW
Atlanta, GA 30303-8960

bcc:
WASO: Julie Thomas
GRSM: Supt.
ARD-DEN: Chris Shaver, Permit Review Group
ARD-DEN:DShepherd:ds:10/31/07:x2075:projectfile#2574:Cliffside Comments.Ltr.Doc

bcc:

GRSM:  Supt.
BLRI: Supt.
WASO: Julie Thomas
ARD-DEN: Chris Shaver, Permit Review Group
ARD-DEN:DShepherd:dls:8/29/07:x2075:projectfile#2739:Dominion   VCHEC   8.29.07
CvrLtr.Doc

**National Park Service**
**Preliminary Comments on the Duke Energy Cliffside Power Plant**
**Prevention of Significant Deterioration (PSD) Permit Application**
**October 31, 2007**

**Background**

Duke Energy (Duke) proposes to add an 800 megawatt (MW) supercritical pulverized coal (PC) fired, boiler (Unit #6) at its existing Cliffside Steam Station in Rutherford County, NC, 130 km east-southeast of Great Smoky Mountains National Park (NP), a Class I area administered by the National Park Service (NPS). Duke proposes to show that addition of this boiler, coupled with emission reductions at existing boilers via shutdown of Units #1 - #4 and improved emission controls on Unit #5, will result in insignificant impacts at Great Smoky Mountains NP.

*Existing Units #1 - #4*: These units are all tangentially-fired PC boilers with electrostatic precipitators (ESPs) for particulate control. Units #1 & #2 are rated at 40 MW and began operation in 1940. Units #3 & #4 are rated at 65 MW and began operation in 1948; they are fitted with some combustion controls to reduce $NO_x$.[1] Emissions from these units are relatively evenly distributed and total 2006 emissions were 5,273 tons of $SO_2$ (@ 1.43 lb/mmBtu) and 2,743 tons of $NO_x$ (@0.39 lb/mmBtu).[2] Although these units will be retired if Unit #6 comes on line, the $SO_2$ reductions from those retirements "will be held in reserve for future projects." Duke proposes to use the $NO_x$ reductions to partially offset $NO_x$ increases from Unit #6 as discussed in the following section on PSD applicability.

*Existing Unit #5* began operation between 8/7/62 and 8/7/77, is rated at 562 MW, and emitted 23,856 tons of $SO_2$ (@ 1.45 lb/mmBtu) and 2,743 tons of $NO_x$ (@0.17 lb/mmBtu) in 2006.[3] (Unit #5 is eligible for controls under the Best Available Retrofit Technology [BART] requirements of the Clean Air Act.) In this proposal, Unit #5 would be retrofitted with combustion controls[4] and SCR and have a new $NO_x$ limit of 2,465 tpy. A wet FGD will be added to Unit #5.

According to EPA's Clean Air Markets Database, 2006 plantwide (Unit #1 - #5) $NO_x$ emissions were 4,177 tons per year (tpy), and plantwide $SO_2$ emissions were 29,128 tpy.

*New Unit #6:* Sulfur dioxide ($SO_2$) emissions would be controlled at 0.15 lb/mmBtu (30-day rolling average) to 5,158 tpy by two Spray Drier Absorbers (SDA) in parallel and "designed to remove ninety-nine percent (99%)" of the $SO_2$.

Nitrogen oxides ($NO_x$) would be controlled at 1.0 lb/MWh (equivalent to 0.10 lb/mmBtu) to 3,504 tpy by combustion controls and Selective Catalytic Reduction (SCR). Although

---

[1] According to EPA's Clean Air Markets Database, Units #3 & #4 have "Combustion Modification/Fuel Reburning".
[2] EPA Clean Air Markets Database
[3] EPA Clean Air Markets Database
[4] According to EPA's Clean Air Markets Database, Unit #5 is now equipped with "Low NOx Burner Technology w/ Closed-coupled/Separated OFA Selective Catalytic Reduction".

the NCDENR analysis refers to a 0.07 lb/mmBtu limit on this boiler, corresponding to 2406.8 tpy, neither limit appears in the draft permit.

Filterable $PM_{10}$ would be limited to 413 tpy by two fabric filters (baghouses) in parallel, while total $PM_{10}$ would be 619 tpy.

The project is also subject to PSD for sulfuric acid mist (172 tpy), and mercury emissions could reach 460 lb/yr, but no additional controls are proposed for these pollutants.

The proposed Unit #5 + Unit #6 $NO_x$ "PSD avoidance" limit (see discussion below) would be 6,370 tpy, and the Unit #5 + Unit #6 $SO_2$ "PSD avoidance" limit would be set at 25,186 tpy. This represents a 2,193 tpy increase in $NO_x$ and a 3,942 tpy decrease in $SO_2$ versus 2006 plantwide emissions.

## Prevention of Significant Deterioration (PSD) Applicability

This Cliffside permit application is being submitted under the PSD program.  The purposes of the PSD program include to "preserve, protect and enhance the air quality in national parks, wilderness areas and other areas of natural, recreational, scenic or historic value" and "insure economic growth will occur in a manner consistent with the preservation of existing clean air resources." 42 U.S.C. 7470.  In other words, the purpose of the PSD program is to manage growth in the context of environmental protection.  For this permit application, the environmental protection context includes consideration of impacts on our Class I area. The Clean Air Act gives the Federal Land Manager (FLM) an affirmative responsibility to protect Air Quality Related Values (AQRVs) of Class I areas, like Great Smoky Mountains NP.

On 4/10/02, EPA and the US Department of Justice filed a Complaint against the Cliffside facility for violations of Clean Air Act, Part C: Prevention of Significant Deterioration of Air Quality ("PSD"), 42 U.S.C. §§7470 to 7492, and the permitting requirements of the North Carolina Administrative Code at Title 15A, Chapter 2, Subchapter 2D, Section .0530 (15A NCAC 2D.0530) by constructing and operating modifications at the Cliffside Station without the necessary application of Best Available Control Technology required by the North Carolina State Implementation Plan. The basis of this Complaint was upheld by a recent decision of the U.S. Supreme Court. In reviewing the Duke application, the North Carolina Department of Environment and Natural Resources (NCDENR) makes no mention of, nor does it consider, the federal enforcement action.

Despite its statutory requirement to reduce emissions from all improperly modified units at Cliffside under the PSD regulations, NCDENR has proposed to allow Unit #6 to "net out" of PSD review for $SO_2$ and $NO_x$ by claiming credit for contemporaneous reductions in emissions of those pollutants from Unit #5. NCDENR has proposed use of actual emissions data from 2001 + 2002 for $NO_x$ and 2003 + 2004 for $SO_2$ to establish baselines from which to calculate emission changes. NCDENR proposes that these baselines be set

at 25,870.6 tpy $SO_2$ and 5,427.8 tpy $NO_x$, and that these values become the bases for plantwide "PSD avoidance" limits.

NCDENR did not attempt to net Unit #6 out of PSD review for $PM_{10}$, $H_2SO_4$, CO, Pb, and VOC.

The overarching issue raised by this application regards the ability of an illegally-modified source to claim credit for reducing emissions from units that would be required to reduce emissions anyway under the BACT provisions of the PSD protection program. According to EPA's New Source Review Workshop Manual (NSRWM):

> The process used to determine whether there will be a net emissions increase will result uses the following equation:
>
> *Net Emissions Change*
> **EQUALS**
> *Emissions <u>increases</u> associated with the proposed modification*
> **MINUS**
> *Source-wide creditable contemporaneous emissions <u>decreases</u>*
> **PLUS**
> *Source-wide creditable contemporaneous emissions <u>increases</u>*

The key issue is whether the reductions proposed by NCDENR are "creditable." Here is what the NSRWM has to say:

> **III.B.4. CREDITABLE AMOUNT**
>
> As mentioned above, only contemporaneous and creditable emissions changes are considered in determining the source-wide net emissions change. All contemporaneous and creditable emissions increases and decreases at the source must, however, be considered. The amount of each contemporaneous and creditable emissions increase or decrease involves determining old and new actual annual emissions levels for each affected emission unit.
>
> The following basic criteria should be used when quantifying the increase or decrease:
>
> ➢ A source cannot receive emission reduction credit for reducing any portion of actual emissions which resulted because the source was operating out of compliance.

As noted above, all existing boilers at the Cliffside station are subject to enforcement action by EPA for violations of New Source Review regulations. Therefore, complete credit for reduction of those emissions may be disallowed. Unit #6 would then become subject to PSD for $SO_2$ and $NO_x$.

## Best Available Control Technology (BACT) Analysis for Unit #6

We believe the proposed emissions from Cliffside Unit #6 could seriously impact resources at Great Smoky Mountains NP (see discussion below). If Duke were to employ advanced combustion and/or pollution control technology that could achieve lower $SO_2$,

$NO_x$, $PM_{10}$, $H_2SO_4$, and mercury limits than currently proposed in the application, its environmental impacts at Great Smoky Mountains NP would be reduced.

Unless NCDENR finds a legitimate way to net it out of PSD, the proposed Unit #6 is subject to PSD and BACT requirements for $SO_2$, $NO_x$, and $PM_{10}$. Because the NPS Air Resources Division office in Denver reviews permit applications for projects potentially impacting any park in the National Park System, we are able to gather information on a wide range of projects and emission control technologies. We are pleased to be able to share some of that information with the NCDENR.

*BACT definition and process:* BACT applies to any pollutant for which there would be a significant net increase in emissions. BACT is defined as

> an emissions limitation (including a visible emission standard) based on the maximum degree of reduction for each pollutant subject to regulation under the Clean Air Act which would be emitted from any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant…

It is important to note that, because BACT is an emission limit, that emission limit can be set by the permitting authority without actually specifying the design of the emission source that is to meet that limit. Thus, a permitting authority has the power to set an emission limit that it has judged to represent BACT for a broad source category, and then allow the applicant the freedom to determine how to meet that emission limit. According to the NSRWM:

> Historically, EPA has not considered the BACT requirement as a means to redefine the design of the source when considering available control alternatives. For example, applicants proposing to construct a coal-fired electric generator, have not been required by EPA as part of a BACT analysis to consider building a natural gas-fired electric turbine although the turbine may be inherently less polluting per unit product (in this case electricity). However, this is an aspect of the PSD permitting process in which states have the discretion to engage in a broader analysis if they so desire. Thus, a gas turbine normally would not be included in the list of control alternatives for a coal-fired boiler. However, there may be instances where, in the permit authority's judgment, the consideration of alternative production processes is warranted and appropriate for consideration in the BACT analysis. A production process is defined in terms of its physical and chemical unit operations used to produce the desired product from a specified set of raw materials. In such cases, the permit agency may require the applicant to include the inherently lower-polluting process in the list of BACT candidates.

So, a permitting authority does have "the discretion to engage in a broader analysis if they so desire."

*Clean Coal Technologies:* One of the fundamental principles of pollution control is to minimize the amount of pollution generated in the first place. According to the NSRWM:

> The first step in a "top-down" analysis is to identify, for the emissions unit in question (the term "emissions unit" should be read to mean emissions unit, process or activity), all "available" control options. Available control options are those air pollution control technologies or techniques with a practical potential for application to the emissions unit and the regulated pollutant under evaluation. Air pollution control technologies and techniques include the application of production process or available methods, systems, and

techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of the affected pollutant. This includes technologies employed outside of the United States. As discussed later, in some circumstances inherently lower-polluting processes are appropriate for consideration as available control alternatives.

Integrated Gasification Combined Cycle (IGCC) is a rapidly-developing technology that has now been demonstrated by Tampa (FL) Electric at its Polk Generating Station to be clean, reliable, and economical.[5] With the problems of reliability addressed by operating experience and inclusion of redundant equipment, and with major vendors providing complete, integrated systems, reliability should continue to improve. While IGCC is currently 10% to 20% more expensive to build than an equivalent PC facility, energy industry experts contend that that cost disadvantage will be partially or entirely offset when national legislation requires carbon dioxide ($CO_2$) capture and sequestration. And, in addition to the advantages in capturing $CO_2$, a well-controlled IGCC facility would emit far less of the conventional pollutants ($SO_2$, $NO_x$, $PM_{10}$) than conventional PC units, as well as facilitating mercury capture and using far less water.

We have received applications for seven proposed IGCC facilities[6] and their relative emissions (in terms of lb/MWh$_{net}$ for $SO_2$, $NO_x$, and filterable $PM_{10}$ and in lb/GWh$_{net}$ for mercury) are shown in Figure 1 (attached) along with Cliffside #6. It is clear that IGCC is a cleaner coal-to-energy technology than the conventional PC boiler technology proposed by Duke.

Considering that facilities such as Cliffside #6 will likely be operating for the next 60 years or more, we believe NCDENR should re-consider and re-evaluate IGCC to help relieve our dependence upon foreign energy sources while protecting our environment.

<u>Conventional PC Boiler BACT</u>

*SO₂:* We understand that North Carolina passed Senate Bill 1587 (SB 1587) in 2006 specifically exempting from its "Clean Smokestacks Law" "any application for an air quality permit that is submitted and determined to be administratively complete by the Department of Environmental and Natural Resources on or before 1 August 2006. An air quality permit issued pursuant to an application described in this section shall both:
1. Include a requirement that the permittee will install advanced control technology designed to remove ninety-nine percent (99%) of any pollutants at each generating unit to which 15A NCAC 2D .0530(b)(1)(A)(iv)[7] would otherwise apply and that the permittee will operate the advanced control technology at any time that electricity is being produced by the electric generating unit other than during startup of the unit.

---

[5] At a recent workshop in Denver on clean coal technology, a representative of Tampa Electric related that the Polk IGCC is now its most reliable unit in its system and is dispatched first because it is also the most economical.

[6] American Electric Power-Mountaineer (WV), Southwestern Power Group-Bowie (AZ), Cash Creek (KY), Excelsior Energy-Mesaba (MN), Southern Co.-Orlando (FL), Pacific Mountain Energy Company (WA), Steelhead (IL)

[7] 15A NCAC 2D .0530 is North Carolina's regulation implementing its PSD program. Section (b)(1)(A)(iv) refers to "an electric utility steam generating unit".

    2.  State that the actual emissions of sulfur dioxide ($SO_2$) shall be no greater than 0.15 pound per million British Thermal Units (BTUs) as measured on a rolling 30-day average."

This had the effect of exempting Unit #6 from North Carolina's Clean Smokestacks Law so that Duke could use the emission reductions that would have otherwise been required to try to "net out" of PSD. An interesting provision of the exemption is the requirement that "…the permittee will install advanced control technology designed to remove ninety-nine percent (99%) of any pollutants at each generating unit…" NCDENR has interpreted this requirement to mean that Duke merely has to design the $SO_2$ scrubber to achieve 99% control, but not actually achieve any better than the 97.3% control needed to meet the 0.15 lb/mmBtu limit.[8] It should be noted that the difference between 99% control and 97.3% control is a factor of 2.7 times greater emissions. NCDENR should explain how the draft permit meets the requirements of SB 1587.

In comparing the performance of $SO_2$ scrubbers, one must consider that it is easier to achieve a higher control efficiency on a gas stream with a higher inlet $SO_2$ concentration, but more difficult to achieve a lower outlet concentration. It follows that it is harder to achieve a higher control efficiency on a gas stream with a lower inlet $SO_2$ concentration, but easier to achieve a lower outlet concentration. So, if one can achieve higher control efficiency on a "cleaner" gas stream, it would indicate a higher degree of scrubbing success.[9]

We have identified in Table 1.a. three boilers proposing to burn coals with lower uncontrolled $SO_2$ emissions but higher $SO_2$ removal efficiencies than Cliffside #6. The uncontrolled emission rates (bolded values) in Table 1 (attached) are derived from the sulfur and heat contents of the coals burned, as well as the uncontrolled emission factors from EPA's "Compilation of Air Pollutant Emission Factors" (AP-42).[10]

For example, if Cliffside #6 were to achieve the same 98.7% $SO_2$ control as the Glades ultra-supercritical PC proposed by FPL, its emissions would be reduced by over 70%.

Table 1.a. also contains the Taylor project in Florida which proposed to burn coal with higher uncontrolled $SO_2$ emissions but with only 30% of the controlled emissions.

*PC Boiler NO$_x$ Control:* NCDENR has proposed to meet the federal New Source Performance Standard of 1.0 lb/MWh on a 30-day rolling average; this is equivalent to 0.10 lb/mmBtu and represents 81% control of $NO_x$, far short of the 99% control

---

[8] At Cliffside #6, after one accounts for 12.5% of the sulfur remaining in the ash, this amounts to an uncontrolled emission rate of 5.6 lb/mmBtu, and the proposed annual emission rate of 0.15 lb/mmBtu represents 97.3% control efficiency.

[9] Likewise, if one can achieve a lower emission rate on a "dirtier" gas stream, more successful scrubbing would again be indicated.

[10] For the sake of consistency, it is assumed that the $SO_2$ emission factor is dependent upon the coal type, but independent of the boiler type. The natural process of retention of sulfur in the ash is just as fundamental a characteristic of the coal burned as its sulfur content and its heating value. So, bituminous coals would emit 95% of their sulfur content as $SO_2$, while sub-bituminous coals would emit 87.5%, and lignites 75%.

requirement contained in SB 1587. NCDENR should explain how the draft permit meets the requirements of SB 1587.

We have identified in Tables 2.a. – 2.c. numerous boilers burning, or proposing to burn coals with lower $NO_x$ emissions. We agree that SCR represents appropriate control technology, and suggest that NCDENR should consider the lower limits proposed by FPL for its Glades project. If Cliffside #6 were to achieve the 0.05 lb/mmBtu rate proposed for Glades, its emissions would be reduced by 50%.

*$PM_{10}$:* NCDENR has proposed a limit of 0.012 lb filterable $PM_{10}$/mmBtu, and 0.018 lb condensable $PM_{10}$/mmBtu. We are now aware of at least three proposed projects (Table 3: Sithe's Desert Rock and Toquop projects, and the Two Elk Expansion Project in Wyoming) that are proposing to meet a filterable $PM_{10}$ limit of 0.010 lb/mmBtu. If Cliffside #6 were to achieve the 0.010 lb/mmBtu rate proposed for these plants, its emissions would be reduced by 17%.

NCDENR has also proposed to allow Unit #6 to meet higher limits of 0.015 lb filterable $PM_{10}$/mmBtu and 0.024 lb total $PM_{10}$/mmBtu if it decides that Unit #6 cannot meet either of the lower limits. NCDENR has proposed to implement such a change as a Minor Permit modification, which would not allow for review and comment by the FLMs or the public. So, for all practical purposes, we must assume that the higher limits apply.

*Hg*: NCDENR will rely upon its criteria pollutant controls to coincidentally reduce mercury emissions to the federal limit. Although mercury is not subject to PSD, other new PC boiler projects (e.g., Florida Power & Light's 2000 MW Glades project and Longleaf Energy's 1,200 MW Hilton, GA project) are proposing to inject powdered activated carbon (in addition to the controls proposed by Duke) to reduce mercury to about half the federal emission limit.

In summary, we believe that further consideration must be given to IGCC "Clean Coal" combustion technology, and believe that Cliffside #6 could achieve lower $SO_2$, $NO_x$, Hg, and $PM_{10}$ emission limits by either choosing an inherently cleaner coal combustion technology or by more effectively using the control technologies chosen for the boiler. Figure 2 illustrates the differences between Cliffside #6 and the FPL Glades project.

## PSD & Best Available Control Technology (BACT) for Cliffside units #1 - #5

One of the fundamental principles of the air regulatory programs in the US is that older emission units become subject to PSD (which may include BACT) when undergoing a major modification. Otherwise, older emission units could retain their "grandfathered" status indefinitely. As discussed above, EPA and the US Department of Justice filed a Complaint against the Cliffside facility for violations of PSD permitting requirements. Therefore, NCDENR should require Duke to undergo PSD review for these units, and application of BACT could result in retirement and/or additional emission controls on one or more of these units.

**Compliance Monitoring**

We recommend that the NCDENR add a $PM_{10}$ Continuous Emission Monitor (CEM) requirement. For example, the West Virginia Division of Air Quality has included both filterable and condensable $PM_{10}$ in its permit limit for Longview Power, and proposed that $PM_{10}$ emissions be monitored by a CEM within 18 months of boiler start-up or when performance specifications for such monitors are promulgated, whichever comes later.[11] We continue to believe that CEMs are an important tool for monitoring compliance. For that reason, we recommend that Duke install PM CEMs on unit #6.

**Modeling Analysis for Modified Plant**

Because NCDENR has proposed no limits on short-term emissions of $SO_2$ for Unit #6, it is impossible to make a definitive judgment on their modeling of short-term impacts. Allowable emissions must be used in NAAQS analyses, and, in the absence of short-term limits, no valid modeling analysis can be conducted.

Assuming that Unit #6 is subject to PSD for $NO_x$ and $SO_2$, a proper modeling analysis should include the following:
- Limits on pollutants should be provided that are consistent with the time periods modeled. To demonstrate attainment of the NAAQS for $SO_2$, three-hour, 24-hr, and annual limits are required. For $PM_{10}$, 24-hr, and annual limits are required. For $NO_x$, a 24-hour limit is needed to assess visibility impacts, and an annual limit is needed to protect NAAQS and Increments.
- The assessment of impacts upon Air Quality Related Values should follow the guidance provided in our FLAG[12] document. Instead, NCDENR approved Duke's use of existing visibility conditions, as opposed to natural conditions, to represent the background condition.

Therefore, the NPS conducted its own Class I air quality analysis to assess impacts to Great Smoky Mountains NP. The NPS modeled the impacts from the new Unit #6 without the questionable netting approach and subjected the new $NO_x$ and $SO_2$ emissions to a proper PSD modeling analysis following the criteria below:
- NPS modeled limits on pollutants that were consistent with the time periods modeled. That is, emission rates were applied that would allow demonstration of PSD increment consumption and AQRV impacts, and also attainment of the NAAQS for $SO_2$, three-hour, 24-hr, and annual averaging periods. The $NO_x$, emissions from the proposed new Unit #6 require a 24-hour limit to assess visibility impacts, and an annual limit to assess impacts to nitrogen deposition, PSD increment consumption and attainment of the NAAQS. For $PM_{10}$, 24-hr, and annual limits are required. The NPS modeling analysis applied the speciated PM emissions rates submitted in the application CALPUFF modeling files.
- The assessment of impacts upon Air Quality Related Values followed the guidance provided in our FLAG document and the EPA Interagency Workgroup on Air Quality Modeling, (December, 1998).

---

[11] Those CEM Performance Specifications were later promulgated by EPA on 1/12/04.

[12] http://www2.nature.nps.gov/air/permits/flag/index.cfm

- Also, several other errors that were in the limited CALPUFF modeling analysis that Duke submitted were corrected. These significant errors included the use turbulence-based dispersion coefficients that were applied in the limited CALPUFF analysis instead of the EPA Guideline Pasquill Gifford dispersion coefficients.[13] There were two significant errors in the limited visibility analysis that was submitted. One was NCDENR's approval of Duke's use of existing visibility conditions to represent the background condition instead of the annual natural background conditions as found in the FLMs FLAG 2000 guidance. The other was the changing of the Extinction Efficiency (1/Mm per $\mu$g/m$^3$) coefficient of elemental carbon from 10 to an undocumented and unexplained value of 8.

The NPS long-range transport CALPUFF analysis used the same meteorological data and modeling domain that Duke used in its application. The same stack parameters in the application were used. Emission rates to address the 24-hour increments and visibility impacts used an NPS 24-hour $SO_2$ emission rate of 1,531 lb/hr,[14] a 24-hour $NO_x$ emission rate of 1,178 lb/hr, a 24-hour $H_2SO_4$ emission rate of 39.4 lb/hr, and the same speciated emission rates of PM that were submitted in the limited analysis in the application. Pasquill Gifford (as per EPA guidance) was used in CALPUFF. The CALPOST visibility analysis used annual natural background conditions with hourly relative humidity as per the FLM's FLAG 2000 guidance. To provide supplemental information, an additional visibility analysis was run using monthly relative humidity from the EPA Guidance for Estimating Natural Visibility Conditions Under the Regional Haze Rule (September, 2003) and annual natural background conditions. To address acid deposition impacts of total sulfur and total nitrogen, annual emission rates of 1,178 lb/hr of $SO_2$, 39.4 lb/hr of $H_2SO_4$, and 550 lb/hr of $NO_x$ were modeled. The impacts to Great Smoky Mountains NP for increments, visibility and acid deposition are presented in the three tables below.

**Table 4. Duke-Cliffside Unit #6 $SO_2$ Increment Modeling Results at Great Smoky Mountains NP**

| Averaging Period | EPA Class I Significance Levels (ugm/m^3) | Year Modeled | | |
|---|---|---|---|---|
| | | 2001 | 2002 | 2003 |
| 3-hr | 1 | 2.196 | 2.04 | 1.704 |
| 24-hr | 0.2 | 0.569 | 0.453 | 0.671 |
| Annual | 0.1 | 0.013 | 0.015 | 0.011 |

The impacts to the $SO_2$ Class I short-term three-hour and 24-hour increments (Table 4.) are greater than the EPA Class I Significant Impact Levels,[15] and thus Unit #6 is subject to a cumulative short-term $SO_2$ increment analysis.

---

[13] Please review the attached March 16, 2006 EPA Clearing house guidance memo on this issue.

[14] Because NCDENR did not include a 24-hour $SO_2$ emissions rate in the draft permit, NPS scaled the proposed 30-day rolling average emission rate upward by a factor of 1.3 to account for the variability of these shorter-term emissions.

[15] Although these levels were proposed by EPA in 1996, they were never promulgated.

**Table 5. Duke-Cliffside Unit #6 Impacts on Visibility at Great Smoky Mountains NP**

| Year | Visibility Method | 2 | 6 @ Ann. Avg. |
|------|-------------------|-----|----------------|
| 2000 | # Days > 5% | 12 | **9** |
| 2000 | # Days > 10% | 3 | 1 |
| 2000 | Max % | 13.88 | 10.76 |
| | | | |
| 2001 | # Days > 5% | 23 | **13** |
| 2001 | # Days > 10% | 7 | 2 |
| 2001 | Max % | 26.63 | 13.84 |
| | | | |
| 2002 | # Days > 5% | 18 | 6 |
| 2002 | # Days > 10% | 7 | 1 |
| 2002 | Max % | 20.89 | 11.91 |
| | | | |
| Total | # Days > 5% | 53 | **28** |
| Total | # Days > 10% | **17** | 4 |
| Total | Max % | 26.63 | 13.84 |

The visibility analyses following the current FLAG guidance, as well as the additional information (Method 6) analysis, demonstrate that Unit #6 would have impacts on visibility that have typically been considered adverse, and would warrant mitigation.

**Table 6. Duke-Cliffside Unit #6 Acid Deposition Impacts on Great Smoky Mountains NP**

| | DAT | Year Modeled | | |
|----------|-----------|-------|-------|-------|
| Pollutant | (kg/ha/yr) | 2001 | 2002 | 2003 |
| Sulfur | 0.010 | **0.014** | **0.014** | **0.013** |
| Nitrogen | 0.010 | 0.005 | 0.005 | 0.005 |

The acid deposition analysis indicates impacts greater than the FLM's Deposition Analysis Thresholds (DAT) for total sulfur.

## Ecosystem Impacts

The Cliffside project will increase atmospheric deposition of pollutants, including sulfur, nitrogen, and mercury, to Great Smoky Mountains National Park. Predicted impacts exceed the Deposition Analysis Thresholds (DAT) for total sulfur in the park and are therefore not considered insignificant. In addition to contributing to acidification of forest soils and streams, sulfur deposition contributes to the formation of methylmercury in the environment, if mercury is present. Methylmercury is extremely toxic and bioaccumulates in fish and wildlife and park managers have identified mercury as a significant threat to park ecosystems. Because no additional controls specific to mercury capture are proposed, mercury emissions from the project could reach 460 lb/yr, the resulting increase in mercury deposition, coupled with the increase in sulfur deposition could impact park resources, including threatened and endangered species.

**Cumulative Visibility Analysis**

Under the federal Regional Haze Rule (RHR), states are to make "reasonable progress" toward the national goal of natural visibility by 2064. As part of that program, states are to assess the effects of reducing emissions from existing sources, as well as increases in emissions from new sources. NCDENR must present its plan for implementing the RHR by December 17, 2007, and we believe it is appropriate for NCDENR to show how issuance of this permit, in conjunction with other growth in the area, will allow it to meet its "reasonable progress" obligation.

**Conclusions & Recommendations:**

- If illegal modifications occurred, NCDENR cannot use all of the emissions reductions at Units #1 - #5 as credits for netting Unit #6 out of PSD review for $SO_2$ and $NO_x$. Units #1 - #6 would be subject to PSD. NCDENR should resolve this issue with the federal government before issuing a permit for this multi-billion dollar project that would have serious impacts upon Air Quality Related Values at Great Smoky Mountains National Park.
- NCDENR should conduct a more rigorous evaluation of the option to use IGCC Clean Coal Technology at Cliffside.
- NCDENR should ensure that Cliffside Unit #6 complies with the intent of Senate Bill 1587.
- The lack of short-term limits on emissions makes it impossible to correctly determine if NAAQS and Increments are being protected. If Cliffside has no short-term limits on $SO_2$, it will also be impossible to determine its impacts upon visibility. NCDENR should add short-term limits on $SO_2$,
- NCDENR should use the natural background conditions recommended by FLAG in the visibility analysis.[16]
- We have shown that boilers burning "cleaner" coal can achieve higher $SO_2$ removal. NCDENR should evaluate the possibility of achieving lower $SO_2$ emission rates for Unit #6.
- We agree with NCDENR that SCR represents BACT. However, we believe that the appropriate limit for a PC boiler burning coal should be 0.05 lb/mmBtu for a 24-hour average, not the proposed 0.010 lb/mmBtu (30-day rolling average)..
- We have shown that other coal-fired boilers are capable of lower filterable $PM_{10}$ emissions. NCDENR should either lower its $PM_{10}$ emissions or justify its need for an emission rate higher than the examples cited. NCDENR should provide an opportunity for the FLMs and the public to review any increase in the proposed emission limits.
- NCDENR should include a requirement for Continuous Emissions Monitoring of $PM_{10}$ as was done by West Virginia in the Longview permit.
- The impacts to the $SO_2$ Class I short-term three-hour and 24-hour increments are greater than the EPA Class I Significant Impact Levels.

---

[16] Contrary to explicit guidance provided by NPS, NCDENR continues to use existing background conditions, thus rendering its visibility analyses useless.

- The visibility analyses following the current FLAG guidance, as well as the additional information (Method 6) analysis, demonstrate that Unit #6 would have impacts on visibility that have typically been considered adverse for other proposed sources.
- NCDENR must show how issuance of this permit, in conjunction with other growth in the area, will allow it to meet its "reasonable progress" obligation.
- The acid deposition analysis indicates impacts greater than the FLM's Deposition Analysis Thresholds (DAT) for total sulfur.
- The resulting increase in mercury deposition coupled with the significant increase in sulfur deposition could impact park resources, including threatened and endangered species.
- If the netting is ultimately not allowable, Duke Energy should reassess its impacts at Great Smoky Mountains NP and implement appropriate mitigation measures to lower its impacts to acceptable levels.
- Regardless of whether or not the netting is allowed, the real-world effect of Unit #6 by itself would be severe impacts upon air quality and air quality related values at Great Smoky Mountains National Park.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **APPALACHIAN VOICES** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No.  1:08-cv-00380-RMU** |
| | ) | |
| **SAMUEL W. BODMAN** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**DECLARATION OF TRACY DAVIDS**
_____

I, Tracy Davids, being of legal age and duly sworn depose and say as follows:

1.  I live in Asheville, North Carolina and have been a member of Appalachian voices since 2004.

2.  I have hiked, camped, backpacked, fished, and been an avid wildlife viewer since I was a young child, a total of about thirty-seven years.

3.  I moved to Asheville in July, 1998 because I wanted to live amongst the vast public lands of the Pisgah and Nantahala National Forests, and the Great Smoky Mountains National Park (GSMNP).  Easy access to public lands for relaxation, rejuvenation, and recreation, and the expansive natural beauty of western North Carolina, were my primary reasons for choosing Asheville as my home.

4.  Since I moved to Asheville, I've averaged between one and two visits to the Pisgah & Nantahala National Forests, Blue Ridge Parkway, Mt. Mitchell and Dupont State Forests, or GSMNP per month.  Of those 12-24 visits, 6-10 are to the GSMNP.

5.  I visit the GSMNP frequently because of its outstanding biological diversity, quiet solitude, and wild character as compared to surrounding national forests which are

logged, roaded, power-lined and heavily managed.  The permanent protection afforded through Park status makes the GSMNP an ideal place for me connect with the natural world unhampered by a heavy human hand.  Connecting with the natural world in this way rejuvenates my spirit and reminds me of my place in the world.

6.  When in the GSMNP, I hike, birdwatch, backpack, camp, swim, sightsee, and search for rare, declining, sensitive, threatened or endangered plants and wildlife such as pink lady slippers and other orchids, Carolina Northern Flying Squirrel, cerulean warbler – in which I am interested both personally and professionally.

7.  I plan to visit the GSMNP and other public lands in this area as long as I am physically able and as long as they are not harmful to my health.

8.  Since moving to Asheville, I have experienced many hazy summer days in the mountains where the air was so fouled by pollution that it was not safe to exert oneself outdoors, especially at high elevations.  I pay attention to ozone warnings in the newspaper and on the radio and choose my hikes accordingly.  As a result, I generally limit my visits to the GSMNP in the summer because it has so many bad ozone days.

9.  For these reasons, I am concerned about the proposed Cliffside Power Plant's impact on air quality in general, and the GSMNP in particular.  Mostly, I am concerned that an increase in air pollution will lessen my ability to safely hike and backpack during the summer even more.  Additionally, I am worried that I will not even be able to sightsee in the GSMNP in the summertime because an increase in air pollution will worsen already seriously impaired scenic views.

10. I also worry about the harm added pollution from the Cliffside power plant will cause to the flora and fauna of the GSMNP, especially rare, sensitive, threatened and endangered species.

11. Finally, because I visit the GSMNP for its untouched, wild character, I worry that an increase in air pollution will damage the area such that it will lose its wild character, thereby diminishing my spiritual enjoyment of a place I love.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29th day of May 2008.

/s/Tracy Davids
Tracy Davids

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **APPALACHIAN VOICES** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No.  1:08-cv-00380-RMU** |
| | ) | |
| **SAMUEL W. BODMAN** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DECLARATION OF JUDITH HALLOCK

---

I, Judith Hallock, being of legal age and duly sworn depose and say as follows:

1.  My name is Judith Hallock and my current residence is 11 Digges Rd., Asheville, NC 28805.

2.  I have been a member of Appalachian Voices since 2003 and a member of the Canary Coalition since its inception. My membership in these groups is driven by my fears and concerns about pollution in the parklands.

3.  My husband and I moved to our residence in Asheville from our cabin and land in Whittier, NC in July 2007.

4.  From 1984 to 2007, we lived and raised our three children in our log cabin in Whittier, NC. During this time we lived about 10 miles from the Great Smoky Mountains National Park (GSMNP).

5.  During the time between 1984 and 2007, my family and I were frequent visitors to the GSMNP. We had frequent gatherings at the picnic area at Deep Creek campground, where we enjoyed wildflower hikes every spring. Summer picnics were often coupled with inner tubing on Deep Creek. We camped there with family and friends.

6.  We hiked, both on overnight backpacking trips staying at shelters and on day hikes. Our favorite family day hike was the Alum Cave Trail up Mt. Leconte. My son, Ty, hiked most of the trail up and down when he was four.

7.  We hiked with groups of elementary/middle school aged children to Andrews Bald, starting from Clingman's Dome, where we camped and played capture the flag.

8.  We biked at Cade's Cove, on the TN side of the park, at least once a year.

9.  During our home schooling years, the park was our outdoor classroom where we studied stream monitoring, biology and geology.

10.  Even as a child growing up in Atlanta, I often came to the GSMNP with my father, who was a member of the Appalachian Trail Club. By introducing me to the GSMNP, he prompted firstly my love of nature, and secondly my love and enjoyment of the park.

11.  Over my lifetime, I have developed a spiritual relationship with not only the GSMNP, but with other state and national park lands in the area as well. Being influenced by the Cherokee Indian culture, I began to experience many of these wild areas as sacred sites.  One of my favorites is the Shining Rock Wilderness/Pilot Knob area. James Mooney, who documented Cherokee mythology, described this area as the home to the first Cherokee man and woman, equivalent to the Garden of Eden. There are many sacred sites in the GSMNP.

12.  Over the years, I have become increasingly concerned with pollution in the GSMNP and other high mountains in the area. As clouds "park" over the tops of the mountains dropping their "acid" rain, many of the old evergreen trees have died, as evidenced by their tree skeletons for all to see.

13.  Also, since my childhood there has been a change in air quality. The Smoky Mountains owe their name to the summer haze that occurs naturally as a result of gases given off

by the flora. But now that smokiness has increased and has become year round, and downgrades the quality of the vistas that are so valued in the mountains. My understanding is that the extra haze is a result of air pollution.

14. A nurse by profession, I am also concerned about lung diseases. There is evidence that increased ozone pollution is a factor in childhood asthma.

15. Even though my husband and I currently live in Asheville, we continue to visit and enjoy the GSMNP. I am concerned that the air pollution that already threatens these lands will be further exacerbated by the severe impacts of the Cliffside Power Plant. Specifically, this plant will affect air quality, which will in turn affect and continue to threaten the flora and fauna of the GSMNP and that of other wild and semi-wild lands in this area. This will affect my ability to enjoy and be spiritually sustained by these lands.

16. Finally, I am concerned about the effects of this plant on my health as well as on the health of my regional community.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of May 2008.


/s/ Judith Hallock
Judith Hallock

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **APPALACHIAN VOICES** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No.  1:08-cv-00380-RMU** |
| | ) | |
| **SAMUEL W. BODMAN** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

### ORDER (Plaintiffs' Proposed)

After considering the briefing, this Court finds that Plaintiffs are threatened with injuries fairly traceable to Defendants' failure to comply with the National Environmental Policy Act and Plaintiffs' injuries can be redressed by a favorable decision of this Court.  Therefore Defendants' Motion to Dismiss is denied.

/s/Ricardo M. Urbina
Ricardo M. Urbina
**United States District Court Judge**