UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **APPALACHIAN VOICES** *et al.*, | ) |
| | ) |
|    **Plaintiffs,** | ) |
| | ) |
|   v. | )   No. 1:08-cv-00380-RMU |
| | ) |
| **SAMUEL W. BODMAN** *et al.*, | ) |
| | ) |
|    **Defendants.** | ) |

**PLAINTIFFS' UNOPPOSED MOTION TO AMEND COMPLAINT**

  Now come Plaintiffs, by and through counsel, requesting this Court to allow them to amended their complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(A).  In support of this motion, Plaintiffs state as follows:  Before a responsive pleading has been filed, each party has the right to amend their pleading once as a matter of course without leave of the court. Johnson v. District of Columbia, 244 F.R.D. 1, 6 (D. D.C. 2007) ("Until a responsive pleading is served, '[t]he Federal Rules of Civil Procedure guarantee a plaintiff *an absolute right* to amend [her] complaint once.'") (quoting James V. Hurson Assocs., Inc. v. Glickman, 229 F.3d 277, 282 (D.C. Cir. 2000)). It is generally accepted that a motion to dismiss does not constitute a responsive pleading for the purposes of Rule 15(a).  Confederate Memorial Ass'n v. Hines, 995 F.2d 295, 299 (D.C. Cir. 1993); Wada v. United States Secret Serv., 525 F. Supp. 2d 1, 15 (D. D.C. 2007); Johnson, 244 F.R.D. at 6.  Because Defendants have not yet filed a responsive motion and do not oppose this motion Plaintiffs may amend their pleadings once as of right.

  Dated this 7th day of August 2008 at Asheville, North Carolina.

/s/ Scott Gollwitzer
Scott Gollwitzer

ATTORNEYS FOR PLAINTIFFS

| | |
|---|---|
| Scott Gollwitzer | Stephen H. Novak |
| In-house Counsel | Senior Staff Attorney |
| Appalachian Voices | Wildlaw |
| 16 Eagle Street, Suite 200 | 46 Haywood Street, Suite 323 |
| Asheville, NC 28801 | Asheville, NC 28801 |
| Ph:  828.505.1963 | Ph:  828.252.9223 |
| Fax: 828.262.1540 | Fax: 828.252.9074 |
| E-mail: scott@appvoices.org | E-mail: wildlawNC@aol.com |
| D.D.C. Bar No. TN0003 | NC Bar No. 23411 |
| On behalf of Appalachian Voices | On behalf of The Canary Coalition |

OF COUNSEL                               ALSO ON THE MOTION

| | |
|---|---|
| Eric V. Schaffer | Benjamin A. Luckett |
| Executive Director | 2nd Year Student |
| Environmental Integrity Project | Lewis and Clark Law School |
| 1920 L Street, N.W., Suite 800 | |
| Washington, DC 20036 | |
| Phone: 202.263.4442 | |
| Fax:    202.296.8822 | |
| D.C. Bar No. 427669 | |

## Certificate of Service

I hereby certify that on 07 August 2008, notice of this filing will be sent via electronic mail to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's electronic filing system.

/s/ Scott Gollwitzer
Scott Gollwitzer

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **APPALACHIAN VOICES** *et al.*, | ) |
| | ) |
|       **Plaintiffs,** | ) |
| | ) |
|       v. | )    No. 1:08-cv-00380-RMU |
| | ) |
| **SAMUEL W. BODMAN** *et al.*, | ) |
| | ) |
|       **Defendants.** | ) |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

### INTRODUCTION

1. Plaintiffs, Appalachian Voices and the Canary Coalition, seek declaratory and injunctive relief against the United States Department of Energy ("DOE") for violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d (2007), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–596, 601–612, and 701–706 (2007), by failing to evaluate the environmental impacts associated with allocating one billion dollars in tax credits through its pre-application review and certification of nine experimental coal-based energy projects authorized under the Energy Policy Act of 2005.

2. Plaintiffs, Appalachian Voices and the Canary Coalition, seek declaratory and injunctive relief against DOE for violating the Endangered Species Act, 16 U.S.C. §§ 1531–1544 (2007), by failing to consult with the U.S. Fish and Wildlife Service ("FWS") and the U.S. National Marine Fisheries Service ("NMFS"), prior to allocating one billion dollars in tax credits through its pre-application review and certification of nine experimental coal-based energy projects authorized under the Energy Policy Act of 2005.

3. Plaintiffs, Appalachian Voices and the Canary Coalition, seek declaratory and injunctive relief against the United States Department of the Treasury ("DOT") for violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d (2007), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–596, 601–612, and 701–706 (2007), by failing to evaluate the environmental impacts associated with certifying one billion dollars in tax credits promoting the construction and operation of nine experimental coal-based energy projects authorized under the Energy Policy Act of 2005.

4. Plaintiffs, Appalachian Voices and the Canary Coalition, seek declaratory and injunctive relief against DOT for violating the Endangered Species Act, 16 U.S.C. §§ 1531–1544 (2007), by failing to consult with the United States Fish and Wildlife Service ("FWS") and the United States National Marine Fisheries Service ("NMFS") prior to certifying one billion dollars in tax credits promoting the construction and operation of nine experimental coal-based energy projects authorized under the Energy Policy Act of 2005.

## VENUE & JURISDICTION

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

6. Because this case involves violations of federal law that can be cured by this Court, subject matter jurisdiction is appropriate pursuant to: 28 U.S.C. § 1331 (2007) (federal question); 28 U.S.C. § 1346(a)(2) (2007) (United States as a defendant); 28 U.S.C. § 1361 (2007) (mandamus); 28 U.S.C. § 2201(a) (2007) (declaratory judgments); and 28 U.S.C. § 2202 (2007) (additional relief).

7. On 31 January 2008, Plaintiffs sent a 60-Day Notice of Intent to Sue DOE and DOT pursuant to the citizen suit provisions of the Endangered Species Act. 16 U.S.C. § 1540(g)(1)(A).

# THE PARTIES

8.  Appalachian Voices is a non-profit, member-based organization based in Boone, North Carolina and is incorporated under the laws of North Carolina.

9.  Appalachian Voices brings people together to solve the environmental problems having the greatest impact on the central and southern Appalachian Mountains.

10.  Appalachian Voices has members who live near, own property near, reside near, own businesses near, visit and otherwise use and enjoy the areas surrounding, and downwind of, Duke Energy's proposed Cliffside power plant in Rutherford and Cleveland counties in North Carolina.

11.  Appalachian Voices' members utilize the areas surrounding, and downwind of, the proposed power plant permanently and regularly to fulfill a variety of legally protected interests including: raising children; residences; owning and operating businesses; swimming; fishing; boating; education; breathing; domestic and municipal water supplies; wildlife viewing, including endangered and threatened species; recreation; and aesthetic and spiritual fulfillment.

12.  Members of Appalachian Voices plan to use the area surrounding, and downwind of, the proposed power plant permanently and regularly as they have customarily done well into the foreseeable future.

13.  Appalachian Voices has members who live near, own property near, reside near, own businesses near, visit and otherwise use and enjoy the coalfield regions of the central and southern Appalachian Mountains.

14.  Appalachian Voices' members utilize the coalfield regions of the central Appalachian Mountains permanently and regularly to fulfill a variety of legally protected interests including: raising children; residences; owning and operating businesses; swimming; fishing; hunting;

boating; education; breathing; domestic and municipal water supplies; wildlife viewing, including endangered and threatened species; recreation; and aesthetic and spiritual fulfillment.

15. Members of Appalachian Voices plan to use the coalfield regions of the central Appalachian Mountains permanently and regularly as they have customarily done well into the foreseeable future.

16. Appalachian Voices' members have suffered, are suffering, and are threatened with, actual injury from Defendants' failure to comply with the National Environmental Policy Act.

17. Appalachian Voices' members have suffered, are suffering, and are threatened with, actual injury from Defendants' failure to comply with the Endangered Species Act.

18. Because the interests of Appalachian Voices' members are directly and irreparably injured by the Defendants' violation of federal law, Appalachian Voices brings this action on behalf of these members and itself.

19. The Canary Coalition is a non-profit organization based in Sylva, North Carolina and is incorporated under the laws of North Carolina.

20. The Canary Coalition works to raise public awareness about the air quality crisis in the Smoky Mountains, the Greater Appalachian region, and nationwide, generating a groundswell of public support to reduce or eliminate major sources of air pollution, thereby improving the health and quality of life enjoyed by all those who breathe.

21. The Canary Coalition has members who live near, own property near, reside near, own businesses near, visit and otherwise use and enjoy the area surrounding, and downwind of, Duke Energy's proposed Cliffside power plant in Rutherford and Cleveland counties in North Carolina.

22. The Canary Coalition's members utilize the areas surrounding, and downwind of, the proposed power plant permanently and regularly to fulfill a variety of legally protected interests including: raising children; local residences; owning and operating businesses; swimming; fishing; boating; education; breathing; domestic and municipal water supplies; wildlife viewing, including endangered and threatened species; recreation; and aesthetic and spiritual fulfillment.

23. Members of the Canary Coalition plan to use the area surrounding, and downwind of, the proposed power plant permanently and regularly as they have customarily done well into the foreseeable future.

24. The Canary Coalition's members have suffered, are suffering, and are threatened by actual injury from Defendants' failure to comply with the National Environmental Policy Act.

25. The Canary Coalition's members have suffered, are suffering, and are threatened by actual injury from Defendants' failure to comply with the Endangered Species Act.

26. Because the interests of the Canary Coalition's members are directly and irreparably injured by the Defendants' violation of federal law, the Canary Coalition brings this action on behalf of these members and itself.

27. Defendant Samuel K. Bodman is the Secretary of the United States Department of Energy.

28. Defendant Henry M. Paulson, Jr., is the Secretary of the United States Department of the Treasury.

29. Defendant Victor K. Der is the Deputy Secretary of Clean Coal within the United States Department of Energy.

30. Defendant Joseph Giove, III, is the Program Analyst for the Office of Clean Energy Systems, within the United States Department of Energy.

## THE NATIONAL ENVIRONMENTAL POLICY ACT

31. Plaintiffs re-allege, as though fully set forth herein, every allegation contained in each of the foregoing paragraphs.

32. The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d (2007), was intended to reduce or eliminate environmental damage by requiring all federal agencies to take a hard look at the environmental consequences of their actions.

33. When any federal agency proposes major federal actions that may significantly affect the quality of the human environment, such as allocating one billion dollars in tax credits essential for the construction, operation and maintenance of nine different experimental coal-fueled energy projects, NEPA controls an agency's planning and decision-making.

34. Federal agencies have just three options for complying with NEPA: (1) exclude the action from further analysis because the action belongs to a class of actions that normally have insignificant impacts; or (2) prepare an Environmental Impact Statement ("EIS") because the proposed action normally has significant impacts; or (3) prepare an Environmental Assessment ("EA") to determine whether the impacts may be significant.

35. If an EA demonstrates that the action will have significant impacts, federal agencies must prepare an EIS that evaluates, *inter alia*: (1) individual and cumulative impacts of the proposed action; (2) alternatives to the proposed action; and (3) measures to mitigate the action's unavoidable impacts.

## THE ADMINISTRATIVE PROCEDURE ACT

36. Plaintiffs re-allege, as though fully set forth herein, every allegation contained in each of the foregoing paragraphs.

37. Judicial review of Defendants' actions under NEPA is governed by the APA which requires a court to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2007).

## THE ENDANGERED SPECIES ACT

38. Plaintiffs re-allege, as though fully set forth herein, every allegation contained in each of the foregoing paragraphs.

39. The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544 (2007), protects, <u>inter alia</u>, the ecosystems upon which endangered species and threatened species depend and provides a program for the conservation of such species.

40. Under the ESA and its implementing regulations, an agency must consult with the FWS and the NMFS before taking any action which <u>may</u> affect listed species or critical habitat, such as allocating one billion dollars in tax credits essential for the construction, operation and maintenance of nine different experimental coal-fueled energy projects.

## STATEMENT OF FACTS

41. Plaintiffs re-allege, as though fully set forth herein, every allegation contained in each of the foregoing paragraphs.

42. On or about 30 November 2006, Defendants, jointly announced the approval and allocation of one billion dollars in tax credits for the construction, operation and maintenance of nine experimental coal-fueled energy projects pursuant to the Energy Policy Act of 2005.

43. According to that announcement "[t]he advanced coal technologies being supported by these awards currently face cost, integration and reliability hurdles that must be overcome if they are to be widely deployed. DOE believes deployment incentives, such as tax credits, will accelerate the widespread use of these technologies and assist in driving down their overall cost."

7

44. That announcement further states: "[t]oday's tax credit awards promote the wide-scale commercialization of technologies that have been successfully demonstrated, but need support to be cost competitive with currently available technologies."

45. Defendant, the Department of Energy, identified these facilities as: (A) Duke Energy's Bituminous IGCC Project in Edwardsport, IN; (B) Tampa Electric's Bituminous IGCC Project in Polk County, FL; (C) Mississippi Power Company's Lignite IGCC Project in Kemper County, MS; (D) Duke Energy's Advanced Coal Project in Rutherford and Cleveland Counties, NC; (E) E.ON U.S. & Louisville Gas and Electric's Advanced Coal Project in Bedford, KY; (F) Carson Hydrogen Power's Gasification Project in Carson, CA; (G) TX Energy's Gasification Project in Longview, TX; and (H) two gasification projects whose proponents "chose not to have their awards announced."

46. At sometime after 08 August 2005 but prior to 30 November 2006, DOE granted pre-application certification to these nine experimental projects.

47. In response to the announcement that it would receive tax credits for two of its proposed projects, a Duke Energy executive stated that the Energy Policy Act of 2005 tax credits were "particularly important" and "very important" to Duke's Indiana and North Carolina projects, respectively.

48. At sometime after 30 November 2006, Tampa Electric announced that it was deferring its plans to build its IGCC project in Polk County, Florida, because, according to its President, "[w]e believe there is a role for IGCC in Tampa Electric's future generation plans, but with the uncertainty of carbon capture and sequestration regulations being discussed at the federal and state levels, the timing is not right to utilize it for a baseload facility needed by 2013. We are not prepared to expose our customers and shareholders to that risk. We sincerely appreciate the

$133.5 million in federal tax credits awarded for this project, but with regulatory uncertainty and related potential cost increases, we are concerned that IGCC may not be the most cost-effective technology to use at this time."

49. On or about 07 May 2008, Excelsior Energy announced that it would receive tax credits under the EPAct.

50. Excelsior Co-CEO Tom Micheletti commented that "We are honored to be the recipient of this important federal assistance award, and we are grateful to all who have worked so hard to implement this critically important energy program."

51. At sometime prior to 07 May 2008, DOE granted pre-application certification for the project described in ¶ 48.

52. Unlike other programs in the Energy Policy Act of 2005, Congress did not exempt these particular tax credit allocations from the requirements of the National Environmental Policy Act.

53. Extracting, processing, transporting, incinerating and disposing the coal used to power these facilities will have significant environmental impacts.

54. At least one of the tax credit recipients, Duke Energy in North Carolina, currently obtains coal extracted by erasing mountaintops from the skyline of the Appalachian Mountains and Duke plans to continue using such coal to fuel its new power plant.

55. Coal-fueled power plants, including those receiving tax credits pursuant to the Energy Policy Act of 2005, are, individually and cumulatively, major sources of air pollution significantly affecting the quality of the human environment.

56. Coal-fueled power plants, including those receiving tax credits pursuant to the Energy Policy Act of 2005, are the principle force driving the market for, and environmental degradation resulting from, mining, processing, transporting, burning and disposing coal.

57. Ignoring the significant environmental impacts associated with coal's cradle-to-grave lifecycle, Defendants approved the allocation of the tax credits without preparing a comprehensive environmental impact statement evaluating the individual and cumulative environmental impacts associated with developing these nine experimental coal-fueled projects.

58. Six of the seven publicly identified projects, ranging from 390–1744 megawatts, far exceed the capacity of facilities for which the Department of Energy normally prepares an environmental impact statement.

59. On 29 June 2007, *via* certified mail, return receipt requested, Appalachian Voices notified the Department of Energy that it was in violation of NEPA for failing to perform any NEPA analysis regarding the impacts of these experimental projects.

60. In an effort to avoid this litigation, Appalachian Voices provided DOE thirty days to correct or explain its violation of NEPA.

61. As of today's date, DOE has failed to respond to Appalachian Voices' notice.

62. On 31 January 2008, *via* certified mail, return receipt requested, Appalachian Voices sent a 60-Day Notice of Intent to Sue, as required for a citizen suit under 16 U.S.C. §§ 1540(g)(1)(A) and 1540(g)(2)(A)(i), to the Secretary of Energy, and Secretary the Treasury for failing to consult with the FWS and NMFS before allocating tax credits that may affect protected species and their habitat.

63. As of today's date, Defendants have failed to respond to the notice or take any corrective measures to avoid litigation.

64. The Great Smoky Mountains National Park is home to eleven listed species: the Indiana bat, Carolina northern flying squirrel, Red-cockaded Woodpecker, Spotfin Chub, Duskytail Darter, Smoky Madtom, Yellowfin Madtom, Spruce-fir Moss Spider, Spreading avens, Virginia spiarea, and Rock gnome lichen.

65. Coal extraction and coal burning power plants pose significant threats to the health and habitat of these species.

66. According to officials with the National Park Service, Duke Energy's North Cliffside project will increase atmospheric deposition of pollutants, including sulfur, nitrogen, and mercury, to Great Smoky Mountains National Park (GSMNP), leading to acidification of forest soils and streams as well as bioaccumulation of mercury in fish and wildlife.

67. According to engineering analyses conducted by the National Park Service, the impacts of Duke Energy's experimental power plant on the Great Smoky Mountains will be ruinous:

> The Cliffside project will increase atmospheric deposition of pollutants, including sulfur, nitrogen, and mercury, to Great Smoky Mountains National Park. Predicted impacts exceed the Deposition Analysis Thresholds (DAT) for total sulfur in the park and are therefore not considered insignificant. In addition to contributing to acidification of forest soils and streams, sulfur deposition contributes to the formation of methylmercury in the environment, if mercury is present. Methylmercury is extremely toxic and bioaccumulates in fish and wildlife and park managers have identified mercury as a significant threat to park ecosystems. Because no additional controls specific to mercury capture are proposed, mercury emissions from the project could reach 460 lb/yr, the resulting increase in mercury deposition, coupled with the increase in sulfur deposition could impact park resources, including threatened and endangered species.

68. Ignoring the significant potential impacts on threatened and endangered species and their habitat associated with coal's cradle-to-grave lifecycle, Defendants approved and allocated the tax credits without consulting the FWS and/or the NMFS.

69. On or about 28 January 2008, Duke Energy received approval to begin construction of its North Carolina project from the North Carolina Division of Air Quality and has commenced construction of that facility.

**PLAINTIFFS' FIRST CLAIM:  DEFENDANTS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT AND THE ADMINISTRATIVE PROCEDURE ACT BY FAILING TO ASSESS THE INDIVIDUAL AND CUMULATIVE ENVIRONMENTAL IMPACTS ASSOCIATED WITH CONSTRUCTING AND OPERATING NINE EXPERIMENTAL COAL-FUELED POWER PROJECTS**

70. Plaintiffs re-allege, as though fully set forth herein, every allegation contained in each of the foregoing paragraphs.

71. Defendants have violated, and continue to violate, NEPA by refusing to: (1) exclude the action from further analysis because the action normally has insignificant impacts; or (2) prepare an EIS because the impacts normally require such analysis; or (3) prepare an EA to determine whether the impacts may be significant.

72. Defendants' refusal to comply with NEPA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2007).

**PLAINTIFFS' SECOND CLAIM: DEFENDANTS VIOLATED THE ENDANGERED SPECIES ACT BY FAILING TO CONSULT WITH THE FISH AND WILDLIFE SERVICE AND THE NATIONAL MARINE FISHERIES SERVICE BEFORE TAKING ACTION LIKELY TO AFFECT LISTED SPECIES AND THEIR HABITAT**

73. Plaintiffs re-allege, as though fully set forth herein, every allegation contained in each of the foregoing paragraphs.

74. Defendants have violated, and continue to violate, the ESA by refusing to engage in consultation with the FWS and the NMFS regarding the effects of these projects on protected species and their habitat and determining whether the projects can proceed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests this honorable Court to enter judgment in their favor and:

1. Determine and declare that Defendants have violated NEPA and the APA by failing to prepare either an environmental assessment or an environmental impact statement evaluating the individual and cumulative environmental impacts of the nine facilities for which it allocated one billion dollars in tax credits;

2. Determine and declare that Defendants have violated Section 7 of the ESA and the APA by failing to engage in consultation with the FWS and NMFS to determine the effects on protected species and their habitats associated with constructing, operating and maintaining the nine facilities for which they approved and allocated one billion dollars in tax credits.

3. Order Defendants to revoke or suspend the tax credits until they fully comply NEPA and the APA by evaluating the individual and cumulative impacts associated with constructing, operating and maintaining these nine facilities, including, *inter alia*: deforestation associated with surface mining; underground mining; endangered, threatened and rare species; blasting (including destruction of aquifers, and drinking water contamination); valley fills; toxic sludge and air pollution created during coal processing; breaches of sludge dams; injection of slurry/sludge into abandoned mines; subsidence above underground mines; transportation of coal by rail, truck and barge; carbon dioxide and other greenhouse gases produced during coal mining, and transport; acid mine drainage; sedimentation in streams, lakes and rivers; landslides; water use and pollution during processing; socio-economic impacts of mining, combusting and disposing of coal; air pollution from combustion (including, all criteria pollutants, greenhouse gases and toxic & hazardous air pollutants); post-combustion waste storage, handling and

disposal; water pollution created before, during and after combustion; the additional pollution and costs of retrofitting the proposed integrated gas combined cycle facilities which are currently designed without sequestration; and issues of environmental justice in each community where the coal used to power these projects will be mined, transported, incinerated and disposed of as air pollution and toxic post-combustion waste.

4. Order Defendants to revoke or suspend the tax credits until they fully comply with the ESA by consulting with the FWS and NMFS.

5. Enjoin Defendants from approving the remainder of the tax credits under the Energy Policy Act of 2005 until Defendants comply with NEPA and the APA.

6. Enjoin Defendants from approving the remainder of the tax credits under the Energy Policy Act of 2005 until Defendants comply with the ESA.

7. Award Plaintiffs costs (including reasonable attorney, witness, and consultant fees) under the Equal Access to Justice Act; under Rule 54 of the Federal Rules of Civil Procedure, and under any statutory authority of this Court.

8. Award such other relief this Court deems appropriate, just, and proper.

Dated at Asheville, North Carolina this 7th day of August 2008.

/s/ Scott Gollwitzer
Scott Gollwitzer

ATTORNEY FOR PLAINTIFFS

Scott Gollwitzer  
In-house Counsel  
Appalachian Voices  
16 Eagle Street, Suite 200  
Asheville, NC 28801  
Ph:  828.505.1963  
Fax: 828.262.1540  
E-mail: scott@appvoices.org  
D.D.C. Bar No. TN0003  
On behalf of Appalachian Voices  

Stephen H. Novak  
Senior Staff Attorney  
Wildlaw  
46 Haywood Street, Suite 323  
Asheville, NC 28801  
Ph:  828.252.9223  
Fax: 828.252.9074  
E-mail: wildlawNC@aol.com  
NC Bar No. 23411  
On behalf of The Canary Coalition  

OF COUNSEL

Eric V. Schaffer  
Executive Director  
Environmental Integrity Project  
1920 L Street, N.W., Suite 800  
Washington, DC 20036  
Phone: 202.263.4442  
Fax:    202.296.8822  
D.C. Bar No. 427669  

ALSO ON THE COMPLAINT

Benjamin A. Luckett  
2nd Year Student  
Lewis and Clark Law School  

**Certificate of Service**

I hereby certify that on 07 August 2008, notice of this filing will be sent via electronic mail to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's electronic filing system.

/s/ Scott Gollwitzer  
Scott Gollwitzer

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **APPALACHIAN VOICES** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | No. 1:08-cv-00380-RMU |
| | ) | |
| **SAMUEL W. BODMAN** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION TO AMEND COMPLAINT**

This matter is presently before the Court upon Plaintiffs' Motion to Amend Their Complaint. Because Plaintiffs motion was filed before any responsive pleadings have been, and because it is unopposed the motion is, as a matter of course, GRANTED.

DATED this ____ day of _____, 2008.

                                                                                                 _____
                                                                                                  **Ricardo M. Urbina**
                                                                                                  United States District Court Judge