**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

APPALACHIAN VOICES *et al.*,          :
                                       :
              Plaintiffs,              :      Civil Action No.:      08-0380 (RMU)
                                       :
              v.                       :      Document Nos.:         3, 18, 29
                                       :
SAMUEL BODMAN,                         :
in his official capacity as Secretary of the   :
Department of Energy *et al.*,         :
                                       :
              Defendants.              :

## MEMORANDUM OPINION

Denying as Moot the Defendants' Motion to Dismiss the Plaintiffs' Complaint;
Granting the Defendants' Motion to Dismiss the Plaintiffs' Amended Complaint;
Denying as Moot the Plaintiffs' Motion for a Preliminary Injunction

## I. INTRODUCTION

This matter is before the court on the plaintiffs' motion for a preliminary injunction and

the defendants' motion to dismiss the complaint for lack of subject matter jurisdiction.  The

plaintiffs are nonprofit organizations located in North Carolina dedicated to "solv[ing] the

environmental problems having the greatest impact on the central and southern Appalachian

Mountains" and "rais[ing] public awareness about the air quality crisis in the Smoky Mountains,

the Greater Appalachian region, and nationwide."  The defendants, the Department of Treasury

("DOT") and the Department of Energy ("DOE"), are responsible for administering programs

established by the Energy Policy Act of 2005, Pub. L. No. 109-58 (2005), that provide tax credits

to companies that use clean coal technology.  The plaintiffs have brought suit under the National

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the Administrative Procedure

Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. §§

1531 *et seq.*, alleging that the defendants erroneously failed to consider the environmental

consequences of the tax credit programs and asking the court to grant a preliminary injunction

suspending the programs.  The defendants assert that the plaintiffs lack standing and have failed

to meet the standard required for injunctive relief.  Because the filing of the plaintiffs' amended

complaint mooted the defendants' motion to dismiss the original complaint, the court denies as

moot that motion.  And because the court determines that the plaintiffs lack standing, the court

grants the defendants' motion to dismiss the amended complaint and denies as moot the

plaintiffs' motion for a preliminary injunction.


## II.  FACTUAL & PROCEDURAL BACKGROUND

The Energy Policy Act of 2005 provides for the allocation of up to $1.65 billion in tax

credits for investment in clean coal facilities.  Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.'

Prelim. Inj. Opp'n") at 2-3 (citing Pub. L. No. 109-58 at § 1307, 119 Stat. 594 at 999-1006

(2005)).  Specifically, the Act adds two new investment tax credits to the Internal Revenue Code:

one for qualifying advanced coal projects, 26 U.S.C. § 48A, and one for qualifying gasification[1]

projects, 26 U.S.C. § 48B.  DOT, in consultation with DOE, is responsible for administering the

tax credit programs.  26 U.S.C. §§ 48A(d)(1), 48B(d)(1).  Only if DOE, after reviewing project

applications, "provides a certification of feasibility and consistency with energy policy goals

('DOE certification') for the project" will the Internal Revenue Service ("IRS") allocate the tax

---

[1]     Gasification is the process of "convert[ing] a solid or liquid product from coal, petroleum
        residue, biomass, or other materials which are recovered for their energy or feedstock value into
        a synthesis gas composed primarily of carbon monoxide and hydrogen for direct use or
        subsequent chemical or physical conversion."  26 U.S.C. § 48B(c)(2).

credits.  IRS Not. 2006-24 at 4.01 (Mar. 13, 2006).  Recipients of tax credits under 26 U.S.C. §§ 48A and 48B have five years and seven years, respectively, to place their project into service.  26 U.S.C. § 48A(d)(2)(E); IRS Not. 2006-25 at § 4.02(10) (Mar. 13, 2006).  If a recipient fails to meet the conditions required to place its project into service within that time period – for example, if it fails to receive all required federal and state environmental approvals – it forfeits the tax credit.  IRS Not. 2006-24 at App. A; IRS Not. 2006-25 at App. A.

In the 2006 round of tax credits, IRS allocated $1 billion in credits to nine clean coal projects: the Duke Energy Cliffside Modernization Project ("Cliffside"), located in North Carolina, and eight other projects in various locations around the country.  Mot. to Dismiss Compl. ("Defs.' NEPA Mot.") at 5-6.[2]  None of the clean coal projects has been placed into service yet, but on January 29, 2008, Duke Energy obtained a construction permit to begin building the Cliffside plant.  Reply in Support of Mot. for Prelim. Inj. ("Pls.' Prelim. Inj. Reply") at 16.  On March 3, 2008, the plaintiffs filed their complaint and moved for a preliminary injunction, claiming that the defendants violated NEPA and the APA by failing to conduct an Environmental Impact Study ("EIS") evaluating the environmental impacts of the tax credit programs.  *See generally* Compl.; Pls.' Prelim. Inj. Mot.  The plaintiffs then filed an amended

---

[2]     The parties' claims and arguments are contained in two sets of filings: the plaintiffs' original complaint, which alleges only a NEPA violation, and the plaintiffs' first amended complaint, which adds an ESA claim.  *See generally* Compl.; Am. Compl.  The defendants filed a motion to dismiss the original complaint before the plaintiffs amended their complaint.  *See generally* Mot. to Dismiss Compl. ("Defs.' NEPA Mot.").  After the plaintiffs amended their complaint, the defendants again moved to dismiss, addressing the ESA claim and incorporating by reference the NEPA-related arguments made in their previous motion to dismiss.  Mot. to Dismiss Am. Compl. ("Defs.' ESA Mot.") at 2.  Because the parties' arguments concerning the NEPA claim and the ESA claim are substantially similar and the standing analysis applies equally to both claims, the court will differentiate between them only when the distinction is relevant to the outcome of the case.

complaint adding to its NEPA claim a claim under the ESA, alleging that the defendants erroneously failed to consult with the U.S. Fish and Wildlife Service and the U.S. National Marine Fisheries Service before allocating the tax credits.  Am. Compl. ¶ 2.  The defendants opposed the preliminary injunction motion and moved to dismiss the amended complaint, maintaining that the plaintiffs lack standing to sue because they have failed to establish injury-in-fact, traceability and redressability.  Defs.' Prelim. Inj. Opp'n at 11-21; Defs.' NEPA Mot. at 7-21; Mot. to Dismiss Am. Compl. ("Defs.' ESA Mot.") at 8-20.

## III.  ANALYSIS

### A.  Legal Standard for Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies.  U.S. CONST. art. III, § 2, cl. 1.  These prerequisites reflect the "common understanding of what it takes to make a justiciable case."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).  Consequently, "a showing of standing is an essential and unchanging predicate to any exercise of a court's jurisdiction."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Put slightly differently, "Article III standing must be resolved as threshold matter."  *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 453 (D.C. Cir. 2004) (citing *Steel Co.*, 523 U.S. at 96-102).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing.  *Defenders of Wildlife*, 504 U.S. at 561; *Steel Co.*, 523 U.S. at 104; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C. Cir. 2003) (per curiam).  The extent of the

plaintiff's burden varies according to the procedural posture of the case. *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898-99 (D.C. Cir. 2002). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct will suffice. *Id.* On a motion for summary judgment, however, the "plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Id.* at 899 (citing FED. R. CIV. P. 56); *accord Fla. Audubon*, 94 F.3d at 666.

To demonstrate standing, a plaintiff must satisfy a three-pronged test. *Sierra Club*, 292 F.3d at 898 (citing *Defenders of Wildlife*, 504 U.S. at 560). First, the plaintiff must have suffered an injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co.*, 523 U.S. at 103). Second, the injury must be fairly traceable to the governmental conduct alleged. *Id.* Finally, it must be likely that the requested relief will redress the alleged injury. *Id.* Our court of appeals has made clear that no standing exists if the plaintiff's allegations are "purely speculative[, which is] the ultimate label for injuries too implausible to support standing." *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001). Nor is there standing where the court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).

The test for standing shifts focus when a plaintiff challenges an agency's failure to comply with a procedural requirement. *Fla. Audubon*, 94 F.3d at 664 (citing *Defenders of Wildlife*, 504 U.S. at 572 n.7). In such cases, as long as the procedural requirement is designed to

protect a threatened, concrete interest of the plaintiff, the violation is sufficient to grant the plaintiff standing. *City of Waukesha*, 320 F.3d at 234. To ensure that the plaintiff's interest is more than a general interest common to all members of the public, however, the procedural-rights plaintiff must show "that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Id.* (citing *Fla. Audubon*, 94 F.3d at 664).

If the plaintiff is an association, it may demonstrate standing as long as "its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires members' participation in the lawsuit." *Consumer Fed'n of Am. v. Fed. Commc'ns Comm'n*, 348 F.3d 1009, 1011 (D.C. Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Finally, if the plaintiff is suing under the APA, the plaintiff must show that the alleged injury falls within the zone of interests that the statute on which the plaintiff bases the complaint seeks to protect. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900 (D.C. Cir. 1996).

### B. The Plaintiffs Lack Standing

#### 1. The Plaintiffs Satisfy the Injury-In-Fact Requirement With Respect to the Cliffside Project Only

The defendants first argue that the plaintiffs have failed to demonstrate that eight of the nine projects – all but the Cliffside project located in North Carolina – threaten their particularized interests. Defs.' NEPA Mot. at 16-18; Defs.' ESA Mot. at 11. The defendants point out that there must be a "geographic nexus between the individual asserting the claim and the location suffering an environmental impact," and allege that the plaintiffs fail to establish this

nexus for all of the projects located outside of North Carolina.  Defs.' NEPA Mot. at 17 (citing

*Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005)).  The plaintiffs fail to

address this argument.  *See generally* Opp'n to Defs.' NEPA Mot. ("Pls.' NEPA Opp'n"); Pls.'

ESA Opp'n.

In order to satisfy the injury-in-fact requirement, the plaintiffs must "show that the

government action that implicated the allegedly violated procedural requirement would subject a

particularized interest of the plaintiff, rather than the environment in general, to increased risk."

*Fla. Audubon*, 94 F.3d at 667.  A plaintiff's need to show that its particularized interests are

threatened is especially acute when the government action at issue "is not one located at a

particular 'site,'" but instead involves a rule whose application has a broad geographic impact.

*Id*.  In such cases, "a court may not assume that the areas used and enjoyed by a prospective

plaintiff will suffer all or any environmental consequences that the rule itself may cause."  *Id*.

Although the plaintiffs have asserted that they use and enjoy areas located near the

Cliffside site, *see* Compl. ¶¶ 6-12, 16-19, they have asserted absolutely no particularized

connection to or interest in the other eight sites located around the country, *see generally id*.

Accordingly, the plaintiffs fail to satisfy the injury-in-fact requirement with respect to the eight

projects other than Cliffside – located in Indiana, Florida, Mississippi, Kentucky, California,

Texas and two undisclosed locations[3] – and the court grants the defendants' motion to dismiss

the plaintiffs' claims as they relate to those eight projects.

The injury-in-fact analysis yields a different result, however, with respect to the Cliffside

project.  The plaintiffs' complaint states that their members regularly use the coalfield regions of

---

[3]        Two of the tax credit recipients "chose not to have their awards announced."  Compl. ¶ 35.

the central Appalachian mountains and the areas surrounding the proposed Cliffside power plant "to fulfill a variety of legally protected interests including: raising children; residences; owning and operating businesses; swimming; fishing; hunting; boating; education; breathing; domestic and municipal water supplies; wildlife viewing; recreation; and aesthetic and spiritual fulfillment." Compl. ¶¶ 7, 10.  In addition, the plaintiffs have submitted declarations in which their members elaborate on their use of and appreciation for the areas surrounding the project site.  *See* Pls.' NEPA Opp'n, Exs. 3, 4.

The defendants counter that the alleged risk to the plaintiffs' interests is too speculative to establish standing.  Defs.' NEPA Mot. at 18-21.  They contend that the environmental harm that the plaintiffs predict the project will create is conjectural, as Cliffside will not become operational until 2012 at the earliest and Duke Energy might abandon the project altogether.  *Id*. at 19-20.  The defendants also dispute the plaintiffs' claim that the project would significantly increase the risk to the environment: they argue that because Duke Energy plans to retire at least four older coal-fired units when the new Cliffside plant is constructed, the project might actually reduce the site's overall emissions.  *Id*. at 20.  In response, the plaintiffs assert that the fact that the plant might not be operational for several years does not render their asserted injury conjectural.  Pls.' NEPA Opp'n at 8.  In addition, the plaintiffs urge the court to construe all disputed factual issues, including the parties' predictions about the impact that the Cliffside project will have on overall emissions, in the plaintiffs' favor.  *Id.* at 7.

When evaluating injury-in-fact in the procedural rights context, the asserted risk need not be immediate.  As the Supreme Court in *Defenders of Wildlife* explained, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the

licensing agency's failure to prepare an environmental impact statement . . . even though the dam

will not be completed for many years." *Defenders of Wildlife*, 504 U.S. at 572 n.7.  Similarly, in

this case, the fact that the Cliffside project will not become operational until 2012 at the earliest

does not preclude a determination that the plaintiffs have established injury-in-fact.  Nor does the

fact that the parties dispute the effect that the Cliffside project will have on the local air quality.

The court agrees with the plaintiffs that at this stage, "the court must be careful not to decide the

questions for or against the plaintiff," and construe factual disputes in the plaintiffs' favor.  *City

of Waukesha*, 320 F.3d at 235.  Consequently, the court holds that the plaintiffs have satisfied the

injury-in-fact requirement with respect to the Cliffside project.

### 2.  The Plaintiffs Fail to Satisfy the Traceability Requirement

The defendants next argue that the plaintiffs fail to establish the second prong of the

standing analysis: the requirement that their injury be fairly traceable to the government conduct

at issue.  Defs.' NEPA Mot. at 8-12; Defs.' ESA Mot. at 14-18.  They maintain that because the

chain of causation rests on the acts of a third party – namely, Duke Energy's decision to go

forward with the Cliffside project – the plaintiffs must show that the allocation of the tax credits

was at least a substantial factor motivating Duke Energy's conduct.  Defs.' NEPA Mot. at 9

(citing *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir. 1987)).  Arguing

that the plaintiffs cannot meet this burden, the defendants point out that "Duke Energy's plans to

construct the Cliffside project predated, and thus were not caused by, the allocation of tax

credit," Defs.' NEPA Mot. at 10 n.4, and the tax credit represents only a small percentage of the

project's overall costs, *id.* at 11.  In addition, the defendants assert that it is speculative whether

any company will change its plans to construct a clean coal unit based on the availability of the tax credit.  *Id.*

The plaintiffs take a different approach to the traceability analysis.  They offer a "four-link causal chain," which in their view establishes traceability by linking the allocation of the tax credits to their injury:

> First, Plaintiffs' members use and will continue to use the [area surrounding the Cliffside site] for a variety of legally protected interests . . . .  Second, the government's own air pollution experts have unequivocally concluded that, in the absence of mitigation measures, the new power plant will have severe impacts on air quality and air quality related values . . . .  Third, Defendants have all but admitted their refusal to comply with NEPA.  Finally, Defendants' refusal to comply with NEPA threatens Plaintiffs' members with harm to their particularized interests – harm that could readily be eliminated or reduced through the imposition of conditions requiring various mitigation measures in order to qualify for a tax credit.

Pls.' NEPA Opp'n at 11.  With respect to the motion to dismiss their NEPA claim, they reject the defendants' reliance on cases involving the acts of third parties, observing that none of the cases cited by the defendants involved an alleged violation of NEPA.  *Id.* at 9 n.3.  "Accordingly," the plaintiffs declare, "Plaintiffs will not waste this Court's time detailing the distinguishing characteristics of: *Cmty. for Creative Non-Violence v. Pierce*; *Dellums v. United States Nuclear Regulatory Comm'n*; *Allen v. Wright*; and *Simon v. E. Ky. Welfare Rights Org.*," *id.* (citations omitted), all of which stand for the proposition that a plaintiff must show that an allegedly erroneous agency action plays a prominent role in motivating a third party's conduct, *see Allen*, 468 U.S. 737, 757 (1984); *Simon*, 426 U.S. 26, 40-46 (1976); *Dellums*, 863 F.2d 968, 980 (D.C. Cir. 1988); *Cmty. for Creative Non-Violence*, 814 F.2d at 668-69.  The defendants respond that the third-party cases are relevant in the NEPA context despite the fact that they did not involve NEPA claims.  Reply in Support of Defs.' NEPA Mot. ("Defs.' NEPA Reply") at 5-6.  Indeed,

the defendants observe that the *Florida Audubon* court, addressing a NEPA claim similar to the one brought here, relied on *Simon* and *Allen*, two of the cases that the plaintiffs contend do not apply to NEPA claims. *Id.* at 6.

Although the plaintiffs consider the third party "substantial factor" test inapplicable in the NEPA context, they argue in the alternative that they satisfy this test because the allocation of the tax credits was a substantial factor motivating the construction of the new Cliffside plant. Pls.' ESA Opp'n at 9-11. They cite a public announcement in which the defendants stated that "deployment incentives, such as tax credits, will accelerate the widespread use of [advanced coal] technologies," *id.* at 9 (citing Am. Compl. ¶ 43), similar statements from executives at Duke Energy and other power companies, Pls.' ESA Opp'n at 9-10 (citing Am. Compl. ¶¶ 47-48), and a report summarizing the investment risks that new power plants face, Pls.' ESA Opp'n at 10-11. And they note that the tax credit represented approximately seven percent of the funding for the Cliffside project, remarking that although the defendants consider this amount insubstantial, "others . . . would describe it as a substantial percentage as it accounts for seven out of every one hundred dollars spent!" *Id.* at 11. The plaintiffs discount the relevance of the defendants' claim that Duke Energy's plans for the Cliffside project predated the Energy Policy Act, urging the court to focus instead on the fact that Duke Energy described the tax credits as being "very important" to the Cliffside project. *Id.* at 9 (citing Am. Compl. ¶ 47).

In *Florida Audubon*, this Circuit articulated the standard required to establish traceability in suits alleging an improper failure to perform an EIS. "[A]n adequate causal chain must contain at least two links: one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an EIS and one connecting

that substantive decision to the plaintiff's particularized injury." *Fla. Audubon*, 94 F.3d at 668.

The court then elaborated on the second link in the causal chain, which often creates the most

difficulty in NEPA cases:

> [A] plaintiff seeking the preparation of an EIS must demonstrate that the particularized injury that the plaintiff is suffering or is likely to suffer is fairly traceable to the agency action that implicated the need for an EIS. In other words, unless there is a substantial probability . . . that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff, the plaintiff lacks standing.

*Id.* at 669. Thus, in order to establish standing, the plaintiffs here must demonstrate that it is

substantially probable that the allocation of the tax credits will demonstrably threaten the

environmental quality near the Cliffside site.

Because this case involves an independent third party, Duke Energy, the third-party

conduct cases that the defendants cite – *Pierce*, *Dellums*, *Allen* and *Simon* – aid the court in

assessing whether the plaintiffs have met the standing test articulated in *Florida Audubon*.

Those cases apply to the question of whether the plaintiffs have standing to bring both their ESA

claim and their NEPA claim even though they did not address NEPA or the ESA specifically. As

the defendants correctly point out, even *Florida Audubon*, one of the lead cases concerning a

failure to perform an EIS in violation of NEPA, relies on *Allen* and *Simon*. *Id.* at 668-70. The

*Florida Audubon* court recognized that the relevant inquiry is not which statute the claims were

brought under, but instead, whether the chain of causation rests on acts of independent third

parties. *See id.* at 670. Here, as the plaintiffs recognize, the chain of causation begins with the

allocation of the tax credits and ends with the increased risk of harm to the environment that

threatens the plaintiffs' interests. Plainly, a crucial link in this chain is Duke Energy's

independent decision to go forward with the Cliffside project.  For that reason, the plaintiffs'

"four-link causal chain," which makes no reference to that decision, is insufficient to establish

traceability.  *See* Pls.' NEPA Opp'n at 11.  Accordingly, the court proceeds to the question of

whether the allocation of the tax credits was at least a substantial factor motivating Duke

Energy's conduct.

The Circuit has made clear that when conducting a standing analysis, courts should not

defer to the views of Congress or administrative agencies as to the effect of a law or policy.  *Fla.*

*Audubon*, 94 F.3d at 670-71; *Dellums*, 863 F.2d at 978-79 (noting that "[d]etermining that

legislation will be 'effective' is not necessarily the same as determining causation for purposes of

Article III").  Therefore, the court is not swayed by the defendants' predictions that the tax credits

will "accelerate the widespread use of [advanced coal] technologies."  *See* Am. Compl. ¶ 43.

The same holds true for the public statement of a Duke Energy executive commenting that the

tax credits were "very important" to the Cliffside project: the question of whether the tax credits

were described as "important" to Duke Energy in a colloquial sense is analytically distinct from

the question of whether the tax credits were "substantial" for the purposes of the Article III

standing analysis.  *See Dellums*, 863 F.2d at 979.  Similarly, the fact that the tax credits represent

seven percent of the funding for the Cliffside project does not, without more, establish that the

tax credit is a substantial factor in Duke Energy's decision to go forward with the project.  *See*

*Allen*, 468 U.S. at 758 (holding that the link between tax exemptions for racially discriminatory

schools and students' diminished ability to receive a desegregated education was too attenuated

to give rise to standing, and noting that "it [wa]s entirely speculative . . . whether withdrawal of a

tax exemption from any particular school would lead the school to change its policies").  Thus,

the plaintiffs cannot "adequately bridge the uncertain ground found in any causal path that rests on the independent acts of third parties." *See Fla. Audubon*, 94 F.3d at 670.  Moreover, the plaintiffs' assertion that the credits prompted Duke Energy to build the Cliffside plant is severely undermined by the fact that Duke Energy was preparing to build the plant even before it was awarded the tax credit.  *See* Defs.' Prelim. Inj. Opp'n, Ex. 7 at 3 (stating that on May 11, 2005 – prior to the 2006 allocation – Duke Energy filed with the North Carolina Utilities Commission information concerning its plans to construct the Cliffside plant).  As a result, the court concludes that the allocation of the tax credits was not a substantial factor in Duke Energy's decision to construct the Cliffside plant, and thus, the plaintiffs have failed to satisfy the traceability prong of the standing requirement.

## IV.  CONCLUSION

For the foregoing reasons, the court holds that the plaintiffs lack standing, denies as moot the defendants' motion to dismiss the plaintiffs' complaint, grants the defendants' motion to dismiss the plaintiffs' amended complaint and denies as moot the plaintiffs' motion for a preliminary injunction.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 10th day of November, 2008.

RICARDO M. URBINA
United States District Judge